NOT YET SCHEDULED FOR ORAL ARGUMENT

---

No. 25-1159
(Consolidated with 25-1160 and 25-1162)

————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————

THE PEOPLE OF THE STATE OF MICHIGAN,
*Petitioner*,
v.
U.S. DEPARTMENT OF ENERGY, AND CHRIS WRIGHT, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF ENERGY,
*Respondents*.

————————

ON PETITION FOR REVIEW OF FINAL ORDER OF THE
DEPARTMENT OF ENERGY

---

**INITIAL OPENING BRIEF OF
PUBLIC INTEREST ORGANIZATION PETITIONERS**

---

Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Elena Saxonhouse (DC Cir. 56639)
Sierra Club Environmental Law
Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
elena.saxonhouse@sierraclub.org

*Counsel for Sierra Club*

Benjamin Chagnon (DC Cir. 65850)
Jennifer Yun (DC Cir. 66550)
Michael Lenoff (DC Cir. 66374)
Earthjustice
1001 G St. NW, Suite 1000
Washington, DC 20001
(202) 745-5210
bchagnon@earthjustice.org
jyun@earthjustice.org
mlenoff@earthjustice.org

*Counsel for Sierra Club and
Urban Core Collective*

Caroline Reiser (DC Cir. 62319)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

Gavin McCabe (DC Cir. 53966)
Natural Resources Defense Council
40 W. 20th St., 11th Floor
New York, NY 10011
(212) 727-4529
gmccabe@nrdc.org

Simi Bhat (DC Cir. 55968)
Karen Chen
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
(415) 875-6110
sbhat@nrdc.org
kchen@nrdc.org

*Counsel for Natural Resources Defense Council*

Lauren Piette (DC Cir. 66519)
Sameer Doshi (DC Cir. 64549)
Earthjustice
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 500-2193
lpiette@earthjustice.org
sdoshi@earthjustice.org

Christine Powell (DC Cir. 64908)
Earthjustice
180 Steuart St., #194330
San Francisco, CA 94105
(415) 217-2035
cpowell@earthjustice.org

*Counsel for Sierra Club and
Urban Core Collective*

Howard A. Learner (DC Cir. 61779)
Bradley Klein
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
T: (312) 673-6500
hlearner@elpc.org
bklein@elpc.org

Katherine S. Duckworth
Environmental Law & Policy Center
1008 Floral Ave. SE
East Grand Rapids, MI 49506
T: (312) 673-6500
kduckworth@elpc.org

*Counsel for the Environmental Law &
Policy Center, Ecology Center, Union
of Concerned Scientists, and Vote
Solar*

ii

Danielle C. Fidler (DC Cir. 62486)
Francis W. Sturges, Jr. (DC Cir. 64964)
Veronica Saltzman (DC Cir. 64096)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
dfidler@catf.us
fsturges@catf.us
vsaltzman@catf.us

*Counsel for Michigan Environmental Council*

Tomás Carbonell (DC Cir. 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(919) 449-4600
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

iii

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties

Petitioners:

25-1159: The People of the State of Michigan.

25-1160: Sierra Club, Natural Resources Defense Council, Michigan Environmental Council, Environmental Defense Fund, Environmental Law and Policy Center, Vote Solar, Union of Concerned Scientists, Ecology Center, and Urban Core Collective.

25-1162: The State of Minnesota and the State of Illinois.

Respondents:

25-1159: U.S. Department of Energy and Chris Wright in his official capacity as Secretary of the U.S. Department of Energy.

25-1160: U.S. Department of Energy and Chris Wright in his official capacity as Secretary of the U.S. Department of Energy.

25-1162: U.S. Department of Energy and Chris Wright in his official capacity as Secretary of the U.S. Department of Energy.

Respondent-Intervenor: Midcontinent Independent System Operator, Inc.

Amici:

Consumers Energy Company.

Institute for Policy Integrity at New York University School of Law.

**B. Rulings under review**

The petitioners in Case Nos. 25-1159, 25-1160, and 25-1162 seek review of three orders from the U.S. Department of Energy and Secretary Chris Wright:

1. *Midcontinent Indep. Sys. Op., Inc., and Consumers Energy Co.*, Order No. 202-25-3, dated May 23, 2025;

2. Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Midcontinent Indep. Sys. Op., Inc. and Consumers Energy Co. Regarding the J.H. Campbell Generation Facility*, Order No. 202-25-3A, dated July 28, 2025; and

3. Order Addressing Arguments Raised on Rehearing, *Midcontinent Indep. Sys. Op., Inc. and Consumers Energy Co. Regarding the J.H. Campbell Generation Facility*, Order No. 202-25-3B, dated September 8, 2025.

**C. Related cases**

The petitions for review in Case Nos. 25-1159, 25-1160, and 25-1162 have not previously been before this Court or any other court. Case Nos. 25-1198, 25-1202, and 25-1254 (consolidated) pending in this Court arise from a renewal of the

v

order issued by the Department of Energy and Secretary Chris Wright at issue in the instant set of petitions. Case No. 25-1285 pending in this Court is also related to this set of petitions because it arises from a Federal Energy Regulatory Commission order on a complaint filed by Consumers Energy Company in response to the same order challenged in these petitions.

vi

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... iv

TABLE OF CONTENTS ................................................................................. vii

TABLE OF AUTHORITIES .......................................................................... ix

GLOSSARY OF ABBREVIATIONS ............................................................ xiv

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ................................................................3

ISSUES PRESENTED.....................................................................................3

STATUTES AND REGULATIONS.................................................................4

STATEMENT OF THE CASE.........................................................................4

    A.  The Federal Power Act provides the federal government only limited authority to regulate electricity generation and the grid. ...............4

    B.  States, grid operators, and utility companies coordinate to deliver a reliable supply of electricity. .....................................................................9

    C.  Petitioners and Consumers Energy worked for years to replace Campbell with safer, cheaper, and more reliable energy. ........................11

    D.  Regulators predicted adequate capacity in summer 2025 in MISO regions. ....................................................................................................14

    E.  The Department blocks Campbell's retirement with a Section 202(c) emergency order...........................................................................15

SUMMARY OF THE ARGUMENT ...............................................................18

STANDING ......................................................................................................19

STANDARD OF REVIEW ..............................................................................22

ARGUMENT ....................................................................................................22

    I.  The Department Acted Unlawfully by Compelling Generation Without Demonstrating an Emergency under Section 202(c)....................................22

A. The Department violated Section 202(c) by using it to address long-term resource adequacy concerns. ....................................23

    1. Section 202(c) reaches only imminent shortfalls, not long-term resource adequacy concerns. ..........................................23

    2. The Department's arguments for rejecting Section 202(c)'s limits fail. ....................................................................31

B. The record reflects no near-term electricity shortfall. ...........................33

    1. The Order reflects the Department's fundamental mischaracterization of resource adequacy and is illogical on its own terms. ...................................................................34

    2. The Department ignored concrete evidence of resource adequacy that contradicts the Department's conclusion. ...................................40

II. The Order Fails to Meet Section 202(c)'s Limits on the Generation the Department Can Order Under an Emergency. ...............................42

A. The Department's conclusion that operating an ailing coal-fired plant best meets the emergency is arbitrary and capricious. ....................42

B. The Department has not limited generation to hours necessary to meet the emergency and to minimize environmental impacts. ...............45

III. These Petitions Are Not Moot. ...................................................47

CONCLUSION ........................................................................49

CERTIFICATE OF COMPLIANCE ...................................................52

CERTIFICATE OF SERVICE .........................................................53

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcoa Inc. v. FERC,*
　564 F.3d 1342 (D.C. Cir. 2009)........................................................28

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.,*
　901 F.3d 356 (D.C. Cir. 2018)........................................................48

*Am. Rivers v. FERC,*
　895 F.3d 32 (D.C. Cir. 2018)....................................................20, 21

*Bangor Hydro-Elec. Co. v. FERC,*
　78 F.3d 659 (D.C. Cir. 1996)........................................................34

*Bd. of Trade of the City of Chi. v. CFTC,*
　605 F.2d 1016 (7th Cir. 1979)......................................................32

*Cal. Indep. Sys. Operator v. FERC,*
　372 F.3d 395 (D.C. Cir. 2004)..................................................27, 28

*City & Cnty. of San Francisco v. FERC,*
　24 F.4th 652 (D.C. Cir. 2022)..................................................43, 46

*Clean Wisconsin v. EPA,*
　964 F.3d 1145 (D.C. Cir. 2000)....................................................20

*Conn. Dep't of Pub. Util. Control v. FERC,*
　569 F.3d 477 (D.C. Cir. 2009)......................................................29

*Crowley Gov't Servs. v. GSA,*
　143 F.4th 518 (D.C. Cir. 2025)....................................................47

*Ctr. for Biological Diversity v. EPA,*
　56 F.4th 55 (D.C. Cir. 2022)........................................................20

*Dist. Hosp. Partners, L.P. v. Burwell,*
　786 F.3d 46 (D.C. Cir. 2015)........................................................41

*Dubin v. United States,*
　599 U.S. 110 (2023)....................................................................25

*Earthworks v. Interior*,
105 F.4th 449 (D.C. Cir. 2024)..............................................................20

*Entergy Corp. v. Riverkeeper*,
556 U.S. 208 (2009)...............................................................................42

*Env't Action v. FERC*,
996 F.2d 401 (D.C. Cir. 1993)...............................................................21

*FCC v. Consumers' Research*,
606 U.S. 656 (2025)...............................................................................48

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)...............................................................................28

*Fed. Trade Comm'n v. Bunte Bros.*,
312 U.S. 349 (1941)...............................................................................30

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016)..........................................................................4, 5, 6

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018)...............................................................40

*Humane Soc'y v. EPA*,
790 F.2d 106 (D.C. Cir. 1986)...............................................................49

*Institutional S'holder Servs. v. SEC*,
142 F.4th 757 (D.C. Cir. 2025)........................................................24, 32

*Kimball Wind, LLC v. FERC*,
140 F.4th 496 (D.C. Cir. 2025)..............................................................22

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..........................................................24, 30, 31, 34, 44

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).....................................................................22, 42, 44

