NOT YET SCHEDULED FOR ORAL ARGUMENT

Nos. 25-1159, 25-1160, 25-1162 (consolidated)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

PEOPLE OF THE STATE OF MICHIGAN, et al.,
*Petitioners*,

v.

UNITED STATES DEPARTMENT OF ENERGY, et al.,
*Respondents*.

Petitions for Review of United States Department of Energy Order No. 202-25-3

**RESPONDENTS' INITIAL ANSWERING BRIEF**

Of Counsel:

JONATHAN BRIGHTBILL
General Counsel
U.S. Department of Energy

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT LUNDMAN
KYLE GLYNN
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-0402
rebecca.jaffe@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and amici

Petitioner in case No. 25-1159 is the State of Michigan.  Petitioners in case No. 25-1160 are Sierra Club, Natural Resources Defense Council, Michigan Environmental Council, Environmental Defense Fund, Environmental Law and Policy Center, Vote Solar, Union of Concerned Scientists, the Ecology Center, and Urban Core Collective.  Petitioners in case No. 25-1162 are the States of Minnesota and Illinois.

Respondents are Chris Wright, Secretary of the United States Department of Energy, and the United States Department of Energy.

The Maryland Office of People's Counsel moved to intervene but was denied intervention.  The Midcontinent Independent System Operator (MISO) and Consumers Energy Company have intervened.

The following parties have filed amicus briefs:  The Institute for Policy Integrity at New York University School of Law; the Citizens Action Coalition of Indiana, Citizens Utility Board of Michigan, Citizens Utility Board of Minnesota, Citizens Utility Board of Wisconsin, and Consumers Council of Missouri; The Niskanen Center, Professor Paul L. Joskow, and Professor Richard Schmalensee; Joshua C. Macey (Yale Law School), Joel Eisen (University of Richmond School of Law), Alison Gocke (University of Virginia School of Law), Sharon Jacobs (Berkeley

School of Law), Alexandra Klass (University of Michigan Law School), Andrew McKinley (Northwestern University Pritzker School of Law), Felix Mormann (Texas A&M University School of Law), David Owen (University of California College of the Law), Shelley Welton (University of Pennsylvania Carey Law School), and Hannah Wiseman (Penn State Dickinson Law).

## B.    Rulings under review

Petitioners challenge Department of Energy Order No. 202-25-3, which was issued on May 23, 2025.

## C.    Related cases

Under Circuit Rule 28(a)(1)(C), this case is related to *Sierra Club v. United States Department of Energy*, Nos. 25-1198, 25-1202, 25-1254 (consolidated) (D.C. Cir.).  This case is also related to *Sierra Club v. United States Department of Energy* Nos. 26-1024, 26-1025, and 26-1028 (consolidated) (D.C. Cir.).

/s/ *Rebecca Jaffe*
REBECCA JAFFE

Counsel for Federal Respondents

iii

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............................................................................ ii

TABLE OF CONTENTS ................................................................iv

TABLE OF AUTHORITIES ........................................................ vii

GLOSSARY ....................................................................................xv

INTRODUCTION ...........................................................................1

STATEMENT OF JURISDICTION................................................3

STATEMENT OF THE ISSUES.....................................................4

STATEMENT OF THE CASE.........................................................5

      A.    Statutory background .........................................................5

      B.    Factual background ...........................................................8

            1.    The national energy emergency ..............................8

            2.    Emergency conditions in the Midwest and the Order ....................................................................13

            3.    The Secretary's rehearing response .........................15

            4.    This litigation .........................................................16

SUMMARY OF ARGUMENT ........................................................17

STANDARD OF REVIEW ..............................................................20

ARGUMENT ....................................................................................21

I.    Section 202(c) grants broad authority to the Secretary to respond to threats facing the Nation's electric infrastructure. ...................................21

A.  Section 202(c) affords broad discretion to the Secretary to identify and address a wide array of emergencies to ensure the Nation has access to reliable electric power....................................23

1.  Text and structure show that section 202(c) grants the Secretary discretion to address a wide array of "emergencies." ..................................................23

2.  Electricity sector context confirms the Secretary's authority to address anticipated shortfalls. ..............................31

3.  The Secretary's interpretation—not Petitioners'—is consistent with historic section 202(c) practice........................36

4.  Petitioners' remaining arguments fail.......................................42

B.  The Secretary may temporarily require that a retiring plant remain available to operate in response to an emergency...................47

II.  Substantial evidence supported the Order. ......................................................51

A.  The facts found show that the identified emergency exists. .......................................................52

B.  Temporarily requiring Campbell to remain available will best meet the emergency and serves the public interest......................71

1.  Substantial evidence supported the Secretary's determination to "meet" the emergency by requiring the Campbell plant to operate. ...................................................71

2.  The Secretary reasonably required economic dispatch. ...............................................................76

C.  This Court cannot ignore the rehearing response..............................80

III.  The Court should not constrain the Department's ability to issue section 202(c) orders to protect public health and safety...........................82

CONCLUSION...............................................................88

v

CERTIFICATE OF COMPLIANCE........................................................................89

ADDENDUM ..............................................................................................................90

# TABLE OF AUTHORITIES

## Cases

*Alcoa Inc. v. FERC*,
  564 F.3d 1342 (D.C. Cir. 2009) ................................................................35

*Allegheny Power v. FERC*,
  437 F.3d 1215 (D.C. Cir. 2006) ................................................................81

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ..................................................................82

*Animal Legal Def. Fund, Inc. v. Glickman*,
  204 F.3d 229 (D.C. Cir. 2000) ..................................................................61

*ASARCO, Inc. v. FERC*,
  777 F.2d 764 (D.C. Cir. 1985) ..................................................................80

*Bd. of Trade of City of Chi. v. Commodity Futures Trading Comm'n*,
  605 F.2d 1016 (7th Cir. 1979) ..................................................................50

*Bradford v. U.S. Dep't of Lab.*,
  101 F.4th 707 (10th Cir. 2024) ................................................................41

*Burlington N. R.R. Co. v. Surface Transp. Bd.*,
  75 F.3d 685 (D.C. Cir. 1996) ......................................................................4

*Cal. Cmtys. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) ....................................................................83

*Cal. Dep't of Water Res. v. FERC*,
  306 F.3d 1121 (D.C. Cir. 2002) ................................................................81

*City & Cnty. of San Francisco v. EPA*,
  604 U.S. 334 (2025) ..................................................................................26

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ..................................................................................30

*City of Olmsted Falls v. FAA*,
  292 F.3d 261 (D.C. Cir. 2002) ..................................................................62

*City of Port Isabel v. FERC,*
    130 F.4th 1034 (D.C. Cir. 2025).................................................................83

*Comm. to Save Lake Murray v. Fed. Power Comm'n,*
    515 F.2d 379 (D.C. Cir. 1975).................................................................53

*Concert Inv., LLC v. Small Bus. Admin.,*
    100 F.4th 215 (D.C. Cir. 2024)..................................................... 32, 81

*Consol. Edison Co. of N.Y. v. Fed. Power Comm'n,*
    511 F.2d 372 (D.C. Cir. 1974)..................................................... 52, 82

*Constellation Energy Commodities Grp., Inc. v. FERC,*
    457 F.3d 14 (D.C. Cir. 2006).................................................................56

*Ctr. for Biological Diversity v. EPA,*
    722 F.3d 401 (D.C. Cir. 2013)..............................................................75

*Davis v. Mich. Dep't of Treasury,*
    489 U.S. 803 (1989)................................................................................23

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020)....................................................................................81

*Entergy Ark., LLC v. FERC,*
    134 F.4th 576 (D.C. Cir. 2025)............................................................59

*Entergy Corp. v. Riverkeeper, Inc.,*
    556 U.S. 208 (2009)................................................................................50

*Env't Def. v. Duke Energy Corp.,*
    549 U.S. 561 (2007)................................................................................17

*Ethyl Corp. v. EPA,*
    541 F.2d 1 (D.C. Cir. 1976) (en banc)...............................................65

*Fed. Power Comm'n v. Transcont'l Gas Pipe Line Corp.,*
    365 U.S. 1 (1961)............................................................................ 48, 74

*Fertilizer Inst. v. EPA,*
    935 F.2d 1303 (D.C. Cir. 1991)...........................................................83

*First Iowa Hydro-Elec. Co-op. v. Fed. Power Comm'n*,
    328 U.S. 152 (1946)..................................................................44

*Fla. Mun. Power Agency v. FERC*,
    315 F.3d 362 (D.C. Cir. 2003)...................................................56

*Grand Trunk Corp. v. Transp. Sec. Admin.*,
    153 F.4th 517 (7th Cir. 2025) ................................... 25, 28, 50

*Gundy v. United States*,
    588 U.S. 128 (2019)................................................... 23, 31

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006)..................................................................36

*In re Espy*,
    80 F.3d 501 (D.C. Cir. 1996).....................................................26

*In re Handy Andy Home Improvement Ctrs., Inc.*,
    144 F.3d 1125 (7th Cir. 1998) ..................................................32

*Island Architectural Woodwork, Inc. v. Nat'l Lab. Rels. Bd.*,
    892 F.3d 362 (D.C. Cir. 2018).....................................................21

*Jackson v. Modly*,
    949 F.3d 763 (D.C. Cir. 2020).....................................................18

*Kreis v. Sec'y of Air Force*,
    866 F.2d 1508 (D.C. Cir. 1989)................................................. 48, 52

*La. Pub. Serv. Comm'n v. FERC*,
    20 F.4th 1 (D.C. Cir. 2021).......................................... 19, 21, 52, 71

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020)..................................................................30

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)..................................................................42

*Lorillard v. Pons*,
    434 U.S. 575 (1978)..................................................................40

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989).................................................................68

*Mayfield v. U.S. Dep't of Lab.*,
117 F.4th 611 (5th Cir. 2024) .................................................41

*N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.*,
878 F.3d 271 (D.C. Cir. 2017)...............................................68

*Nasrallah v. Barr*,
590 U.S. 573 (2020).................................................................21

*Nat'l Ass'n of Broadcasters v. FCC*,
147 F.4th 978 (D.C. Cir. 2025)..............................................20

*Nat'l Lead Co. v. United States*,
252 U.S. 140 (1920).................................................................40

*Otter Tail Power Co. v. Fed. Power Comm'n*,
429 F.2d 232 (8th Cir. 1970) ........................................... 42, 43

*PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*,
438 F.3d 1184 (D.C. Cir. 2006)..............................................53

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015)...................................................................51

*Pub. Emps. for Env't Resp. v. EPA*,
77 F.4th 899 (D.C. Cir. 2023)................................................56

*Rawat v. Comm'r*,
108 F.4th 891 (D.C. Cir. 2024)..............................................36

*Richmond Power & Light v. FERC*,
574 F.2d 610 (D.C. Cir. 1978)......................................... 42, 43

*Russello v. United States*,
464 U.S. 16 (1983) ........................................................ 26, 28, 29

*S.C. Pub. Serv. Auth. v. FERC*,
762 F.3d 41 (D.C. Cir. 2014)..................................................52

x

*Save Our Sebasticook v. FERC*,
431 F.3d 379 (D.C. Cir. 2005) ......................................................... 21, 81

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) .................................................................................47

*Sierra Club v. U.S. Dep't of Energy*,
867 F.3d 189 (D.C. Cir. 2017) ......................................................... 41, 74

*State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*,
580 U.S. 26 (2016) ........................................................................ 26, 28, 29

*Tenneco Oil Co. v. FERC*,
571 F.2d 834 (5th Cir. 1978) ...................................................................81

*Transcont'l Gas Pipe Line Corp. v. FERC*,
518 F.3d 916 (D.C. Cir. 2008) ................................................................70

*Trump v. Hawaii*,
585 U.S. 667 (2018) .................................................................................48

*Trump v. Mazars USA, LLP*,
39 F.4th 774 (D.C. Cir. 2022) .................................................................4

*Turlock Irr. Dist. v. FERC*,
786 F.3d 18 (D.C. Cir. 2015) ..................................................................67

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001) .................................................................................74

*United States v. Rutherford*,
442 U.S. 544 (1979) .................................................................................32

*United States v. S. Ry. Co.*,
364 F.2d 86 (5th Cir. 1966) .....................................................................28

*United States v. S. Ry. Co.*,
380 F.2d 49 (4th Cir. 1967) .....................................................................28

*Utility Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .......................................................................... 17, 24

*Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*,
   435 U.S. 519 (1978).................................................................. 47, 51

*Webster v. Doe*,
   486 U.S. 592 (1988)........................................................................47

*West Virginia v. EPA*,
   597 U.S. 697 (2022)........................................................................41

*Xcel Energy Servs. Inc. v. FERC*,
   41 F.4th 548 (D.C. Cir. 2022).........................................................61

**Statutes**

8 U.S.C. § 1252(b)(4)(B) .......................................................................21

16 U.S.C. § 824(a) ..................................................................................6

16 U.S.C. § 824(b)(1)..........................................................................6, 44

16 U.S.C. § 824a(b)-(c)...........................................................................26

16 U.S.C. § 824a(c)................................................................ 44, 74, 75, 79

16 U.S.C. § 824a(c)(1) ............. 1, 5, 6, 22, 24, 25, 29, 30, 32, 33, 34, 37, 44, 46, 47,
                                    48, 49, 50, 51, 52, 56, 62, 70, 75, 76, 77

16 U.S.C. § 824a(c)(2) ........................................................................6, 78

16 U.S.C. § 824a(c)(3) ..................................................................... 7, 22, 74

16 U.S.C. § 824a(c)(4)(A) .................................................................. 6, 27, 39

16 U.S.C. § 824a(d) ......................................................................... 28, 45

16 U.S.C. § 824a(e)...............................................................................45

16 U.S.C. § 824a(f) ...............................................................................46

16 U.S.C. § 824a(g) ..............................................................................46

16 U.S.C. § 824o................................................................................ 13, 35

16 U.S.C. § 824o(a)(1)................................................................13

16 U.S.C. § 824o(a)(3)................................................................46

16 U.S.C. § 824o-1(a)(1)-(2) .....................................................30

16 U.S.C. § 824o-1(a)(4)-(6) .....................................................30

16 U.S.C. § 824o-1(a)(7) ............................................................29

16 U.S.C. § 824o-1(a)(7)(A)(i) ...................................................29

16 U.S.C. § 824o-1(a)(7)(A)(ii) ..................................................29

16 U.S.C. § 824o-1(a)(7)(B)(i)-(ii) .............................................29

16 U.S.C. § 825*l*(a) ....................................................... 7, 21, 69, 80

16 U.S.C. § 825*l*(b) ............................................ 3, 4, 20, 52, 55, 67, 82

33 U.S.C. § 1326(b) ...................................................................50

42 U.S.C. § 4332(2)(C) ..............................................................49

42 U.S.C. § 7151(b) .....................................................................5

42 U.S.C. § 7172(a)(1)(B) ..........................................................45

50 U.S.C. § 1601 *et seq.*.............................................................11

Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94,
§ 61002, 129 Stat. 1312 (2015)............................................39

## Regulations

10 C.F.R. § 205.371 ......................................................... 7, 36, 56

## Other Authorities

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal
Texts (2012) ........................................................ 25, 36

Benjamin Rolsma, *The New Reliability Override*,
    57 Conn. L. Rev. 789 (2025) ..................................................... 37, 38, 39

Black's Law Dictionary (3d ed. 1933)...................................................25

H.R. Rep. No. 113-86 (2013)...............................................................40

S. Rep. No. 74-621 (1935) ...................................................................27

3 F.P.C. 714 (May 21, 1942) ...............................................................37

6 F.P.C. 320 (Jan. 14, 1947) ...............................................................38

*N. Am. Elec. Reliability Corp.*,
    116 FERC ¶ 61,062 (2006) ..............................................................35

*N. Am. Elec. Reliability Corp.*,
    117 FERC ¶ 61,126 (2006) ..............................................................35

Order No. 2023,
    184 FERC ¶ 61,054 (2023) ..............................................................32

# GLOSSARY

FERC        Federal Energy Regulatory Commission

MISO        Midcontinent Independent System Operator

Order        Department of Energy Order No. 202-25-3 (Campbell 1)

## INTRODUCTION

The United States is facing a national energy emergency.  In fact, the power grids in this country are facing a "five-alarm fire." *NERC President Warns of 'Five-alarm Fire' for Grid Reliability*, Utility Dive (Oct. 22, 2025), https://perma.cc/85SC-NVSF.  In response to "a shortage of electric energy" in the Midwest, the Secretary of Energy issued Order No. 202-25-3, invoking his well-established authority under section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c)(1).  DOE1_1.  This ordered "such generation . . . of electric energy as in [his] judgment will best meet the emergency and serve the public interest."  16 U.S.C. § 824a(c)(1).  Secretary Wright directed the J.H. Campbell power plant (Campbell) in Michigan—a 1,560 megawatts facility that the record confirms had *15 years* of service life remaining—to continue to generate electricity.  Though Campbell had been approved to close in 2022 for *economic* reasons, things changed by 2025.  Independent electric-grid reliability authorities and the operators of the Midcontinent Independent System Operator (MISO)[1] had identified an unexpected and (in the context of the electricity sector) "sudden increase in the demand for electric energy" in this region.  *See id.*  The Secretary's emergency order was entirely

---

[1] MISO is a Regional Transmission Organization established in 1998 and the electric grid operator for a 15-state region in the central U.S., including Michigan.

consistent with the requirements of section 202(c), and the Department's (and, before that, the Federal Power Commission's) 90-year history of using that authority.

Petitioners ask this court to upend the Secretary's ability to address the emergency at hand. But their legal arguments contradict the plain text of Federal Power Act section 202(c). The statute broadly defines what constitutes an "emergency" for purposes of this specific provision. It does not limit the Secretary to addressing "unexpected" or "imminent" circumstances. Petitioners' facile attempt to read such (nonexistent) limitations into section 202(c) through cherry-picked dictionary citations is inconsistent with the statutory context, statutory history, industry context, and decades of administrative history and practice. Congress presumptively ratified the Department's longstanding interpretation of the breadth and use of this authority when modifying section 202, but left this core language untouched.

Nor do Petitioners demonstrate that the Secretary's findings lack substantial evidence. The record confirms that electricity demand—stagnant for close to two decades—unexpectedly and suddenly increased in the past two years. Reasons include expanding electrification of cars, trucks, and other transportation, the sudden proliferation of artificial-intelligence and other data centers, and a reshoring of domestic industry. Yet little reliable, dispatchable generation—i.e., largely weather-independent sources that grid operators can turn on, off, or adjust on demand to match supply with real-time demand—has been added over the last two decades.

2

Other national experts on electricity reliability have confirmed the reliability problems facing the grid. Indeed, just two months before the Secretary's order, MISO asked the Federal Energy Regulatory Commission (FERC) to approve a proposed plan for reducing delays in deployment of generation as a solution to the "urgent resource adequacy and reliability needs in the near term." MISO, *Revisions to the Open Access Transmission, Energy and Operating Reserve Tariff Expedited Resource Addition Study Filing*, ER25-1674-000, at 1 (Mar. 17, 2025), https://perma.cc/QC72-EQAS. For when reliability fails and the power goes out, Americans die. Billions of economic waste can follow. And the Campbell plant has been instrumental in supplying reliable energy during crucial seasons—saving lives and protecting the health and safety of countless Americans. "The finding of the [Secretary] as to the facts" is "supported by substantial evidence" and so "shall be conclusive." 16 U.S.C. § 825*l*(b). The Court should reject Petitioners' attempt to substitute its own (and Petitioners') judgments about what will best serve the public interest for that of the Secretary. Section 202(c)'s broad delegation to the Secretary's "judgment" should be affirmed, and the petitions denied.

## STATEMENT OF JURISDICTION

Under the Federal Power Act, a party to a proceeding aggrieved by an emergency order may seek review in the courts of appeals within 60 days after the Department issues an order on the rehearing application or the rehearing application is

3

deemed denied. 16 U.S.C. § 825*l*(b). Petitioners timely petitioned for review on July 24, 2025 (Michigan and public interest organizations) and July 25, 2025 (Minnesota and Illinois).

