No. 25-1159
(Consolidated with 25-1160 and 25-1162)

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

THE PEOPLE OF THE STATE OF MICHIGAN,
*Petitioner*,

v.

U.S. DEPARTMENT OF ENERGY, AND CHRIS WRIGHT, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF ENERGY,
*Respondents*.

ON PETITION FOR REVIEW OF FINAL ORDER OF THE
DEPARTMENT OF ENERGY

### INITIAL REPLY BRIEF OF
### PUBLIC INTEREST ORGANIZATION PETITIONERS

Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Elena Saxonhouse (DC Cir. 56639)
Sierra Club Environmental Law
Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
elena.saxonhouse@sierraclub.org

*Counsel for Sierra Club*

Benjamin Chagnon (DC Cir. 65850)
Jennifer Yun (DC Cir. 66550)
Michael Lenoff (DC Cir. 66374)
Earthjustice
1250 I St NW, 4th Floor
Washington, DC 20005
(202) 745-5210
bchagnon@earthjustice.org
jyun@earthjustice.org
mlenoff@earthjustice.org

*Counsel for Sierra Club and
Urban Core Collective*

Caroline Reiser (DC Cir. 62319)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

Gavin McCabe (DC Cir. 53966)
Natural Resources Defense Council
40 W. 20th St., 11th Floor
New York, NY 10011
(212) 727-4529
gmccabe@nrdc.org

Simi Bhat (DC Cir. 55968)
Karen Chen
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
(415) 875-6110
sbhat@nrdc.org
kchen@nrdc.org

*Counsel for Natural Resources Defense Council*

Lauren Piette (DC Cir. 66519)
Sameer Doshi (DC Cir. 64549)
Earthjustice
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 500-2193
lpiette@earthjustice.org
sdoshi@earthjustice.org

Christine Powell (DC Cir. 64908)
Earthjustice
180 Steuart St., #194330
San Francisco, CA 94105
(415) 217-2035
cpowell@earthjustice.org

*Counsel for Sierra Club and Urban Core Collective*

Howard A. Learner (DC Cir. 61779)
Bradley Klein
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
T: (312) 673-6500
hlearner@elpc.org
bklein@elpc.org

Katherine S. Duckworth
Environmental Law & Policy Center
1008 Floral Ave. SE
East Grand Rapids, MI 49506
T: (312) 673-6500
kduckworth@elpc.org

*Counsel for the Environmental Law & Policy Center, Ecology Center, Union of Concerned Scientists, and Vote Solar*

Danielle C. Fidler (DC Cir. 62486)
Francis W. Sturges, Jr. (DC Cir. 64964)
Veronica Saltzman (DC Cir. 64096)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
dfidler@catf.us
fsturges@catf.us
vsaltzman@catf.us

*Counsel for Michigan Environmental Council*

Tomás Carbonell (DC Cir. 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(919) 449-4600
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................... iv

TABLE OF AUTHORITIES ............................................................................ vi

GLOSSARY OF ABBREVIATIONS ................................................................ ix

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

ARGUMENT .....................................................................................................2

   I.  The Department Violated Section 202(c) by Failing to Demonstrate an
      Emergency. ................................................................................................2

     A.  Section 202(c) does not allow the Department to address
         non-imminent concerns. .....................................................................2

        1.  Section 202(c)'s plain text reaches only shortages requiring
           immediate action. .....................................................................3

        2.  Statutory structure confirms the imminence requirement. ....................7

        3.  The Department's past practice underscores the imminence
           requirement.............................................................................12

     B.  The record lacks support for a shortage emergency................................13

        1.  The Department's evidence of long-term challenges cannot
           support a shortage emergency. .........................................................14

        2.  The Department's near-term evidence does not support a
           shortage emergency.........................................................................16

        3.  The Department's new justifications for the Order fail.......................20

  II.  The Order Fails to Comply with Section 202(c)'s Other Limits...................22

     A.  The Department failed to explain how Campbell "best meets" the
         emergency.......................................................................................22

     B.  The Department has flouted Section 202(c)'s "hours necessary" and
         "minimiz[ing] environmental impacts" requirements..............................23

  III. This Court Can Order Relief. ....................................................................24

CONCLUSION ................................................................................................25

CERTIFICATE OF COMPLIANCE...................................................................28

CERTIFICATE OF SERVICE ........................................................................29

**Page(s)**

**Cases**

*Atchley v. AstraZeneca UK Ltd.*,
165 F.4th 592 (D.C. Cir. 2026)......................................................................4

*Biden v. Nebraska*,
600 U.S. 477 (2023)......................................................................................10

*Bufkin v. Collins*,
604 U.S. 369 (2025)......................................................................................12

*City & Cnty. of San Francisco v. FERC*,
24 F.4th 652 (D.C. Cir. 2022)......................................................................17

*Clean Fuels All. Am. v. EPA*,
169 F.4th 307 (D.C. Cir. 2026)....................................................................24

*Conn. Dep't of Pub. Util. Control v. FERC*,
569 F.3d 477 (D.C. Cir. 2009)........................................................................9

*Consol. Edison Co. of N.Y. v. Fed. Power Comm'n*,
511 F.2d 372 (D.C. Cir. 1974)..................................................................8, 17

*Daikin Applied Ams. Inc. v. EPA*,
39 F.4th 701 (D.C. Cir. 2022)......................................................................16