*Nat'l Shooting Sports Found. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013)...............................................................40

*New York v. FERC*,
535 U.S. 1 (2002)......................................................................................5

x

*Ohio v. EPA*,
603 U.S. 279 (2024)................................................................................43

*Otter Tail Power Co. v. Fed. Power Comm'n*,
429 F.2d 232 (8th Cir. 1970) .........................................................26, 27

*Pac. Gas. & Elec. Co. v. FERC*,
113 F.4th 943 (D.C. Cir. 2024).....................................................22, 24

*Pierre-Noel v. Bridges Pub. Charter Sch.*,
113 F.4th 970 (D.C. Cir. 2024)..............................................................48

*In re Pub. Emps. for Env't Resp.*,
957 F.3d 267 (D.C. Cir. 2020)...............................................................21

*Pub. Util. Comm'n of Cal. v. FERC*,
236 F.3d 708 (D.C. Cir. 2001)...............................................................48

*Ralls Corp. v. Comm. on Foreign Inves. in U.S.*,
758 F.3d 296 (D.C. Cir. 2014)...............................................................48

*Richmond Power & Light of City of Richmond v. FERC*,
574 F.2d 610 (D.C. Cir. 1978)...............................................26, 32, 44

*S. Carolina Pub. Serv. Auth. v. FERC*,
762 F.3d 41 (D.C. Cir. 2014)..................................................................25

*Sacramento Mun. Util. Dist. v. FERC*,
616 F.3d 520 (D.C. Cir. 2010)..................................................................5

*Safari Club Int'l v. Jewell*,
842 F.3d 1280 (D.C. Cir. 2016), and (2) ...........................................47

*Sierra Club v. EPA*,
926 F.3d 844 (D.C. Cir. 2019).................................................................19

*Sinclair Wyoming Ref. Co. LLC v. EPA*,
114 F.4th 693 (D.C. Cir. 2024)......................................................34, 39

*Trump v. Mazars USA, LLP*,
39 F.4th 774 (D.C. Cir. 2022).................................................................47

*Whitman v. Am. Trucking Ass'n*,
531 U.S. 457 (2001)...................................................................................29

xi

*Wisconsin Pub. Power v. FERC*,
  493 F.3d 239 (D.C. Cir. 2007) ...................................................9

**Statutes**

5 U.S.C. § 706(2)(A) ...................................................22

5 U.S.C. § 706(2)(C) ...................................................22

16 U.S.C. § 824(a) ...................................................5, 29

16 U.S.C. § 824(b) ...................................................5, 29

16 U.S.C. § 824(b)(1) ...................................................5, 29

16 U.S.C. § 824a ...................................................33

16 U.S.C. § 824a(a) ...................................................6, 27

16 U.S.C. § 824a(b) ...................................................6, 27

16 U.S.C. § 824a(c) ...................................................3, 4, 25, 27

16 U.S.C. § 824a(c)(1) ...................................2, 7, 18, 19, 22, 24, 25, 26, 27, 42, 44

16 U.S.C. § 824a(c)(2) ...................................7, 19, 29, 42, 45, 46

16 U.S.C. § 824a(c)(3) ...................................................29

16 U.S.C. § 824a(c)(4) ...................................................7, 29, 47

16 U.S.C. § 824a(c)(5) ...................................................3, 32

16 U.S.C. § 824*o* ...................................................8, 9, 33

16 U.S.C. § 824*o*(d) ...................................................8

16 U.S.C. § 824*o*(d)(1) ...................................................28

16 U.S.C. § 824*o*(d)(2) ...................................................28

16 U.S.C. § 824*o*(e) ...................................................8, 28

16 U.S.C. § 824*o*(i)(2) ...................................................8, 28

16 U.S.C. § 825*l*(a) ...................................................3, 48

xii

16 U.S.C. § 825*l*(b) ................................................................3, 16, 48

42 U.S.C. § 7151(b) ..........................................................................6

42 U.S.C. § 7192(a)...........................................................................3

**Code of Federal Regulations**

10 C.F.R. § 205.371 ...................................................................30, 31

**Federal Register**

46 Fed. Reg. 39984 (Aug. 6, 1981)..................................................30

89 Fed. Reg. 38508 (May 7, 2024)...................................................46

**Executive Orders**

Executive Order No. 14,261 (Apr. 8, 2025) .....................................44

Executive Order No. 14,262 (Apr. 8, 2025) ................................39, 44

Executive Order No. 14,156 (Jan. 20, 2025) ....................................39

**Prior 202(c) Orders**

Order No. 202-17-4 (Sept. 14, 2017).................................................46

Order No. 202-22-4 (Dec. 24, 2022)...................................................8

Order No. 202-24-1 (Oct. 9, 2024) .....................................................8

**Other Authorities**

3 Oxford English Dictionary (1st ed. 1913) ......................................24

Ben Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789
    (2025).......................................................................................8, 25

S. Rep. No. 74-621 (1935). ....................................................7, 26, 27

S. Rep. No. 109-78 (2005) ..................................................................8

Webster's New International Dictionary of the English Language
    (1930)...........................................................................................24

(Page 13 of Total)

## GLOSSARY OF ABBREVIATIONS

EPA             Environmental Protection Agency

FERC            Federal Energy Regulatory Commission

MISO            Midcontinent Independent System Operator

NERC            North American Electric Reliability Corporation

**INTRODUCTION**

In 2022, the owner of the aging J.H. Campbell coal-fired power plant in Michigan, its state regulator, and its regional grid operator all agreed that the plant should retire. Over four years, they worked together to ensure that cheaper, cleaner generation sources would replace (indeed, exceed) the plant's production. And for four years, members of the community surrounding the plant looked forward to the day that Campbell's pollution—estimated to cause more than 30 premature deaths and hundreds of millions of health costs *each year*—would end.

But right before Campbell's retirement, the Department of Energy invoked Section 202(c) of the Federal Power Act, an emergency provision, to block Campbell's closure and compel its continued operation. The Department initially justified that action by claiming a short-term electricity shortage in summer 2025. Three months later, when denying Petitioners' rehearing request, the Department shifted gears, disputing that Section 202(c) limits its discretion to addressing imminent shortages and asserting long-term concerns about grid reliability as an additional justification for the order. The Department has cited those long-term concerns to renew the order well past summer 2025.

There is no Section 202(c) emergency. As a threshold matter, the Department's interpretation of Section 202(c) is wrong. Section 202(c) places meaningful limits on the Department's discretion, permitting it to compel

1

generation only where an "emergency exists"—that is, to prevent an imminent, unexpected shortage of electricity. 16 U.S.C. § 824a(c)(1). The Federal Power Act addresses long-term grid reliability elsewhere, in provisions that withhold federal authority to exercise command-and-control authority over the grid. The Department therefore may not use Section 202(c) to address long-term grid reliability concerns.

The Department's only claim of imminent crisis—a supposed summer 2025 shortage—fails because the record reflects no such shortage. As the Department recognized, both Campbell's owner and grid operator obtained "sufficient capacity" for the summer, JA____[DOE0001_2], a finding that is irreconcilable with the Department's claimed emergency. The few sources the Department cites to establish an emergency undermine its claim.

Even if there had been an emergency, the Department still blew past Section 202(c)'s limits on generation by requiring Campbell to operate even when unnecessary to meet the Department's claimed emergency.

The Court should declare the order and its justifications unlawful and set it aside, notwithstanding the nominal expiration of the order. The Department has now twice renewed the order, each time repeating the same errors presented here. The Court can and should put an end to the Department's continued abuse of its

2

authority, which has imposed millions of dollars in unnecessary costs and pollution on residents of Michigan and the Midwest.

## JURISDICTIONAL STATEMENT

This petition challenges orders issued pursuant to Section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c): Order No. 202-25-3 (May 23, 2025), JA____[DOE0001], as modified on rehearing by Order No. 202-25-3B (Sept. 8, 2025), JA____[DOE0016].

The Court has jurisdiction over these orders. *See* 16 U.S.C. §§ 824a(c)(5), 825*l*(b); 42 U.S.C. § 7192(a). Petitioners were parties below, are aggrieved by these orders, and timely sought rehearing on June 18, 2025. JA____, ____-____[DOE0016_1,23-24]; 16 U.S.C. § 825*l*(b). Their request for rehearing was denied by operation of law 30 days later, 16 U.S.C. § 825*l*(a); *see* Order No. 202-25-3A (July 28, 2025), JA____[DOE0015], and Petitioners timely petitioned for review in this Court on July 24, 2025. The Department issued its rehearing order on September 8, 2025. JA____[DOE0016]. These petitions are not moot. *See infra* § III.

## ISSUES PRESENTED

1.  Whether the Department exceeded its authority under Section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c), by justifying Campbell's forced operation based on purported long-term concerns.

3

2. Whether the Department failed to engage in reasoned decisionmaking to establish an emergency under Section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c).

3. Whether the Department's conclusion that Campbell's continued operation "will best meet the emergency" is arbitrary and capricious. 16 U.S.C. § 824a(c).

4. Whether the Department violated Section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c), by ordering generation beyond the "hours necessary to meet the emergency" and without "minimiz[ing] any adverse environmental impacts."

5. Whether these petitions present a live controversy.

## STATUTES AND REGULATIONS

The addendum (ADD) contains relevant statutes and regulations.

## STATEMENT OF THE CASE

### A. The Federal Power Act provides the federal government only limited authority to regulate electricity generation and the grid.

The Federal Power Act governs federal regulation of electricity. Before the Act, "state and local agencies oversaw nearly all generation, transmission, and distribution of electricity." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 265-66 (2016). The Act filled a regulatory gap relating to interstate commerce, while

4

"maintain[ing] a zone of exclusive state jurisdiction." *Id*. at 266; *see New York v. FERC*, 535 U.S. 1, 6 (2002). The Act thus extends federal authority "only to those matters which are not subject to regulation by the States," 16 U.S.C. § 824(a), such as interstate transmission and sale of electric energy, *id.* § 824(b). The result is a dual structure for addressing the creation, management, and reliability of the electric grid, with the states taking the lead and the federal government playing a circumscribed role on issues the states lack authority to address.