The Order expired on August 21, 2025. DOE1_3. Respondents do not contend that the Order's expiration moots this case. This Court may review issues "capable of repetition yet evading review." *Trump v. Mazars USA, LLP*, 39 F.4th 774, 786 (D.C. Cir. 2022); *see also Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 690 (D.C. Cir. 1996). The Secretary ordered the Campbell plant to continue operating on August 20, 2025 (Campbell 2), November 18, 2025 (Campbell 3), and February 17, 2026 (Campbell 4). Petitioners petitioned for review of Campbell 2 in October 2025 and of Campbell 3 in January 2026, and those cases are currently in abeyance pending resolution of this case.

## STATEMENT OF THE ISSUES

1. Whether the Secretary acted within his broad section 202(c) authority by requiring Campbell's continued operations, considering that (A) the Secretary found that an emergency exists due to a shortage of electric energy and facilities to generate it, among other causes, and (B) section 202(c)'s plain text allows the Secretary to require generation that, in his judgment, will best meet the emergency and serve the public interest.

4

2.  Whether substantial evidence supported the Secretary's conclusive findings that (A) an emergency exists and (B) continued operations of the Campbell plant will meet the emergency.

3.  Whether, in assessing the equities of any putative remedy, the Court should merely remand for any necessary additional fact-finding without vacatur and avoid constraining the Secretary's ability to issue section 202(c) orders to protect public health and safety.

**STATEMENT OF THE CASE**

**A.    Statutory background**

The Federal Power Act gives the Secretary of Energy broad authority to mandate "such generation, delivery, interchange, or transmission of electric energy as in [his] judgment will best meet" an "emergency."  16 U.S.C. § 824a(c)(1).  This emergency authority originally resided with the Federal Power Commission; it was transferred to the Department of Energy in 1977.  *See* 42 U.S.C. § 7151(b).

Section 202(c) authority is granted:  (1) "[d]uring the continuance of any war in which the United States is engaged," or (2) "whenever the [Secretary] determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes."  16 U.S.C. § 824a(c)(1).

5

The Secretary can issue a section 202(c) order "either upon [his] own motion or upon complaint, with or without notice, hearing, or report." *Id.* The power of the Secretary to order generation in an emergency is a "specifically provided" exception to the Federal Power Act's ordinary-course recognition of state authority over generation in other Act provisions. *Id.* § 824(a), (b)(1).

If an emergency order "may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation," the Secretary "shall ensure that such order requires generation, delivery, interchange, or transmission of electric energy only during hours necessary to meet the emergency and serve the public interest." *Id.* § 824a(c)(2). Such an order "shall expire not later than 90 days after" being issued. *Id.* § 824a(c)(4)(A). Nonetheless, the Secretary may "renew or reissue such order . . . for subsequent periods, not to exceed 90 days for each period, as the [Secretary] deems necessary to meet the emergency and serve the public interest." *Id.* The statute imposes no limits on how long an "emergency" might persist, or on how many times the Secretary may determine it appropriate to "renew or reissue such order[s]." *See id.*

An order should be, but only to the maximum extent "practicable," "consistent with any applicable Federal, State, or local environmental law or regulation and minimize[] any adverse environmental impacts." *Id.* § 824a(c)(2). Parties who take actions to comply with an order are shielded from "civil or criminal liability" if an

6

emergency order causes noncompliance with environmental laws or regulations. *Id.* § 824a(c)(3).

"Until the record in a proceeding shall have been filed in a court of appeals, . . . the [Secretary] may at any time, upon reasonable notice and in such manner as [he] shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by [him]." *Id.* § 825*l*(a).

Longstanding Department regulations further define "emergency" to include "an unexpected inadequate supply of electric energy which may result from the unexpected outage or breakdown of facilities for the generation, transmission or distribution of electric power." 10 C.F.R. § 205.371. Emergencies "may be the result of weather conditions, acts of God, or unforeseen occurrences," "result from a sudden increase in customer demand," or from "an inability to obtain adequate amounts of the necessary fuels to generate electricity, or a regulatory action which prohibits the use of certain electric power supply facilities." *Id.* "Extended periods of insufficient power supply *as a result of inadequate planning* or the failure to construct necessary facilities can result in an emergency." *Id.* (emphasis added).

B.    **Factual background**

1.    **The national energy emergency**

For much of the past two decades, electricity demand was relatively flat, growing at an annual average rate of 0.1% between 2005 to 2020.[2]  Many policy-makers were advocating an energy transition, characterized by planned retirement of dispatchable power plants (fueled by coal, gas, or petroleum),[3] combined with the government-subsidized proliferation of variable, intermittent renewable generation of wind or solar.[4]

But the last few years have seen a sudden increase in electricity demand.  Electric cars, buses and other transportation, reshoring of manufacturing, and artificial-intelligence and other data centers are leading to unexpected growth in current and forecasted electricity demand curves.[5]  Moreover, artificial-intelligence data center

---

[2] *After More than a Decade of Little Change, U.S. Electricity Consumption Is Rising Again*, U.S. Energy Information Administration (May 13, 2025), https://perma.cc/X62V-VN4L.

[3] *Planned Retirements of U.S. Coal-fired Electric-Generating Capacity to Increase in 2025*, U.S. Energy Information Administration (Feb 25, 2025), https://perma.cc/KE49-F6PT.

[4] *Net Generation by Renewable Sources*, U.S. Energy Information Administration, (accessed Mar. 16, 2026), https://perma.cc/2YFS-PT6K; DOE19_2.

[5] *Grid Reliability and U.S. Coal Fleet Attributes*, National Association of Regulatory Utility Commissioners, at 3 (July 2025), https://perma.cc/ZKF8-WB2E.

and manufacturing demands for electricity are directly tied to our Nation's continued security. DOE19_1-2; DOE20_1-2.

At the same time, the electricity sector is planned and deployed on a multiyear scale, with investment in plants engineered to run for decades requiring tens-of-millions-of dollars of capital investment that will often not be returned for many years.[6] New generation is not progressing at the pace required to meet the rising demand. "Even when projects move forward, local siting challenges, labor shortages, environmental reviews, and other factors can extend construction timelines, prolonging periods of elevated reliability risk.  For most of 2025, approximately 52 [gigawatts] of approved generation was awaiting construction, and nearly 32 [gigawatts] of that generation reported an expected delay in the Commercial Operations Date." *2026 Reliability Imperative Report*, MISO, at 4 (Feb. 2026), https://perma.cc/CYH7-58MA.

The soaring demand has stretched global supply chains for generation equipment to their limits.  And, in 2024, the typical project built took 55 months from the

---

[6] *See, e.g., Capital Cost and Performance Characteristic Estimates for Utility Scale Electric Power Generating Technologies*, U.S. Energy Information Administration, at 5-7 (Jan. 2024), https://perma.cc/J3W9-RKHK (showing modeled construction times and costs for U.S. coal plants).

interconnection request to commercial operations.[7]  That is a steep growth from a timeline of 36 months in 2015 and 22 months in 2008.[8]

Unexpected power outages often have catastrophic effects on lives and commerce.  Per a 2004 report, the economic cost of power interruptions to U.S. electricity consumers was $79 billion annually.[9]  In the healthcare sector, interruptions can disrupt critical services such as dialysis or oxygen concentrators.[10]  Heavy industries face delays when special motors must be safely restarted, impacting project timelines and costs.  Transportation networks may come to a standstill, leading to gridlock that affects businesses and emergency services, including ambulances and police.  Even brief outages lasting only minutes can trigger extended delays.  Systems do not always recover immediately.  Restoring load safely can require substantial time given

---

[7] *See Characteristics of Power Plants Seeking Transmission Interconnection as of the End of 2024*, Lawrence Berkeley National Laboratory, at 4 (Dec. 2025), https://perma.cc/2287-MSXU.

[8] *Id.*

[9] *Understanding the Cost of Power Interruptions to U.S. Electricity Consumers*, Lawrence Berkeley National Laboratory, at 26 (Sept. 2004), https://perma.cc/GAA8-B6FB.

[10] *Challenges and Considerations for Healthcare Facilities and Residents Affected by Planned Power Outages*, U.S. Health and Human Services, at 1 (2021), https://perma.cc/X79Y-VLST.

the engineering physics of the grid, which may not allow for rapid power restoration all at once.[11]

Mitigating the dangers of blackouts requires reliable energy sources for American families.  For example, Texas's Winter Storm Uri led to widespread blackouts over five days in 2021.  This resulted in over 200 deaths related to cold-exposure, disruption to medical treatment, or faulty use of non-electric heating sources.[12]  During the recent Winter Storm Fern, dispatchable power was crucial to ensuring the safety of Americans when other energy sources faltered.  The Secretary's efforts to keep reliable resources like coal plants operational prevented widespread blackouts.[13]

On January 20, 2025, President Trump issued an Executive Order entitled *Declaring a National Energy Emergency*.  DOE19_1.  Invoking Presidential authority under the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*, the President determined that the "generation capacity of the United States" is "far too inadequate to

---

[11] *Prioritizing Resilience*, National Governors Association, at 3-4 (May 2023), https://perma.cc/3FFS-Q8HZ.

[12] *February 2021 Winter Storm-Related Deaths—Texas*, Texas Health and Human Services, at 2-3 (Dec. 31, 2021), https://perma.cc/8DA9-Z2DS.

[13] *Fact Sheet:  Energy Department Prevented Blackouts & Saved American Lives During Winter Storms*, U.S. Department of Energy (Feb. 6, 2026), https://perma.cc/VRH9-APQW.

meet our Nation's needs." DOE19_1. "The United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." DOE19_3. And "[w]ithout immediate remedy, this situation will dramatically deteriorate in the near future due to a high demand for energy." DOE19_2.

In April 2025, President Trump issued Executive Order 14262, *Strengthening the Reliability and Security of the United States Electric Grid*. DOE20_1. The President found that "[t]he United States is experiencing an unprecedented surge in electricity demand driven by rapid technological advancements, including the expansion of artificial-intelligence data centers and an increase in domestic manufacturing." *Id.* "This increase in demand, coupled with existing capacity challenges, places a significant strain on our Nation's electric grid." *Id.* And the "[l]ack of reliability in the electric grid puts the national and economic security of the American people at risk." *Id.* The President declared that the "electric grid must utilize all available power generation resources, particularly those secure, redundant fuel supplies that are capable of extended operations." DOE20_2.

The President directed the Secretary to "streamline, systemize, and expedite [the Department]'s processes for issuing orders under [s]ection 202(c)." *Id.* The President also directed the Secretary to "ensure any generation resource identified as critical within an at-risk region is appropriately retained as an available generation

12

resource" and to "prevent" generation resources exceeding 50 megawatts of capacity "from leaving the bulk-power system." DOE20_3. The "bulk-power system" refers to the energy from interconnected electricity generation sources and the high-voltage transmission networks that comprise the electric grid; it generally does not include local distribution lines that bring power from high-voltage networks to individual homes. *See* 16 U.S.C. § 824o(a)(1).

### 2.    Emergency conditions in the Midwest and the Order

On May 23, 2025, the Secretary issued the Order under section 202(c). DOE1_3. Based on substantial evidence, the Secretary determined that an emergency exists in portions of the Midwest "due to a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes." DOE1_1. As explained in the Order, MISO forecasted potential tight reserve margins during the summer of 2025, particularly during periods of high demand or low electricity generation. *Id.* Reserve margins are the generating capacity a power system has available to ensure reliability during times of stress, such as unexpected outages or severe weather events. The 2025 Summer Reliability Assessment of the North American Electric Reliability Corporation showed that MISO was at elevated risk for shortfalls. *Id.*[14]

---

[14] Pursuant to 16 U.S.C. § 824o, the North American Electric Reliability Corporation is the FERC-certified electric reliability organization statutorily tasked with establishing and ensuring compliance with reliability standards for the U.S. electric grid.

Evidence before the Secretary showed that new electricity generation additions would be insufficient to offset various negative impacts, such as plant retirements. DOE1_1-2. Since 2020, 2,700 megawatts of reliable, dispatchable coal-fired generating capacity in Michigan had been retired. DOE1_1. Besides coal, Michigan's Big Rock Point Nuclear Plant shut down in 1997. *Id.* Palisades Nuclear Plant closed in 2022. *Id.* These assets provided near-constant, reliable electricity.

Michigan's 1,560-megawatt Campbell plant was scheduled to stop operating on May 31, 2025—*15 years* before the end of its design life. *Id.*; DOE2_1. The plant's retirement would further decrease available dispatchable generation capacity within the region. DOE1_1. Dispatchable generation means that a plant can produce electricity on demand, unlike non-dispatchable resources dependent on favorable weather conditions, like wind or solar. Dispatchable capacity was insufficient to meet growing demand, which could result in power losses to homes and businesses, risking public health and safety. DOE1_2.

The Secretary acknowledged that MISO and Consumers Energy (owner of Campbell) had incorporated the plant's retirement into their forecasts, including Consumers' acquisition of a 1,200-megawatt natural gas power plant. DOE1_1-2. But, based on the North American Electric Reliability Corporation's assessment and information from MISO, demand growth meant an elevated risk of shortfalls remained. DOE1_2. Accordingly, the Secretary found that the Campbell plant was

14

"necessary" to address the energy emergency. *Id.* He further found that continued operations of Campbell were in the public interest to avoid potential losses of power to homes and local businesses, mitigating public health and safety risks. *Id.*

The Order directed MISO and Consumers Energy to "take all measures necessary to ensure that the Campbell plant is available to operate." *Id.* It also directed MISO to "take every step to employ economic dispatch of the Campbell Plant to minimize cost to ratepayers." *Id.* Economic dispatch is the process of operating power plants to meet electricity demand at the lowest marginal cost by selecting generators in order from least to most expensive. And the Order was limited in duration to align with the emergency circumstances. *Id.* In line with section 202(c)(2), the Order further mandated that Campbell plant operations "must comply with applicable environmental requirements . . . to the maximum extent feasible while operating consistent with the emergency conditions." DOE1_3.

The Order was effective upon issuance and expired on August 21, 2025. *Id.*[15]

### 3.    The Secretary's rehearing response

In June 2025, Michigan, Minnesota, and Illinois, the public interest organizations, and the Organization of MISO States sought rehearing before the Department.

---

[15] Petitions for review of FERC orders approving revisions to MISO's tariff in response to the Order are currently pending before this Court, *e.g.*, *People of the State of Michigan v. FERC*, No. 25-1285 (D.C. Cir.). The consolidated petitions are in abeyance pending Petitioners' challenge to the Order.

DOE16_1.  In September 2025, the Secretary issued Order No. 202-25-3B address-ing the arguments raised on rehearing and reaching the same result.  *Id.*  The Secre-tary explained that there was "no dispute" that he "has the statutory authority under [Federal Power Act] section 202(c) to (1) determine that an emergency exists, and then (2) exercise his judgment to address that emergency."  DOE16_4.  The emer-gency determination was "consistent with section 202(c)'s text and prior [Depart-ment] practice."  DOE16_7.  The Secretary also explained why requiring the Camp-bell plant to remain available was the best emergency response.  DOE16_17-18.  Retired generation facilities are difficult if not impossible to bring back online once lost.  DOE16_7.

### 4.   This litigation

Petitioners petitioned this Court to review the Order.  MISO intervened, and Consumers Energy intervened solely to protect its ability to recover its costs.  Peti-tioners also challenge the subsequent Campbell orders.  *E.g.*, Nos. 25-1198 (Camp-bell 2); 26-1024 (Campbell 3).  Petitioners have not yet challenged Campbell 4.  The time for seeking rehearing from the agency (a prerequisite to judicial review) has not yet run.  This Court denied the Department's motion to consolidate the Campbell 1 and 2 cases, instead holding Campbell 2 in abeyance pending the outcome here.  Campbell 3 is also in abeyance.

**SUMMARY OF ARGUMENT**

1.  Section 202(c) gives the Secretary broad discretion to respond to threats facing the electricity grid.  The Order falls well within his emergency authority.

(A)  The statute's text expansively defines what constitutes an "emergency" for purposes of Federal Power Act section 202(c).  It does not require imminence or an unexpected development.  Rather, the statute's text grants the Secretary discretion to determine that an emergency exists.  This expressly includes a sudden increase in demand, a shortage of generation facilities, or other causes.  Nor does the statute require any particular findings, while also facially permitting renewal in up to 90-day blocks so long as an emergency continues.  Congress thus recognized that emergencies can encompass threats of varying scope and duration.

Citing mere dictionary definitions, Petitioners claim that section 202(c) emergencies must be sudden, unexpected, and imminent.  But "a statutory term—even one defined in the statute—'may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.'"  *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (*UARG*) (quoting *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)).  Historic practice by the Federal Power Commission and the Department further confirms that section 202(c) emergencies can be foreseeable, and last years.  Yet Congress revised section 202 numerous times (including section 202(c)) in the face of such practice.  Congress never

17

added an "imminence" or "foreseeability" limitation—thereby ratifying the Federal Power Commission's long practice, and later the Department's, of using section 202(c) to address electricity shortages of longer duration and foreseeability. *See Jackson v. Modly*, 949 F.3d 763, 773 (D.C. Cir. 2020) (recognizing that amendments to "the specific provision at issue" reflect congressional acquiescence to existing interpretations). Petitioners' atextual definition flies in the face of statutory text, context, historic practice, ratification, and a broader understanding of the U.S. electricity industry that Congress wrote section 202(c) to regulate.

(B)  Under section 202(c), the Secretary is also granted broad discretion to use his "judgment" on what "will best meet the emergency and serve the public interest." The statute gives the Secretary many options. He can order "generation, delivery, interchange, or transmission of electric energy." And, notably, the statute lacks rigid procedural requirements often present in decisions subject to stringent judicial review. The Secretary need not even provide notice, hold a hearing, or prepare a report before issuances. Requiring a power plant to operate, that was otherwise slated for retirement, easily fits the bill. Contrary to Petitioners' contentions, the Secretary was not required to prepare any particular analysis, weigh alternatives, or to select the best theoretically possible emergency response.

2.  Substantial evidence supported the Order.

18

(A)  Far more than a "mere scintilla" of evidence supported the Secretary's findings.  *La. Pub. Serv. Comm'n v. FERC*, 20 F.4th 1, 7 (D.C. Cir. 2021) (citation omitted).  The evidence showed that electricity demand was rising, power plants that produce thousands of megawatts of energy are retiring, new generation sources are projected to be insufficient to offset power plant retirements and rising demand, MISO was at "elevated risk" for reliability problems, and higher than normal temperatures were expected.  The Secretary interpreted the totality of this evidence and applied his expertise to find that an emergency exists.

(B)  More than a "mere scintilla" of evidence also supported the Secretary's finding that continued Campbell plant operations would best meet the emergency and serve the public interest.  The Secretary acted reasonably in ordering a retiring power plant to remain open to meet the emergency shortage of generation and facilities, exacerbated by retirements and unexpected load growth.  The evidence supporting this determination included evidence of increasing demand, testimony to Congress, information about the risks posed by retiring power plants, planning data from MISO, and information about how reliably coal plants operate, particularly compared to weather-dependent sources like wind and solar.  Also, once the Campbell plant retired, it would have been difficult to bring back online (if not impossi-

ble).  Separate from his determination that the Campbell plant must continue oper-ating to meet the emergency, the Secretary reasonably ordered the Campbell plant to operate under "economic dispatch," where possible, to defray costs for ratepayers.