*Del Monte Fresh Produce Co. v. United States*,
570 F.3d 316 (D.C. Cir. 2009)......................................................................24

*Ethyl Corp. v. EPA*,
541 F.2d 1 (D.C. Cir. 1976)............................................................................6

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)......................................................................................16

*Fla. Mun. Power Agency v. FERC*,
315 F.3d 362 (D.C. Cir. 2003)......................................................................16

*Grand Trunk Corp. v. TSA*,
153 F.4th 517 (7th Cir. 2025).........................................................................5

*Gundy v. United States*,
588 U.S. 128 (2019)........................................................................8

*Kimball Wind, LLC v. FERC*,
140 F.4th 496 (D.C. Cir. 2025)...................................................16

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026)...............................................................7, 8

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)........................................................................2

*Maryland People's Couns. v. FERC*,
761 F.2d 768 (D.C. Cir. 1985)...................................................24

*Medical Marijuana, Inc. v. Horn*,
604 U.S. 593 (2025)........................................................................4

*Otter Tail Power Co. v. Federal Power Comm'n*,
429 F.2d 232 (8th Cir. 1970) ...................................................6, 8

*Richmond Power & Light v. FERC*,
574 F.2d 610 (D.C. Cir. 1978).............................................5, 6, 10

*Sinclair Wyoming Refin. Co. v. EPA*,
114 F.4th 693 (D.C. Cir. 2024)...................................................17

*Stanley v. City of Sanford*,
606 U.S. 46 (2025)...................................................................6, 12

*United States v. S. Ry. Co.*,
364 F.2d 86 (5th Cir. 1966) .........................................................5

*United States v. S. Ry. Co.*,
380 F.2d 49 (4th Cir. 1967) .........................................................5

**Statutes**

16 U.S.C. § 824a(a) ...................................................................................8

16 U.S.C. § 824a(c)(1) ...............................................2, 3, 4, 6, 12, 22

16 U.S.C. § 824a(c)(2) ...........................................................11, 23

16 U.S.C. § 824a(c)(5) ...............................................................18

16 U.S.C. § 824*o*(e)(3) ...............................................................9

16 U.S.C. § 824*o*(i)(2) ...............................................................9

16 U.S.C. § 824*o*-1(a)(7) ...........................................................12

16 U.S.C. § 825*l*(a) ...................................................................18

16 U.S.C. § 825*l*(b) ...................................................................18

**Code of Federal Regulations**

10 C.F.R. § 205.371 ..............................................................12, 13

**Other Authorities**

Black's Law Dictionary (3d ed. 1933)..............................................5

S. Rep. No. 74-621 (1935) ......................................................7

*NERC President Warns of 'Five-alarm Fire' for Grid Reliability*,
    Utility Dive (Oct. 22, 2025), https://perma.cc/85SC-NVSF ...........................14

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| FERC | Federal Energy Regulatory Commission |
| MISO | Midcontinent Independent System Operator |
| NERC | North American Electric Reliability Corporation |
| PIO | Public Interest Organizations |
| PIOB | Public Interest Organizations Opening Brief |
| SB | States Opening Brief |
| DB | Department Brief |
| SR | States Reply |

# INTRODUCTION AND SUMMARY OF ARGUMENT

The Department's Brief confirms that it is seeking to transform Section 202(c)'s rarely invoked emergency provision into a sweeping authority to address *any* potential electricity shortage, no matter how far off. This unprecedented power grab has supplanted the entities responsible for long-term grid planning under the Federal Power Act—states, utilities, grid operators, and FERC. And it has torpedoed years of planning around Campbell's retirement by Michigan and MISO, which had already secured surplus generation capacity for 2025-2026. Forcing Campbell to operate therefore has not "sav[ed] lives," DB3,[1] but needlessly racked up costs while exposing surrounding communities to deadly pollution.

The Department cannot square its Secretary-knows-best approach with Section 202(c)'s limits. *Infra* § I.A. The Department's claim of an emergency shortage is based on misread evidence, and its Brief's copy-and-paste reasoning cannot save the Order. *Infra* § I.B. The Department further erred by failing to meet

---

[1] "PIOB__" refers to the Public Interest Organizations Opening Brief, "SB__" refers to the States Opening Brief, "DB__" refers to the Department Brief, and "SR__" refers to the States Reply. PIO Petitioners incorporate the arguments made in the States Reply.

Section 202(c)'s limits on generation during an emergency. *Infra* § II. This Court should set aside the Order and provide effective relief. *Infra* § III.[2]

## ARGUMENT

**I.** **The Department Violated Section 202(c) by Failing to Demonstrate an Emergency.**

    **A.** **Section 202(c) does not allow the Department to address non-imminent concerns.**

The Department may compel generation only where an "emergency exists by reason of," as relevant here, "a shortage of electric energy or of facilities for the generation or transmission of electric energy." 16 U.S.C. § 824a(c)(1). This "fix[es]" the "boundaries of" the Department's "delegated authority" to shortages requiring an imminent response, not the far-off concerns the Order identified here. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (cleaned up); PIOB23-33.