This fundamental division of labor applies to regulating "resource adequacy," which is "the availability of an adequate supply of generation [or other resources] to support safe and reliable operation of the transmission grid." *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 526 (D.C. Cir. 2010) (cleaned up). Because resource adequacy is primarily a function of the "generation of electric energy," over which the federal government does not have "jurisdiction" except where otherwise "specifically provided," 16 U.S.C. § 824(b)(1), responsibility for ensuring resource adequacy resides primarily with states, grid operators, and utilities.

This backdrop is reflected in the two sections of the Act that directly address the federal government's limited involvement over grid reliability: Section 202 encourages the voluntary creation and coordination of the grid while allowing the

5

federal government to step in when there is an emergency, and Section 215 establishes nationwide standards for reliability.[1]

Section 202 establishes a three-tiered framework for federal involvement over grid coordination. Under the first tier, Section 202(a) allows the federal government to pursue "an abundant supply of electric energy" but only by facilitating "*voluntary* interconnection and coordination of facilities for the generation, transmission, and sale of electric energy." 16 U.S.C. § 824a(a) (emphasis added). Under this light-touch approach, market-based mechanisms for ensuring sufficient supply have become the norm. *See Elec. Power Supply Ass'n*, 577 U.S. at 267-68.

When this voluntary mechanism fails, the second tier, Section 202(b), allows the federal government to *require* utilities to sell or exchange energy with other facilities, but only upon application of "any State commission or of any person engaged in [those activities]." 16 U.S.C. § 824a(b). Still, the government has "no authority to compel the enlargement of generating facilities for such purposes." *Id.*

The final tier, Section 202(c), exists as a backstop mechanism that allows the federal government to address emergencies. Enacted in 1935 in response to a

---

[1] The Federal Energy Regulatory Commission (FERC) and the Department share responsibility for administering the Federal Power Act. FERC has responsibility for most aspects of Sections 202 and 215, while the Department has authority under Section 202(c). 42 U.S.C. § 7151(b).

6

"serious power shortage" during World War I, Section 202(c) is "appropriately limited" to addressing wartime shocks and other "similar crises" like "[d]rought and other natural emergencies." S. Rep. No. 74-621, at 19, 49 (1935). Section 202(c) thus provides that the government may compel, among other things, generation of electricity, but only "[d]uring the continuance of any war in which the United States is engaged," and, outside of wartime, when the agency determines that a like "emergency exists by reason of [1] a sudden increase in the demand for electric energy, or [2] a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or [3] other causes." 16 U.S.C. § 824a(c)(1).

Because compelling generation is a drastic remedy, Congress expressly limited federal authority even when an emergency does exist. The federal government can order only the generation that "will best meet the emergency and serve the public interest." *Id*. When Congress revisited Section 202(c) in 2015, it further restricted the Department's authority when an order "may result in a conflict with . . . environmental law or regulation." *Id.* § 824a(c)(2). In those circumstances, generation can occur (1) "only during hours necessary to meet the emergency and serve the public interest"; (2) for up to 90 days; and (3) while "minimiz[ing] any adverse environmental impacts." *Id.* §§ 824a(c)(2), (4).

During the twentieth century, Section 202(c) was used "sparingly" outside of wartime shortages. Ben Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789, 803 (2025). More recently, Section 202(c) orders have addressed imminent shortages lasting a few days, primarily during natural disasters such as winter storms and hurricanes, and upon request by a grid operator or utilities. *See* Order No. 202-22-4 (Dec. 24, 2022), https://perma.cc/FDQ2-57KU (winter storms); Order No. 202-24-1 (Oct. 9, 2024), https://perma.cc/V8JL-K5VE (Hurricane Milton); Rolsma, 57 Conn. L. Rev. tbl. 1 (collecting orders).

Section 215, added in 2005, modestly expands the limited federal authority to regulate the long-term reliability of the grid. 16 U.S.C. § 824*o*. This provision displaced a voluntary system of grid reliability standards with mandatory, nationwide reliability standards that would be developed and enforced by a federally certified, but independent, entity called an Electric Reliability Organization. *Id.* § 824*o*(d), (e); *see also* S. Rep. No. 109-78, at 48 (2005). But the standards cannot be enforced by ordering generation facilities to operate, 16 U.S.C. § 824*o*(e), and Section 215 specifically disallows requiring the "construction of additional generation" or "enforc[ing] compliance" with "adequacy" standards. *Id.* § 824*o*(i)(2).

**B. States, grid operators, and utility companies coordinate to deliver a reliable supply of electricity.**

Exercising their authority retained under the Federal Power Act, states, grid operators, and utilities safeguard short-term and long-term resource adequacy through comprehensive planning and implementation of reliability standards. They also balance the impacts of generation on host communities and ratepayers.

Here, Michigan is the state with primary authority for regulating resource adequacy of utilities within the state, including whether power plants may retire. *See* States Br. § Statement.A.

Grid operators play an equally essential role. *See Wisconsin Pub. Power v. FERC*, 493 F.3d 239, 246-48 (D.C. Cir. 2007); JA____-____[DOE0010_194-195]. The Midcontinent Independent System Operator (MISO) is a regional grid operator whose territory includes Michigan and stretches from Montana down to Louisiana, organized into zones 1 through 10. JA____[DOE_0004_12]. MISO ensures resource adequacy by meeting both industry standards and those of the North American Electric Reliability Corporation (NERC), the independent Electric Reliability Organization certified under Section 215. *See* 16 U.S.C. § 824*o*; JA____[DOE0010_194].

To do so, MISO regularly measures whether available generation can meet demand. Each year, MISO runs thousands of simulations based on weather and facility data to identify the circumstances that would most stress the system.

9

JA_____-_____[DOE0008_8-9]; JA_____-_____[DOE0009_262-317]. MISO then uses those studies and demand forecasts from entities that supply electricity to end-users ("load-serving entities") to determine the generating capacity needed to meet each upcoming season's projected peak demand. JA_____-_____[DOE0008_10-11]; JA_____[DOE0009_312-315]. This target includes a "reserve margin," a buffer of generating capacity to account for potential emergencies, such as unexpected power outages or demand increases. JA_____-_____[DOE0008_10-11]; JA_____[DOE0009_316]. For example, if the MISO region's projected peak demand were 100 gigawatts and MISO's target reserve margin were 7%, the total capacity requirement would be 107 gigawatts. The reserve margin analysis aims to achieve the industry-standard goal of no more than one "loss of load event" (*e.g.,* an involuntary blackout from demand exceeding supply) per decade. JA_____-_____[DOE0008_8-11]; JA_____[DOE0009_316].

MISO then apportions this capacity requirement across all load-serving entities. JA_____[DOE0008_11]. To meet their requirements, load-serving entities may participate in MISO's annual Planning Resource Auction. JA_____-_____[DOE0008_10-11]. If supply is plentiful, MISO may procure excess capacity even beyond its target reserve margin.

MISO also uses a host of tools to address unexpected swings in demand or supply in real time. JA_____-_____[DOE0008_12-13]. As relevant here, MISO's

10

"Max-Gen event" alert protocol addresses potential shortages through increasingly stringent measures that boost generation or reduce usage. First, MISO sends an alert to facility operators to suspend optional maintenance or other activities that reduce power output. JA____-____[DOE0009_128-130]; JA____[DOE0008_12]. MISO then issues a potential shortfall warning, reducing electricity exports and preparing for imports. JA____[DOE0009_133-135]; JA____[DOE0008_12-13]. If these measures are insufficient, MISO proceeds through ten steps labeled "1a" through "5," turning on backup generators (step 1a), using demand response resources (*i.e.*, paying consumers not to use power at certain times, step 1a), importing from neighboring regions (step 2c), and so on. JA____-____, ____-____[DOE0009_136-148,161-162]; JA____[DOE0008_12-13]. Only on the final step, step 5, does any involuntary blackout occur. JA____, ____[DOE0009_148,162]; JA____[DOE0008_13]. Between 2009 and June 2024, MISO documented only two events beyond step 3, none of which were in Campbell's region. JA____-____[DOE0009_96-119].

### C. Petitioners and Consumers Energy worked for years to replace Campbell with safer, cheaper, and more reliable energy.

For just over a half-century, emissions from the Campbell coal plant have been harming the health of residents downwind of the facility—from Michigan to Maine—and preventing nearby residents from enjoying the surrounding Lake Michigan beaches, parks, and their own backyards. Each year, Campbell emits

11

around one hundred thousand pounds of air toxics, hundreds of pounds of particulate matter, many millions of pounds of nitrogen oxides and sulfur dioxide, and over ten billion pounds of carbon dioxide. JA____[DOE0007_12] (collecting EPA data); *see also* JA____-____[DOE0008__1216-1219]. Campbell emits more sulfur dioxide and particulate matter than any other plant in Consumers' generation fleet. JA____-____[DOE0008__1216-1219]. Campbell also uses approximately one billion gallons of water per day from Lake Michigan while discharging contaminated wastewater, including toxic metals, back into the lake. JA____[DOE0008_43]; JA____[DOE0007_13]. And burning coal at Campbell creates coal ash; the plant site holds roughly 6.2 million cubic yards of toxic ash. JA____[DOE0010_226].

That pollution's human costs are staggering. Campbell's emissions are deadly: Their respiratory and cardiovascular harms are estimated to cause 36-81 premature deaths and $389-$879 million in health impact costs annually, according to 2021 expert testimony based on EPA and independent peer-reviewed scientific models. JA____-____[DOE0008_1221-1222]. The community around Campbell is particularly socioeconomically vulnerable and exposed to more adverse environmental effects—like water pollution and proximity to toxic waste dumps—than most of the rest of the state. JA____[DOE0007_13]; JA___[DOE0008_1228-1229].

Campbell's aging units are increasingly unreliable and costly to maintain. Two of its three units are beyond their typical operational life, JA____, ____[DOE0008_37,383], and all three units have suffered unexpected breakdowns during recent years, with outage rates well above the national average for coal-burning units. JA____-____[DOE0008_26-27]. This means Campbell is also expensive to maintain. In 2021, Consumers projected that retiring Campbell in 2025 would save ratepayers $365 million just in avoided capital expenditures and major maintenance costs. JA____-____[DOE0008_678-679].