3.  The Court should uphold the Order and deny the petitions.  But even if there were some error, the Court should merely remand to the Department for further findings without vacatur, and not otherwise impair the agency's ability to issue sec-tion 202(c) orders to protect public health and safety.  In determining the appropriate equitable remedy, the Court considers disruptive consequences.  Here, the disruptive consequences of a ruling that constrains the Secretary's ability to protect public health and safety are self-evident.  Power outages cost lives, and electric grid relia-bility is facing a "five-alarm fire."  The Secretary must be able to use section 202(c) to protect public health and safety, particularly in anticipation of extreme weather events like the recent Winter Storm Fern and the ensuing, prolonged cold snap.  The equities thus do not warrant relief that would restrict the Secretary's flexible sec-tion 202(c) authority, including as to Campbell.

## STANDARD OF REVIEW

Questions of law are reviewed de novo.  *Nat'l Ass'n of Broadcasters v. FCC*, 147 F.4th 978, 991 (D.C. Cir. 2025).  When the Court reviews an order under the Federal Power Act, the Secretary's findings "as to the facts, if supported by substan-tial evidence, shall be conclusive."  16 U.S.C. § 825*l*(b).  This "low bar" is satisfied

20

so long as the agency provides "more than a mere scintilla" of evidence, *La. Pub. Serv. Comm'n*, 20 F.4th at 7 (citation omitted), and it "requires a very high degree of deference," *Island Architectural Woodwork, Inc. v. Nat'l Lab. Rels. Bd.*, 892 F.3d 362, 370 (D.C. Cir. 2018) (marks and citation omitted); *see also Nasrallah v. Barr*, 590 U.S. 573, 584 (2020) ("The standard of review is the substantial-evidence standard: The agency's 'findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" (quoting 8 U.S.C. § 1252(b)(4)(B))).

Under the Federal Power Act, the Secretary can "modify or set aside, in whole or in part, any finding or order made or issued by [him]" until "the record in a proceeding shall have been filed in the court of appeals." 16 U.S.C. § 825*l*(a). Courts thus rely heavily on the agencies' ability "to correct [their] own errors, which might obviate judicial review" or otherwise "facilitate[] judicial review" through the rare rehearing procedures in 16 U.S.C. section 825*l*. *Save Our Sebasticook v. FERC*, 431 F.3d 379, 381 (D.C. Cir. 2005).

## ARGUMENT

### I.      Section 202(c) grants broad authority to the Secretary to respond to threats facing the Nation's electric infrastructure.

Section 202(c) authorizes the Secretary to require changes to operation of electric generation facilities whenever he determines that an "emergency exists by

21

reason of . . . a shortage of electric energy or of facilities for the generation or transmission of electric energy . . . or other causes." 16 U.S.C. § 824a(c)(1). Text and context demonstrate that section 202(c) empowers the Secretary to alleviate both near-term and longer-term shortages of electric energy—even if an acute shortfall or blackout might not materialize until much later. Contrary to Petitioners' insistence (States' Br. 26; Organizations' Br. 24), the provision is not limited to short-term, sudden, unexpected, and imminent shortages of electricity.

Further, by its express terms, section 202(c) affords the Secretary broad latitude in determining when a statutory emergency exists and how to address it. The Secretary has conclusive discretion to use his "judgement" to respond as he deems "best," upon his "own motion" and "without notice, hearing, or report." 16 U.S.C. § 824a(c)(1). And the Secretary may expressly do so even if the chosen emergency response could conflict with environmental laws. *Id.* § 824a(c)(3).

Here, the Secretary determined that a statutory emergency "exists in portions of the Midwest region of the United States due to a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes." DOE1_1; DOE16_6. The emergency conditions existed throughout the 2025 summer and were projected to persist beyond that summer. DOE1_1-2; DOE16_14. To respond to the emergency, the Secretary directed Campbell to remain available to

operate in a manner appropriate given the past operation of the plant and the projected need for its availability.  DOE1_1-3; DOE16_16-18.  This Order falls within section 202(c)'s broad scope.

> **A.    Section 202(c) affords broad discretion to the Secretary to identify and address a wide array of emergencies to ensure the Nation has access to reliable electric power.**

Text, structure, statutory history, administrative history, and an informed understanding of the electricity sector all confirm that section 202(c) authorizes the Secretary to alleviate both near-term and longer-term shortages of electric energy and facilities.  Petitioners' contrary argument relies primarily on wooden dictionary definitions of "emergency" that ignore the full language Congress used in both section 202(c) and elsewhere in the statute.  And their other arguments are flatly inconsistent with statutory, regulatory, and industry context.

> **1.    Text and structure show that section 202(c) grants the Secretary discretion to address a wide array of "emergencies."**

**a.**  The text of section 202(c) facially uses "emergency" to include even a prolonged and foreseeable shortage of electric energy on the Nation's grid.  To begin, section 202(c) does not use the word "emergency" "in a vacuum." *Gundy v. United States*, 588 U.S. 128, 141 (2019) (Kagan, J., plurality op.) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).  It instead spells out what constitutes a section 202(c) "emergency" by capacious examples.  An emergency may

23

exist due to: "a shortage of electric energy"; "a sudden increase in the demand for electric energy"; a shortage "of facilities for the generation or transmission of electric energy"; a shortage "of fuel or water for generating facilities"; or for "other causes."  16 U.S.C. § 824a(c)(1).

Words must always be interpreted in the light of their surrounding context.  A "statutory term . . . may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.'"  *UARG*, 573 U.S. at 320.  For example, in *UARG*, the Supreme Court reviewed various Environmental Protection Agency policies that incorporated different understandings of what an "air pollutant" may mean under the Clean Air Act.  *Id.* at 316-22.  The Court nevertheless rejected the agency's attempt to graft a single, statute-wide interpretation of "air pollutant" into every instance of use in the Clean Air Act.  *Id.*  That same principle holds true here.  In section 202(c), the word "emergency" is defined and must be understood in the company it keeps.  That facially includes even a prolonged and foreseeable "shortage" on the Nation's grid.

This is consistent with the leading legal dictionary in 1935, when the statute was enacted.  "Emergency" was variously defined to include "a perplexing contingency or complication of circumstances," or—even more on point here—a "relatively permanent condition of insufficiency of service or of facilities resulting in

24

social disturbance or distress." Black's Law Dictionary 654 (3d ed. 1933). Regardless, Petitioners' citation to other dictionaries fails. For, even assuming that Petitioners' cherry-picked definitions track a "layman's conception of emergency," that lay conception cannot limit the discretion that Congress expressly delegated to the Secretary in section 202(c)'s "specific text." *Grand Trunk Corp. v. Transp. Sec. Admin.*, 153 F.4th 517, 523 (7th Cir. 2025). "[T]o define emergency, [the Court] must start not with intuition but with the specific text of the statute." *Id.*; *see* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 418 (2012) (cautioning that dictionaries may "define a word inadequately" and "without accounting for its semantic nuances as they may shift from context to context"). And here, section 202(c) defines "emergency" broadly to include any "shortage[s]" of electric power.

Other statutory context confirms Congress's determination that an "emergency" for purposes of section 202(c) is not limited to unexpected near-term shortfalls or blackouts.

*First*, the word "sudden" appears in section 202(c), but it modifies only one example of an "emergency"—"a sudden increase in the demand for electric energy." It does not modify the separate examples of "a shortage of electric energy *or* of facilities for the generation *or* transmission of electric energy, *or* of fuel or water for generating facilities, *or* other causes." 16 U.S.C. § 824a(c)(1) (emphasis added); *see*

25

*In re Espy*, 80 F.3d 501, 505 (D.C. Cir. 1996) ("[A] statute written in the disjunctive is generally construed as 'setting out separate and distinct alternatives.'" (citation omitted)). Plus, the word "sudden" neither precedes nor limits the term "emergency" itself. The fact that Congress chose to use "sudden" in one place but not another in the same provision means that a "shortage of electric energy" or facilities need not be sudden. *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 344 (2025) ("[I]t is generally presumed that Congress acts intentionally and purposely in [statutory language's] disparate inclusion or exclusion." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))); *State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*, 580 U.S. 26, 34 (2016) ("Congress' use of 'explicit language' in one provision 'cautions against inferring' the same limitation in another provision.").

*Second*, the word "temporary" appears in section 202(c), but it modifies only the "connections of facilities" and does not modify "a shortage of electric power." *See* 16 U.S.C. § 824a(b)-(c). Nor does the statute otherwise require Secretarial responses to be "temporary." *Contra* States' Br. 28; Organizations' Br. 25. Regardless, there can be no dispute that the Secretary's action here has a logical endpoint. Rather than purporting to require Campbell's operation in perpetuity, the Secretary "limited" the Order "in duration to align with the emergency circumstances." DOE1_2. The fact that the Secretary did not specify when the emergency will "end"

26

(States' Br. 16) does not support Petitioners' view that the Secretary is exceeding his emergency powers. Indefiniteness is not the same as permanence.

*Third*, section 202(c) expressly authorizes the Secretary to "renew or reissue" expired 90-day orders "for subsequent periods, . . . as the [Secretary] determines necessary to meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(4)(A). The statute also does not limit the Secretary to any specific number of renewals—leaving the question of how long an emergency lasts to the Secretary's discretion. *See id.* If the only "emergencies" covered by section 202(c) were fleeting, near-term shortages, Congress would not have authorized the Secretary to renew emergency orders for 90 days and beyond.

That makes sense. Emergencies, including those that strain the electric grid, are not necessarily short and fleeting. Just like "any war" (for which the Secretary can also act under section 202(c)), emergencies can be prolonged, without certain endpoints. In fact, Congress enacted section 202(c) partially in response to crises created by "[d]rought." S. Rep. No. 74-621 at 49 (1935); Organizations' Br. 26. Droughts are often not a sudden and fleeting occurrence with a definite endpoint, nor are they necessarily unexpected occurrences.

Other circuits have recognized that the term "emergency," as used in analogous contexts, is broad and can encompass both near-term and longer-term "looming

27

threats." *Grand Trunk Corp.*, 153 F.4th at 524-25 (describing how, "[f]or decades, . . . the federal government has declared emergencies that have lasted years," like in response to COVID-19 and to prolonged terrorism threats); *United States v. S. Ry. Co.*, 364 F.2d 86, 94 (5th Cir. 1966) (reasoning that emergencies can "exist over an extended period of time"); *United States v. S. Ry. Co.*, 380 F.2d 49, 55 n.17 (4th Cir. 1967) (rejecting "that an 'emergency' . . . is necessarily a problem which is sudden in origin or temporary in nature and that the [agency was] per se precluded from dealing with chronic problems").

**b.** Section 202(c) also sharply contrasts with two other provisions in the Federal Power Act that expressly require immediacy or imminence. The first is section 202(d), which refers to "any emergency requiring immediate action." 16 U.S.C. § 824a(d). That is notably different than section 202(c), which refers to an "emergency" and a "shortage of electric energy" or facilities, but excludes the phrase "requiring immediate action." Yet again, Congress is presumed to act intentionally when it "includes particular language in one section of a statute but omits it in another." *Russello*, 464 U.S. at 23 (citation omitted); *see also State Farm*, 580 U.S. at 34.

Next, Congress expressly included an imminence requirement in a different emergency provision of the Federal Power Act—section 215A—which concerns

28

"grid security emergencies."  16 U.S.C. § 824o-1(a)(7).  All grid security emergencies must be either "occurrence[s] or *imminent* danger[s]."  *Id.* (emphasis added).  Yet that imminence requirement is absent in section 202(c), which means Congress meant to *exclude* an imminence requirement under that provision.  *Russello*, 464 U.S. at 23; *State Farm*, 580 U.S. at 34.

Comparing sections 202(c) and 215A shows how Congress imbued the Secretary with broad discretion to make section 202(c) emergency determinations.  Unlike section 202(c), which refers generally to "emergenc[ies]" and contains a non-exhaustive list of examples, 16 U.S.C. § 824a(c)(1), section 215A is far more narrowly tailored.  It refers to a specific subset of emergencies—"grid security"—that can only exist under two circumstances that Congress expressly defined in *meticulous* detail.  The first arises due to (1) "a malicious act using electronic communication or an electromagnetic pulse" or (2) "a geomagnetic storm event."  *Id.* § 824o-1(a)(7)(A)(i).  Those occurrences must be capable of disrupting "electronic devices or communications networks" "that are essential to the reliability of critical electric infrastructure or of defense critical electric infrastructure."  *Id.*  And "disruption," "with significant adverse effects" to that infrastructure's reliability, must occur "as a result."  *Id.* § 824o-1(a)(7)(A)(ii).  The second is "a direct physical attack on critical electric infrastructure or on defense critical electric infrastructure" that causes similar "significant adverse effects."  *Id.* § 824o-1(a)(7)(B)(i)-(ii).

As this comparison shows, "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). And it opted for capacious terms in section 202(c) to enhance—not limit—the Secretary's discretion. Reinforcing the point, Congress specifically defined the terms used in section 215A's definition of a grid security emergency. 16 U.S.C. § 824o-1(a)(1)-(2), (4)-(6) (defining terms like "critical electric infrastructure," "defense critical electric infrastructure," "electromagnetic pulse," and "geomagnetic storm"). But, unlike in section 215A, Congress declined to define the terms used to describe a section 202(c) emergency—entrusting the Secretary to find when a "shortage of electric energy" or "other causes" create an emergency. *Id.* § 824a(c)(1).

Regardless, even if all section 202(c) emergencies were to categorically require an immediate response, that is not a basis to read "sudden, imminent, and unexpected" into the statute where it is not. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (explaining that courts may not "impos[e] limits on an agency's discretion that are not supported by the text"). An energy emergency can require immediate action even if there is no sudden, imminent, or unexpected electrical shortfall. Consider a hypothetical. Engineers identify a structural flaw in a bridge and say the bridge will collapse within five years if it continues to bear heavy trucks. The collapse is not sudden or imminent, and the

30

flaw has been identified; so the emergency is not unexpected. But it is folly to suggest immediate action is not required. Plans must be made, lanes closed, and repairs made that can require months or even years. Similarly here, an energy emergency can logically require immediate action (preventing a power plant from retiring in May) even if the projected shortfall is not imminent (it may not occur until the weather becomes worse in August) and may thereafter continue (into the winter and beyond).

In sum, section 202(c)'s text grants the Secretary discretion to require immediate action that will alleviate both near-term and longer-term "shortages" on the grid. The Secretary's determination that emergency conditions existed both due to a shortage that would cause unacceptable reliability risks in the near-term and expected to persist beyond the summer was well within the bounds of that statutory authority. DOE1_1-2; DOE16_14.

### 2. Electricity sector context confirms the Secretary's authority to address anticipated shortfalls.

The Secretary's interpretation is confirmed by considering it in the context of the electricity industry. Like the word "emergency," the Federal Power Act does not exist "in a vacuum." *Gundy*, 588 U.S. at 141 (citation omitted). Section 202(c) operates with the background of the electricity sector's protracted process for infrastructure development and its incorporation of long-term risk analysis. This is crucial to understanding what Congress understands an "emergency" due to "sudden

31

increase" in demand or a "shortage of electric energy" to mean, 16 U.S.C. § 824a(c)(1), because those terms must "be construed with 'reference to the actual context of the regulated industry in question," *Concert Inv., LLC v. Small Bus. Admin.*, 100 F.4th 215, 222 (D.C. Cir. 2024) (citation omitted); *see also In re Handy Andy Home Improvement Ctrs., Inc.*, 144 F.3d 1125, 1128 (7th Cir. 1998) ("[C]ontext consists not merely of other sentences but also of the real-world situation to which the language pertains."). This is particularly important given Congress's repeated modification of section 202 (including to subsection (c))—against a history of repeated use to respond to longer-term electricity shortages—without modifying the language at issue. *See United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979) ("[O]nce an agency's statutory construction has been 'fully brought to the attention of the public and the Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." (citation omitted)).

Planning and adding electricity generation capacity to the U.S. electric grid is a many-year process.[16] Even when there is agreement that additional electricity capacity is needed on the electric grid, there exists a severe lag to adding generation

---

[16] *Characteristics of Power Plants Seeking Transmission Interconnection as of the End of 2024*, Lawrence Berkeley National Laboratory, at 47 (Dec. 2025), https://perma.cc/2287-MSXU; *see also* Order No. 2023, 184 FERC ¶ 61,054 ¶¶ 37-38.

resources.  Some of this is caused by lengthy state, utility, and market operator resource planning processes.  Long waits for permitting and siting processes add further time, as well as long interconnection queues.  The typical project built in 2024 took 55 months from the interconnection request to commercial operations.[17]  Average construction lead time for dispatchable generation is three years for gas-combined cycle and four years for coal.[18]  These lengthy construction times do not take into account the permitting, interconnection, equipment procurement, and financing phases of project development.  When added to construction, this results in a duration of five to ten-plus years from project conception to commercial operation for a large, reliable, dispatchable unit of hundreds of megawatts.[19]

In this context, a need for electric energy may be "sudden" far in advance of the catastrophe.  *See* 16 U.S.C. § 824a(c)(1).  Indeed, section 202(c) even lists "tem-

---

[17] *See Characteristics of Power Plants Seeking Transmission Interconnection as of the End of 2024*, Lawrence Berkeley National Laboratory, at 47 (Dec. 2025), https://perma.cc/2287-MSXU.

[18] *See Cost and Performance Characteristics of New Generating Technologies, Annual Energy Outlook 2022*, U.S. Energy Information Administration, tbl. 1 (Mar. 2022), https://perma.cc/E8YQ-DFT4.

[19] *Characteristics of Power Plants Seeking Transmission Interconnection as of the End of 2024*, Lawrence Berkeley National Laboratory, at 47 (Dec. 2025), https://perma.cc/2287-MSXU; *see also Cost and Performance Characteristics of New Generating Technologies, Annual Energy Outlook 2022*, tbl. 1 (Mar. 2022), https://perma.cc/E8YQ-DFT4.

porary connections of facilities" and "generation, delivery, interchange, or transmission of electric energy" as possible solutions to an emergency, solutions that can take months or even years to accomplish. *Id.*

The Department has previously exercised its section 202(c) power accounting for such timelines. In 2017, for example, it directed Dominion Energy to operate certain coal-fired units pending construction of a new transmission line that would take 21 months.[20] The power to address an emergency necessarily includes the power to mitigate or ameliorate the worst-case scenario, and the "suddenness" of increased demand must be interpreted relative to the time it takes in the massive electricity sector to recognize a sustained demand increase and to intervene with appropriate supply.

Similarly, in the electric sector, the nationally-accepted tolerance for electricity outages is low. And rightly so, considering the importance of constantly available electricity in modern American life. Good utility practice and governing laws have incorporated overlapping layers of redundancy for assessing and delivering "grid reliability": specifically, "the provision of an adequate, secure, and stable flow of electricity as consumers may need it." *Reliability Explainer*, FERC, at 1 (Aug. 16, 2023), https://perma.cc/DH8Q-TULL. In fact, the Federal Power Act provides for FERC to designate an electric reliability organization to establish standards and

---

[20] Order No. 202-17-2 (available at https://perma.cc/KEW2-9WEK).

34

promote the reliable operation of the bulk-power system, 16 U.S.C. § 824o, and FERC did so, *N. Am. Elec. Reliability Corp.*, 116 FERC ¶ 61,062, *order on reh'g and compliance*, 117 FERC ¶ 61,126 (2006), *aff'd sub nom.*, *Alcoa Inc. v. FERC*, 564 F.3d 1342 (D.C. Cir. 2009). FERC certified the North American Electric Reliability Corporation as the electric reliability organization responsible for the development and enforcement of mandatory reliability standards.

A commonly used reference for reliability is the "1 in 10" rule—accepting a tolerance of an electricity outage no more than one event day every ten years.[21] This electric sector expectation for performance implies that a "shortage" within the meaning of section 202(c) cannot be limited to imminent catastrophic power losses. Within the electricity sector, a shortage is instead generally thought to exist whenever the resources on the grid are projected to be insufficient to prevent loss of load in the next five years.[22]

In short, increasing the amount of dispatchable electricity onto the grid in response to an electricity "shortage" is not a quick turn. And the Department's section 202(c) interpretation is logically consistent with a proper understanding of the industry regulated under the Federal Power Act. Indeed, interpreting section 202(c)

---

[21] *See, e.g.*, *Resource Adequacy Metrics and Criteria Roadmap*, MISO, at 3 (Dec. 2024), https://perma.cc/N6BB-AWT8.