The Department agrees that this "emergency-determination requirement" limits its authority. DB41-42. But it maintains Section 202(c) is not limited to "imminent shortages of electricity" because it reaches "any shortages of electric power," even if "an acute shortfall or blackout might not materialize" for years. DB21-25 (cleaned up). But Section 202(c)'s text, structure, and historical use say

---

[2] Petitioners have not asked this Court to disregard the Rehearing Order. *Contra* DB80-82.

otherwise. The Department's contrary reading rests on its showing that an "emergency" can be long-*lasting*, but it cites nothing to establish that an "emergency" can encompass a crisis that may not *emerge* for years. The Department's desire to address such longer-term generation and reliability challenges cannot override the Federal Power Act's clear assignment of that authority to others.[3]

### 1. Section 202(c)'s plain text reaches only shortages requiring immediate action.

**a.** Section 202(c) empowers the Department to act on shortages that rise to the level of an "emergency." 16 U.S.C. § 824a(c)(1). The Department thus may act only where a shortage causes a "pressing necessity" or "exigency" that "calls for immediate action or remedy." *See* PIOB24 (citation omitted).

The Department resists this limitation because, in its view, the word "emergency" does no independent work. DB23-25. Under this theory, Section 202(c) defines "emergency" directly with the "examples" in the provision, such that any shortage—no matter how inchoate—suffices. DB23-25.

But that's not what Section 202(c) says. If Congress wanted Section 202(c) to be that expansive, it could have omitted the "emergency" qualifier: the

---

[3] Authority over generation lies with states; regional coordination and planning, with MISO, as overseen by FERC; and reliability standard setting, with NERC. *See* PIOB4-11; SR1-2, 12-13.

Department may act whenever it "determines that ~~an emergency~~ [there] exists ~~by reason of~~ a . . . shortage of electric energy." 16 U.S.C. § 824a(c)(1). Instead, Congress required that an "emergency exists *by reason of*" a shortage. *Id.* (emphasis added). That requires both an "emergency" and one caused by a shortage. *See Atchley v. AstraZeneca UK Ltd.* 165 F.4th 592, 600-01 (D.C. Cir. 2026) ("by reason of" requires a "causal connection" (cleaned up)); *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 600, 612 (2025) (establishing an "injur[y] in his business or property by reason of a violation" mandated showing injury and violation). Rightly so: Not every shortage requires emergency intervention. *See* SR8-9. And if "emergency" had no independent meaning, then Section 202(c)'s "other causes" of emergency would have no meaning. 16 U.S.C. § 824a(c)(1).

The Department's fallback is that "emergency" cannot require imminence because one dictionary and some courts have recognized that emergencies can be long-lasting. DB24-25, 27-28. That is a non-sequitur: Whether an emergency can be long-lasting is a separate question from whether an emergency is defined by a need for immediate action.

The Department's own sources confirm that, even if an "emergency" can be long-*lasting*, it still would not encompass the kind of far-off concerns identified here. Before the Department's preferred dictionary explains that emergencies can be long-lasting (a "relatively permanent condition of insufficiency"), it first defines

4

the term the same way Petitioners have, as requiring imminence: "a sudden or unexpected occasion for action; exigency; pressing necessity." Black's Law Dictionary 654 (3d ed. 1933). Similarly, the Department's lead case, *Grand Trunk Corp. v. TSA*, recognizes that while "long-*lasting* emergencies" can exist, "constantly looming threats" do not rise to an emergency unless they pose an "acute and ever-present problem tantamount to an ongoing emergency." 153 F.4th 517, 524-25 (7th Cir. 2025) (emphasis added); *contra* DB22 (disclaiming that an emergency must involve acute concerns). In other words, even if an emergency need not be "sudden in origin or temporary in nature," long-brewing concerns are not an emergency unless and until they "reach a level requiring immediate and drastic action." *United States v. Southern Railway Co.*, 380 F.2d 49, 55 n.17 (4th Cir. 1967); *see also United States v. S. Ry. Co.*, 364 F.2d 86, 94 (5th Cir. 1966) (emergency must be "a combination of circumstances which calls for immediate action.").

Petitioners' cases engage directly with Section 202 and confirm this understanding. *See, e.g.*, PIOB26 (citing *Richmond Power & Light v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978) and *Otter Tail Power Co. v. Federal Power Comm'n*, 429 F.2d 232, 234 (8th Cir. 1970)). They go far beyond "reiterat[ing] the language of the statute," *contra* DB42-43: *Richmond* determined that the Department correctly interpreted "Section 202(c)" as "devoid of a solution" when

the "supply is adequate" and there is therefore no emergency, 574 F.2d at 615; and *Otter Tail* recognized Section 202(c) reaches only those "cris[e]s" that "necessitate immediate action on the part of the Commission," not those "likely to develop in the foreseeable future." 429 F.2d at 234.

**b.** The Department has no persuasive response to two other features of Section 202(c) that confirm its imminence requirement.

First, Section 202(c) speaks in the present tense, allowing the Department to act only when an "emergency *exists*" or "*[d]uring* the continuance of any war." 16 U.S.C. § 824a(c)(1) (emphasis added); PIOB25; *cf. Ethyl Corp. v. EPA*, 541 F.2d 1, 12-13 (D.C. Cir. 1976) ("will endanger" standard reflects a "precautionary" approach). This confirms the "statute's temporal reach," *Stanley v. City of Sanford*, 606 U.S. 46, 52 (2025) (cleaned up), such that, "[o]n its face," Section 202(c) "enables the Commission to *react* to a war or national disaster . . . to maintain electrical service *during* such emergency." *Otter Tail*, 429 F.2d at 234 (emphasis added). While the Department can address imminent concerns, the possibility of war or emergency years in the future is not enough.