Petitioners spent years advocating to replace Campbell with cheaper, cleaner, and more reliable energy. In 2021, Consumers began its resource planning proceeding, during which Petitioners asked it to retire Campbell and replace it with other generation sources. In 2022, the Michigan Public Service Commission approved a settlement agreement—joined by many of Petitioners here—that set Campell's May 31, 2025 retirement date. JA____-____[DOE0008_190-225].

The Michigan Commission rejected concerns that Campbell's retirement would threaten resource adequacy. *See* States Br. § Statement.B. With good reason: The settlement bolstered Consumers' resource adequacy by replacing Campbell's 1,560 megawatts with the New Covert gas plant (1,176 megawatts), extending operations of two oil- and gas-fired units at the Karn plant (784 megawatts), and committing to add battery storage and hundreds of megawatts of new solar energy

13

generation. JA____, ____, ____, ____, ____-____,

____[DOE0008_125,135,187,196,198-199,205]. In all, Consumers' capacity

increased by hundreds of megawatts. MISO likewise approved the retirement.

JA____[DOE0009_40]; States Br. § Statement.B.

At that point, Consumers transitioned from Campbell to the cheaper, cleaner,

and more reliable New Covert and Karn plants and has continued to develop other

capacity. JA____, ____-____[DOE0008_535,544-545]. As for Campbell, it

adopted a reactive, "fix it if breaks" approach, resulting in a significant decline in

investment and maintenance, making Campbell even less reliable than before.

JA____, ____-____[DOE0008_28,37-38].

**D. Regulators predicted adequate capacity in summer 2025 in MISO regions.**

Leading up to Campbell's retirement, Consumers, the Michigan

Commission, and MISO continued to ensure resource adequacy. Consumers'

routine filings with the Michigan Commission showed that the company had

procured sufficient capacity leading up to May 2025 and surplus resources for

summer 2025—the time period at issue here. JA____[DOE0007_24] (collecting

filings); JA____[DOE0008_1524]. In fact, Consumers' filings showed adequate

resources through spring 2029. JA____, ____[DOE0008_1253,1524].

MISO's data also showed surplus resources for the summer. Its planning

auction for summer 2025 through spring 2026 acquired more than sufficient

14

capacity to meet the upcoming year's projected peak demand, even accounting for Campbell's retirement. JA____[DOE0004_12]. For summer 2025, MISO achieved a 9.8% reserve margin, almost two percentage points higher than its target. JA____[DOE0004_5]. That surplus capacity (2.6 gigawatts) was over 1.5 times more than Campbell's capacity. JA____[DOE0004_4]. Campbell's MISO zone also cleared well above target. JA____[DOE0004_18] (column Z7).

**E. The Department blocks Campbell's retirement with a Section 202(c) emergency order.**

Shortly before the four-year planning process would have culminated in Campbell's retirement, the Department overrode Consumers' and Michigan's planning decisions by declaring an emergency under Section 202(c). Order No. 202-25-3 (May 23, 2025), JA____[DOE0001] ("Order").

The Order did not identify any concrete emergency in any specific location but claimed Campbell's capacity was needed for at least 90 days. JA_____-____[DOE0001_2-3]. The claimed emergency was generalized—"in portions of the Midwest region" due to an electricity shortage—and stemmed from "potential tight reserve margins during the summer 2025 period" due to "the retirement of thermal generation capacity." JA____[DOE0001_1].

At the same time, the Department acknowledged that MISO acquired "sufficient capacity" for summer 2025, and that "MISO and Consumers have incorporated [Campbell's] planned retirement into their supply forecasts." JA_____-

15

____[DOE0001_1-2]. Yet, based on a few quotes from two sources, the Department concluded that "insufficiency of dispatchable capacity . . . during the summer months" could result in the "potential loss of power to homes and local businesses." JA____-____[DOE0001_1-2].

The Order asserted without explanation that Campbell's forced operation "is necessary to best meet the emergency." JA____[DOE0001_2]. The Department recognized that the Order may "conflict with environmental standards," and claimed to limit operation to the "hours necessary to meet the emergency" and to "minimize any adverse impacts." JA____[DOE0001_2]. But the Department also directed MISO and Consumers to employ "economic dispatch" of Campbell, meaning requiring Campbell to offer its capacity in the market regardless of any need for it to meet an emergency shortfall. JA____[DOE0001_2]. It thus would operate whenever its offers are accepted in the market, not just when there is a shortage.

The Department responded to rehearing requests by reaching "the same result" while "modif[ying]" its reasoning. Order No. 202-25-3B (Sept. 8, 2025), JA____[DOE0016_1] ("Rehearing Order"); 16 U.S.C. § 825*l*(b).

The Rehearing Order continued to claim a summer shortfall. JA____-____[DOE0016_10-13]. But the Department also contested Section 202(c)'s limits on its authority. The Department argued that Section 202(c) grants unbounded

16

"latitude" and "discretion" to determine the existence and scope of an emergency. JA____-____[DOE0016_6-7]. In particular, it contended that the provision does not limit the Department to addressing "imminent" shortages and asserted a new basis for having forced Campell to operate: That mandating Campbell's operation addresses *long-term* concerns, such as "growing resource adequacy concerns" and "unacceptable reliability risks" that might emerge "within five years." JA____, ____-____[DOE0016_7,10-14].

The Rehearing Order also defended ordering economic dispatch, because the Department believed it would "reduc[e] electricity costs." JA____[DOE0016_16]. But it also "clarified" that if economic dispatch is unavailable, Campbell may operate "on a must run basis," *i.e.*, requiring it to run at all times, regardless of an emergency need for its capacity. JA____[DOE0016_16].

The Department has twice renewed the Order, declaring that "emergency conditions . . . continue, both in the near and long term." Order No. 202-25-7 (Aug. 19, 2025), ADD_095; Order No. 202-25-9 (Nov. 18, 2025), ADD_105. The Department claimed "resource adequacy problems" were now a "year-round concern" that is "likely to continue in subsequent years" until 2030. ADD_096-100; ADD_105-110.

17

## SUMMARY OF THE ARGUMENT

**I.** The Department failed to demonstrate that the claimed near-term summer 2025 electricity shortage and long-term reliability concerns qualify as Section 202(c) emergencies.

**A.** The Department may not rely on long-term concerns because Section 202(c)'s fundamental requirement—of an "emergency"—covers only imminent shortages. 16 U.S.C. § 824a(c)(1). That interpretation follows from Section 202(c)'s text. And the remainder of Section 202 and Section 215 speak to the federal government's narrow authority over long-term grid reliability, confirming Section 202(c) is not meant to do more. Reading Section 202(c) to preclude consideration of long-term concerns also aligns with the careful federal-state balance Congress struck and the Department's own prior interpretation of the provision. The Department's discretion does not justify exceeding these limits.

**B.** The Department also fails to support the claimed summer 2025 shortfall. As the Department concedes, the record shows there was "sufficient capacity" in the summer. JA____-____[DOE0001_1-2]. The Department's contrary claim depends on misconstruing quotes from the resource-adequacy experts and ignoring other key evidence that would contradict the Department's conclusion.

**II.** Even assuming an emergency, the Department blew past other limits imposed by Section 202(c). Nothing in the record shows that reviving a decrepit

18

coal plant would "best meet the emergency." 16 U.S.C. § 824a(c)(1). And by ordering Campbell to offer its capacity regardless of need, the Department required Campbell to operate more than just "during hours necessary to meet the emergency." *Id.* § 824a(c)(2).

**III.** Notwithstanding the nominal expiration of the Order, mootness does not bar this Court's review. The Department's continued renewal of the Order—each for 90 days and each time repeating the same legal errors challenged here—either means that the Order has not expired or that the capable of repetition yet evading review exception to mootness applies.

## STANDING

Petitioners have standing because Campbell's continued operation harms its members. The "interests at stake are germane to" Petitioners' organizational purposes, and neither the "claims asserted" nor the "relief requested requires the participation of individual members." *Sierra Club v. EPA*, 926 F.3d 844, 848 (D.C. Cir. 2019) (cleaned up).[2] Petitioners' members also have standing in their own right, because they "suffer[] injury-in-fact fairly traceable" to the Order that is

---

[2] ADD_018-021 (Sierra Club); ADD_029-033 (Natural Resources Defense Council); ADD_040-047 (Michigan Environmental Council); ADD_059-062 (Environmental Defense Fund); ADD_070-071 (Environmental Law and Policy Center); ADD_076-078 (Vote Solar); ADD_082-083 (Union of Concerned Scientists); ADD_087-088 (Ecology Center).

likely to be redressed by a favorable decision. *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 67 (D.C. Cir. 2022).

Campbell's continued operation creates air and water pollution that harms Petitioners' members. *See supra* 11-12. In June alone, Campbell emitted hundreds of thousands of pounds of sulfur dioxide and nitrogen oxides and nearly 1.5 million pounds of carbon dioxide; in June and July, it discharged roughly 40 billion gallons of polluted water into Lake Michigan. ADD_232. Members that live within five miles of the plant feel the effects of that air pollution, which exacerbates conditions like hypertension and chronic obstructive pulmonary disease and causes sinus headaches, burning eyes, and pneumonia.[3] *See Clean Wisconsin v. EPA*, 964 F.3d 1145, 1156 (D.C. Cir. 2000). The pollution ruins members' enjoyment of the many recreational areas around the plant and near Lake Michigan, with some members avoiding hiking, swimming, or otherwise being outside in these areas altogether.[4] *See Am. Rivers v. FERC*, 895 F.3d 32, 41 (D.C. Cir. 2018); *Earthworks v. Interior*, 105 F.4th 449, 455 (D.C. Cir. 2024). The

---

[3] ADD_025 ¶¶ 3-4, ADD_027 ¶¶ 14-15 (Oppenhuizen); ADD_022-023 ¶¶ 5-6, 9 (Hoekema); ADD_034-036 ¶¶ 4, 10 (Alicki); ADD_072 ¶¶ 2-5 (Crosby).