[22] *2026 Long-Term Reliability Assessment*, North American Electric Reliability Corporation, at 12-13 (Jan. 2026), https://perma.cc/W2Y4-S59W.

to impose an "imminence," "foreseeability," or other nonexistent limitation would effectively neuter the Secretary's authority to respond to many of the textually enumerated "emergenc[ies]" that Congress obviously intends. *See* Scalia & Garner, Reading Law 63 (explaining how texts should be interpreted "to work rather than fail"); *see also Rawat v. Comm'r*, 108 F.4th 891, 898 (D.C. Cir. 2024) (noting the "familiar principle of statutory construction . . . that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute" (quoting *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006))).

### 3. The Secretary's interpretation—not Petitioners'—is consistent with historic section 202(c) practice.

The Secretary's interpretation of section 202(c) is entirely consistent with past practice. *First*, under the regulatory definition dating from at least 1981, an emergency can result from "[e]xtended periods of insufficient power supply as a result of inadequate planning or the failure to construct necessary facilities." 10 C.F.R. § 205.371. That's exactly what the Secretary responded to with the Campbell order. *See* DOE1_2 (describing how MISO's planning resource auction showed new capacity additions have proven insufficient to offset retirements).

*Second*, Petitioners' claim that the Secretary's action was "unprecedented" is spectacularly wrong. It is simply not true that all previous emergency orders under section 202(c) addressed shorter emergencies. States' Br. 29; Organizations' Br. 30.

36

Nor is it of any moment that the Secretary acted on his own initiative. The statute expressly authorizes the Secretary to issue section 202(c) orders *sua sponte* on his "own motion." 16 U.S.C. § 824a(c)(1). Petitioners' arguments also misrepresent the historical practice as to the length of prior emergency orders.

Congress first passed section 202(c) with the Federal Power Act of 1935. In the 90 years since, section 202(c) orders have ranged widely in duration. Some section 202(c) emergencies lasted for years, often indefinitely until the emergency subsided. Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789, 843-46 (2025) (listing orders issued by the Federal Power Commission). According to one compilation, the Federal Power Commission issued 28 section 202(c) orders (and one recommendation) between 1941 and 1972. *Id.* Of those 28, 11 orders applied to "indefinite" emergencies. *Id.* Two orders issued before World War II lasted for 13 years and one month. *Id.* at 845-46. Eight orders issued during World War II, six of which were either based on emergencies or emergencies plus the war (two were based only on war), and they lasted either indefinitely or for the "duration of" the emergency. *Id.* at 844-45. Two of those eight terminated after 12 years. *Id.* at 844; *see also* 3 F.P.C. 714 (May 21, 1942) (order determining "that an emergency exists," in addition to the war, and the order was not terminated until 12 years later— long after war ended). Seven other orders lasted between one month and eight years.

37

Rolsma, 57 Conn. L. Rev. at 843-45; *see, e.g.*, 6 F.P.C. 320 (Jan. 14, 1947) (order requiring interconnection across a five-state region and lasting for eight years).

Petitioners ignore this history of the Federal Power Act. This is ironic, given that they cite the importance of "contemporaneous" interpretations. Organizations' Br. 30 (citation omitted). The State Petitioners pretend as if all usage of section 202(c) before the Department's "founding in 1977" does not exist. States' Br. 29. But the Department succeeded to the same section 202(c) authority that was used extensively before 1977. Because the operative language was passed in 1935, it would be cherry-picking to ignore its repeated use between 1935 and 1977.

Even after Congress transferred section 202(c) authority to the Department, the Secretary continued to issue orders of varying duration. According to one compilation of 19 section 202(c) orders that the Department issued between 2000 and 2024, the orders ranged in duration from 2 days to 21 months. Rolsma, 57 Conn. L. Rev. at 839-42. This is also not the first time the Secretary temporarily prevented the impending shutdown of a plant in response to an emergency shortage of energy and generation facilities. In December 2005, a section 202(c) order required continued operation of the Mirant Corporation's Potomac River generating station. Order No. 202-05-3.[23] The emergency lasted *for over a year-and-a-half. See* Order

---

[23] The initial Mirant order is available at: https://perma.cc/MQJ3-TQKC. The agency docket is available at: https://www.energy.gov/oe/docket-eo-05-01-documents-concerning-2005-2007-emergency-reliability-orders-concerning-potomac.

Nos. 202-06-2, 202-07-1, 202-07-2, 202-07-3.  The Secretary acted not in response to any near-term or imminent shortfall that Petitioners insist is required, but to "ensure a reliable supply of electric energy" for the District of Columbia.  Order No. 202-05-3 at 8; *see id.* at 4 (noting that absent the plant's capacity, a blackout would occur *if* certain transmission lines failed).

There are other examples.  In June 2017, the Secretary issued Order No. 202-17-2 regarding Dominion Energy's Yorktown Units in Virginia.  Notwithstanding Sierra Club's objections that an emergency must relate to a sudden or unexpected shortfall, *see* Sierra Club Mot. to Intervene & Pet. for Reh'g at 4-9 (July 13, 2017), https://perma.cc/3ST3-VN7C, the Department extended the initial order six times, Rolsma, 57 Conn. L. Rev. at 819-20.[24]

Notably, many of the prolonged section 202(c) orders were issued before Congress amended the statute to require more examination of potential conflicts with environmental laws after 90 days.[25]  But that is no help to Petitioners.  Congress also provided that the agency may "renew or reissue" orders causing a conflict with environmental laws.  16 U.S.C. § 824a(c)(4)(A).  And Congress did nothing to limit

---

[24] The docket for the Yorktown orders is available at: https://www.energy.gov/oe/articles/federal-power-act-section-202c-pjm-interconnection-dominion-energy-virginia-2017.

[25] Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94, § 61002, 129 Stat. 1312, 1772-73 (2015) (amending section 202(c)).

the total number of renewals that could issue.  Nor did Congress amend or constrain the meaning of "emergency"—notwithstanding the past, longstanding, consistent practice (by two different agencies) of using section 202(c) orders to mitigate long-lasting electricity shortages.  And that established practice included the Secretary's use of section 202(c) to prevent a plant's impending shutdown to protect reliability for over a year, although the blackout risk was contingent on other events and not imminent.

By amending portions of the broader statute—while leaving the operative "emergency" language of section 202(c) untouched—Congress reaffirmed and ratified the Federal Power Commission's and the Secretary's interpretation of emergency, and consistent exercise of such authority, throughout the long history of the Federal Power Act.  *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (noting "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change"); *Nat'l Lead Co. v. United States*, 252 U.S. 140, 147 (1920) (similarly explaining "Congress is presumed to have legislated with knowledge of such an established usage of an executive department of the government"); H.R. Rep. No. 113-86 at 5-6 (2013) (legislative history showing Congress's awareness of Mirant orders before 2015 amendments).

This is most-certainly *not* a case where the Secretary is claiming "to discover in a long-extant statute an unheralded power representing a transformative expansion" of his authority. States' Br. 30-31 (quoting *West Virginia v. EPA*, 597 U.S. 697, 724-25 (2022)). The Secretary (and Federal Power Commission before him) "previously claimed the authority at issue" for decades in numerous materially similar actions. *Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 617 (5th Cir. 2024). Petitioners cannot credibly argue that the Order is "transformative." Nor is this a case where the agency "lacks 'expertise'" in the relevant field. *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 728 (10th Cir. 2024) (citations omitted); *cf. Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 199 (D.C. Cir. 2017) (noting the Department's "expertise in energy markets").

The Secretary is also not asserting some new emergency authority on the assumption that he is unbound by section 202(c)'s text, as Petitioners contend. States' Br. 32; Organizations' Br. 31. The Department acknowledges that section 202(c)'s emergency-determination requirement is a precondition to acting under that provision. *Contra* Organizations' Br. 31 (baselessly asserting that "the Department claims [s]ection 202(c) does not place any meaningful limits on its authority"). The Department's position is simply that section 202(c) "delegates authority" to the Sec-

41

retary to make emergency determinations based on a reasonably foreseeable short-age, though it may not be imminent; "courts must respect" that express statutory delegation. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024).

### 4.   Petitioners' remaining arguments fail.

Other than their misguided arguments based on out-of-context dictionary definitions, and their misadventure into the history of section 202(c) orders, Petitioners have very little to show for their position that "long term" inadequacy of electric generation and facilities cannot be an "emergency" for purposes of section 202(c). States' Br. 25-37; Organizations' Br. 22-33.

**a.**  Petitioners invoke two Federal Power Commission cases as purportedly discussing the limits of an emergency. States' Br. 28-29 & Organizations' Br. 26 (citing *Richmond Power & Light v. FERC*, 574 F.2d 610 (D.C. Cir. 1978); *Otter Tail Power Co. v. Fed. Power Comm'n*, 429 F.2d 232 (8th Cir. 1970)). But these are inapposite. Neither addressed an argument that the Secretary (or the Federal Power Commission) exceeded emergency powers. Their limited discussion of section 202(c) simply reiterated the language of the statute. The holdings and analyses of the cited cases are irrelevant to the question of whether the Secretary acted within his statutory authority at Campbell.

In *Richmond Power*, the question was instead whether the Federal Power Commission reasonably exercised its discretion "in *declin*[*ing*] to declare an emergency" under section 202(c)—not whether the Order that was actually issued was within the Secretary's authority.  574 F.2d at 614 (emphasis added).  As such, *Richmond Power* did not define the outer limits of "emergency" but simply held that the Federal Power Commission did not abuse its discretion in not declaring an emergency based on different factual circumstances more than 50 years ago.  *Otter Tail* is equally off the mark, involving no exercise of authority under section 202(c).  Rather, the Secretary issued an order in that case "pursuant to [section] 202(b)" of the Federal Power Act, and the petitioner asserted that the "case [was] not governed by [section] 202(b)."  429 F.2d at 233.  The issue here is the Secretary's authority under section 202(c), not section 202(b).  More fundamentally, and like *Richmond Power*, *Otter Tail* did not purport to define the outer limits of "emergency," noting only potential circumstances that might give rise to one.  *See id*. at 234

**b.**  Petitioners next make three attempts to claim that statutory context and structure support their reading.  None withstands scrutiny.

*First*, Petitioners argue the statute's structure entrusts long-term resource adequacy to states.  By preventing Campbell's retirement to mitigate the shortage identified, the Secretary allegedly upset state authority over long-term grid planning.

States' Br. 1, 16, 36-37; Organizations' Br. 18, 29.  But the Federal Power Act expressly provides that state jurisdiction yields during energy emergencies.  *See* 16 U.S.C. § 824a(c); *First Iowa Hydro-Elec. Co-op. v. Fed. Power Comm'n*, 328 U.S. 152, 168 (1946) ("[W]here the Federal Government supersedes the state government there is no suggestion that the two agencies both shall have final authority [under the Federal Power Act].").  Under the Federal Power Act, states retain jurisdiction over generation facilities "except as specifically provided" in subchapter two.  16 U.S.C. § 824(b)(1).  And subchapter two contains section 202(c).  As discussed, this provision expressly provides broad federal authority to require certain actions during emergencies—including orders regarding "generation" otherwise ordinarily left to the states.  In other words, the provision's text expressly authorizes the Secretary to intervene into what Petitioners refer to as resource adequacy.  One enumerated emergency condition authorized for mitigation is a "*shortage*" of resources like generation and facilities.  *Id.* § 824a(c)(1) (emphasis added).

Without textual explanation, Petitioners claim that the Secretary's authority under section 202(c) evaporates when the threatened inadequacies are long term.  It cannot be the case that Congress wanted the Secretary to sit idly by when the emergency conditions are dire enough to persist for years.  This is an industry where generation planning occurs on decadal timelines—with shortages projected in the

44

next five years being particularly concerning.[26]  It often takes around five years or more to bring new generation online through traditional state and federal regulatory procedures.[27]  The inadequacy of state and regional planning—permitting retirements like Campbell's when that generation is need for future resource adequacy—contributed to the MISO emergency.  The Secretary cannot assume that states can or will fix longer-term problems themselves, and section 202(c) does not require him to do so.

*Second*, despite Petitioners' "three-tiered" framework theory (Organizations' Br. 26-29), nothing in the structure of the individual subsections of section 202 implies limitations of the Secretary's section 202(c) emergency power.  Subsection (a) merely continues to facilitate the regional pooling that existed prior to the statute's adoption.  Subsection (b) authorizes the ordering of interconnection upon request.[28]  Beyond that, the provisions speak to temporary connections during emergencies by persons outside federal jurisdiction, 16 U.S.C. § 824a(d); transmitting energy to foreign countries, *id.* § 824a(e); wholesale transmission or sale of electricity, *id.*

---

[26] *See, e.g., 2026 Long-term Reliability Assessment,* North American Electric Reliability Corporation, at 7-8, 12-13 (Jan. 2026), https://perma.cc/5T2H-6HSH (focusing on anticipated resource shortages beginning in Summer 2028 in MISO).

[27] *See Characteristics of Power Plants Seeking Transmission Interconnection as of the End of 2024*, Lawrence Berkeley National Laboratory, at 4 (Dec. 2025), https://perma.cc/2287-MSXU.

[28] Pursuant to 42 U.S.C. section 7172(a)(1)(B)'s delegation, FERC exercises this authority.

§ 824a(f); and rulemakings to ensure continuity of service, *id.* § 824a(g).  Subsection (c) plainly authorizes federal emergency action in response to "insufficient generation," Organizations' Br. 26—specifically, a "shortage of electric energy or of facilities for the generation . . . of electric energy" like the shortage found here.  16 U.S.C. § 824a(c)(1); *see* DOE1_1.  Subsections (a) and (b), like subsection (c), contain no "specific and limited enumeration" that distinguishes between short- and long-term resource adequacy.  *Contra* Organizations' Br. 27 (citation omitted).  The words "short term" and "long term" appear nowhere in section 202.

*Third*, Petitioners oddly contend that Federal Power Act section 215 supports their argument.  Organizations' Br. 26.  They read section 215 as "authoriz[ing] the government to establish mandatory, nationwide reliability standards for the grid," suggesting that the Secretary therefore cannot act to address reliability under section 202(c).  *Id.* at 28.  Petitioners' reliance on section 215 is a red herring.  Nothing in the Secretary's emergency order purports to adopt a nationwide reliability standard or to enlarge a facility or to construct new generation capacity.  *See* 16 U.S.C. § 824o(a)(3) (defining "reliability standard" to provide for "reliable operation of the bulk-power system," but the term "does not include any requirement to enlarge such facilities or to construct new transmission capacity or generation capacity").  It is a case-specific order directing a power plant to remain available to operate because of

conditions meeting the express statutory meaning of "emergency." DOE1; DOE16_10-14.

### B. The Secretary may temporarily require that a retiring plant remain available to operate in response to an emergency.

Petitioners also try to pervert the statutory text to require that the Secretary divine and select *the* "best" possible response to any energy emergency. States' Br. 51-54; Organizations' Br. 42-45. But, in section 202(c), Congress uses the word "best" to convey broad discretion to the "judgment" of the Secretary. The Secretary's decision about what is "best" is thus to be free from searching judicial review and second guessing. Petitioners' interpretation is again refuted by the text, context, and policies of the statute. By departing from the plain text of the statute, Petitioners invite this Court to repeat the mistake of *Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.* and impose atextual procedural standards not expressly required by Congress. 435 U.S. 519, 557-58 (1978); *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 181-82 (2025) (cautioning courts must be at their "most deferential" when evaluating agency exercises of discretion that require "speculative assessments or predictive or scientific judgments" (citation omitted)).

The text of section 202(c) entrusts to the Secretary's "judgment" the choice of what response "will best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(1). Such express delegation to the "judgment" of the Secretary "fairly exudes deference" and agency discretion. *Webster v. Doe*, 486 U.S. 592, 600

47

(1988); *see also Trump v. Hawaii*, 585 U.S. 667, 684 (2018) (statutory language "as he shall deem necessary" "exude[d] deference"); *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1513 (D.C. Cir. 1989) (similar). Section 202(c) does not, by contrast, state that the Secretary must choose *the* best *possible* means of meeting the emergency; nor does it require that he analyze all (or even any other) potential alternatives. *See* 16 U.S.C. § 824a(c)(1) (providing that the Secretary need not prepare a "report"). What response will best serve the public interest is a matter of the Secretary's "judgment," which only requires substantial evidence. *Id.*

Notably, the text of section 202(c) does not spell out any particular factors the Secretary must consider in determining what "will best" serve the "public interest." And "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency" and broad discretion. *Fed. Power Comm'n v. Transcont'l Gas Pipe Line Corp.*, 365 U.S. 1, 29 (1961).

Statutory context likewise confirms congressional intent to grant the Secretary deference to decide what will best serve, rather than constrain the Secretary to divining "the best" response. *Contra* Organizations' Br. 43. Congress grants the Secretary numerous tools in section 202(c) for emergency responses. He has "authority" to "require by order" "temporary connections of facilities" and "generation, delivery, interchange, or transmission of electric energy." 16 U.S.C. § 824a(c)(1). The

48

Secretary may then choose what "in [his] judgment will best meet the emergency and serve the public interest." *Id.* Such a broad grant of tools and discretion would plainly include ordering a retiring plant remain to available to "generat[e]" power to mitigate the shortage. *Id.* (providing that the Secretary "*shall* have authority" to require "generation" (emphasis added)); DOE1_2.

Petitioners' contrary view is also inconsistent with the policies underlying section 202(c). Specifically, Petitioners' interpretation—and the judicial second-guessing it would unleash—would significantly impede its use as an emergency provision. If the Secretary must analyze potential alternatives to determine what possible measure is actually "the" best, he could be constrained to act when time is of the essence. Yet, nowhere does section 202(c) require that the Secretary engage in the National Environmental Policy Act-like comparison of alternatives that Petitioners suggest is required. *Compare* 16 U.S.C. § 824a(c)(1) (section 202(c), giving the Secretary "authority, either upon [his] own motion or upon complaint, with or without notice, hearing, or report"), *with* 42 U.S.C. § 4332(2)(C) (National Environmental Policy Act, requiring agency to prepare "a detailed statement" on, inter alia, "a reasonable range of alternatives").

Furthermore, consider the broader context of section 202(c). It does not include the procedural prerequisites and articulated predicate findings often demanded in other agency statutes. Nor is any "notice, hearing, or report" required. 16 U.S.C.

49

§ 824a(c)(1). This "imbue[s] [the Secretary] with significant discretion" to deter-mine how threats are best resolved. *Grand Trunk Corp.*, 153 F.4th at 523-24 (inter-preting a similarly structured statute that grants emergency authority to an agency); *see Bd. of Trade of City of Chi. v. Commodity Futures Trading Comm'n*, 605 F.2d 1016, 1023 (7th Cir. 1979) ("The fact that the Commission is authorized by Congress to take emergency action is, in itself, a suggestion of Congressional intent to commit such actions to the Commission's discretion.").

Interpreting section 202(c) as delegating authority to determine what response is "best" does not write "best meet" out of the statute, as Petitioners contend. States' Br. 54. There is no surplusage created by reading the phrase "in [the Secretary's] judgment will best meet" as entrusting the question of what's "best" to the Secre-tary's judgment. 16 U.S.C. § 824a(c)(1). By insisting that the Secretary must weigh alternatives, it is Petitioners who create surplusage. They read "in [the Secretary's] judgment" out of section 202(c). *Id.*

Petitioners' cases also fail to support their argument that "best" here requires an analysis of alternatives and explanation for why an emergency response was the most advantageous. *See* States' Br. 53; Organizations' Br. 43. They cite *Entergy Corp. v. Riverkeeper, Inc.*, where the Clean Water Act mandated reliance on "*the best technology available*" when adopting certain regulatory standards. 556 U.S. 208, 218 (2009) (emphasis added) (quoting 33 U.S.C. § 1326(b)). But section 202(c)

does not require "the" best-emergency-response-available.  It delegates to the "judgment" of the Secretary the discretion to determine what "will best meet the emergency."  16 U.S.C. § 824a(c)(1).  In misreading the statute, Petitioners ask this Court to commit an error the Supreme Court has repeatedly warned against:  "courts lack authority 'to impose upon [an] agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good.'"  *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 102 (2015) (quoting *Vt. Yankee*, 435 U.S. at 549).