Second, the Department cannot explain why Congress would allow *any* electricity shortage to suffice when Section 202(c) is limited to the exigent circumstances of war, 16 U.S.C. § 824a(c)(1), and the harms arising from "sudden increase[s] in the demand," 16 U.S.C. § 824a(c)(1). PIOB25-26. Again, it is no

6

answer that wars can "be *prolonged*, without certain endpoints." DB27 (emphasis added); *see supra* 4-5. And the Department's observation that "sudden" qualifies only "increase[s] in the demand," not shortages, DB25-26, ignores that a phrase in a statute is best "understood" based on "the company it keeps." DB24. Congress viewed Section 202(c) as reaching a set of "similar crises," S. Rep. No. 74-621, at 49 (1935), so it makes little sense to interpret the provision to reach *distant* shortages but only *sudden* demand increases. In any event, the Department's own cases recognize that even when a crisis is not sudden, it is not an "emergency" until it becomes imminent. *See supra* 5.

**2. Statutory structure confirms the imminence requirement.**

**a.** The Federal Power Act's broader structure confirms that Section 202(c) is a stopgap to address exigencies, PIOB26-29, not a tool by which the federal government could "fix longer-term problems" itself, DB45; *see also* DB30-31. Other provisions of the Federal Power Act—including Sections 202(a), 202(b), and 215—speak directly to the federal government's limited authority over long-term resource adequacy and reliability planning, reflecting Congress's intent to preserve primary responsibility for utility regulation with the states. PIOB26-29. This "backdrop of clear and limited delegations" illustrates that Congress did not intend for the Department to ignore these constraints and "unlock . . . extraordinary power" based on a "declaration of emergency." *See Learning Res., Inc. v. Trump*,

146 S. Ct. 628, 640 (2026) (Roberts, C.J., concurring); *see also Consol. Edison Co. of N.Y. v. Fed. Power Comm'n*, 511 F.2d 372, 382-83 (D.C. Cir. 1974) ("residual emergency powers . . . must be carefully confined"). The Court should reject the Department's interpretation—that the Secretary can usurp states' long-term planning role whenever he claims a shortage—because it would render these limitations meaningless. PIOB27-29.

The Department first responds that nothing in the "individual subsections" of Section 202's three-part structure implies any limitations for Section 202(c). DB45-46. But the three-part framework itself indicates Section 202(c)'s limits. *See Gundy v. United States*, 588 U.S. 128, 141 (2019) ("[W]ords of a statute must be read . . . with a view to their place in the overall statutory scheme." (cleaned up)). Each part of this framework is aimed at ensuring sufficient supply, with increasing federal authority to intervene depending on how imminent the need. *See* PIOB26-27; *Otter Tail*, 429 F.2d at 234. Even if the words "short term" and "long term" may not appear, DB46, only Section 202(a), for example, permits the federal government to pursue long-term goals like securing "an abundant supply of electric energy." 16 U.S.C. § 824a(a). Interpreting a much narrower emergency provision to address that same end nullifies those provisions' constraints.

The Department's rejection of Section 215's import suffers from a similar flaw. It claims Section 215 is irrelevant because the Order does not "adopt a

nationwide reliability standard" or demand that anyone "construct" or "enlarge" a generating facility. DB46. But addressing "reliability risks" that may emerge in "five years" intrudes on Section 215's domain. JA____[DOE0016_14]; *see also* DB33-36, 62-63. And the federal government may not "order compliance with a reliability standard" without adhering to Section 215's procedural and substantive safeguards—notice, a hearing, and limited remedies. 16 U.S.C. §§ 824*o*(e)(3), (i)(2); PIOB27-28. The Department may not circumvent these limits by intoning emergency, particularly where Section 215 was added because Section 202 did not address long-term grid reliability. PIOB8, 27-28.

Finally, the Department maintains that it can intrude on state authority over generation because Section 202(c) is an exception to states' otherwise plenary authority. DB43-44. But the Department's approach to this exception swallows the rule. Allowing the Department to take over whenever a potential shortage is projected in "the next five years," DB44-45, would eliminate any role for states and other regulators. *See* SR11-13. Indeed, here, the Department has invoked this exceptional authority to prevent a coal plant retirement and impose on Michigan its policy preferences about how to secure long-term resource adequacy. This far exceeds Section 202(c)'s bounds: Absent an imminent concern, the Department cannot "interfere[]" with "retirement of existing generators," *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009), or impose the

9

Department's preferred "means of [electricity] production," *Richmond*, 574 F.2d at 615. *Contra* DB57-58.

The Department argues that it should nonetheless be permitted to override this default division of authority because the electricity sector's problems can take years to solve and it "cannot assume that states can or will fix longer-term problems themselves." DB31-36, 44-45. But the record shows no real risk of looming concerns going unaddressed. Non-emergency responses can and do resolve far-off problems without the need for emergency command-and-control intervention. *See* SR11-13; *infra* § I.B.