[4] ADD_089 ¶ 6 (DiSano); ADD_066-067 ¶¶ 16-17 (Hauptman); ADD_074 ¶¶ 2-4 (LeVeque); ADD_072-073 ¶¶ 2-7 (Crosby); ADD_038 ¶ 9 (Babka); ADD_027 ¶ 15 (Oppenhuizen); ADD_023-024 ¶ 10 (Hoekema); ADD_084 ¶¶ 5-6 (Judge); ADD_080 ¶ 7 (Lozano-Buhl); ADD_035 ¶ 8 (Alicki); ADD_053-055 ¶¶ 25-26, 32-37 (Nieves).

noise from coal trains delivering to the plant and the plant itself has also caused members to stay inside.[5] *See In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 272 (D.C. Cir. 2020). All of these harms are traceable to the Order—and would be redressed by setting the Order aside—because the Order is the reason Campbell has not retired. *See Am. Rivers*, 895 F.3d at 41.

Beyond environmental harms, Petitioners and their members also are ratepayers,[6] so they have standing for the reasons explained further in the States Brief. The continued operation of Campbell has cost $53 million. ADD_176. There is at least a substantial probability that Petitioners and their members will bear these costs. *See Env't Action v. FERC*, 996 F.2d 401, 406 (D.C. Cir. 1993). The Order anticipated as much, JA____[DOE0001_3]; JA____[DOE0016_21-22], and FERC approved allocating the costs of operating Campbell to utilities that serve Petitioners and their members. *Consumers Energy v. MISO*, 192 FERC ¶ 61,158, at P 40 (Aug. 15, 2025). Ruling for Petitioners would reduce the risk they will pay those costs. *See id.* at P 42.

---

[5] ADD_025-026 ¶¶ 5-7 (Oppenhuizen); ADD_023 ¶ 8 (Hoekema).

[6] ADD_021 ¶ 11 (Sierra Club); ADD_092 ¶ 9 (Urban Core Collective); ADD_046 ¶ 33 (Michigan Environmental Council); ADD_071 ¶ 10 (Environmental Law and Policy Center); ADD_088 ¶ 10 (Ecology Center); ADD_090 ¶ 8 (DiSano); ADD_072-073 ¶¶ 6-7(Crosby); ADD_074-075 ¶ 5 (LeVeque); ADD_038 ¶ 10 (Babka); ADD_034 ¶ 5 (Alicki); ADD_028 ¶ 17 (Oppenhuizen); ADD_024 ¶ 11 (Hoekema); ADD_085 ¶ 10 (Judge); ADD_080-081 ¶ 8 (Lozano-Buhl); ADD_056-057 ¶¶ 44-45 (Nieves); ADD_064 ¶ 6, ADD_068 ¶ 22 (Hauptman).

**STANDARD OF REVIEW**

The Administrative Procedure Act applies to review of agency actions under the Federal Power Act. *Kimball Wind, LLC v. FERC*, 140 F.4th 496, 499 (D.C. Cir. 2025). This Court will set aside any "agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Pac. Gas. & Elec. Co. v. FERC*, 113 F.4th 943, 947-48 (D.C. Cir. 2024).

**ARGUMENT**

I.    **The Department Acted Unlawfully by Compelling Generation Without Demonstrating an Emergency under Section 202(c).**

Section 202(c) authorizes the Department to compel "generation . . . of electric energy" only if an "emergency exists." 16 U.S.C. § 824a(c)(1).

The basis for the Department's claim of emergency has been a moving target. But at no point has it met the provision's fundamental requirement: an emergency. The Department initially claimed an emergency based on an alleged summer 2025 electricity shortage. JA____[DOE0001_1]. When asked to square that claim with the grid operator's determination that it had "sufficient capacity," JA____[DOE0001_2], the Department defended its short-term emergency claim while also contesting the threshold proposition that Section 202(c) constrains it to

22

addressing imminent shortages. JA____-____, ____-____[DOE0016_6-7_10-14].

The Department thus revealed an alternative theory: that the Order had been intended to address non-imminent reliability risks that may emerge within five years—a theory that has animated the Order's subsequent renewals. JA____-____[DOE0016_13-14]; ADD_97-100; ADD_105-110.

Both the long-term and short-term theories fail. Section 202(c) bars the Department's reliance on long-term concerns because Section 202(c) limits the Department's discretion to compelling generation only when faced with an *imminent* shortage. § I.A. And the record belies the Department's claim of an imminent resource adequacy crisis in summer 2025. § I.B. Because there is no qualifying emergency, the Order must be set aside.

### A. The Department violated Section 202(c) by using it to address long-term resource adequacy concerns.

The Department's claim of a long-term emergency fails because it may use Section 202(c) to address only imminent shortages and not long-term resource adequacy concerns. § I.A.1. The Department's attempts to contest that foundational limitation fail. § I.A.2.

#### 1. Section 202(c) reaches only imminent shortfalls, not long-term resource adequacy concerns.

As relevant here, the Department may compel generation of "electric energy" only if it determines an "emergency exists by reason of . . . a shortage of

23

electric energy or of facilities for the generation . . . of electric energy." 16 U.S.C. § 824a(c)(1). That provision supplies the "boundaries" of the Department's authority, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024), and the "traditional tools of statutory construction"—text, statutory context, and agency practice—confirm that the Department may address only imminent electricity shortages. *Pac. Gas.*, 113 F.4th at 947 (cleaned up).

*Text.* Section 202(c) authorizes the Department to address only those "shortage[s] of electric energy" that arise in the context of an "emergency." 16 U.S.C. § 824a(c)(1). That requirement—of an "emergency"—supplies the provision's essential limit, and its ordinary meaning confirms that the Department can address only imminent, unexpected shortages. When Congress passed Section 202(c) in 1935, an "emergency" was a "*sudden* or *unexpected* appearance or occurrence" or "[a]n unforeseen occurrence or combination of circumstances which calls for *immediate* action or remedy; pressing necessity; *exigency*." Webster's New International Dictionary of the English Language 716 (1930) (emphasis added); *see also* 3 Oxford English Dictionary 119 (1st ed. 1913) (defining emergency as "a state of things *unexpectedly* arising, and urgently demanding *immediate* action" (emphasis added)); *Institutional S'holder Servs. v.*

*SEC*, 142 F.4th 757, 766 (D.C. Cir. 2025) (cleaned up) (looking to "contemporaneous dictionaries").[7]

The remainder of Section 202(c) underscores the need for exigency. The very first "emergency" that can "exist[]" is "a *sudden* increase in the demand for electric energy,"16 U.S.C. § 824a(c)(1) (emphasis added), paralleling the common definition of emergency. Likewise, the text uses the present tense—requiring a determination that an "emergency *exists*," *id.*—accentuating the focus on imminent shortfalls, not far-off, inchoate ones. The Section's title and text also both emphasize that Section 202(c) provides only "temporary" authority. *Id.* § 824a(c), (c)(1); *Dubin v. United States*, 599 U.S. 110, 120-21 (2023) ("[A] title is especially valuable where it reinforces what the text's nouns and verbs independently suggest." (cleaned up)). Congress would not have authorized the Department to act only temporarily if it wanted to empower the Department to address risks that may not materialize for years.

Reading "emergency" to reach only imminent, unexpected shortages also "avoid[s] . . . giving" the provision "unintended breadth" by aligning its reach with the wartime power Section 202(c) describes in the first instance. *See S. Carolina*

---

[7] That is still the definition of emergency. *See* Rolsma, 57 Conn. L. Rev. at 812 n.147.

*Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 59 (D.C. Cir. 2014) (cleaned up); 16 U.S.C. § 824a(c)(1). Congress intended that Section 202(c) would reach—and be "appropriately limited to"—wartime power shortages and other "similar crises" that could arise after "[d]rought and other natural emergencies." S. Rep. No. 74-621, at 19, 49. That is why this Court has recognized Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances." *Richmond Power & Light of City of Richmond v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978); *see also Otter Tail Power Co. v. Fed. Power Comm'n,* 429 F.2d 232, 233-34 (8th Cir. 1970) (Section 202(c) "enables the Commission to react to a war or national disaster").

Based on the text alone, the Department may not use Section 202(c) to address the non-imminent, long-term resource adequacy concerns it has claimed.

***Context.*** Two aspects of the Federal Power Act—Section 202's three-tiered structure and Section 215—speak directly to federal authority over grid reliability and confirm that Congress did not intend Section 202(c) to address non-imminent concerns.

In the context of Section 202's broader structure, Section 202(c) must have a limited role. If the federal government believes there is insufficient generation to meet long-term demand, JA____-____[DOE0016_13-14], the Act allows it to pursue a more "abundant supply of electric energy" using its non-emergency

26

authority to "promote" "*voluntary* interconnection and coordination" at the regional level. 16 U.S.C. § 824a(a) (emphasis added). That reflects Congress's judgment that the way to ensure "the greatest possible economy" and "proper utilization" of the electricity markets is not top-down federal intervention, but bottom-up collaboration. *Id.* If those efforts fall short, Section 202(b) allows a more coercive means to promote a more interconnected grid, but only if states or utilities ask for federal intervention. *Id.* § 824a(b). And even then, the government cannot "compel" anyone to bring additional generating facilities online. *Id.*

Section 202(c) fills a narrow residual space, allowing for "temporary" command-and-control only in cases of "emergency." *Id* § 824a(c), (c)(1); *see also* S. Rep. No. 74-621, at 49. Congress limited Section 202(c) to "react to a war or national disaster" precisely because these other, less coercive mechanisms exist to address "a crisis which is likely to develop in the foreseeable future but which does not necessitate immediate action." *Otter Tail Power,* 429 F.2d at 233-34. In other words, Congress's "specific and limited enumeration" of federal power over long-term resource adequacy in Sections 202(a) and (b) is "strong evidence that" Section 202(c) "confers no such authority." *Cal. Indep. Sys. Operator v. FERC*, 372 F.3d 395, 401 (D.C. Cir. 2004).