In sum, section 202(c) is a provision facially granting the Secretary broad discretion to exercise technical judgment and expertise to respond to emergencies in the electric power sector.  It expressly disclaims the Secretary's obligation to jump through the procedural hurdles Congress often imposes in other statutes.  Petitioners' strained reading of "best"—and the procedural hurdles Petitioners thereby read into the authority of section 202(c)—cannot be reconciled with the text, context, policies, and case law.

## II.    Substantial evidence supported the Order.

With the best reading of the statute fully endorsing the Secretary's authority to issue the Campbell order, it was likewise premised on substantial evidence.  The Secretary had far more than "a mere scintilla" of support for (A) the Secretary's determination that an emergency exists and (B) his determination that continued operations of the Campbell plant would best meet the emergency.  That evidence easily

51

"satisfies the low bar of the substantial evidence standard." *La. Pub. Serv. Comm'n*, 20 F.4th at 7 (citation omitted); *see S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54-55 (D.C. Cir. 2014) (Federal Power Act case, explaining that "review of [FERC's] determinations is particularly deferential because such matters are either fairly technical or 'involve policy judgments that lie at the core of the regulatory mission'" (citation omitted)); *Consol. Edison Co. of N.Y. v. Fed. Power Comm'n*, 511 F.2d 372, 382-83 (D.C. Cir. 1974) (viewing agency justification through lens of severe time restraints imposed by emergency conditions). The Secretary's factual findings are thus "conclusive," 16 U.S.C. § 825*l*(b), and not (under this statute) to be weighed or judged against other evidence Petitioners argued or presented below.

## A.    The facts found show that the identified emergency exists.

Because the Secretary can act under section 202(c) "whenever [he] determines that an emergency exists," 16 U.S.C. § 824a(c)(1), emergency findings are entitled to strong deference. *See Kreis*, 866 F.2d at 1513 (distinguishing between statutory authorizations based on "the objective existence of certain conditions" and those based on a "Secretary's *determination* that such conditions are present," the latter of which "fairly exudes deference" (emphasis added)). Here, the Secretary found that an emergency exists for several reasons: a "shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes." DOE1_1. Ample evidence supported his finding: (1) electricity demand is increasing, (2) power

52

plants that produce thousands of megawatts of energy had retired, (3) planning information from MISO showed that new electricity generation sources were insufficient to offset retirements and rising demand, (4) MISO was at an "elevated risk" for reliability problems, and (5) higher than normal temperatures were projected. DOE1_1-2.

Petitioners improperly look at each piece of evidence in isolation. They try to claim that each one standing alone does not establish an emergency. *E.g.*, Organizations' Br. 33-40. But the Secretary was entitled to consider the totality of the circumstances in finding an emergency. *See PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) ("[W]e ourselves use a totality test to make a variety of fact-intensive determinations."); *see also Comm. to Save Lake Murray v. Fed. Power Comm'n*, 515 F.2d 379, 384 (D.C. Cir. 1975) (holding, in a Federal Power Act case, that "[t]he totality of the record indicates that the order of the Commission is supported by 'substantial evidence'"). This Court's review must focus on the full evidentiary picture before the Secretary.

***Demand is rapidly rising.*** First, the Secretary issued the Order because electricity demand is increasing. DOE1_1; DOE16_11. The record contains substantial evidence supporting that suddenly rising demand (particularly when considered against the decadal scale of the electric power sector) is contributing to emergency

conditions within the MISO region. The North American Electric Reliability Corporation 2025 Summer Reliability Assessment observed that "[l]oad growth is driving higher peak demand forecasts and contributing to resource and transmission adequacy challenges in many areas." DOE5_7. MISO is not unique in that regard. In January 2025, the President declared a national energy emergency because the Nation's generation capacity is "far too inadequate to meet our Nation's needs." DOE19_1. In the *Strengthening the Reliability and Security of the United States Electric Grid* Executive Order, the President noted the "surge in electricity demand driven by rapid technological advancements, including the expansion of artificial-intelligence data centers and an increase in domestic manufacturing." DOE20_1. He found that there is "strain" on the Nation's grid and emphasized the risks of the "[l]ack of reliability in the electric grid." *Id.*

In March 2025, MISO's Senior Vice President of Planning and Operations, Jennifer Curran, testified before Congress that "the MISO region faces resource adequacy and reliability challenges due to . . . growing pressures from extreme weather[] and rapid load growth." DOE16_13. Curran explained that electricity demand was growing because of continued electrification (e.g., converting commercial fleet and other vehicles to electricity, drawing power from the grid), manufacturing, and extreme weather. DOE21_2. Notably, she testified that the demand from "energy-hungry data centers" was "unexpected." DOE21_6. MISO's electric load

54

was now projected to grow by 60 percent over the next 20 years, "threatening to outpace new electric resource additions if urgent action isn't taken." *Id.*

As this testimony shows, even if Petitioners are correct that a section 202(c) emergency must be an "unforeseen occurrence" (and they are not), *see* States' Br. 26 & Organizations' Br. 24, there is record evidence that rising demand was sudden and unexpected. Ironically, despite their insistence that an emergency must be created by unforeseen circumstances, Petitioners assert that there must be no emergency here because state and regional planners foresaw no emergency. *See* States' Br. 33; Organizations' Br. 34. The record shows that their planning proved inadequate. *See* DOE16_7 (explaining that the Secretary's emergency determination is consistent with 10 C.F.R. section 205.371's example of "inadequate planning").

Ignoring that substantial evidence makes the Secretary's findings "conclusive," 16 U.S.C. § 825*l*(b), Petitioners attempt to quibble with Curran's testimony and dispute its veracity. They instead focus on comments that MISO submitted to FERC for a conference in May 2025. States' Br. 43 & Organizations' Br. 41 (citing DOE9_174). But the May 2025 MISO comments align with Curran's testimony regarding increasing demand. For example, the May 2025 MISO statement to FERC provides that "we expect much stronger growth from continued electrification efforts, a resurgence in manufacturing, and an unexpected demand for energy hungry data centers to support artificial intelligence." DOE9_168. MISO further stated that

55

increased demand "threatens to outpace new electric resource additions if urgent action isn't taken." *Id.* That is exactly what Curran testified. DOE21_6.

In any event, even if Petitioners' preferred comments did not align with Curran's testimony (they do), Curran's testimony would still provide substantial evidence—obviously more than a scintilla—to support upholding the Order. "The question . . . is not whether record evidence supports [Petitioners'] version of events, but whether it supports [the agency]'s." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 368 (D.C. Cir. 2003). That is consistent with the general principle that "[b]alancing conflicting evidence is the agency's job, not [a court's]." *Pub. Emps. for Env't Resp. v. EPA*, 77 F.4th 899, 918 (D.C. Cir. 2023) (citation omitted); *see also Constellation Energy Commodities Grp., Inc. v. FERC*, 457 F.3d 14, 24 (D.C. Cir. 2006) ("[I]t is within the scope of the agency's expertise to make . . . a prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view." (citation omitted)).

Petitioners also contend that "long-term" demand growth cannot support the Secretary's emergency determination. Organizations' Br. 36. But this is a rehash of their mistaken interpretation of section 202(c), which does not distinguish between near-term and longer-term emergencies. *See* 16 U.S.C. § 824a(c)(1). It would be nonsense for the agency to ignore evidence of increasing demand simply because

those increases will persist long term and indefinitely. Regardless, even accepting Petitioners' interpretation, evidence that demand will increase during and beyond a near-term period is obviously relevant to whether there is an impending emergency.

***Generation needed to meet rising demand is being lost.*** Second, since 2020, about 2,700 megawatts of coal-fired generating capacity had been retired in Michigan and no new coal-fired facilities were planned. DOE1_1; DOE3_13. Nuclear power plants in Michigan had also been decommissioned. The Big Rock Point Nuclear Plant shut down in 1997, and the Palisades Nuclear Plant closed in 2022. DOE3_13. Curran, the MISO official, stressed both that MISO's generator interconnection queue cycles currently "are taking three to four years," DOE21_8, and that "accelerated early retirement" of existing generation sources contributed to reliability challenges. DOE21_2. Here, Campbell was about to retire when the Secretary issued the Order. DOE1_1. And it was retiring early—15 years before the end of its scheduled design life. DOE2_1. It is difficult to bring generation facilities back online after they retire, so Campbell's retirement would have accelerated the shortage of facilities available to meet rising demand, thus exacerbating the energy emergency. DOE16_7. That is why the Secretary determined that, if he "had waited to act until the conditions identified by [the North American Electric Reliability Corporation] arose, it would have been too late for him to take any effective action." DOE16_11.

Coal-plant retirements contribute to the emergency situation because, on top of the lost power generation capacity, coal is especially reliable. Weather-dependent resources like wind and solar "often do not have the 24/7 availability, flexibility, and duration attributes of the power plants they are replacing." DOE21_2, 5; *see also* DOE21_7 ("A growing reliability risk is that the rapid retirement of existing coal and gas power plants threatens to outpace the ability of new resources with the necessary operational characteristics to replace them."). Petitioners note the planned replacements for Campbell included gas- and oil-fired plants, plus solar generation. Organizations' Br. 13. That is, again, cherry-picking. Even though some of the Campbell plant's replacement megawatts would not be weather-dependent, the Secretary's emergency determination was based on conditions throughout MISO, with the shortage projected to continue (indeed, it did continue) for some time. DOE5_16; DOE16_11-12. Most new capacity across MISO has been weather-dependent solar power. DOE4_6.

To illustrate how these new capacity sources are insufficient to make up for lost coal generation, MISO has experienced 11 wind droughts since 2020. These are extended periods with extremely low wind output, including one that lasted 40 consecutive hours. DOE21_5. And solar output is "dramatically reduced" in overcast or cloudy weather and is "virtually zero" overnight. *Id.* Even though wind and solar electricity generation were growing, "the actual amount of electricity available to

the system during critical hours could decline by about 32 [gigawatts]" because of wind and solar's limitations. *Id.* According to Curran, these factors—specifically, increased demand plus power plant retirements and more extreme weather—"significantly increase[] operational challenges, uncertainty, and reliability risks." DOE21_6.

Petitioners cite a Department report, States' Br. 45-46, to dispute the existence of an emergency. But the report does not support Petitioners' position. Properly read, it only confirms the Secretary's factual finding. The report emphasizes the danger of plant retirements, saying that the "status quo of more generation retirements and less dependable replacement generation is" inconsistent with "continued grid reliability (ensuring 'resource adequacy')." States Addendum ADD15.

***Lost reliable generation is not being adequately replaced.*** Third, planning information from MISO showed that new electricity generation sources were insufficient to offset the retirements and rising demand. MISO conducts an auction every year where generators sell capacity, which is the ability to produce electricity when necessary. *Entergy Ark., LLC v. FERC*, 134 F.4th 576, 579 (D.C. Cir. 2025). The auction provides important information to show whether there will be enough power available in the coming year.

MISO's auction results for planning year 2025 to 2026 showed that "new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources."  DOE1_2; DOE4_6.  The results showed that new capacity (i.e., new power generation sources) did not keep pace with decreases caused by plant retirements and other factors like reduced accreditation.  DOE4_2.  "Accreditation" is a mechanism for quantifying a power generation source's ability to contribute to grid reliability during high-risk periods.  So, for example, if a gas plant had a history of forced outages coincident with peak demand, then its accreditation value would decrease.  Accreditation "is the only value that can be relied upon to ensure that energy will be provided by a resource during the periods of greatest need."  DOE9_173.  Wind and solar have "significantly lower" accreditation values than conventional power plants (like coal) because they are weather dependent.  DOE9_180-81.

For the auction, MISO had a reserve margin target, which is the minimum amount of unused electricity generation capacity (above expected peak demand) that the grid operator must maintain to ensure reliability.  The reserve margin acts as a buffer against stresses, such as generator failures or extreme weather.  MISO had a lower reserve margin target for 2025 to 2026 compared to the previous year's auction.  Yet even with the lower target, MISO's surplus above the reserve margin target still dropped 43 percent.  DOE4_2.  MISO's auction results "reinforce[d] the need

to increase capacity, as demand is expected to grow." *Id.* The Secretary's reasonable interpretation of this evidence is entitled to deference. *Animal Legal Def. Fund, Inc. v. Glickman*, 204 F.3d 229, 235 (D.C. Cir. 2000) ("[C]ourts are most deferential of agency readings of scientific evidence.").

Petitioners disagree with the Secretary's finding, contending instead that MISO was able to procure sufficient capacity. Organizations' Br. 35-36. But the Secretary explained that, while MISO's auction results "demonstrated sufficient capacity, the summer months reflected the highest risk and a tighter supply-demand balance," which "reinforce[d] the need to increase capacity." DOE1_2 (marks omitted). The auction results supported the Secretary's interpretation, showing that MISO faced "[o]ngoing [c]hallenges," including "[a]ccelerating demand for electricity," "[r]apid pace of generation retirements," and "[m]ore frequent extreme weather." DOE4_7; *see also* DOE4_2 ("[P]ressure persists with reduced capacity surplus across the region."). And, in any event, interpreting MISO's auction results is a matter requiring technical expertise. Under the Federal Power Act, the Court must "defer to [the Department]'s technical decisionmaking within its expertise." *Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 557 (D.C. Cir. 2022) (citation omitted).

Petitioners emphasize that the Campbell plant closure had been planned, that MISO and the Michigan Public Service Commission had evaluated the plant's retirement, and that the Department "needed to explain why it reached a different conclusion than MISO and the [Michigan Public Service Commission]." States' Br. 33-34, 46; Organizations' Br. 34. This argument is specious. The Department can issue section 202(c) orders "with or without notice, hearing, or report." 16 U.S.C. § 824a(c)(1). It need not explain why its conclusions differed from Petitioners' preferred path. And, in any event, the Department "is entitled to rely upon its . . . forecasts, and to credit the views of its own experts . . . over [Petitioners'] contrary views." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 272 (D.C. Cir. 2002).

Relatedly, Petitioners point to how other generation sources were planned to replace Campbell. States' Br. 43; Organizations' Br. 1, 13-14. But merely alleging that Campbell's capacity "was replaced with equivalent resources" that had around the same capacity, States' Br. 43, does nothing to undermine the Secretary's finding that MISO generation resources were inadequate. Available capacity is only *one side of the equation*. The Secretary's emergency determination also relied on *increasing demand*. And Petitioners do not explain why merely replacing Campbell with "equivalent resources" was enough to keep up with rising demand absent Campbell's additional generating capacity. Also, as discussed above (pp. 58-59), solar generation (one of Campbell's replacement sources) is less reliable. DOE21_5.

Petitioners contend that the Secretary improperly found that "inadequate planning is *itself* an emergency." States' Br. 35-36.  But that was not what the Secretary found.  The emergency is "*a shortage of electric energy*" and "*a shortage of facilities*" that is partially due to a resource-planning failure, like the plan to retire Campbell.  DOE1_1 (emphasis added); *id.* at 2 (describing how MISO auction results showed new capacity additions have proven insufficient to offset retirements).

***Inadequate replacements cause regionwide reliability risks.***  Fourth, the failure to adequately replace lost generation in the face of rising demand has created unacceptable reliability risks.  DOE16_14.  Largely because of fossil fuel plant retirements and the operational limitations of wind and solar, the North American Electric Reliability Corporation determined that MISO was at an "elevated risk" of reliability problems.  DOE5_5.  The Corporation prepares reliability assessments to evaluate risks and potential grid performance during times of stress (such as severe weather).

The Order explained that the Corporation's summer 2025 reliability assessment showed that MISO was at an "elevated risk of operating reserve shortfalls during periods of high demand or low resource output."  DOE1_1.  In particular, the retirement of thermal generation capacity (such as coal, gas, or oil) "create[d] the potential for electricity supply shortfalls."  *Id.*  MISO was at "elevated risk" during summer 2025 because, among other reasons, 1,575 megawatts of natural gas and

coal generation had retired in MISO since the previous summer.  DOE5_5.  The "highest energy shortfall risk" was in August because of the decline in dispatchable generation (i.e., on-demand generation like gas or coal) and the increasing share of solar and wind generation resources.  *Id.*  In the late summer, solar output diminishes earlier in the day leaving only wind, which varies, and dispatchable generation sources, which have decreased, to meet demand.  *Id.*

Petitioners suggest that the "elevated risk" shown in the North American Electric Reliability Corporation's summer 2025 reliability assessment does not support the Secretary's emergency determination.  They note "elevated risk" is not the highest risk level.  States' Br. 38; Organizations' Br. 37.  That's irrelevant.  "Elevated risk" means there is potential for insufficient operating reserves in above-normal conditions projected in coming years.  DOE5_10.  The statute does not require the Secretary find an "extreme risk" or the highest risk level.  And Petitioners cannot dispute that the Corporation gave MISO an elevated-risk assessment.  DOE5_5; *see also* DOE5_16 ("Demand forecasts and resource data indicate that MISO is at elevated risk of operating reserve shortfalls during periods of high demand or low resource output.").  And, as the Secretary explained, the elevated-risk assessment "suggests that there will be significant strain on the grid in the MISO service area even in normal operating conditions."  DOE16_11.  "If the Secretary had waited to

act until the conditions identified by [the Corporation] arose, it would have been too late for him to take any effective action." *Id.*

It was thus appropriate for the Secretary to act when he did to ensure that the Campbell plant would remain available to address the threatened harms.

Petitioners curiously assert that there was no emergency because areas have been under "elevated risk" designations "without . . . ever experiencing blackouts" and no blackouts materialized in the summer. Organizations' Br. 2, 37-38. But the Secretary ordered Campbell to run to prevent blackouts. That it contributed to the reliability of MISO and preventing blackouts does not prove it was not needed. Plus, it would defy logic—and the objective of section 202(c)—if the Secretary could not take emergency action based on emergency conditions that create reliability risks, even if those risks have not yet materialized in the form of an outage or fail to materialize in the first 90 or 180 days. That is the very point of section 202(c) as "precautionary legislation." *Ethyl Corp. v. EPA*, 541 F.2d 1, 13 (D.C. Cir. 1976) (en banc); *see also id.* (discussing importance of agency action to "precede, and, optimally, prevent, the perceived threat"). Under section 202(c), "the Secretary was required to act before the shortage actually occurred." DOE16_12.

Petitioners minimize the risks, saying that the "elevated risk" designation means only 15 minutes of power outage a year. States' Br. 39. But the North American Electric Reliability Corporation was evaluating reliability risks on the bulk-

65

power system.  As noted above, the "bulk-power system" means the energy from interconnected electrical generation sources and the high-voltage transmission networks that comprise the electric grid.  Even a 15-minute outage on the bulk power system can cause widespread, dangerous consequences, including cascading system failures.  And those failures would unacceptably risk human life and public safety.

For example, on August 14, 2003, the United States and Canada experienced the largest electrical power blackout in North American history.  The massive power outage impacted approximately forty million people in eight U.S. states and ten million people in the Canadian province of Ontario and led to financial losses estimated at four to ten billion dollars.[29]  The loss of just one transmission line instantly triggered cascading failures throughout Northeastern U.S. and Canada.  "The cascade started at 4:06 p.m. and *spread in less than seven minutes* throughout an area of roughly 9,300 square miles."[30]  "More than 508 generating units at 265 power plants, including 22 nuclear power plants, shut down during the massive outage."[31]

---

[29] *System Failure Case Studies, Powerless*, National Aeronautics and Space Administration, at 1 (Dec. 2007), https://perma.cc/KCZ6-2HZG.