In any event, the question is not whether "threatened" long-term "inadequacies" will be addressed, but by whom. DB33-34, 44; *see Biden v. Nebraska*, 600 U.S. 477, 501 (2023) ("The question here is not whether something should be done; it is who has the authority to do it."). Here, Congress's answer was that state- and market-led decisions—with complementary federal oversight by FERC, not top-down control—would best handle "generation planning [that] occurs on decadal timelines." *Contra* DB44-45. The Department's desire to handle long-term planning cannot countermand Congress's clear intent.

Limiting Section 202(c) to exigent shortages therefore does not "neuter" it. *Contra* DB35-36. The Department can deploy the enumerated "solutions to an emergency," DB34, to solve imminent problems as it has done for decades,

including during Winter Storm Fern. *See* PIOB32-33; DB85 (citing a 5-day 202(c) order issued during Fern). Meanwhile, the federal government need not "sit idly by" while others address long-term problems, DB44: FERC can act alongside states using its non-emergency authority.

**b.** Section 202(c) also must be limited to imminent concerns because it is otherwise impossible to tailor "generation" to the "hours necessary to meet the emergency." 16 U.S.C. § 824a(c)(2). Far-off crises do not have any well-defined need, PIOB29, as the Department's brief illustrates, DB78.

**c.** The Department marshals three pieces of contextual support, but none helps it.

First, it contends that Section 202(c) is not limited to "fleeting, near-term shortages" because it can renew the 90-day orders. DB27 (citing 16 U.S.C. § 824a(c)(4)(A)). But that provision confirms the need for imminence, because it indicates the Department should be focused on the next 90 days. PIOB29. Moreover, the possibility of long-lasting emergencies does not dispense with the imminence requirement. *See supra* 4-5.

Second, the Department argues that "emergency" cannot require imminence because Section 202(d) refers to an "emergency requiring immediate action." DB28. Even if "requiring immediate action" is "redundant, serving only to underscore" the nature of emergencies Section 202(d) addresses, the "canon

against surplusage is not an absolute rule." *Stanley*, 606 U.S. at 56. It does not apply when the Department's contrary reading would fail to give effect to the term "emergency" in Section 202(c), *see Bufkin v. Collins*, 604 U.S. 369, 387 (2025), or require adopting an "unusual meaning that will avoid surplusage over a more natural one," *Stanley*, 606 U.S. at 56 (cleaned up).

Finally, Section 215A's inclusion of the word "imminent" in the definition of "grid security emergency," DB28-29, supports Petitioners' interpretation. This provision, unlike Section 202(c), expressly defines emergency. 16 U.S.C. § 824*o*-1(a)(7) ("'emergency' means"); *compare id.* § 824a(c)(1) ("emergency exists by reason of"). And Congress defined the term "emergency" in Section 215A in the way Petitioners have, to require the "occurrence or imminent danger of" specific "grid security" harms. 16 U.S.C. § 824*o*-1(a)(7). Accordingly, while Section 215A deploys more detail on what harms might qualify, DB29-30, it still shares the need for present or imminent harm.

### 3. The Department's past practice underscores the imminence requirement.

The Department's own regulations reject the Department's approach here. PIOB30-31. The regulations define emergency to be "an unexpected inadequate supply of electric energy" that generally results from "unexpected" causes or "unforeseen occurrences." 10 C.F.R. § 205.371. Not every "[s]ituation[] where a

shortage of electric energy is projected" is an emergency: "[T]he inability to supply electric service" must be "imminent." *Id.*

The Department counters that "inadequate planning or the failure to construct necessary facilities" can result in an emergency. DB36. But inadequate planning does not always justify action; that failure must "result in an emergency" and "[e]xtended periods of insufficient power supply." 10 C.F.R. § 205.371; PIOB33.

The Department's use of Section 202(c) here is also out-of-step with its historical use. PIOB30; *see* Energy Law Scholars Br. § II, Doc. No. 2151890. The Department claims otherwise, DB36-39, but it identifies only long-*lasting* emergencies. No prior 202(c) order has addressed a problem that may be years away. *See* SR14-17.

### B. The record lacks support for a shortage emergency.

The Order must be set aside because it relied on cherry-picked quotes from a handful of sources, all of which fail to establish a shortage emergency. PIOB33-41. On review, the Department makes scant effort to defend such a shortage; it instead focuses on evidence of "shortages projected in the next five years" and leans on a misapplied standard of review to paper over the Order's misreading of the cited sources. DB44-45, 52-70. But evidence of non-imminent concerns cannot justify a

13

Section 202(c) order, *see supra* § I.A, and the Order's claim of summertime emergency is not supported by the record.[4]

### 1. The Department's evidence of long-term challenges cannot support a shortage emergency.

Once the Court interprets Section 202(c) to require imminence, the Department's evidence concerning only long-term resource adequacy challenges cannot support the Order. *See supra* § I.A; *accord* DB56-57. Such evidence includes MISO executive Jennifer Curran's congressional testimony—now heralded by the Department as a linchpin for the Order, *see generally* DB54-70. That testimony describes long-term planning challenges, such as demand growth "over the next 20 years," as the Department acknowledges. DB54-55. The same applies to the Order's other evidence of long-term challenges, *see* PIOB36-40 (discussing instances of the Order distorting long-term evidence to support summer shortage), and the Department Brief's new record quotes, *see* DB54, 61 (citing

---

[4] The Department attempts to shore up these record deficiencies with nearly 30 extra-record citations. *See, e.g.*, DB8-11, 31-36. This evidence comes too late. And, as the very first such citation illustrates, DB1, the cherry-picking continues: The NERC president stated that "[t]he reliability of the power grid remains extremely high," despite challenges. *NERC President Warns of 'Five-alarm Fire' for Grid Reliability*, Utility Dive (Oct. 22, 2025), https://perma.cc/85SC-NVSF.