The Department also may not use Section 202(c) to address the core concern alleged here—"unacceptable reliability risks within five years,"

27

JA____[DOE0016_14]—because a separate provision, Section 215, addresses that concern. Section 215 authorizes the government to establish mandatory, nationwide reliability standards for the grid, 16 U.S.C. § 824*o*(d)(1)-(2), but it constrains authority to enforce "standards for adequacy" and does not allow enforcing reliability standards by compelling generation. *See id.* §§ 824*o*(e), (i)(2). Put differently, Section 215 establishes a finely calibrated and limited federal authority over grid reliability. Section 215 thus provides additional "strong evidence" that Section 202(c) confers no authority to address long-term reliability concerns. *Cal. Indep. Sys. Operator*, 372 F.3d at 401. Indeed, Congress added Section 215 in 2005, in recognition that the Act—including Section 202(c)—did not address long-term grid reliability. *See Alcoa Inc. v. FERC*, 564 F.3d 1342, 1344 (D.C. Cir. 2009). By using Section 202(c) to bypass Section 215's limits, the Department has "contradict[ed] Congress' clear intent as expressed in its more recent," reliability-specific legislation that was enacted with the understanding that the Department had "no authority" to address long-term reliability through Section 202(c). *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143, 156 (2000).

In short, these provisions indicate that the Department may not compel generation unless the feature that distinguishes Section 202(c) from these other sources of authority—an imminent shortage requiring immediate response—is

28

present. Two other aspects of the Federal Power Act confirm that this limited emergency provision does not grant the broad power the Department claims.

First, the Department cannot square its approach with Congress's recognition, in 2015, that Section 202(c) orders must be sharply limited where the order "may result in a conflict" with other environmental requirements. 16 U.S.C. § 824a(c)(2), (4). In those circumstances, Section 202(c) relaxes compliance with environmental standards while confining non-compliance to hours needed to meet the emergency and only then for 90 days, subject to renewal. *Id.* § 824a(c)(2), (3), (4). Congress did not intend to bury a long-term override of environmental standards in such a narrow emergency provision. *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).

Second, the Department's use of its limited emergency power as a long-term planning tool upsets the careful balance Congress struck in the Federal Power Act between state and federal authority. 16 U.S.C. § 824(a), (b). Congress preserved state authority over generation facilities, *id.* § 824(b)(1), including the "right" to "require retirement of existing generators . . . without direct interference from" the federal government. *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009). The federal government's Section 202(c) authority is an exception to its otherwise limited role, *see* 16 U.S.C. § 824(b), not carte blanche to override state and grid operator decisions on long-term resource adequacy.

29

***Agency Practice.*** The Department's historical use of Section 202(c) also demonstrates that it is not meant to address long-term concerns. Until the Order, the Department had consistently used Section 202(c) to address the imminent possibility of power outages due to war or natural disasters—not to address long-term planning concerns. *See supra* 8; States Br. § II.A. The "want of assertion of power by those who presumably would be alert to exercise it" can confirm such power was not conferred. *Fed. Trade Comm'n v. Bunte Bros.*, 312 U.S. 349, 351-52 (1941); *see Loper Bright*, 603 U.S. at 394 ("contemporaneous[]" and "consistent" interpretations "may be especially useful in determining [a] statute's meaning").

Indeed, the Department's own regulations reflect this exclusion of long-term concerns. The Department recognized for over forty years that the statute authorizes orders "during a period of unexpected inadequate supply of electricity," not to "solve long-term problems." 46 Fed. Reg. 39984, 39985-86 (Aug. 6, 1981). The regulations thus define an emergency as "an unexpected inadequate outage or breakdown" of facilities, where "[s]uch events may be the result of weather conditions, acts of God, or unforeseen occurrences not reasonably within the power of the affected 'entity' to prevent." 10 C.F.R. § 205.371.

The regulations also refute directly the Department's view that it can take over long-term planning before an imminent shortage occurs: "[W]here a shortage

30

of electric energy is projected due solely to the failure of [responsible] parties," there is no emergency "unless the inability to supply electric service is *imminent*." *Id.* (emphasis added). While "inadequate planning or the failure to construct necessary facilities can result in an emergency," the Department may not utilize a "continuing emergency order" to mandate long-term system planning. *Id.*

### 2. The Department's arguments for rejecting Section 202(c)'s limits fail.

The Department's Rehearing Order did not meaningfully engage with any of these arguments demonstrating Section 202(c)'s limited breadth. It has supplied no contrary definition of "emergency" that could support its position, nor has it squared its approach with the structure of the Act. Instead, the Department claims Section 202(c) does not place *any* meaningful limits on its authority, for two reasons. Neither works.

The Department first contends that the plain terms of Section 202(c) "cannot limit" its discretion to claim an emergency because the statute "delegates a wide degree of latitude" to the Department. JA____-____[DOE0016_6-7]. But even for statutes that "delegate[] discretionary authority," courts retain an obligation to "independently interpret the statute" to "fix[] the boundaries of the delegated authority" and "ensure that agencies exercise their discretion" within those bounds. *Loper Bright*, 603 U.S. at 395, 404 (cleaned up). Here, the statutory text, context,

31

and history limit the Department to addressing imminent shortages, and the Order

is unlawful because the Department exceeded that limit.

The Seventh Circuit's decision in *Board of Trade of the City of Chicago v.*

*CFTC*, 605 F.2d 1016 (7th Cir. 1979), is not to the contrary. *Contra*

JA____[DOE00016_8]. There, the court recognized that Congress had "carefully

designated the context in which a discretionary [emergency] decision" by the

Commodity Futures Trading Commission could be made. 605 F.2d at 1022-23.

The court did not police those bounds because it interpreted the statute to foreclose

judicial review of the Commission's orders. 605 F.2d at 1017-18, 1025. Here, by

contrast, the Federal Power Act expressly contemplates judicial review of Section

202(c) orders. 16 U.S.C. § 824a(c)(5). Accordingly, this Court can review the

Department's use of Section 202(c), just as it has previously done. *See Richmond*

*Power*, 574 F.2d at 614-15.

The Department's fallback is that requiring it to "act only when a shortage of

electricity is 'imminent' makes no sense" because it would prevent "any

meaningful action." JA____-____[DOE0016_6-7]. But the Department "may not

rewrite" statutory terms "to suit its own sense of how the statute should operate."

*Institutional S'holder*, 142 F.4th at 766 (cleaned up). In any event, its concerns are

misplaced. That "some retired generation facilities generally cannot be brought

back online in a matter of days," JA____[DOE0016_7], may be true but is

32

irrelevant here. The government can use its non-emergency powers—reflected in Sections 202(a), 202(b), and 215—to address its five-year concerns long before they result in an imminent shortfall. *See* 16 U.S.C. §§ 824a, 824*o*. Indeed, the record shows that those with primary responsibility for long-term resource adequacy—states and grid operators—have addressed and will continue to address any concern before it becomes imminent. *See infra* 39-40. Should an imminent crisis arise, the Department can take "meaningful action" close-in-time, as it has consistently done when addressing natural disasters. *See supra* 8.

The Department also maintains that its own regulation allows addressing non-imminent concerns. But the provision explaining that "[e]xtended periods of insufficient power supply as a result of inadequate planning . . . can result in an emergency," JA____[DOE0016 _7] (quoting 10 C.F.R. § 205.371), does not eliminate the need for an imminent shortage. Consistent with the statutory structure, if inadequate planning will result in an imminent shortage, the Department may step in. But the Department cannot use Section 202(c) to take over long-term resource adequacy planning before any shortage emerges.

### B.    The record reflects no near-term electricity shortfall.

The Order's validity thus turns on whether the Department has supported the only imminent concerns it has raised: an alleged risk of homes and businesses losing power in summer 2025. JA____[DOE0001_2].

33

Nothing the Department provides to substantiate that risk survives arbitrary-and-capricious review.[8] The Order concedes that MISO planned for Campbell's retirement and obtained "sufficient capacity" for summer 2025. JA\_\_\_\_-\_\_\_\_[DOE0001_1-2]. Yet, the Order papers over these fundamental observations by relying on misleading quotes, § I.B.1, and ignoring contrary evidence from MISO, the Michigan Commission, and Consumers—the parties primarily responsible for resource planning, § I.B.2.[9]

### 1. The Order reflects the Department's fundamental mischaracterization of resource adequacy and is illogical on its own terms.

The Department combines out-of-context quotes from four sources with conclusory evidence to assert that an emergency existed. The Order's scant evidentiary support reflects the Department's misunderstanding of how resource planning works. Such a fundamental flaw in supporting its decision renders the Order arbitrary and capricious. *See Sinclair Wyoming Ref. Co. LLC v. EPA*, 114 F.4th 693, 712 (D.C. Cir. 2024) (finding that EPA's "misunderstanding of the

---

[8] The "substantial evidence" and "arbitrary and capricious" standards are the same "substantive standard." *Bangor Hydro-Elec. Co. v. FERC*, 78 F.3d 659, 663 n.3 (D.C. Cir. 1996).

[9] The Department's claim of discretion does not absolve its obligation to engage in reasoned decisionmaking within Section 202(c)'s bounds. *See Loper Bright*, 603 U.S. at 395.

dynamics and features of [the market at issue]" rendered its conclusion arbitrary and capricious).

### MISO's Planning Resource Auction Results for 2025-2026

The Order asserts that a resource adequacy emergency existed based on selective quotes from MISO's 2025-2026 Planning Resource Auction results. JA____[DOE0001_2]; JA____-____[DOE0016_10-12]. But this document shows that MISO secured *more* capacity than needed to meet both its projected peak demand plus a reasonable buffer: MISO's surplus capacity—beyond the recommended buffer—in summer 2025 was 2.6 gigawatts, *i.e.*, over 1.5 times more than Campbell's capacity. *See* JA____-____, ____[DOE0004_4-5,12]; *supra* 15.

The Department acknowledges these results "demonstrated sufficient capacity," JA____[DOE0001_2], but it brushes aside this conclusion, instead relying on out-of-context quotes from the slide deck announcing the results.

First, the Order supports its summer emergency claim by asserting that "the summer [auction results] reflected 'the highest risk and a tighter supply-demand balance.'" JA____[DOE0001_2]; JA____, ____[DOE0016_2,12]. But it omitted the rest of the quoted sentence, which reads: "The 2025 PRA demonstrated *sufficient capacity* at the regional, subregional and zonal levels, with the summer *price* reflecting the highest risk and a tighter supply-demand balance."