[30] *Id.* at 2 (emphasis added).

[31] *Id*. at 2-3; *see also Understanding the Cost of Power Interruptions to U.S. Electricity Consumers*, Lawrence Berkeley National Laboratory, at xii (Sept. 2004), https://perma.cc/GAA8-B6FB (noting the significance of short-term, momentary interruptions because "(more frequent) momentary power interruptions have a stronger impact on the total cost of interruptions than (less frequent) sustained interruptions, which last 5 minutes or more").

66

Petitioners downplay other risks, arguing that MISO and Consumers Energy had incorporated Campbell's retirement into their forecasts and had acquired other sources to replace it. States' Br. 8-9, 33-34. But the North American Electric Reliability Corporation gave MISO an elevated risk assessment *after* incorporating Consumers Energy's new plant into its analysis. DOE16_12. And, in any event, the question of how best to interpret and respond to the Corporation's risk assessments is a technical question on which the Court should defer to the Department. *See Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 26 (D.C. Cir. 2015) (explaining how the Court is "particularly reluctant to interfere with the agency's reasoned judgments when its orders involve complex scientific or technical questions" (marks and citation)).

In this same vein, Petitioners (Organizations' Br. 41) prefer the determinations of MISO's Independent Market Monitor (a third-party that evaluates MISO). At a FERC conference, this person did "not believe" a different reliability assessment (a long-term reliability assessment) from the North American Electric Reliability Corporation. DOE9_205. The MISO Independent Market Monitor asserted that "[t]he resource adequacy challenges and risks in MISO are not nearly daunting as portrayed by MISO planning reports or the [Corporation] 2024 Long-Term Reliability Assessment." DOE9_204.

Again, this is an improper argument, as "substantial evidence" supports the Secretary's finding, and that "finding shall be conclusive." 16 U.S.C. § 825*l*(b).

And even the MISO Independent Market Monitor acknowledged the conflicting opinions regarding resource adequacy, stating that "[f]ew topics in wholesale electricity markets have engendered the debate and controversy as have resource adequacy." DOE9_206. The Court "ha[s] then, at worst, the ordinary situation of controverted evidence, in which [the Court] must defer to the reasonable and conscientious interpretations of the agency." *N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.*, 878 F.3d 271, 288 (D.C. Cir. 2017) (citation omitted); *see Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts . . . ."). Petitioners' disagreement with the Secretary's weighing of evidence regarding regionwide reliability risks is legally irrelevant.

***Weather events exacerbate the grid's vulnerability.*** Fifth, in addition to weather-related evidence already discussed, projections from the National Oceanic and Atmospheric Administration showed that the Midwest had a 33 to 40 percent chance of above-normal summer temperatures in summer 2025. DOE16_12. In June 2025 (after the Secretary issued the Order but before he issued the rehearing response), the National Oceanic and Atmospheric Administration increased its summer estimates to be a 40 to 50 percent chance of above-normal temperatures. DOE16_12. The evidence thus indicated that the grid—already vulnerable thanks

68

to retirements of reliable energy and sharply rising demand—would be even more strained by summer heat.

In fact, while the Order was in effect—but before the Secretary's September rehearing response and "the record in [this] proceeding [was] filed in [the] court of appeals," 16 U.S.C. § 825*l*(a)—MISO issued dozens of energy emergency alerts to manage grid reliability.  DOE16_12-13; *see also* DOE17 (compilation of MISO alerts).  The alerts "confirm the ongoing emergency and sudden increased threats to energy reliability."  DOE16_12.  MISO has different types of alerts, including: Energy Emergency Alert Level 1, which means that all available generation sources are being used and MISO is at risk of having insufficient reserves; Energy Emergency Alert Level 2, which means that MISO cannot meet energy requirements and asks customers to voluntarily reduce energy usage; and Energy Emergency Alert Level 3, which means that MISO has implemented or is about to implement rotating blackouts.  DOE5_11.  On June 23, 2025, MISO issued an Energy Emergency Alert Level 1 because of "hot weather and high demand during a heat dome."  DOE16_12 (marks omitted); *see also* DOE17_7-8 (MISO Energy Emergency Alert Level 1 notice).

Petitioners contend that Energy Emergency Alert Level 1 "is the lowest level of [Energy Emergency Alert]" and it "indicates concern, not emergency."  States' Br. 44.  But it is an "Emergency Alert," not a "Concern Alert."  Petitioners cite, for

example, certain section 202(c) emergency orders where the Department allowed generation resources to exceed emissions limits only during Energy Emergency Alert Levels 2 or 3. *Id.* at 44 & n.8. But Congress did not limit the Department's discretion to identify emergencies by Energy Emergency Alert Levels. *See* 16 U.S.C. § 824a(c)(1). Petitioners also ignore that the Secretary's determination here was based on the totality of circumstances—with weather conditions that ultimately led to the emergency alerts being just one factor.[32]

Overall, Petitioners casually dismiss the threats the Secretary was combating. But the Secretary explained that he was trying to prevent potential power losses risking public health and safety. DOE1_2. The Court's review should be "particularly deferential" when the Department is involved in the "highly technical" arena of interpreting emergency alerts and their significance in protecting the public from the health and safety risks of power outages. *Transcont'l Gas Pipe Line Corp. v. FERC*, 518 F.3d 916, 920 (D.C. Cir. 2008) (citation omitted).

---

[32] Petitioners suggest that "[d]eclaring an energy shortfall crisis" based on Energy Emergency Alert Level 1 is "akin to rushing to the emergency room for a stubbed toe." Organizations' Br. 38-39. To the contrary, responding to Energy Emergency Alert Level 1 is akin to going to the emergency room when the chest pain you are having may be the start of a heart attack.

70

### B. Temporarily requiring Campbell to remain available will best meet the emergency and serves the public interest.

Upon finding that an emergency exists, the Secretary's judgment was that continued operations of the Campbell Plant would best meet the emergency and serve the public interest. DOE1_2; DOE16_15-18. Consumers Energy was "speed[ing] closure" of Campbell's three units, closing units one and two six years earlier than their scheduled design lives and closing unit three 15 years sooner than its scheduled design life. DOE2_1. Substantial evidence supported the Secretary's order that the Campbell plant should temporarily remain available to operate. In addition, the Secretary reasonably ordered economic dispatch of the plant.

### 1. Substantial evidence supported the Secretary's determination to "meet" the emergency by requiring the Campbell plant to operate.

It is plainly rational to temporarily keep a retiring power plant open to meet an emergency energy shortage that is exacerbated by retirements. Petitioners' arguments in response fail to overcome the deference that must be afforded to the Secretary's factual findings. *See La. Pub. Serv. Comm'n*, 20 F.4th at 7. The evidence supporting those findings included evidence of increasing demand, previous and scheduled power plant retirements, testimony to Congress from a MISO official, the North American Electric Reliability Corporation's assessment of the risks posed by retiring power plants, the MISO auction results regarding the impact of retiring power plants, and the operational characteristics of coal plants.

71

As for increasing demand, ensuring that Campbell can remain available to meet it during emergency conditions obviously meets the emergency. The inability to serve increased demand is itself an emergency, as national security and the U.S. economy depend on power for data centers and factories that produce jobs. DOE19_2. As discussed above, electricity demand was increasing, *e.g.*, DOE5_7, DOE21_6, yet thousands of megawatts of coal-fired generating capacity had been retired, DOE3_13. Curran testified to Congress that "accelerated early retirement" of existing electricity generation sources was contributing to electricity reliability challenges. DOE21_2. The North American Electric Reliability Corporation determined that MISO was at "elevated risk" during summer 2025 because 1,575 megawatts of gas and coal generation had retired in MISO since the previous summer. DOE5_5. And the MISO auction results showed that new generation sources were "insufficient" to offset the negative impacts of power plant retirements. DOE1_2; DOE4_2, 6. Curran also testified that reliability needs should "inform the pace of retirement of existing electric generating resources," and existing sources must not be "retired before adequate new electric generation is available." DOE21_2, 9.

Petitioners contend that Curran did not advocate for "undoing coal plant retirements." Organizations' Br. 40. But that is exactly what she did when she said that reliability needs should "inform the pace of retirement of existing electric generating resources," and existing sources must not be "retired before adequate new

72

electric generation is available." DOE21_2. More fundamentally, the factual basis for her testimony—that adequate generation must be available to ensure reliable energy before plants like Campbell are retired—is what supports the Secretary's factual findings.

To best meet the emergency, the Secretary determined that the Campbell plant must not close while the shortage continues to exist. He explained the characteristics of coal plants that supported his determination. "[S]ome retired generation facilities generally cannot be brought back online in a matter of days." DOE16_7. Preventing the Campbell plant from retiring "was necessary to ensure that it would be available to produce electric energy to prevent blackouts in summer peak load periods." *Id.*

Petitioners acknowledge that it "may be true" that retired generation facilities cannot be brought back online quickly, but they contend that this fact is "irrelevant." Organizations' Br. 32-33. Instead, they argue that the Department should ignore the emergency and allow "states and grid operators" to "address any concern." *Id.* at 33. But Congress authorized the Secretary to address energy emergencies in section 202(c). And the Secretary is endeavoring to prevent outages that threaten public health and safety. Those risks are not mere "concerns" that the Secretary deems "irrelevant" and feels he can blithely ignore.

Petitioners contend that the Order is not in the public interest because the plant will burn more coal and cause more pollution. States' Br. 51; Organizations' Br. 46.

73

But the statute does not require the Secretary to weigh potential pollution against the public health and safety risks of power outages. *See* 16 U.S.C. § 824a(c). To the contrary, any violations of environmental laws that arise from complying with section 202(c) orders "shall not be considered a violation of such environmental law or regulation, or subject such party to any requirement, civil or criminal liability, or a citizen suit." 16 U.S.C. § 824a(c)(3). Congress prioritized preventing power outages over minimizing pollution. *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (where Congress has already "decided the order of priorities in a given area," a court sitting in equity must follow the "balance that Congress has struck" (citations omitted)). This Court has previously held that the "public interest" may weigh in favor of fossil fuel production despite "environmental concerns." *Sierra Club*, 867 F.3d at 203 ("[E]ven if the Department determined the impacts were significant, it could still find that the public interest weighs in favor of allowing the exports."). And, here, the "public interest" is of utmost importance— preventing power outages that risk public health and safety. DOE1_2. Because the Secretary's public-interest analysis was "necessarily" based on his "expert knowledge," this Court should defer. *Transcont'l Gas*, 365 U.S. at 29.

Petitioners insist that the Secretary had to "compare among alternatives to discern whether other options better resolve" the emergency. States' Br. 53; *see also* Organizations' Br. 43 (claiming the Department must show that "Campbell beat out

74

other alternatives"). But as explained above (pp. 48-51), the statute does not require the agency to compare alternatives. *See* 16 U.S.C. § 824a(c). Instead, the statute authorizes the Secretary to order temporary connections "with or without notice, hearing, or report." *Id.* § 824a(c)(1). In any event, the emergency exists because demand has been increasing and power plants that produce thousands of megawatts of energy have been retiring, yet weather-dependent sources lack the "24/7 availability, flexibility, and duration attributes" to replace them. DOE21_2, 5 (adding that even though wind and solar electricity generation were rapidly growing, "the actual amount of electricity available . . . during critical hours could decline by about 32 [gigawatts]" because of wind and solar's limitations). In that context, ordering the Campbell plant to keep operating would "best meet the emergency." 16 U.S.C. § 824a(c)(1). Given that the emergency was based on increased demand and a shortage of facilities (caused in part by plant retirements), it was rational for the Secretary to direct the Campbell plant to temporarily remain open. DOE1_1-2.

Petitioners also suggest that the chosen emergency response had to "resolve" the entire "region-wide, years-long emergency." States' Br. 52-54. To the contrary, however, the Secretary was not required to resolve the entire emergency in one order. "[A]gencies have great discretion to treat a problem partially." *Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 410 (D.C. Cir. 2013) (citation omitted). The Secretary must determine, "in [his] judgment," what level of generation "will best

75

meet" the emergency.  16 U.S.C. § 824a(c)(1).  The level of generation required by Campbell here could be "best"—and is—tailored to the emergency without solving the entire thing at once.

## 2.    The Secretary reasonably required economic dispatch.

Contrary to Petitioners' contentions, the Secretary reasonably ordered MISO to employ economic dispatch of the Campbell plant to minimize costs.  As an initial matter, the Secretary is not statutorily required to minimize economic impact when issuing section 202(c) orders.  "If the parties affected by such order fail to agree upon the terms of any arrangement between them in carrying out such order," then the Secretary or FERC "may prescribe by supplemental order such terms as it finds to be just and reasonable, including the compensation or reimbursement which should be paid to or by any such party."  16 U.S.C. § 824a(c)(1).  Here, the judgment was reasonable, and the findings to require economic dispatch supported.  This was appropriate to advance the main relief for Campbell to remain open.  *See* DOE1_3 (requiring MISO to "ensure the operational availability *and* economic dispatch of the Campbell Plant" (emphasis added)).

To minimize costs to ratepayers, the Secretary directed MISO to employ economic dispatch.  DOE1_2.  Economic dispatch is the process of operating the electricity system at the lowest possible cost, by dispatching electricity generators in order from least to most expensive subject to various constraints.  In the rehearing

76

response, the Secretary clarified that "to the extent operational (including safety) limitations prevent the Campbell Plant from being economically dispatched, offering the Campbell Plant on a must run basis may be necessary to ensure the units are available to operate." DOE16_16. Petitioners suggest that "must run" means that Campbell "must run at all hours." Organizations' Br. 45-46. To the contrary, "must run" simply means that plant operators commit to run the next day for a minimum amount of time they specify, regardless of the price being paid for the power they generate. Here, the Secretary explained that Consumers and MISO must ensure that the Campbell plant is available, including by operating it on a "must run" basis if necessary, but, if possible, MISO should also minimize costs by employing economic dispatch. DOE16_16.

Petitioners contend that section 202(c) does not authorize economic dispatch in these circumstances, but this argument fails. States' Br. 47-51; Organizations' Br. 45. The statute does not impose limits on requiring economic dispatch, but instead grants broad authority to require such generation "as in [the Secretary's] judgment will best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(1). For emergency orders that may conflict with environmental laws, the statute directs the Secretary to "ensure that such order requires generation . . . only during hours necessary to meet the emergency and serve the public interest." *Id.*

77

§ 824a(c)(2). But the Order is entirely consistent with this requirement. "To minimize adverse environmental impacts," the Secretary "limit[ed] operation of dispatched units through the expiration of the Order." DOE1_3. The Secretary said that the plant must be available to operate and, if possible, MISO could use economic dispatch to reduce costs. He also directed the plant to comply with applicable environmental requirements "to the maximum extent feasible while operating consistent with the emergency conditions." *Id.*

Casting aside these express restrictions, Petitioners contend that the Secretary did not restrict Campbell's operations enough because economic dispatch "does not limit operation only to hours of emergency" and the Secretary cannot use section 202(c) to order plants to run "during hours when there is no emergency." States' Br. 48-49. But, here, the emergency is no isolated short-term weather event lasting only a few hours or days. The "emergency" is the longer-term and persistent "shortage of electricity" and facilities because of increasing demand, power plant retirements, and elevated risks for reliability problems, as explained above (pp. 53-70). *See also* DOE16_14 ("[I]f current retirement schedules and incremental additions remain unchanged, most regions—including the MISO region relevant to the Emergency Order—will face unacceptable reliability risks within five years.").

78

The Secretary reasonably prescribed that, if possible, MISO can offset the costs of operating Campbell by employing economic dispatch, but, again, that directive is subsidiary to the Secretary's directive that the plant must be available to maintain reliability during the shortage. Petitioners themselves acknowledge that coal plants "require long ramp-up times" and "[t]o be available to ramp up for peak demand, a plant like Campbell typically needs to operate during normal conditions." States' Br. 49. They assert that the Campbell plant should "remain[] on standby" instead of running more often. *Id.* at 51. But they ignore the efficiency and reliability benefits associated with a large plant that can reduce the risk of outages.

Ironically, Petitioners complain that the Secretary tried to reduce costs by ordering economic dispatch but then also complain about the costs of the Campbell plant's operations. *Id.* at 49-50. But again, the statute contains no requirement to minimize costs; the statute is about reducing the risk of outages during emergencies. *See* 16 U.S.C. § 824a(c). The Secretary simply endeavored to minimize costs to help ratepayers while ensuring that the Campbell plant would remain available during the energy emergency. Petitioners also assert that the Department's "search for cost savings" violates section 202(c). Organizations' Br. 46. But section 202(c) does not prohibit the Secretary from, where possible, trying to minimizing costs. *See* 16 U.S.C. § 824a(c).

The Secretary reasonably determined that continued operations of the Campbell plant "will best meet" the emergency, and he reasonably imposed certain conditions in an attempt to defray costs by ordering economic dispatch. This was thoroughly supported by far more than substantial evidence.

## C.    This Court cannot ignore the rehearing response.

In his response to rehearing requests, the Secretary provided more detail explaining the basis for the Order. Petitioners claim that the rehearing response provides "new" and "post hoc justifications." States' Br. 43; Organizations' Br. 17. But the rehearing response simply further explained the reasons for the Order, including in response to issues raised by the Petitioner. That is expressly allowed by the distinct procedures in the Federal Power Act and consistent with broader administrative law.

First, the Federal Power Act authorizes the Secretary to offer supplemental and even new findings or evidence on rehearing. This statute's judicial review and rehearing procedures are exceptional in administrative law: the Secretary "may *at any time, . . .* modify or set aside, *in whole or in part*, *any* finding or order" up until he lodges the administrative record for judicial review. 16 U.S.C. § 825*l*(a). Then-Judge Scalia described this review provision as "virtually unheard of" in the discretion it thereby grants. *See ASARCO, Inc. v. FERC*, 777 F.2d 764, 774 (D.C. Cir. 1985). Put another way, the Federal Power Act purposefully incorporates a robust

80

rehearing authority based on the types of matters that come before the Secretary and FERC. Ordinary administrative law principles regarding post hoc rationalization do not limit their scope of action on rehearing. *See id.*; *see also Tenneco Oil Co. v. FERC*, 571 F.2d 834, 842 (5th Cir. 1978) (noting how petitioner "would dismiss this as a 'post-hoc rationalization,' but that is one function of opinions on rehearing"). Indeed, had the Secretary "significantly altered" his decision on rehearing, it would have been incumbent on Petitioners to then seek rehearing of that order to perfect judicial review. *See Cal. Dep't of Water Res. v. FERC*, 306 F.3d 1121, 1125-26 (D.C. Cir. 2002).

In any event, "[t]he policy of the post hoc rationalization rule does not prohibit" an "amplified articulation." *Concert Inv., LLC*, 100 F.4th at 220 (citation omitted); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) ("[T]he agency can offer a fuller explanation of the agency's reasoning *at the time of the agency action*." (marks and citation omitted)). And having the agency's "expert judgment" regarding why a "party's objection is not well taken" "facilitates judicial review." *Save Our Sebasticook*, 431 F.3d at 381; *see also Allegheny Power v. FERC*, 437 F.3d 1215, 1222 (D.C. Cir. 2006) (acknowledging that a rehearing response may supply "a new improved rationale" (cleaned up)).

This Court has held that "[i]n view of the severe time restraints imposed by [] emergency conditions, the justifications offered by the [agency] in support of its

81

actions need not be as elaborate as required for the implementation of a permanent

[] plan." *Consol. Edison Co.*, 511 F.2d at 382-83.  The Court should reject Petition-

ers' suggestion to ignore the rehearing response.