JA____[DOE0005_7] and JA____[DOE0004_7], which describe only long-term challenges).[5]

Curran's testimony confirms why such far-off concerns are irrelevant. It shows how MISO's non-emergency mechanisms are working as intended to address longer-term demand growth. PIOB39-40; SB42-43. MISO is studying "future electricity needs" to "inform the electric resource planning decisions, which are the purview of the states and utilities in the MISO region." JA____-____[DOE0021_6-7]. MISO's proposed solutions include "improving existing market and operations processes," "encourag[ing] interregional collaboration," and "letting *local reliability requirement*s determine the pace of retirement of existing power plants." JA____-____[DOE0021_6-10] (emphasis added).

Contrary to the Department's assertion, Curran never calls for "undoing coal plant retirements." DB72-73. Calling for *local* reliability requirements to guide resource retirement and replacement decisions *going forward* is nothing like soliciting federal intervention to undo years-long planning by utilities, states, and MISO. *See* JA____-____[DOE0021_9-10] (recommending, under "looking ahead," providing information that "states and utilities" need to make "prudent electric resource decisions"). Indeed, Campbell had met Michigan's reliability

_____

[5] The cited Executive Orders cannot support the Order because they contain only generalized conclusions. PIOB39; SB42.

requirements and procured replacement resources, and MISO approved Campbell's retirement. *See* PIOB13-14.

### 2. The Department's near-term evidence does not support a shortage emergency.

As for the handful of sources describing conditions in summer 2025, none demonstrates a shortage requiring immediate federal intervention. PIOB34-39. The Order itself recognizes that the region had "sufficient capacity" for the summer, JA____[DOE0001_2] (cleaned up), and the remaining quotes the Department emphasizes, read in context, do not show otherwise.

**a**. As a threshold matter, the Department urges the Court to overlook its unsupported conclusion based on a misapplied standard of review. DB51-52. But Section 202(c) orders must be both factually supported and "reasonable and reasonably explained." *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Kimball Wind, LLC v. FERC*, 140 F.4th 496, 499 (D.C. Cir. 2025). And under either the arbitrary-or-capricious or substantial-evidence tests, an order must be set aside where, as here, the record does not support the agency's conclusion. PIOB34 n.8; *see also Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 368 (D.C. Cir. 2003); *Daikin Applied Ams. Inc. v. EPA*, 39 F.4th 701, 712 (D.C. Cir. 2022). None of the Department's reasoning for applying a less demanding standard works.

First, the Department repeatedly emphasizes that this case involves technical expertise. DB61, 67, 70. But even in highly technical areas, this Court routinely sets aside unreasonable agency actions, based on misunderstandings of core concepts or facts, unsupported conclusions, or conclusory analyses. *See, e.g.*, *City & Cnty. of San Francisco v. FERC*, 24 F.4th 652, 658-59 (D.C. Cir. 2022) (vacating action based on alleged reliability concerns because of FERC's conclusory analysis); *Sinclair Wyoming Refin. Co. v. EPA*, 114 F.4th 693, 712 (D.C. Cir. 2024) (vacating agency determination due to its misunderstanding of "the dynamics and features" of the relevant market).

Second, that Section 202(c) is an emergency provision does not excuse the Order's errors. DB52. A pressing need to act might justify the Department being less elaborate. *See Consol. Edison*, 511 F.2d at 381-83. But here, Petitioners' objection is not that of unelaborate explanation, but that the Department misrepresents the record. *See* PIOB34-40; *infra* § I.B.2.b. Moreover, no similar "severe time restraints" exist here, DB52: The Department had months to supply reasoning on rehearing and the identified "emergency" is reliability risks in the next five years.

The Department is also wrong that it has no obligation to explain its decision because it can act without "notice, hearing, or report." *Contra* DB62, 75. Such explanation is necessary to allow for the judicial review Section 202(c) provides.

*See* 16 U.S.C. § 824a(c)(5). Indeed, the statutory rehearing process is meant to create an agency record to facilitate that review, *see* 16 U.S.C. § 825*l*(a)-(b), as the Department concedes, DB81.

Lastly, the Secretary's discretion to determine that an emergency exists does not make this Court's review less demanding, *contra* DB52, as Petitioners explained, *see* PIOB31-32, 34 n.9.

**b.** Applying the appropriate standard of review, the Department cannot salvage the Order. Even under a "totality of the circumstances" approach, DB53, 70, the Department may not manufacture an emergency based on documents that do not say what the Department claims.[6]

First, MISO's 2025-2026 capacity auction results do not support a shortage emergency in summer 2025 because MISO procured more than sufficient capacity for the season. PIOB35-37; JA____, ____[DOE0004_2,12]. The Department tries to turn that clear "surplus" into a cause for concern because the surplus was not as large as in the previous year. DB60-61. But a smaller surplus is still the opposite of a shortage.

---

[6] The Department also acted unreasonably by ignoring record evidence contradicting its conclusion. PIOB40-41; SR17-20.