35

JA____[DOE0004_12] (emphasis added). Higher prices during a period of higher demand due to warmer weather indicate a healthy market, not a resource adequacy emergency. And higher prices alone do not indicate a summertime emergency, as MISO procured sufficient supply for all seasons.

Second, the Order relies on a slide titled "new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources." JA____[DOE0004_13]; *see* JA____[DOE0001_2]. But "negative impacts" refers to the decrease in the amount of *offers* that MISO received for the 2025 summer auction compared to 2024. JA____[DOE0004_13]. MISO still received enough offers to procure more than sufficient capacity, regardless of the absolute number of offers decreasing from the prior year.

The Order's assertion that the auction results "reinforce the need to increase capacity," JA____[DOE0001_2]; JA__[DOE0016_2], is again based on a cherry-picked quote: The "need" arises because "demand is expected to grow with new large load additions." JA____[DOE0004_2]. But citing expected long-term demand growth to justify a 90-day emergency order fundamentally misunderstands how resource adequacy planning works: Large load additions are not dumped on grid operators without notice. Any such additions for summer 2025 would already have been incorporated into the 2025 planning auction, and any longer-term load

36

additions would be part of future planning auctions, with regulators, utilities, and grid operators carefully studying and approving them. This generalized long-term observation therefore does not support the Department's claim of a summertime shortage emergency.

***NERC's 2025 Summer Reliability Assessment***

The Order's use of a quote from NERC's 2025 Summer Reliability Assessment, that "MISO is at elevated risk of operating reserve shortfalls during periods of high demand or low resource output," mischaracterizes what such a "risk" represents in NERC's risk assessment system. JA____[DOE0001_1]; JA____, ____[DOE0016_2,11].

The purpose of the NERC Assessment and its "elevated risk" label indicates that the Order's reliance is misguided. The Assessment is intended to help the industry and regulators be "better prepared to take necessary actions to ensure [grid] reliability." JA____[DOE0005_4]. In this context, an "elevated risk" is the middle category of three risk levels and describes a risk of MISO using its existing mitigation measures, such as requesting energy imports from neighbors. JA____, ____[DOE0005_8,10]. NERC's solutions for "elevated risk" therefore entail far less drastic steps (such as reviewing protocols for using those mitigation measures) than halting a planned plant retirement. JA____[DOE0005_8]. Unsurprisingly, far from signaling an emergency, NERC has routinely designated areas as "elevated

risk" without those areas ever experiencing blackouts: In the past five summers, NERC designated MISO as an "elevated" or "high" risk region, JA____, ____, ____, ____[DOE0009_477,527,573,621], with no load-shedding in any of those summers. JA____-____[DOE0009_110-119]. This illustrates that "elevated risk" designations are not useful for determining the existence of an imminent electricity shortage.

***Summer 2025 Energy Emergency Alerts***

The Department similarly misunderstands the significance of MISO's "Energy Emergency Alert 1" in summer 2025 when it contends that the alerts "confirm the ongoing emergency and sudden increased threats to energy reliability." JA____-____[DOE0016_12-13]. Setting aside whether alerts post-dating the Order are relevant, *see* States Br. § III.A, they also do not show an emergency. MISO's alerts in summer 2025 were all the second step (Step 1b) or below out of MISO's ten-step process designed to address risks of potential shortfalls. JA____-____[DOE0016_12-13]; *see supra* 10-11; States Br. § III.A (discussing the Department's prior practice of treating Energy Emergency Alert 2 as the minimum level triggering Section 202(c)). These low-level alerts are part of MISO's standard operating procedures for addressing manageable fluctuations in supply and demand; they do not indicate that MISO faced a meaningful risk of an imminent electricity shortage. Declaring an energy shortfall crisis at the second

38

lowest step of a ten-step scale is akin to rushing to the emergency room for a stubbed toe.

### Evidence of long-term reliability risks

The Department also invokes several sources discussing *long-term* grid reliability concerns. JA____-____[DOE0016_13-14]. Unsurprisingly, none reasonably explain the existence of a near-term emergency requiring immediate federal intervention.

First, the Department cites two Executive Orders declaring a "National Energy Emergency" as "inform[ing] the Secretary's decision and action." JA____[DOE0016_13]. But the Executive Orders provide no factual evidence that could be applicable to MISO regions or summer 2025, simply asserting that "insufficient energy production . . . constitutes an unusual and extraordinary threat." JA____[DOE0019]; *see also* JA____[DOE0020] (claiming "an unprecedented surge in electricity demand"). Reliance on such unsupported, generalized conclusions is arbitrary and capricious. *See Sinclair*, 114 F.4th at 714.

Second, the Department cites a MISO executive's congressional testimony, JA____[DOE0016_13], but the testimony contains no suggestion of an imminent electricity shortage crisis affecting MISO. Instead, the testimony explains how MISO intended to meet the long-term challenges described in the Rehearing Order, such as "much stronger growth [in demand for electricity],"

39

JA____[DOE0016_13], using its existing non-emergency planning mechanisms. JA____-____[DOE0021_6-10]. Absent from her list of solutions is undoing coal plant retirements or asking the Department to override long-term resource planning. JA____-____[DOE0021_6-10]. Far from supporting the Department's decision to force Campbell's operation, the testimony reflects that long-term "electric resource planning decisions . . . are the purview of the states and utilities in the MISO region." JA____[DOE0021_7].

Lastly, citing nothing, the Rehearing Order states that "DOE's assessment reveals that, if current retirement schedules and incremental additions remain unchanged, most regions—including the MISO Region relevant to the Emergency Order—will face unacceptable reliability risks within five years." JA____[DOE0016_14]. Such a conclusory statement, without any evidence, cannot sufficiently support its contention that such reliability risks exist, let alone that those five-year-out reliability risks actually create a near-term emergency. *Nat'l Shooting Sports Found. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) ("We do not defer to an agency's conclusory or unsupported suppositions." (cleaned up)).

### 2. The Department ignored concrete evidence of resource adequacy that contradicts the Department's conclusion.

The Department also "ignore[d] evidence contradicting its position" that a summer electricity shortfall existed. *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346

40

(D.C. Cir. 2018) (cleaned up). This failure renders the Department's conclusion arbitrary and capricious.

First, the Department failed to consider any of the regulatory approval documents for Campbell demonstrating that its retirement did not pose any concerns. *See* States Br. § III.B.

Second, the Department failed to address contradictory evidence brought to its attention during the rehearing process. *See* JA___[DOE0007_25]. For example, within two weeks of the Order, MISO officials testifying at a FERC technical conference rejected that any resource adequacy emergency existed within their region: A MISO representative stated that no capacity deficits had materialized in 2025, JA____[DOE0009_174]; and MISO's Independent Market Monitor, responsible for scrutinizing the performance of MISO's markets and procedures, testified that "MISO is more than adequate moving into the Summer of 2025." JA____[DOE0009_205]. The Department's failure to engage with statements from parties most knowledgeable about the region's resource adequacy renders its reasoning arbitrary and capricious. *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) ("an agency cannot *ignore* new and better data").

## II.    The Order Fails to Meet Section 202(c)'s Limits on the Generation the Department Can Order Under an Emergency.

Even if the Department had properly established an "emergency," the Department may order generation only if it determines that generation "will best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(1). And where, as here, the order "may result in a conflict" with environmental requirements, JA____[DOE0001_2], the Department may order generation "only during hours necessary to meet the emergency and serve the public interest" and in a way that "minimizes any adverse environmental impacts." 16 U.S.C. § 824a(c)(2). The Order meets neither requirement.

### A.    The Department's conclusion that operating an ailing coal-fired plant best meets the emergency is arbitrary and capricious.

Section 202(c)(1) requires that the Department order only "generation" that "in its judgment will best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(1). The word "best" is inherently a comparative term and means "that which is 'most advantageous.'" *Entergy Corp. v. Riverkeeper*, 556 U.S. 208, 218 (2009) (cleaned up). Here, the Department has not offered "a satisfactory explanation" for why Campbell was the most advantageous choice, and the Order should be set aside. *See State Farm*, 463 U.S. at 43.

The Order's sole explanation for selecting Campbell parrots the statutory language, that "additional dispatch of the Campbell Plant is necessary to best meet

the emergency and serve the public interest." JA____[DOE0001_2]; *see also*

JA____-____[DOE0016_17-18]; JA____-____[DOE0008_66-68]. But this

"passing reference to relevant factors" is not "reasoned and principled

decisionmaking." *City & Cnty. of San Francisco v. FERC*, 24 F.4th 652, 658 (D.C.

Cir. 2022) (cleaned up). No further explanation can be divined from the record. It

neither points to a shortfall in the area served by Campbell nor identifies operating

Campbell as a way—let alone the best way—to address alleged resource shortfall

issues. Indeed, the Department cannot claim that Campbell beat out other

alternatives because there is no indication that the Department considered any

alternatives, even though, as the record makes clear, resources other than Campbell

could address potential shortfalls. *See supra* 10-11, 14-15; *see also* JA____,

____[DOE0007_34,41] (describing energy imports and other options).

The Department also ignored evidence that Campbell cannot reliably address

any time-sensitive resource shortfalls. Campbell cannot turn on quickly in response

to extreme demand; it can take up to 12 hours to become fully operational.

JA____[DOE0008_39]. Moreover, Campbell's capacity is often unavailable, with

high outage rates that increased due to foregone maintenance. *See supra* 13. When

selecting the "best" way to address reliability concerns, the Department "cannot

simply ignore [this] 'important aspect of the problem'"—Campbell's poor

reliability track record. *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (cleaned up).

43

The Department's decision to single out Campbell ultimately relied on "factors which Congress ha[d] not intended it to consider." *State Farm*, 463 U.S. at 43. The Department selected Campbell not because it would "best meet the emergency," but to meet the Administration's long-term goal of using "all mechanisms available" to retain existing coal plants. JA____[DOE0020]; *see also* Executive Order No. 14,261 (Apr. 8, 2025). The Department may not choose Campbell simply because blocking its retirement would serve the Administration's other ends. *See* JA____-____[DOE0016_13-14]; *cf. Richmond Power*, 574 F.2d at 615 (fear of overdependence on foreign oil is not proper Section 202(c) consideration).