*    *    *

Substantial evidence supported the findings of the Order.  An emergency ex-

ists.  And requiring the Campbell plant to continue operating will meet the emer-

gency and serve the public interest.  Under the Federal Power Act, the Secretary's

findings are "conclusive."  16 U.S.C. § 825*l*(b).  The Court must defer to the Secre-

tary's expert analysis and deny Petitioners' request to reweigh the evidence.

### III.    The Court should not constrain the Department's ability to issue section 202(c) orders to protect public health and safety.

The Court should uphold the Order and deny the petitions.  But, should the

Court determine that some issue requires further administrative action, the Court

should merely remand to the Department without entering an injunction or ordering

other equitable relief that impairs the agency's ability to issue section 202(c) orders

to protect public health and safety.  Given the unpredictability of future threats to

the grid that might warrant section 202(c) action, preserving the Secretary's ability

to flexibly respond to future emergencies is critical.

When reviewing an agency administrative decision, a court is required to ap-

propriately tailor the remedy in light of the "disruptive consequences" of its action.

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 202 (D.C. Cir.

82

1993). That inquiry is inherently one of equity, calling upon the court to weigh competing evidence and fashion relief in light of the interests of the parties and others affected by the court's decision. *See, e.g., Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (recognizing the appropriateness of leaving agency action in place "when equity demands"). In that light, it is appropriate for the Court to consider the mounting evidence, like the attached declaration of Timothy Kocher, the Deputy Director of the Department of Energy Office of Cybersecurity, Energy Security, and Emergency Response, that the United States is facing an energy emergency that Campbell can continue to meet. ADD-17a-22a; *see also City of Port Isabel v. FERC*, 130 F.4th 1034, 1038 (D.C. Cir. 2025) (considering new evidence of disruptive consequences in adjudicating petitions for rehearing).

First, there is no reason to vacate the Order on review here. That order has expired. The Campbell plant has been operating under subsequent section 202(c) orders, which are not before the Court now. The Court has placed challenges to those orders in abeyance.

Second, the court should impose no other remedy that constrains the Department's ability to protect public health and safety in the future. The Court should plainly consider the potential disruptive consequences here. "[I]f saving a snail warrants judicial restraint, so does saving the power supply." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (remanding agency action without

83

vacatur because, without the power plant at issue, "the region might not have enough power next summer, resulting in blackouts").

Third, the potential disruptiveness of overbroad relief is self-evident. If the Court unduly constrains the Secretary's ability to issue section 202(c) orders to ensure the reliability of the grid and reduce the risks of power outages, DOE1_2, the Secretary would be less able to quickly and flexibly respond to emergencies. The Secretary's ability to do so is critical to protecting public health and safety. For example, a study of the 2003 New York blackout showed that, during the blackout, mortality rose 28 percent for various reasons, including failures of home-operated medical equipment. *Lights Out: Impact of the August 2003 Power Outage on Mortality in New York, NY*, Epidemiology (Mar. 2012), https://perma.cc/FC2U-P4TW.

Because the Secretary's ability to flexibly address emergencies is as critical now as it has ever been, any relief should be narrowly tailored. Electricity grid reliability is facing a "five-alarm fire," according to the Chairman and Chief Executive Office of the North American Electric Reliability Corporation, Jim Robb. *NERC President Warns of 'Five-alarm Fire' for Grid Reliability*, Utility Dive (Oct. 22, 2025), https://perma.cc/85SC-NVSF. FERC's former Chairman David Rosner recently stated that the grid "need[s] every single megawatt, every single electron and every single molecule we can get to meet demand on those peak days and peak hours." *Id*. MISO similarly warned, "[w]ith demand now growing rapidly, it is

critical that existing resources be maintained," *2026 Reliability Imperative Report*, MISO, at 4 (Feb. 2026), https://perma.cc/CYH7-58MA, as has the National Association of Regulatory Utility Commissioners, *Grid Reliability and U.S. Coal Fleet Attributes*, at 15,  https://perma.cc/7KW3-WQTV ("The potential for energy shortages in regions undergoing rapid coal retirements is an ongoing concern.").

Extreme weather events highlight the risk of insufficient reliability, and Winter Storm Fern in early 2026 is a good example.  *See* Order No. 202-26-06, at 1, 5 (available at https://perma.cc/4DWT-FHJB); *see also* DOE21_6.  During Winter Storm Fern, wind generation was limited as turbines iced over.  *Winter Storm Fern Proved Coal is Still the Power Grid's Reliable Backbone,* Real Clear Energy, at 1 (Feb. 16, 2026), https://perma.cc/56VD-Q5BM.  Solar panels were covered in snow and daylight hours shortened.  *Id.*  Hydropower was limited by frozen waterways.  *Id.*  By contrast, coal plants operating with on-site fuel like Campbell continued to be available.  *Id.*  In fact, during peak stress times during the storm, coal provided 40 percent of generation in MISO.  *A White Paper: Lessons From the Edge—Insights from Winter Storm Fern on the U.S. Electric Grid,* Energy Central, at 5 (Feb. 2026), https://perma.cc/3NEA-GNJD.

Campbell's generation was essential to protect public health and safety during Winter Storm Fern and the ensuing, prolonged cold snap.  Kocher Decl. ¶¶ 8-11 (Mar. 16, 2023).  During the storm, MISO declared an Energy Emergency Alert

Level 2 (which means that MISO cannot meet energy requirements) for the region including Michigan. *Id.* ¶ 8. Campbell provided critical generation capacity during that time and, if it had not been available, MISO would have needed to source additional generation capacity that may not have been available. *Id.* Per daily preliminary operational data provided by MISO to the Department, during the Winter Storm Fern of 2026 and the ensuing intense cold snap, the Campbell plant generated a total of 302,189 megawatt-hours from January 23, 2026, through February 7, 2026. *Id.* ¶ 10. Considering the average amount of power used by American homes,[33] Campbell's generation was enough to keep the lights on for over 600,000 homes for those 15 days.

As these facts show, temporarily preventing a plant's retirement, as in Campbell's case, can prove to be a valuable emergency response. Recent testimony of John Moura, the North American Reliability Corporation's Director of Reliability Assessments reinforced this point. *DOE "Emergency" Power Plant Orders Help Grid Reliability:    NERC Official*, Utility Dive (Feb. 20, 2026), https://perma.cc/8PNS-HHV3. He described how the Secretary's section 202(c) orders "ha[ve] certainly helped, especially in this past winter, maintain reliability." *Id.*

---

[33] *Frequently Asked Questions: How Much Electricity Does an American Home Use?*, U.S. Energy Information Administration, https://perma.cc/6Q6U-K7YW.

While the Secretary's emergency orders have ranged in benefit, he said, "in the aggregate, it's definitely been a help to keep units online." *Id.* This Court should thus not fashion any relief that overbroadly restricts the Secretary's ability to temporarily prevent a retirement like Campbell's.

That is particularly true considering that Campbell may be essential moving forward. In January 2026, the North American Electric Reliability Corporation released its long-term reliability assessment, which indicated that the MISO region is at high risk of energy shortfalls in the next five years. Kocher Decl. ¶ 7. Outages may occur starting in 2028. *Id.* At this time, the Department continues to believe the Campbell plant's continued availability is necessary to enable adequate response to emergency situations like significant weather events. *Id.* ¶ 13; *see also Plan to Close J.H. Campbell Power Plant Is Misguided*, Mackinac Center for Public Policy (Dec. 22, 2025), https://perma.cc/5XYM-RH6E (noting the "urgency to keep the [Campbell] plant open," given the North American Electric Reliability Corporation's warnings of rising grid reliability risks "amid surging electricity demand" and the plant's "local support within Ottawa County" as evidenced by the county's Board of Commissioners having passed a resolution to keep the plant open, as did seven townships, and a petition to keep the plant open that had thousands of signatures).

* * *

Disruptive consequences will ensue if the Court issues overbroad relief constraining the Department's ability to issue section 202(c) orders to protect public health and safety. Should the Court determine that some aspect of the Secretary's decision was inadequate, the Court should merely remand to the Department without vacatur.

## CONCLUSION

The Court should deny the petitions.

Respectfully submitted,

Of Counsel:

JONATHAN BRIGHTBILL
General Counsel
U.S. Department of Energy

/s/ *Rebecca Jaffe*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT LUNDMAN
KYLE GLYNN
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice

*Counsel for Federal Respondents*

March 17, 2026
90-13-5-17962

88

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of the Court's November 20, 2025 order (20,000 words for Respondents' brief) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 19,692 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Rebecca Jaffe*
REBECCA JAFFE
Counsel for Federal Respondents

89

# ADDENDUM

16 U.S.C. § 824 ................................................................................ 1a

16 U.S.C. § 824a .............................................................................. 4a

16 U.S.C. § 824o-1 .......................................................................... 8a

10 C.F.R. § 205.371 ....................................................................... 16a

Decl. of Timothy Kocher (Mar. 16, 2026) ...................................... 17a

USCA Case #25-1159      Document #2164147      Filed: 03/17/2026      Page 106 of 127

United States Code Annotated
  Title 16. Conservation
    Chapter 12. Federal Regulation and Development of Power (Refs & Annos)
      Subchapter II. Regulation of Electric Utility Companies Engaged in Interstate Commerce

16 U.S.C.A. § 824

§ 824. Declaration of policy; application of subchapter

Effective: December 4, 2015
Currentness

**(a) Federal regulation of transmission and sale of electric energy**

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

**(b) Use or sale of electric energy in interstate commerce**

**(1)** The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

**(2)** Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824*o*, 824*o*-1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824*o*, 824*o*-1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

**(c) Electric energy in interstate commerce**

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

ADD-1a

USCA Case #25-1159    Document #2164147    Filed: 03/17/2026    Page 107 of 127

**(d) "Sale of electric energy at wholesale" defined**

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

**(e) "Public utility" defined**

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f) [1] , 824i, 824j, 824j-1, 824k, 824*o*, 824*o*-1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

**(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt**

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

**(g) Books and records**

**(1)** Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of--

   **(A)** an electric utility company subject to its regulatory authority under State law,

   **(B)** any exempt wholesale generator selling energy at wholesale to such electric utility, and

   **(C)** any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

**(2)** Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

**(3)** Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

**(4)** Nothing in this section shall--

**(A)** preempt applicable State law concerning the provision of records and other information; or

**(B)** in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

**(5)** As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005.

### CREDIT(S)

(June 10, 1920, c. 285, pt. II, § 201, as added Aug. 26, 1935, c. 687, Title II, § 213, 49 Stat. 847; amended Pub.L. 95-617, Title II, § 204(b), Nov. 9, 1978, 92 Stat. 3140; Pub.L. 102-486, Title VII, § 714, Oct. 24, 1992, 106 Stat. 2911; Pub.L. 109-58, Title XII, §§ 1277(b)(1), 1291(c), 1295(a), Aug. 8, 2005, 119 Stat. 978, 985; Pub.L. 114-94, Div. F, § 61003(b), Dec. 4, 2015, 129 Stat. 1778.)

### Footnotes

1       So in original. Section 824e of this title does not contain a subsec. (f).

16 U.S.C.A. § 824, 16 USCA § 824
Current through P.L. 119-73. Some statute sections may be more current, see credits for details.

**End of Document**                                                © 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #25-1159    Document #2164147    Filed: 03/17/2026    Page 109 of 127

United States Code Annotated
  Title 16. Conservation
    Chapter 12. Federal Regulation and Development of Power (Refs & Annos)
      Subchapter II. Regulation of Electric Utility Companies Engaged in Interstate Commerce

16 U.S.C.A. § 824a

§ 824a. Interconnection and coordination of facilities; emergencies; transmission to foreign countries

Effective: December 4, 2015
Currentness

**(a) Regional districts; establishment; notice to State commissions**

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnection and coordinated electric facilities. It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts. Before establishing any such district and fixing or modifying the boundaries thereof the Commission shall give notice to the State commission of each State situated wholly or in part within such district, and shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations.

**(b) Sale or exchange of energy; establishing physical connections**

Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: *Provided,* That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them.

**(c) Temporary connection and exchange of facilities during emergency**

**(1)** During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes, the Commission shall have authority, either upon its own motion or upon complaint, with or without notice, hearing, or report, to

**ADD-4a**

USCA Case #25-1159      Document #2164147      Filed: 03/17/2026      Page 110 of 127

require by order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest. If the parties affected by such order fail to agree upon the terms of any arrangement between them in carrying out such order, the Commission, after hearing held either before or after such order takes effect, may prescribe by supplemental order such terms as it finds to be just and reasonable, including the compensation or reimbursement which should be paid to or by any such party.

**(2)** With respect to an order issued under this subsection that may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation, the Commission shall ensure that such order requires generation, delivery, interchange, or transmission of electric energy only during hours necessary to meet the emergency and serve the public interest, and, to the maximum extent practicable, is consistent with any applicable Federal, State, or local environmental law or regulation and minimizes any adverse environmental impacts.

**(3)** To the extent any omission or action taken by a party, that is necessary to comply with an order issued under this subsection, including any omission or action taken to voluntarily comply with such order, results in noncompliance with, or causes such party to not comply with, any Federal, State, or local environmental law or regulation, such omission or action shall not be considered a violation of such environmental law or regulation, or subject such party to any requirement, civil or criminal liability, or a citizen suit under such environmental law or regulation.

**(4)(A)** An order issued under this subsection that may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation shall expire not later than 90 days after it is issued. The Commission may renew or reissue such order pursuant to paragraphs (1) and (2) for subsequent periods, not to exceed 90 days for each period, as the Commission determines necessary to meet the emergency and serve the public interest.

**(B)** In renewing or reissuing an order under subparagraph (A), the Commission shall consult with the primary Federal agency with expertise in the environmental interest protected by such law or regulation, and shall include in any such renewed or reissued order such conditions as such Federal agency determines necessary to minimize any adverse environmental impacts to the extent practicable. The conditions, if any, submitted by such Federal agency shall be made available to the public. The Commission may exclude such a condition from the renewed or reissued order if it determines that such condition would prevent the order from adequately addressing the emergency necessitating such order and provides in the order, or otherwise makes publicly available, an explanation of such determination.

**(5)** If an order issued under this subsection is subsequently stayed, modified, or set aside by a court pursuant to section 825*l* of this title or any other provision of law, any omission or action previously taken by a party that was necessary to comply with the order while the order was in effect, including any omission or action taken to voluntarily comply with the order, shall remain subject to paragraph (3).

**(d) Temporary connection during emergency by persons without jurisdiction of Commission**

During the continuance of any emergency requiring immediate action, any person or municipality engaged in the transmission or sale of electric energy and not otherwise subject to the jurisdiction of the Commission may make such temporary connections with any public utility subject to the jurisdiction of the Commission or may construct such temporary facilities for the transmission of electric energy in interstate commerce as may be necessary or appropriate to meet such emergency, and shall not become subject to the jurisdiction of the Commission by reason of such temporary connection or temporary construction: *Provided,* That such temporary connection shall be discontinued or such temporary construction removed or otherwise disposed

of upon the termination of such emergency: *Provided further,* That upon approval of the Commission permanent connections for emergency use only may be made hereunder.

**(e) Transmission of electric energy to foreign country**

After six months from August 26, 1935, no person shall transmit any electric energy from the United States to a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application unless, after opportunity for hearing, it finds that the proposed transmission would impair the sufficiency of electric supply within the United States or would impede or tend to impede the coordination in the public interest of facilities subject to the jurisdiction of the Commission. The Commission may by its order grant such application in whole or in part, with such modifications and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate.

**(f) Transmission or sale at wholesale of electric energy; regulation**

The ownership or operation of facilities for the transmission or sale at wholesale of electric energy which is (a) generated within a State and transmitted from the State across an international boundary and not thereafter transmitted into any other State, or (b) generated in a foreign country and transmitted across an international boundary into a State and not thereafter transmitted into any other State, shall not make a person a public utility subject to regulation as such under other provisions of this subchapter. The State within which any such facilities are located may regulate any such transaction insofar as such State regulation does not conflict with the exercise of the Commission's powers under or relating to subsection (e).

**(g) Continuance of service**

In order to insure continuity of service to customers of public utilities, the Commission shall require, by rule, each public utility to--

**(1)** report promptly to the Commission and any appropriate State regulatory authorities any anticipated shortage of electric energy or capacity which would affect such utility's capability of serving its wholesale customers,

**(2)** submit to the Commission, and to any appropriate State regulatory authority, and periodically revise, contingency plans respecting--

**(A)** shortages of electric energy or capacity, and

**(B)** circumstances which may result in such shortages, and

**(3)** accommodate any such shortages or circumstances in a manner which shall--

**(A)** give due consideration to the public health, safety, and welfare, and

USCA Case #25-1159    Document #2164147    Filed: 03/17/2026    Page 112 of 127

**(B)** provide that all persons served directly or indirectly by such public utility will be treated, without undue prejudice or disadvantage.

## CREDIT(S)

(June 10, 1920, c. 285, pt. II, § 202, as added Aug. 26, 1935, c. 687, Title II, § 213, 49 Stat. 848; amended Aug. 7, 1953, c. 343, 67 Stat. 461; Pub.L. 95-617, Title II, § 206(a), Nov. 9, 1978, 92 Stat. 3141; Pub.L. 114-94, Div. F, § 61002, Dec. 4, 2015, 129 Stat. 1772.)

16 U.S.C.A. § 824a, 16 USCA § 824a
Current through P.L. 119-73. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #25-1159     Document #2164147     Filed: 03/17/2026     Page 113 of 127

United States Code Annotated
  Title 16. Conservation
    Chapter 12. Federal Regulation and Development of Power (Refs & Annos)
      Subchapter II. Regulation of Electric Utility Companies Engaged in Interstate Commerce

16 U.S.C.A. § 824*o*-1

§ 824*o*-1. Critical electric infrastructure security

Effective: December 4, 2015
Currentness

**(a)Definitions**

For purposes of this section:

**(1)Bulk-power system; Electric Reliability Organization; regional entity**

The terms "bulk-power system", "Electric Reliability Organization", and "regional entity" have the meanings given such terms in paragraphs (1), (2), and (7) of section 824*o*(a) of this title, respectively.

**(2)Critical electric infrastructure**

The term "critical electric infrastructure" means a system or asset of the bulk-power system, whether physical or virtual, the incapacity or destruction of which would negatively affect national security, economic security, public health or safety, or any combination of such matters.

**(3)Critical electric infrastructure information**

The term "critical electric infrastructure information" means information related to critical electric infrastructure, or proposed critical electrical infrastructure, generated by or provided to the Commission or other Federal agency, other than classified national security information, that is designated as critical electric infrastructure information by the Commission or the Secretary pursuant to subsection (d). Such term includes information that qualifies as critical energy infrastructure information under the Commission's regulations.

**(4)Defense critical electric infrastructure**

The term "defense critical electric infrastructure" means any electric infrastructure located in any of the 48 contiguous States or the District of Columbia that serves a facility designated by the Secretary pursuant to subsection (c), but is not owned or operated by the owner or operator of such facility.

**(5)Electromagnetic pulse**

**ADD-8a**

USCA Case #25-1159    Document #2164147    Filed: 03/17/2026    Page 114 of 127

The term "electromagnetic pulse" means 1 or more pulses of electromagnetic energy emitted by a device capable of disabling or disrupting operation of, or destroying, electronic devices or communications networks, including hardware, software, and data, by means of such a pulse.

**(6)Geomagnetic storm**

The term "geomagnetic storm" means a temporary disturbance of the Earth's magnetic field resulting from solar activity.

**(7)Grid security emergency**

The term "grid security emergency" means the occurrence or imminent danger of--

**(A)(i)** a malicious act using electronic communication or an electromagnetic pulse, or a geomagnetic storm event, that could disrupt the operation of those electronic devices or communications networks, including hardware, software, and data, that are essential to the reliability of critical electric infrastructure or of defense critical electric infrastructure; and

**(ii)** disruption of the operation of such devices or networks, with significant adverse effects on the reliability of critical electric infrastructure or of defense critical electric infrastructure, as a result of such act or event; or

**(B)(i)** a direct physical attack on critical electric infrastructure or on defense critical electric infrastructure; and

**(ii)** significant adverse effects on the reliability of critical electric infrastructure or of defense critical electric infrastructure as a result of such physical attack.