Second, the Department's reliance on NERC's "elevated risk" designation and MISO's 2025 summer "Emergency Alerts" focuses solely on those labels without considering their meaning. PIOB37-39.

An "elevated risk" in the NERC assessment is not an imminent blackout risk, but the risk that MISO may use existing mitigation measures to resolve any "potential for insufficient operating reserves in above-normal conditions." JA____-____, ____, ____[DOE0005_5-6,11,16]; *see* PIOB37-38; *contra* JA____[DOE0016_11] (incorrectly describing elevated risk as "significant strain . . . even in normal operating conditions"); DB64 (repeating error).[7] The Department's attempt to equate "elevated risk" with imminent blackout risk further crumbles under the historical evidence that no involuntary blackout occurred in the five summers preceding the Order when MISO was an elevated or high-risk region. *See* PIOB37-38. The Department has no answer to this track record, asserting without evidence only that the Order prevented blackouts during summer 2025. DB65.

Disregarding the definition of "elevated risk," the Department argues that any "potential" for insufficient reserves "in coming years" establishes an

---

[7] NERC's assessment incorporated the National Oceanic Atmospheric Administration's expectation of above-normal temperatures. JA____[DOE0016_12]; *see* DB68-69; SB39 n.6.

emergency. DB64-65. But again, the risk is of using mitigation measures, such that no "losses of power to homes and local businesses" will result. DB15. And even if there were a lingering risk of such losses, DB65-66, such a risk always exists, as reflected in the widely accepted "one event per decade" standard for ensuring resource adequacy. *See* DB35; PIOB10. Permitting the Department to act on an ever-present risk of a shortfall would stretch "emergency" beyond recognition.[8]

MISO's 2025 summer alerts also did not indicate an imminent crisis. They were step two or below of MISO's *ten*-step protocol designed to address manageable fluctuations in supply and demand. *See* PIOB38-39. In response, the Department merely repeats the error from the Rehearing Order—elevating label over substance. DB69 ("[I]t is an 'Emergency Alert,' not a 'Concern Alert.'"). Such low-level alerts do not call for an extreme interventionist measure. *See* SB44-45.

### 3.  The Department's new justifications for the Order fail.

The Department's late-breaking justifications for the Order are not only improper but also unavailing.

---

[8] Nothing in the record reflects a risk of another event like the 2003 blackout or that Campbell could possibly address any such risk. *See* JA____[DOE0005_12]; *contra* DB66.

First, the Department argues that MISO should have secured even more surplus capacity in 2025-2026 and that simply replacing Campbell's capacity was insufficient because demand is rising. *See* DB58, 62-63. But the increases in demand the Department identifies will not result in any near-term shortage. Rather, even if generation did not keep up with demand growth, the upshot would be that "the planned growth of manufacturing, artificial intelligence, and data centers cannot occur," JA___[DOE0021_6], *not* "power losses risking public health and safety," DB70. PIOB36-37. Section 202(c) thus supplies no basis for the Department to micromanage capacity targets to serve these sources of demand increase.

Second, the Department repeatedly asserts that wind and solar energy are unreliable and therefore MISO and Michigan cannot be trusted to secure sufficient capacity. *See, e.g.*, DB58-60, 62-64. Nothing in the record indicates that MISO is facing an emergency shortage due to its wind and solar resources. Most of the Department's criticism of wind and solar resources comes from mischaracterized quotes from MISO documents. Yet, MISO itself approved Campbell's retirement based on replacing Campbell's capacity with oil-and-gas generation resulting in a four-hundred-megawatt increase, *even before* accounting for new solar and battery capacities. *See* PIOB13-14. And MISO already accounts for any weather-related

variability in their accreditation methodology, approved by FERC. *See*

JA____[DOE0004_38]; JA____-____[DOE0007_16-17].

**II.     The Order Fails to Comply with Section 202(c)'s Other Limits.**

> **A.     The Department failed to explain how Campbell "best meets" the emergency.**

The Department failed to explain why, in its judgment, keeping Campbell

open "best meets" the identified emergency. *See* PIOB42-45; 16 U.S.C.

§ 824a(c)(1).

The Department responds that it had no obligation to analyze, let alone

explain, why preventing Campbell's retirement was its choice, because the word

"best" serves only to broaden its discretion. DB47. But the statute specifies what

"best" means: The Department must determine what will "best meet the

emergency," not exercise its "best judgment." 16 U.S.C. § 824a(c)(1). That the

Department may use its judgment does not relax its obligation to explain why

Campbell was the best choice. *See* PIOB44-45; *supra* § I.B.2.a; *contra* DB47-51.

The Department belatedly attempts to explain its choice by regurgitating the

same rationales used to support the emergency finding. DB71-74; PIOB44-45

(highlighting concession that the Order offered no explanation). But the "best

meets" requirement is separate from whether a statutory emergency exists;

evidence supporting an emergency declaration does not show why one solution is

best. PIOB43. The Department ultimately fails to address Campbell's well-known

reliability concerns and concedes that it did not consider any alternatives, including those that might "minimiz[e] pollution," notwithstanding its statutory obligation to do so. *See* DB73-74; 16 U.S.C. § 824a(c)(2).