In the end, the Department conceded that it failed to explain its conclusion. It contended it did not have to because Section 202(c)(1) "delegates a wide degree of latitude," and so it is not required to "engage in a lengthy weighing of options or explanation." JA____[DOE0016_18]. But even where a statute "delegates discretionary authority," a reviewing court still must "ensur[e] the agency has engaged in 'reasoned decisionmaking' within th[e] boundaries" the statute prescribes. *Loper Bright*, 603 U.S. at 395 (cleaned up). And here, that means the Department must explain why operating Campbell "will best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(1). Engaging in reasoned decisionmaking may not demand a "lengthy weighing of options," particularly

44

where (unlike here) an identified shortage is imminent, JA____[DOE0016_18], but it does require at least some explanation.

**B. The Department has not limited generation to hours necessary to meet the emergency and to minimize environmental impacts.**

The Department's concession that the Order "may result in a conflict with a requirement of . . . environmental law," 16 U.S.C. § 824a(c)(2); *see* JA____[DOE0016_3]; JA____[DOE0001_2], means that it must also order generation "only during hours necessary to meet the emergency" and in a way that "minimizes any adverse environmental impacts," 16 U.S.C. § 824a(c)(2). These requirements are particularly important here, given Campbell's well-documented pollution and health impacts. *See supra* 11-12. The Order violates both requirements.

The Order violates the statutory mandate to require generation "only during hours necessary to meet the emergency" by requiring MISO to "employ economic dispatch of the Campbell Plant," JA____[DOE0001_2], or, where necessary, to operate Campbell on a "must run basis." JA____[DOE0016_16]. These ways of running Campbell, by definition, cannot minimize the hours of operation. Under economic dispatch, Campbell would not just run when needed to meet the emergency—the "potential loss of power to homes and local businesses," JA____[DOE0001_2]—but would be required to offer its capacity in the market and run whenever its offer is accepted. And if Campbell operates on a "must run

45

basis," it must run at all hours, not just when needed. In the end, the Department conceded its order sought to "minimize[e] the cost to ratepayers," JA____-____[DOE0016_16-17], not the hours of Campbell's operation. Setting aside that this approach does not minimize costs, *see* States Br. § IV.A, the Department's search for cost savings instead of minimizing hours of operation violates Section 202(c).[10]

For the same reason, the Department has not "minimize[d] any adverse environmental impacts." 16 U.S.C. § 824a(c)(2). Running Campbell instead of other generation sources will not minimize environmental impacts because Campbell is more likely than other sources to pollute. That is inherently true of coal-fired power plants like Campbell, *see, e.g.*, 89 Fed. Reg. 38508, 38509 (May 7, 2024); JA____-____[DOE0007_48-49], and particularly true of Campbell itself, because Consumers has avoided maintaining required air pollution controls. JA____-____[DOE0008_41-42]. It thus would have been appropriate for the Department to include measures to minimize reliance on Campbell, *see, e.g.*, Order No. 202-17-4 (Sept. 14, 2017), https://perma.cc/DDW3-KSP4 (requiring exhaustion of "all reasonably and practicably available resources," including

---

[10] The Department's sole explanation here—a "passing reference" to the statutory factors—also is not "reasoned and principle decisionmaking." *City & Cnty. of San Francisco*, 24 F.4th at 658 (cleaned up); JA____[DOE0001_2-3]; JA____-____[DOE0016_14-17].

available imports and demand response, to minimize an increase in emissions), not accelerate its use.

### III.    These Petitions Are Not Moot.

Mootness is of no concern here, for two reasons: the Order has not expired, and the capable of repetition yet evading review exception applies.

The initial 90-day order has not expired because it has been renewed. Section 202(c) treats orders extending an order beyond the initial 90-day period as *renewals*. 16 U.S.C. § 824a(c)(4)(A), (B). The Department has treated subsequent orders the same way. *See* ADD_095, 100; ADD_109-110. Accordingly, the Order has not expired.[11]

But even if the Order has expired, the "capable of repetition yet evading review" exception to mootness plainly applies. Both requirements of that exception are met here.

First, the Order's 90-day duration is "too short to be fully litigated before" the Order's expiration. *Trump v. Mazars USA, LLP*, 39 F.4th 774, 786 (D.C. Cir. 2022). An action "in effect for only three months" is live for "too short" a time "to

---

[11] This case is also not moot (1) because Petitioners challenge not just the Order but also "the *policy* that underlies that action," *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1287 (D.C. Cir. 2016), and (2) for the reason the States raise (at § I): Resolution of this petition "may affect" the resolution of the FERC proceedings relating to recovery of Consumers' compliance costs. *Crowley Gov't Servs. v. GSA*, 143 F.4th 518, 526 (D.C. Cir. 2025); *see Consumers*, 192 FERC ¶ 61,158, at P 42.

47

complete judicial review of [its] lawfulness." *FCC v. Consumers' Research*, 606 U.S. 656, 671 n.1 (2025); *see also Pub. Util. Comm'n of Cal. v. FERC*, 236 F.3d 708, 714 (D.C. Cir. 2001) ("[O]rders of less than two years' duration ordinarily evade review." (cleaned up)). That is particularly true here, where would-be petitioners must request rehearing before the agency and wait 30 days to seek judicial review. 16 U.S.C. § 825*l*(a)-(b).

Second, the "legal questions [this case] presents for decision" will likely be the "basis of a continuing controversy." *Pierre-Noel v. Bridges Pub. Charter Sch.*, 113 F.4th 970, 978 (D.C. Cir. 2024) (citation omitted); *see Ralls Corp. v. Comm. on Foreign Inves. in U.S.*, 758 F.3d 296, 324 (D.C. Cir. 2014). There is "no mere risk" that the Department will "repeat" its "wrongful conduct": The Department has "already" twice "done so" and has indicated it will do so again. *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 362 (D.C. Cir. 2018) (cleaned up); ADD_100; ADD_109-110. And each renewal raises the same issues presented here: whether the Department can invoke Section 202(c) to address long-term reliability concerns, *see supra* § I.A; ADD_097-098; ADD_106-107; whether the Department's near-term emergency finding is arbitrary because it fundamentally misunderstands the relevant evidence, *see supra* § I.B; ADD_094-097; ADD_103-105; whether the Department has failed to explain how Campbell "best meet[s] the emergency," *see supra* § II.A; ADD_100; ADD_109-110; and

48

whether the Department has failed to limit the hours of Campbell's operation and minimize environmental impact, *see supra* § II.B; ADD_101; ADD_110.

Accordingly, this Court can resolve issues presented both by an order and "renewals in a series." *See Humane Soc'y v. EPA*¸ 790 F.2d 106, 114 (D.C. Cir. 1986). This Court should address the issues that are presented here and will keep arising in subsequent renewals, and it should declare the Order and its justifications unlawful and set it aside.

## CONCLUSION

This Court should grant the petitions, vacate the Order as modified by the Rehearing Order, and declare the Order and its justifications unlawful.

Dated: December 19, 2025                 Respectfully Submitted,

*/s/ Benjamin Chagnon*[12]
Benjamin Chagnon (DC Cir. 65850)
Jennifer Yun (DC Cir. 66550)
Michael Lenoff (DC Cir. 66374)
1001 G St. NW, Suite 1000
Washington, DC 20001
(202) 745-5210
bchagnon@earthjustice.org
jyun@earthjustice.org
mlenoff@earthjustice.org

Lauren Piette (DC Cir. 66519)
Sameer Doshi (DC Cir. 64549)
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 500-2193
lpiette@earthjustice.org
sdoshi@earthjustice.org

Christine Powell (DC Cir. 64908)
180 Steuart St., #194330
San Francisco, CA 94105
(415) 217-2035
cpowell@earthjustice.org

*Counsel for Sierra Club and*
*Urban Core Collective*

*/s/ Gregory E. Wannier*
Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Elena Saxonhouse (DC Cir. 56639)
Sierra Club Environmental Law
Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
elena.saxonhouse@sierraclub.org

*Counsel for Sierra Club*

*/s/ Howard A. Learner*
Howard A. Learner (DC Cir. 61779)
Bradley Klein
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
hlearner@elpc.org
bklein@elpc.org

Katherine S. Duckworth
Environmental Law & Policy Center
1008 Floral Ave. SE
East Grand Rapids, MI 49506
T: (312) 673-6500
kduckworth@elpc.org

*Counsel for the Environmental Law &*
*Policy Center, Ecology Center, Union of*
*Concerned Scientists, and Vote Solar*

---

[12] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

50

*/s/ Caroline Reiser*
Caroline Reiser (DC Cir. 62319)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

Gavin McCabe (DC Cir. 53966)
Natural Resources Defense Council
40 W. 20th St., 11th Floor
New York, NY 10011
(212) 727-4529
gmccabe@nrdc.org

Simi Bhat (DC Cir. 55968)
Karen Chen
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
(415) 875-6110
sbhat@nrdc.org
kchen@nrdc.org

*Counsel for Natural Resources Defense Council*

*/s/ Danielle C. Fidler*
Danielle C. Fidler (DC Cir. 62486)
Francis W. Sturges, Jr. (DC Cir. 64964)
Veronica Saltzman (DC Cir. 64096)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
dfidler@catf.us
fsturges@catf.us
vsaltzman@catf.us

*Counsel for Michigan Environmental Council*

*/s/ Tomás Carbonell*
Tomás Carbonell (DC Cir. 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(919) 449-4600
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

51

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a), D.C. Circuit Rule 32(e), and the Court's November 20, 2025 and December 2, 2025 Orders, because this document contains 9,992 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e).

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Benjamin Chagnon*
Benjamin Chagnon
DC Cir. 65850
Attorney

52

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 19, 2025, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit through this Court's CM/ECF system, which will serve a copy on all registered users.

/s/ Benjamin Chagnon
Benjamin Chagnon
DC Cir. 65850
Attorney

53