**(8)Secretary**

The term "Secretary" means the Secretary of Energy.

**(b)Authority to address grid security emergency**

**(1)Authority**

Whenever the President issues and provides to the Secretary a written directive or determination identifying a grid security emergency, the Secretary may, with or without notice, hearing, or report, issue such orders for emergency measures as are necessary in the judgment of the Secretary to protect or restore the reliability of critical electric infrastructure or of defense critical electric infrastructure during such emergency. As soon as practicable but not later than 180 days after December 4, 2015, the Secretary shall, after notice and opportunity for comment, establish rules of procedure that ensure that such authority can be exercised expeditiously.

**(2)Notification of Congress**

USCA Case #25-1159    Document #2164147    Filed: 03/17/2026    Page 115 of 127

Whenever the President issues and provides to the Secretary a written directive or determination under paragraph (1), the President shall promptly notify congressional committees of relevant jurisdiction, including the Committee on Energy and Commerce of the House of Representatives and the Committee on Energy and Natural Resources of the Senate, of the contents of, and justification for, such directive or determination.

**(3)Consultation**

Before issuing an order for emergency measures under paragraph (1), the Secretary shall, to the extent practicable in light of the nature of the grid security emergency and the urgency of the need for action, consult with appropriate governmental authorities in Canada and Mexico, entities described in paragraph (4), the Electricity Sub-sector Coordinating Council, the Commission, and other appropriate Federal agencies regarding implementation of such emergency measures.

**(4)Application**

An order for emergency measures under this subsection may apply to--

**(A)** the Electric Reliability Organization;

**(B)** a regional entity; or

**(C)** any owner, user, or operator of critical electric infrastructure or of defense critical electric infrastructure within the United States.

**(5)Expiration and reissuance**

**(A)In general**

Except as provided in subparagraph (B), an order for emergency measures issued under paragraph (1) shall expire no later than 15 days after its issuance.

**(B)Extensions**

The Secretary may reissue an order for emergency measures issued under paragraph (1) for subsequent periods, not to exceed 15 days for each such period, provided that the President, for each such period, issues and provides to the Secretary a written directive or determination that the grid security emergency identified under paragraph (1) continues to exist or that the emergency measure continues to be required.

**(6)Cost recovery**

**(A)Critical electric infrastructure**

ADD-10a

If the Commission determines that owners, operators, or users of critical electric infrastructure have incurred substantial costs to comply with an order for emergency measures issued under this subsection and that such costs were prudently incurred and cannot reasonably be recovered through regulated rates or market prices for the electric energy or services sold by such owners, operators, or users, the Commission shall, consistent with the requirements of section 824d of this title, after notice and an opportunity for comment, establish a mechanism that permits such owners, operators, or users to recover such costs.

**(B)Defense critical electric infrastructure**

To the extent the owner or operator of defense critical electric infrastructure is required to take emergency measures pursuant to an order issued under this subsection, the owners or operators of a critical defense facility or facilities designated by the Secretary pursuant to subsection (c) that rely upon such infrastructure shall bear the full incremental costs of the measures.

**(7)Temporary access to classified information**

The Secretary, and other appropriate Federal agencies, shall, to the extent practicable and consistent with their obligations to protect classified information, provide temporary access to classified information related to a grid security emergency for which emergency measures are issued under paragraph (1) to key personnel of any entity subject to such emergency measures to enable optimum communication between the entity and the Secretary and other appropriate Federal agencies regarding the grid security emergency.

**(c)Designation of critical defense facilities**

Not later than 180 days after December 4, 2015, the Secretary, in consultation with other appropriate Federal agencies and appropriate owners, users, or operators of infrastructure that may be defense critical electric infrastructure, shall identify and designate facilities located in the 48 contiguous States and the District of Columbia that are--

**(1)** critical to the defense of the United States; and

**(2)** vulnerable to a disruption of the supply of electric energy provided to such facility by an external provider.

The Secretary may, in consultation with appropriate Federal agencies and appropriate owners, users, or operators of defense critical electric infrastructure, periodically revise the list of designated facilities as necessary.

**(d)Protection and sharing of critical electric infrastructure information**

**(1)Protection of critical electric infrastructure information**

Critical electric infrastructure information--

**(A)** shall be exempt from disclosure under section 552(b)(3) of Title 5; and

ADD-11a

**(B)** shall not be made available by any Federal, State, political subdivision or tribal authority pursuant to any Federal, State, political subdivision or tribal law requiring public disclosure of information or records.

**(2)Designation and sharing of critical electric infrastructure information**

Not later than one year after December 4, 2015, the Commission, after consultation with the Secretary, shall promulgate such regulations as necessary to--

**(A)** establish criteria and procedures to designate information as critical electric infrastructure information;

**(B)** prohibit the unauthorized disclosure of critical electric infrastructure information;

**(C)** ensure there are appropriate sanctions in place for Commissioners, officers, employees, or agents of the Commission or the Department of Energy who knowingly and willfully disclose critical electric infrastructure information in a manner that is not authorized under this section; and

**(D)** taking into account standards of the Electric Reliability Organization, facilitate voluntary sharing of critical electric infrastructure information with, between, and by--

**(i)** Federal, State, political subdivision, and tribal authorities;

**(ii)** the Electric Reliability Organization;

**(iii)** regional entities;

**(iv)** information sharing and analysis centers established pursuant to Presidential Decision Directive 63;

**(v)** owners, operators, and users of critical electric infrastructure in the United States; and

**(vi)** other entities determined appropriate by the Commission.

**(3)Authority to designate**

Information may be designated by the Commission or the Secretary as critical electric infrastructure information pursuant to the criteria and procedures established by the Commission under paragraph (2)(A).

**(4)Considerations**

ADD-12a

USCA Case #25-1159    Document #2164147    Filed: 03/17/2026    Page 118 of 127

In exercising their respective authorities under this subsection, the Commission and the Secretary shall take into consideration the role of State commissions in reviewing the prudence and cost of investments, determining the rates and terms of conditions for electric services, and ensuring the safety and reliability of the bulk-power system and distribution facilities within their respective jurisdictions.

**(5)Protocols**

The Commission and the Secretary shall, in consultation with Canadian and Mexican authorities, develop protocols for the voluntary sharing of critical electric infrastructure information with Canadian and Mexican authorities and owners, operators, and users of the bulk-power system outside the United States.

**(6)No required sharing of information**

Nothing in this section shall require a person or entity in possession of critical electric infrastructure information to share such information with Federal, State, political subdivision, or tribal authorities, or any other person or entity.

**(7)Submission of information to Congress**

Nothing in this section shall permit or authorize the withholding of information from Congress, any committee or subcommittee thereof, or the Comptroller General.

**(8)Disclosure of nonprotected information**

In implementing this section, the Commission and the Secretary shall segregate critical electric infrastructure information or information that reasonably could be expected to lead to the disclosure of the critical electric infrastructure information within documents and electronic communications, wherever feasible, to facilitate disclosure of information that is not designated as critical electric infrastructure information.

**(9)Duration of designation**

Information may not be designated as critical electric infrastructure information for longer than 5 years, unless specifically re-designated by the Commission or the Secretary, as appropriate.

**(10)Removal of designation**

The Commission or the Secretary, as appropriate, shall remove the designation of critical electric infrastructure information, in whole or in part, from a document or electronic communication if the Commission or the Secretary, as appropriate, determines that the unauthorized disclosure of such information could no longer be used to impair the security or reliability of the bulk-power system or distribution facilities.

**(11)Judicial review of designations**

Notwithstanding section 825*l*(b) of this title, with respect to a petition filed by a person to which an order under this section applies, any determination by the Commission or the Secretary concerning the designation of critical electric infrastructure

information under this subsection shall be subject to review under chapter 7 of Title 5, except that such review shall be brought in the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in the District of Columbia. In such a case the court shall examine in camera the contents of documents or electronic communications that are the subject of the determination under review to determine whether such documents or any part thereof were improperly designated or not designated as critical electric infrastructure information.

**(e)Security clearances**

The Secretary shall facilitate and, to the extent practicable, expedite the acquisition of adequate security clearances by key personnel of any entity subject to the requirements of this section, to enable optimum communication with Federal agencies regarding threats to the security of the critical electric infrastructure. The Secretary, the Commission, and other appropriate Federal agencies shall, to the extent practicable and consistent with their obligations to protect classified and critical electric infrastructure information, share timely actionable information regarding grid security with appropriate key personnel of owners, operators, and users of the critical electric infrastructure.

**(f)Clarifications of liability**

**(1)Compliance with or violation of this chapter**

Except as provided in paragraph (4), to the extent any action or omission taken by an entity that is necessary to comply with an order for emergency measures issued under subsection (b)(1), including any action or omission taken to voluntarily comply with such order, results in noncompliance with, or causes such entity not to comply with any rule, order, regulation, or provision of this chapter, including any reliability standard approved by the Commission pursuant to section 824o of this title, such action or omission shall not be considered a violation of such rule, order, regulation, or provision.

**(2)Relation to section 824a(c) of this title**

Except as provided in paragraph (4), an action or omission taken by an owner, operator, or user of critical electric infrastructure or of defense critical electric infrastructure to comply with an order for emergency measures issued under subsection (b)(1) shall be treated as an action or omission taken to comply with an order issued under section 824a(c) of this title for purposes of such section.

**(3)Sharing or receipt of information**

No cause of action shall lie or be maintained in any Federal or State court for the sharing or receipt of information under, and that is conducted in accordance with, subsection (d).

**(4)Rule of construction**

Nothing in this subsection shall be construed to require dismissal of a cause of action against an entity that, in the course of complying with an order for emergency measures issued under subsection (b)(1) by taking an action or omission for which they would be liable but for paragraph (1) or (2), takes such action or omission in a grossly negligent manner.

ADD-14a

USCA Case #25-1159      Document #2164147      Filed: 03/17/2026      Page 120 of 127

**CREDIT(S)**

(June 10, 1920, c. 285, pt. II, § 215A, as added Pub.L. 114-94, Div. F, § 61003(a), Dec. 4, 2015, 129 Stat. 1773.)

16 U.S.C.A. § 824*o*-1, 16 USCA § 824o-1

Current through P.L. 119-73. Some statute sections may be more current, see credits for details.

---

**End of Document**                                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

**ADD-15a**

USCA Case #25-1159    Document #2164147    Filed: 03/17/2026    Page 121 of 127

Code of Federal Regulations
  Title 10. Energy
    Chapter II. Department of Energy
      Subchapter A. Oil
        Part 205. Administrative Procedures and Sanctions (Refs & Annos)
          Subpart W. Electric Power System Permits and Reports; Applications; Administrative Procedures and Sanctions; Grid Security Emergency Orders (Refs & Annos)
            Emergency Interconnection of Electric Facilities and the Transfer of Electricity to Alleviate an Emergency Shortage of Electric Power (Refs & Annos)

10 C.F.R. § 205.371

§ 205.371 Definition of emergency.

Currentness

"Emergency," as used herein, is defined as an unexpected inadequate supply of electric energy which may result from the unexpected outage or breakdown of facilities for the generation, transmission or distribution of electric power. Such events may be the result of weather conditions, acts of God, or unforeseen occurrences not reasonably within the power of the affected "entity" to prevent. An emergency also can result from a sudden increase in customer demand, an inability to obtain adequate amounts of the necessary fuels to generate electricity, or a regulatory action which prohibits the use of certain electric power supply facilities. Actions under this authority are envisioned as meeting a specific inadequate power supply situation. Extended periods of insufficient power supply as a result of inadequate planning or the failure to construct necessary facilities can result in an emergency as contemplated in these regulations. In such cases, the impacted "entity" will be expected to make firm arrangements to resolve the problem until new facilities become available, so that a continuing emergency order is not needed. Situations where a shortage of electric energy is projected due solely to the failure of parties to agree to terms, conditions or other economic factors relating to service, generally will not be considered as emergencies unless the inability to supply electric service is imminent. Where an electricity outage or service inadequacy qualifies for a section 202(c) order, contractual difficulties alone will not be sufficient to preclude the issuance of an emergency order.

SOURCE: 39 FR 35489, Oct. 1, 1974; 45 FR 71560, Oct. 28, 1980; Secs. 205.370 through 205.379 appear at 46 FR 39987, Aug. 6, 1981; 61 FR 35114, July 5, 1996; 83 FR 1180, Jan. 10, 2018; 85 FR 3232, Jan. 21, 2020; 90 FR 29682, July 3, 2025, unless otherwise noted.

AUTHORITY: Department of Energy Organization Act, Pub.L. 95–91, 91 Stat. 565 (42 U.S.C. 7101 et seq.); Federal Power Act, Pub.L. 66–280, 41 Stat. 1063 (16 U.S.C. 792 et seq.); E.O. 10485, 18 FR 5397, 3 CFR, 1949–1953, Comp., p. 970 as amended by E.O. 12038, 43 FR 4957, 3 CFR 1978 Comp., p. 136; E.O. 14154, 90 FR 8353.; (Approved by the Office of Management and Budget under Control No. 1901–0245); Pub.L. 95–91, 91 Stat. 565 (42 U.S.C. 7101); Pub.L. 66–280, 41 Stat. 1063 (16 U.S.C. Section 792 et seq.); E.O. 10485, 18 FR 5397, 3 CFR, 1949–1953, Comp., p. 970 as amended by E.O. 12038, 43 FR 4957, 3 CFR 1978 Comp., p. 136; Department of Energy Delegation Order No. 00–002.00Q (Nov. 1, 2018).; Department of Energy Organization Act, Pub.L. 95–91, 91 Stat. 565 (42 U.S.C. 7101). Federal Power Act, Pub.L. 66–280, 41 Stat. 1063 (16 U.S.C. 791(a))

Current through March 12, 2026, 91 FR 12083. Some sections may be more current. See credits for details.

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

People of the State of Michigan, et al.,

    *Petitioners*,

v.

    Case Nos. 25-1159, 25-1160, 25-1162

United States Department of Energy and
Christopher A. Wright, Secretary,
United States Department of Energy,

    *Respondents*.

## <u>DECLARATION OF TIMOTHY KOCHER</u>

I, Timothy Kocher, hereby declare and state as follows:

1. I am a Deputy Director in the Office of Cybersecurity, Energy Security, and Emergency Response (CESER) at the U.S. Department of Energy (the Department). My business address is 1000 Independence Ave, SW, Washington, D.C., 20585.

2. I joined the Department in May 2025, where I manage the Department's mission to strengthen the security and resilience of the nation's energy infrastructure against evolving cyber and physical threats. I am responsible for supervising the daily operations of the CESER office and all associated lines of effort—from incident response to stakeholder engagement. I also assist with the critical mission of safeguarding today's energy system against periods of inadequate resources, like

1

## ADD-17a

shortages of generation and generation facilities.

3.  In my current role, one of my areas of focus is on energy market dynamics, including available generation and resources, balanced against current and projected energy demand. In emergency situations and extreme weather events, I engage directly with energy sector owners and operators to ensure that resource needs are met by leveraging emergency authorities of the U.S. Government and coordinating emergency response across industry and government partners. As such, I routinely review daily operating reports filed by generator owners ordered to run pursuant to Federal Power Act section 202(c), 16 U.S.C. § 824a(c), to ensure adequate electricity in the United States, as well as expert reporting regarding the seasonal and long-term reliability of the system.

4. I previously worked for the Department as a Special Adviser from September 2017 to January 2021. In this capacity, I worked to increase the security and resilience of the energy sector against cyber threats.

5.  The statements contained in this declaration are based upon my personal knowledge and upon information provided to me in my official capacity.

6. The North American Electric Reliability Corporation (NERC) develops and enforces reliability standards for grid operators, which are approved by the Federal Energy Regulatory Commission and, in Canada, by Canadian regulators. Specifically, NERC is responsible for independently assessing and reporting on the

2

**ADD-18a**

overall reliability, adequacy, and associated risks that could impact the upcoming summer and winter seasons as well as the long-term, 10-year period.[1]

7. In January 2026, NERC released its 2025 Long-Term Reliability Assessment (NERC 2025 LTRA).[2] In that report, NERC assessed that the Midcontinent Independent System Operator (MISO) region is at high risk of energy shortfalls over the next five years, stating that it faces significant reliability challenges as "projected resource additions do not keep pace with escalating demand forecasts and announced generator retirements." NERC LTRA at 7–8. NERC determined that this would worsen to "high risk" for outages starting in 2028. This determination is based on the combination of accelerating demand growth from new data centers and the retirement of existing thermal generators. The 2025 NERC Long-Term Reliability Assessment notes that "MISO's accredited thermal capacity has decreased by 8.8 GW, driven primarily by reductions in accredited capacity of existing facilities and retirements." *Id*. at 43. The report observes that winter peak periods are a particular concern, with projections showing "shortfalls in planned resources for winter peak periods." *Id*. at 15. NERC also concluded that "risks could expand into spring and fall generator maintenance periods when the available dispatchable generation is not enough to counter wind and solar variability when

---

[1] *See* https://www.nerc.com/our-work/assessments.
[2] Available at https://www.nerc.com/globalassets/our-work/assessments/nerc_ltra_2025.pdf.

3

**ADD-19a**

demand is high." *Id*. at 15.

8. The J.H. Campbell plant is within the MISO footprint. And the plant's generation was essential to protect public health and safety during Winter Storm Fern and the ensuing, prolonged cold snap. During the storm, MISO operated under a cold weather alert and declared conservative operations from January 23 to February 1, 2026. Additionally, on January 24, MISO declared both an Energy Emergency Alert (EEA) 1 and EEA 2 "Maximum Generation Event" for MISO's North and Central Regions due to generation outages, high demand, and transfer capability limits. Campbell was able to provide critical generation capacity during the EEA 2 Maximum Generation Event conditions, beyond any capacity being provided by the Covert Generating Station and the D.E. Karn Generating Complex, which had been identified by Consumers and approved by the Michigan Public Service Commission as part of the replacements for Campbell's electric generation capacity. If Campbell had not been available to run during these periods, MISO would have needed to source additional generation capacity that may not have been available.

9. Because the Secretary directed Campbell to stay online notwithstanding the announced plans for its retirement, the plant has run consistently, increasing the electricity generation capacity available to help ensure the stability of the grid for customers, especially during periods of extreme heat or cold.

**ADD-20a**

10. The production of electricity from the Campbell Plant has been a critical asset to maintain reliability in the MISO region. Per daily preliminary operational data provided by MISO to the Department, during the Winter Storm Fern of 2026 and the intense cold snap that followed, the Campbell plant generated a total of 302,189 MWh from January 23, 2026, through February 7, 2026.

11. If the Secretary had not ordered the Campbell plant to run through Order No. 202-25-3 (Campbell 1), the plant would have retired, and its resources would not have been available to serve weather events highlighted above.

12. Likewise, if the Campbell plant retires, it will not be available to contribute to the total amount of generation capacity needed in times of grid stress, like the significant weather events detailed above, or to keep pace with escalating demand. The Secretary has determined that grid stress requiring Campbell's continued operation has persisted since expiration of the single May order at issue in this case.

13. In light of NERC's 2025 Winter and Long-term Reliability Assessments, together with continued grid events like this winter's extreme weather events, it is imperative that all currently available resources continue to be available to serve growing demand and enable adequate response to emergency situations like the significant weather events experienced in the MISO region since May 2025.

5

**ADD-21a**

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing

is to the best of my knowledge true and correct.


Executed this 16th day of March 2026, in Washington, D.C.

TIMOTHY KOCHER
Digitally signed by TIMOTHY KOCHER
Date: 2026.03.16 17:49:33 -04'00'
_____
Timothy Kocher

**ADD-22a**