**B.      The Department has flouted Section 202(c)'s "hours necessary" and "minimiz[ing] environmental impacts" requirements.**

The Order's directive to employ economic dispatch—or offer Campbell's output on a "must-run basis" if necessary—violates Section 202(c)'s requirement of (1) ordering generation "only during hours necessary to meet the emergency" and (2) "minimiz[ing] any adverse environmental impacts." 16 U.S.C. § 824a(c)(2); *see* PIOB45-47.

The Department argues that ordering economic dispatch is compatible with the "hours necessary" limitation because the Order also "limit[ed] operation of dispatched units through the expiration of the Order." DB77-78. But requiring Campbell to run whenever its offer sells in the market, even when other generation sources are available, could not possibly limit its operation to the hours necessary. PIOB45-46.

The Department ultimately claims that this obligation does not apply here because this emergency involves a "persistent 'shortage of electricity.'" DB78. But even if that were true, economic dispatch would not make sense: A *persistent* shortage could not be remedied by mandating Campbell's output only when the market conditions are right. And the Department cannot escape this fundamental

mismatch by asserting that the "economic dispatch" directive is a "subsidiary" goal, DB79, as neither the Order nor Rehearing Order supports that claim.

The Department also fails to respond to Petitioners' objection that requiring economic dispatch (or allowing must-run) cannot minimize environmental impacts. Again, the Department cannot reconcile economic dispatch with this obligation by stating that it ordered both. *Contra* DB78; JA____[DOE0001_3].

## III.   This Court Can Order Relief.

The parties agree that mootness does not bar this Court's review. PIOB47-49; DB4. The Court should vacate the order: The government made serious errors that cannot be remedied on remand, and it failed to establish any disruptive consequences, let alone those outweighing the economic and health harms from Campbell's operation. *See* SR24-26; PIOB11-13, 19-21; *contra* DB82-87. In any event, even short of vacatur, this Court can provide effective forward-looking relief. *See, e.g.*, *Maryland People's Couns. v. FERC*, 761 F.2d 768, 779 (D.C. Cir. 1985) ("certified copy of [the] opinion" and orders "to show cause why the successor orders should not be vacated"); *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 325 (D.C. Cir. 2009) (declaratory relief available under "capable of repetition yet evading review" exception); *Clean Fuels All. Am. v. EPA*, 169 F.4th 307, 313 n.2 (D.C. Cir. 2026) (same for ongoing policies).

# CONCLUSION

This Court should vacate the Order as modified by the Rehearing Order and declare the Order and its justifications unlawful.

Dated: April 7, 2026                    Respectfully Submitted,

/s/ Benjamin Chagnon[9]
Benjamin Chagnon (DC Cir. 65850)
Jennifer Yun (DC Cir. 66550)
Michael Lenoff (DC Cir. 66374)
1250 I St. NW, 4th Floor
Washington, DC 20001
(202) 745-5210
bchagnon@earthjustice.org
jyun@earthjustice.org
mlenoff@earthjustice.org

Lauren Piette (DC Cir. 66519)
Sameer Doshi (DC Cir. 64549)
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 500-2193
lpiette@earthjustice.org
sdoshi@earthjustice.org

Christine Powell (DC Cir. 64908)
180 Steuart St., #194330
San Francisco, CA 94105
(415) 217-2035
cpowell@earthjustice.org

*Counsel for Sierra Club and
Urban Core Collective*

/s/ Gregory E. Wannier
Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Elena Saxonhouse (DC Cir. 56639)
Sierra Club Environmental Law
Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
elena.saxonhouse@sierraclub.org

*Counsel for Sierra Club*

/s/ Howard A. Learner
Howard A. Learner (DC Cir. 61779)
Bradley Klein
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
hlearner@elpc.org
bklein@elpc.org

Katherine S. Duckworth
Environmental Law & Policy Center
1008 Floral Ave. SE
East Grand Rapids, MI 49506
T: (312) 673-6500
kduckworth@elpc.org

*Counsel for the Environmental Law &
Policy Center, Ecology Center, Union of
Concerned Scientists, and Vote Solar*

---

[9] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

*/s/ Caroline Reiser*
Caroline Reiser (DC Cir. 62319)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

Gavin McCabe (DC Cir. 53966)
Natural Resources Defense Council
40 W. 20th St., 11th Floor
New York, NY 10011
(212) 727-4529
gmccabe@nrdc.org

Simi Bhat (DC Cir. 55968)
Karen Chen
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
(415) 875-6110
sbhat@nrdc.org
kchen@nrdc.org

*Counsel for Natural Resources Defense Council*

*/s/ Danielle C. Fidler*
Danielle C. Fidler (DC Cir. 62486)
Francis W. Sturges, Jr. (DC Cir. 64964)
Veronica Saltzman (DC Cir. 64096)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
dfidler@catf.us
fsturges@catf.us
vsaltzman@catf.us

*Counsel for Michigan Environmental Council*

*/s/ Tomás Carbonell*
Tomás Carbonell (DC Cir. 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(919) 449-4600
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a), D.C. Circuit Rule 32(e), and the Court's November 20, 2025 and December 2, 2025 Orders, because this document contains 4,996 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e).

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Benjamin Chagnon*
Benjamin Chagnon
DC Cir. 65850
Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 7, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit through this Court's CM/ECF system, which will serve a copy on all registered users.

/s/ Benjamin Chagnon
Benjamin Chagnon
DC Cir. 65850
Attorney
