**ORAL ARGUMENT SCHEDULED FOR MAY 15, 2026**
No. 25-1159 and consolidated cases

IN THE

# United States Court of Appeals for the District of Columbia Circuit

THE PEOPLE OF THE STATE OF MICHIGAN, *et al.*,

*Petitioners*,

– v. –

UNITED STATES DEPARTMENT OF ENERGY, *et al.*,

*Respondents*,

MIDCONTINENT INDEPENDENT SYSTEM OPERATOR, INC.,

*Intervenor-Respondents*.

On Petitions for Review of United States Department of Energy Order No. 202-25-3

**FINAL BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS**

Jennifer Danis
Daniel J. Jones
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 998-6047
jennifer.danis@nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

April 10, 2026

## CIRCUIT RULE 28(A)(1) STATEMENT

As required by Circuit Rule 28(a)(1), counsel for the Institute for Policy Integrity at New York University School of Law certify as follows:

(1)    All parties, amici, and intervenors appearing in this case are listed in Petitioners' opening briefs.

(2)    References to the final agency action under review appear in Petitioners' opening briefs.

(3)    Related and consolidated cases appear in Petitioners' opening briefs.

## RULE 26.1 DISCLOSURE STATEMENT

The Institute for Policy Integrity (Policy Integrity) is a nonpartisan, not-for-profit organization at New York University School of Law.[*] No publicly held entity owns an interest in Policy Integrity. Policy Integrity does not have any members who have issued shares or debt securities to the public.

---

[*] This brief does not purport to represent the views, if any, of New York University School of Law.

## TABLE OF CONTENTS

**Page**

CIRCUIT RULE 28(A)(1) STATEMENT ...................................................i

RULE 26.1 DISCLOSURE STATEMENT.................................................ii

TABLE OF AUTHORITIES.................................................................... v

GLOSSARY OF ACRONYMS & ABBREVIATIONS ..........................viii

INTEREST OF *AMICUS CURIAE* & AUTHORITY TO FILE............... 1

SUMMARY OF ARGUMENT ................................................................ 2

ARGUMENT ......................................................................................... 6

    I.    States Bear Primary Responsibility For Ensuring Resource Adequacy, With Support From Regional Grid Operators And FERC. ........................................................... 6

        A.    States have the jurisdictional responsibility of ensuring resource adequacy, with support from regional grid operators and FERC................................ 7

        B.    The first step of resource adequacy planning is setting a target, a decision within state jurisdiction that involves policy choices about local factors. .......... 14

        C.    The next step of resource adequacy analysis requires modeling the regional electric system to determine whether the resource adequacy target is met.................................................................... 19

        D.    Both the State of Michigan and MISO performed analyses and determined that the Campbell Plant's scheduled retirement did not threaten regional resource adequacy.........................................21

    II.    DOE May Not Substitute Its Judgments About Resource Identification Or Resource Adequacy Planning. ........................................................................... 24

        A.    Section 202(c) does not authorize DOE to substitute its judgment about resource adequacy for that of the states or regional grid operators. ......... 25

B.    Neither DOE's order nor the NERC analysis underlying it identify how or why the Campbell Plant is necessary to regional resource adequacy........28

CONCLUSION ...................................................................................32

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016)......................7
*New York v. FERC*, 535 U.S. 1 (2002) ...................................................7

## Statutes

16 U.S.C. § 824(b)(1).................................................... 6, 7, 11, 26
16 U.S.C. § 824a(c)(1) ................................................... 14, 25, 28
16 U.S.C. § 824d(a) ........................................................... 11, 26
16 U.S.C. §§ 824o(a)(2) ...........................................................11
Mich. Comp. Laws § 460.6t(3) (2025).........................................22
Mich. Comp. Laws § 460.6w(8)(a) (2025)...................................22

## Other Authorities

Ari Peskoe, *Unjust, Unreasonable, and Unduly Discriminatory: Electric Utility Rates and the Campaign Against Rooftop Solar*, 11 Tex. J. Oil Gas & Energy L. 211 (2016)...........................................................8, 26
Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789 (2025) ................................................................................ 14, 25
Coley Girouard, *Understanding IRPs: How Utilities Plan for the Future*, Advanced Energy United (Aug. 11, 2015, at 4:59 PM), https://perma.cc/5MDN-26QY ........................................................ 7, 8
Derek Stenclik & Michael Goggin, *Resource Adequacy for a Clean Energy Grid* (2021), https://perma.cc/EQS3-3F9N ..............................19
Elec. Power Rsch. Inst., *Metrics and Criteria* (2024), https://perma.cc/W4VF-VQPD ........................................................17
Elec. Power Rsch. Inst., *Resource Adequacy for a Decarbonized Future* (2022), https://perma.cc/7G9V-CNWB ...............................................16
*Electricity Explained: Factors Affecting Electricity Prices*, U.S. Energy Info. Admin., https://perma.cc/KH98-BNE5 (last updated June 29, 2023) ...................................................................................18
Energy Sys. Integration Grp., *New Resource Adequacy Criteria for the Energy Transition* (2024), https://perma.cc/NXU4-N4UG ...... 15, 17, 18
Evan Halper & Jake Spring, *Trump Is Forcing This Dirty, Costly Coal Plant to Stay Open*, Wash. Post (June 6, 2025),

https://www.washingtonpost.com/business/2025/06/01/energy-climate-trump-coal-solar ...................................................................................... 24

*Fact Sheet*, Midcontinent Indep. Sys. Operator, https://perma.cc/FB77-68PH (last visited Dec. 16, 2025) ........................................................... 9

Fed. Energy Regul. Comm'n, *Understanding Wholesale Capacity Markets* (2025), https://perma.cc/4DF3-EEHL .................................. 6, 8

Jennifer Danis, Christoph Graf, Ph.D. & Matthew Lifson, Inst. for Pol'y Integrity, *Enough Energy: A Review of DOE's Resource Adequacy Methodology* (2025), https://policyintegrity.org/files/publications/IPI_EnoughEnergy_Final Report.pdf ....................................................................................... 2, 20

Kenneth W. Irvin et al., *Department of Energy Blocks Shutdown of Coal-Fired Power Plant and Oil- and Gas-Fired Generator Units With Federal Emergency Orders*, Sidley (June 13, 2025), https://perma.cc/3AVR-V9LX ................................................................ 23

*Key Players*, N. Am. Elec. Reliability Corp., https://perma.cc/2CME-ZV9N (last visited Dec. 19, 2025) ........................................................ 11

Mich. Pub. Serv. Comm'n, *Revised Integrated Resource Plan Filing Requirements* (2022), https://perma.cc/7GBU-UQ4P .......................... 22

Midcontinent Indep. Sys. Operator, *MISO Markets and Market Participation Overview*, https://perma.cc/U3FH-M3PF 1 (last visited Dec. 2, 2025) ...................................................................................... 22

Midcontinent Indep. Sys. Operator, *Planning Year 2025–2026 Loss of Load Expectation Study Report* (2024), https://perma.cc/4GX2-MJLR .............................................................................................................. 12

Midcontinent Indep. Sys. Operator, *Resource Adequacy Metrics and Criteria Roadmap* (2024), https://perma.cc/M9SW-2LKW ........ 9, 10, 14

*MISO History 101*, Midcontinent Indep. Sys. Operator, https://perma.cc/Y6F9-3WGM (last visited Dec. 17, 2025) ................... 22

N. Am. Elec. Reliability Corp. & Nat'l Acad. of Eng'g, *Evolving Planning Criteria for a Sustainable Power Grid* (2024), https://perma.cc/KE8D-W6VX .......................................................................................................... 17

N. Am. Elec. Reliability Corp., *2025 Summer Reliability Assessment* (2025), https://perma.cc/UY7T-G8RF ................................................ 29

N. Am. Elec. Reliability Corp., *2025–2026 Winter Reliability Assessment* (2025), https://perma.cc/8H4V-UA4S ......................................... 13, 31

N. Am. Elec. Reliability Corp., *Planning Resource Adequacy Analysis, Assessment and Documentation (No. BAL-502-RF-03)* (2025), https://perma.cc/3WUZ-63WF .............................................................. 12

PJM Interconnection LLC, *Demand Response* (2024), https://perma.cc/4BHD-6K7U ............................................................... 9

*Reliability Assessments*, N. Am. Elec. Reliability Corp., https://perma.cc/7N37-5PBW (last visited Dec. 12, 2025) .................... 13

*Resource Adequacy*, Midcontinent Indep. Sys. Operator https://perma.cc/42QU-GQED (last visited Dec. 16, 2025) ................. 10

*Resource Planning*, Mich. Pub. Serv. Comm'n, https://perma.cc/2Y69-DP68 (last visited Dec. 2, 2025) ................................................ 21, 22

U.S. Dep't of Energy, *Evaluating the Reliability and Security of the United States Electric Grid* (2025), https://perma.cc/A587-S88S ........ 27

*What We Do: Operate the Power System*, ISO New England, https://perma.cc/3QZB-2GA5 (last visited Dec. 8, 2025) ...................... 9

*Who We Are, What We Do and Why It Matters*, ReliabilityFirst, https://perma.cc/94NV-DUNC (last visited Dec. 8, 2025) ................... 12

## Regulations and Supporting Documents

Planning Resource Adequacy Assessment Reliability Standard, 76 Fed. Reg. 16250 (Mar. 23, 2011) ................................................................ 12

## Administrative and Executive Materials

*Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, 187 FERC ¶ 61,068 (2024) ................. 12

*In re Capacity Demonstrations for the 2028/2029 Planning Year*, No. U-21775 et al., Order (Mich. Pub. Serv. Comm'n Aug. 21, 2025) ........... 23

*Order Accepting Tariff Revisions*, 187 FERC ¶ 61,202 (2024) ............... 10

Req. for Reh'g by Mich. Att'y Gen. Dana Nessel, U.S. Dep't of Energy Order No. 202-25-3 (June 18, 2025) ............................................. 23, 25

U.S. Dep't of Energy, Order No. 202-25-3 (May 23, 2025) ............... 28, 29

U.S. Dep't of Energy, Order No. 202-25-7 (Aug. 20, 2025) .................... 30

U.S. Dep't of Energy, Order No. 202-25-9 (Nov. 18, 2025) .................... 31

# GLOSSARY OF ACRONYMS & ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| DOE | United States Department of Energy |
| FERC | Federal Energy Regulatory Commission |
| MISO | Midcontinent Independent System Operator |
| NERC | North American Electric Reliability Corporation |

## INTEREST OF *AMICUS CURIAE* & AUTHORITY TO FILE

The Institute for Policy Integrity at New York University School of Law (Policy Integrity) is a nonpartisan, not-for-profit think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in the fields of administrative law, economics, and public policy.[1]

Policy Integrity has produced extensive scholarship on energy law and regulation and on energy market design, and regularly submits comment letters to state public utility commissions, regional grid operators, the Federal Energy Regulatory Commission (FERC), and the Department of Energy (DOE). Recently, Policy Integrity published a report on a subject relevant here: how grid planners should analyze if a region has sufficient electricity generation resources to avoid unplanned power outages. *See* Jennifer Danis, Christoph Graf, Ph.D. & Matthew Lifson, Inst. for Pol'y Integrity, *Enough Energy: A Review of DOE's Resource Adequacy Methodology* (2025),

---

[1] Per Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief wholly or partly, and no person contributed money intended to fund its preparation or submission.

https://policyintegrity.org/files/publications/IPI_EnoughEnergy_FinalRe
port.pdf.

Policy Integrity submits this *amicus curiae* brief to assist the Court
in understanding what entities are responsible for ensuring a region's
"resource adequacy," or the extent to which it has sufficient generation
resources to satisfy electricity demand. This brief explains the
complicated methods through which these entities analyze and make
determinations about resource adequacy. This background will help the
Court assess the extent of DOE's emergency powers under Section 202(c)
of the Federal Power Act.

All parties have consented to the filing of this brief. A single joint
*amicus curiae* brief is not practicable in this case due to the numerous
and complicated legal issues involved.

## SUMMARY OF ARGUMENT

At the heart of this case is DOE's use of Federal Power Act Section
202(c) to identify a specific power plant, the J.H. Campbell Plant, as
supposedly necessary to ensure the regional electric grid in the Midwest
has enough energy resources. But DOE is not the appropriate entity to
make this determination. Rather, the states, with support from FERC

2

and regional grid operators, are primarily responsible for ensuring regional "resource adequacy," which is achieved when a region has enough energy supply to meet expected demand under various uncertain future conditions.

DOE is not the proper entity to independently identify a resource as essential for achieving resource adequacy, nor to impose its divergent determinations about resource adequacy on those who manage the grid. To understand why, it is necessary to first understand how such determinations are made and who is responsible for making them. This brief explains the proper roles of the states, regional grid operators, and federal entities in ensuring resource adequacy. Drawing on this background, the brief further explains that Section 202(c) does not authorize DOE to usurp the responsibilities that the Federal Power Act assigns primarily to the states, supported by FERC and the grid operators.

**I.** Electric power outages can occur when demand for electricity exceeds the available supply of electric power generation. Generally, when a region's electric power supply exceeds demand, that region should be safe from unexpected outages. To reduce the risk of power outages,

3

planners must analyze whether the region in question will attain a targeted level of resource adequacy.

The Federal Power Act assigns responsibility for ensuring resource adequacy primarily to the states, which are supported by the regional grid operators and FERC. The states (and FERC, through energy markets that it regulates) are best suited for this task because they are rate regulators, obligated to balance the costs of obtaining additional energy resources against the local risks of outages. Resource adequacy analysis is a complex planning process that requires planners to first set a resource adequacy target, which involves policy choices about region-specific issues, balancing the local costs of securing more energy resources against the risk of outages. Planners next perform sophisticated modeling of the regional electric system. Based on this modeling, planners can assess whether a region has achieved its resource adequacy target, whether a particular generation resource is necessary to maintain regional resource adequacy, and what energy resources might be necessary to replace that generation resource if it retires.

In this case, both Michigan and the regional grid operator, the Midcontinent Independent System Operator (MISO), performed resource

4

adequacy analyses and determined that the planned retirement of the Campbell Plant did not threaten regional resource adequacy.

**II.** Section 202(c) is an emergency-response tool for DOE to help address the risk of unanticipated power outages—not to override resource adequacy decisions by the states and grid operators. By using Section 202(c) to seize the role of resource adequacy monitor, DOE usurps the role that the Federal Power Act assigns to the states (supported by the grid operators and FERC). Unlike the states, DOE is not a rate regulator with a responsibility to consider impacts on ratepayers, and decisions about the appropriate regional resource mix belong to the states whose ratepayers must foot the bill. Further, DOE's order requiring the continued operation of the Campbell Plant reveals that DOE did not use or rely on appropriate tools to identify that resource as necessary to either short-term or long-term regional resource adequacy, a finding that stands in direct contrast to Michigan's and MISO's conclusions to the contrary.

For these reasons, this Court should reject arguments that Section 202(c) authorizes DOE to override judgments reached by the states and

grid operators who are responsible for maintaining regional resource adequacy.

## ARGUMENT

**I.     States Bear Primary Responsibility For Ensuring Resource Adequacy, With Support From Regional Grid Operators And FERC.**

The Federal Power Act leaves primary responsibility for determining the appropriate mix of energy generation resources to the states, who are supported by FERC and (where they exist) regional grid operators. 16 U.S.C. § 824(b)(1); *see* Fed. Energy Regul. Comm'n, *Understanding Wholesale Capacity Markets* (2025), https://perma.cc/4DF3-EEHL. To ensure that there is a sufficient supply of energy to avoid power outages, the states and grid operators perform analyses of regional resource adequacy. Resource adequacy analysis involves setting a target—a policy determination about local costs and risks—and performing complex modeling of the regional electric system. State public utility commissions are rate regulators, and have a responsibility to balance the benefits of decreased outage risks against the costs of procuring additional generation capacity, which are passed along to electricity ratepayers. And the grid operators have expertise in

addressing local resource adequacy issues arising in the regions that they manage. In this case, both the Michigan Public Service Commission and MISO concluded, based on their resource adequacy analyses, that the planned retirement of the Campbell Plant did not threaten regional resource adequacy.

### A. States have the jurisdictional responsibility of ensuring resource adequacy, with support from regional grid operators and FERC.

Under the Federal Power Act, states have the right to determine their energy resource mix. *See* 16 U.S.C. § 824(b)(1). This right includes the ability to establish the state's portfolio of generation resources and to site those resources. *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 154 (2016); *see also New York v. FERC*, 535 U.S. 1, 24 (2002).

Some states fully retain this authority, and their state public utility commissions exercise it by requiring utilities to develop "integrated resource plans," or plans for how to meet forecasted energy demand for the territories they serve. *See* Coley Girouard, *Understanding IRPs: How Utilities Plan for the Future*, Advanced Energy United (Aug. 11, 2015, at 4:59 PM), https://perma.cc/5MDN-26QY. In most of these states, public utility commissions have the authority to review and either approve or

7

reject utilities' submitted plans. *Id.* State public utility commissions are rate regulators, responsible for ensuring that the electricity rates that customers pay are "just and reasonable." *See* Ari Peskoe, *Unjust, Unreasonable, and Unduly Discriminatory: Electric Utility Rates and the Campaign Against Rooftop Solar*, 11 Tex. J. Oil Gas & Energy L. 211, 228 & n.77 (2016) (surveying state public utility commission statutes and finding that they require commissions to ensure that rates are "just and reasonable," or some version of that standard). This responsibility means that, when setting resource adequacy targets and determining whether they will be met, state public utility commissions must balance the impacts that securing sufficient energy resources will have on the ratepayers who will pay for them.

Other states have partially or entirely ceded their responsibility for ensuring resource adequacy to regional (i.e., interstate) grid operators, who run wholesale capacity markets designed to make sure the regions have enough energy resources to avoid shortfalls. *See* Fed. Energy Regul. Comm'n, *Understanding Wholesale Capacity Markets*, *supra*. As the grid operators balance electricity supply and demand in real time, they have a wide range of tools at their disposal that make them uniquely

positioned to address specific, local resource adequacy issues arising in the regions they manage. *See, e.g.*, *What We Do: Operate the Power System*, ISO New England, https://perma.cc/3QZB-2GA5 (last visited Dec. 8, 2025). For example, operators run "demand response" programs, which compensate electricity consumers for reducing demand during times of peak stress on the grid, reducing the amount of energy generation needed to meet those moments of constraint. *See, e.g.*, PJM Interconnection LLC, *Demand Response* 1 (2024), https://perma.cc/4BHD-6K7U.

MISO is one such grid operator, managing the grid for a large swath of states in the Midwest, including Michigan. *Fact Sheet*, Midcontinent Indep. Sys. Operator, https://perma.cc/FB77-68PH (last visited Dec. 16, 2025). States within MISO retain the "primary responsibility to maintain resource adequacy, including overseeing the planning or securing of new resources by load-serving entities [mainly electric utilities] . . . to adequately meet demand." Midcontinent Indep. Sys. Operator, *Resource Adequacy Metrics and Criteria Roadmap* 9 (2024), https://perma.cc/M9SW-2LKW. MISO supports states' resource adequacy efforts by "(a) providing states and [load-serving entities] with the

9

information needed to effectively plan the system and (b) administering [an auction] that verifies adequacy in the prompt year." *Id.* at 4. Helping ensure resource adequacy is a "key function of MISO," and "MISO's resource adequacy construct complements the jurisdiction that regulatory authorities have in determining the necessary level of adequacy." *Resource Adequacy*, Midcontinent Indep. Sys. Operator https://perma.cc/42QU-GQED (last visited Dec. 16, 2025). MISO also performs detailed modeling of the electric system to measure risks to the system. Midcontinent Indep. Sys. Operator, *Resource Adequacy Metrics*, *supra*, at 9–10.

MISO's capacity markets help to balance the costs and benefits of procuring more energy supply and to prepare for planned resource retirements. With input from the states, MISO recently implemented a FERC-approved tariff that is designed to, among other things, "properly balance[e] [energy] procurement costs and volumes to establish prices in proportion to incremental reliability value," and to "improv[e] investment and retirement decisions by using price signals to properly time resource entry and exit." *Order Accepting Tariff Revisions*, 187 FERC ¶ 61,202, at P 9, P 39 (2024) (noting that the Organization of MISO States supported

MISO's proposal). This tariff is designed to help "improv[e] pricing and resource decisions on a seasonal and locational basis" through more accurate short-term market signals. *Id.*

The federal government also helps guide resource adequacy efforts. In states that plan for resource adequacy primarily through wholesale capacity markets run by a regional grid operator, FERC is responsible for ensuring that the wholesale capacity markets result in "just and reasonable" rates. 16 U.S.C. §§ 824(b)(1), 824d(a). FERC's responsibilities as a rate regulator complement those of the state public utility commissions.

Additionally, the North American Electric Reliability Corporation (NERC) may develop or adopt standards supporting grid reliability—like ones governing best practices for conducting resource adequacy planning and analyses—and submit them to FERC, which become binding if FERC approves them. *See* 16 U.S.C. §§ 824o(a)(2), (b)(1); *Key Players*, N. Am. Elec. Reliability Corp., https://perma.cc/2CME-ZV9N (last visited Dec. 19, 2025). There is only one FERC-approved resource adequacy planning standard in place, and it is for the ReliabilityFirst region, which includes Michigan and part of MISO. *Who We Are, What We Do and Why It*

11

*Matters*, ReliabilityFirst, https://perma.cc/94NV-DUNC (last visited Dec. 8, 2025); *see* Planning Resource Adequacy Assessment Reliability Standard, 76 Fed. Reg. 16250 (Mar. 23, 2011). MISO, as a designated planning coordinator, adheres to and achieves this NERC standard. *See* Midcontinent Indep. Sys. Operator, *Planning Year 2025–2026 Loss of Load Expectation Study Report* 56–60 (2024), https://perma.cc/4GX2-MJLR; *see also* N. Am. Elec. Reliability Corp., *Planning Resource Adequacy Analysis, Assessment and Documentation (No. BAL-502-RF-03)* (2025), https://perma.cc/3WUZ-63WF, JA1036. Importantly, this is a *planning process and analysis* standard; it does not (nor could it) require states or grid operators to set or achieve specific resource adequacy targets, because those decisions belong jurisdictionally to the states. *Cf. Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, 187 FERC ¶ 61,068 at P 254 (2024) (noting that determinations about "integrated resource planning, the generation mix [and] siting and construction of transmission facilities or generation resources" are "matters reserved to states" by the Federal Power Act).

NERC also issues annual assessments of both short- and long-term resource adequacy risk nationwide using stress tests that capture

different future conditions. While NERC serves an important advisory role by providing "risk-informed recommendations" about resource adequacy planning and analyses, the ultimate determinations about whether specific generation resources are or are not necessary remain with the states (and, where applicable, the regional grid operators). *Reliability Assessments*, N. Am. Elec. Reliability Corp., https://perma.cc/7N37-5PBW (last visited Dec. 12, 2025) (noting that NERC's recommendations provide only "the basis for actionable enhancements to resource . . . planning methods"). NERC's reports do not examine the regions at a level of granularity that would illuminate any particular resource's role or contribution to overall regional resource adequacy. *See, e.g.*, N. Am. Elec. Reliability Corp., *2025–2026 Winter Reliability Assessment* 17 (2025), https://perma.cc/8H4V-UA4S (NERC's most recent report finding that MISO has NERC's lowest assigned risk level because it has more energy resources available than called into service, as well as grid management tools to support its operational flexibility).

DOE also has a role to play in preventing power outages, albeit a limited one. Under Section 202(c) of the Federal Power Act, DOE may

13

issue orders—including orders to generators to continue operating—in response to emergencies that could lead to power outages. 16 U.S.C. § 824a(c)(1).[2] This limited, emergency role is an important one when emergencies occur. But as explained in Section II.A below, it does not authorize DOE to make judgments about resource adequacy that usurp the roles of the entities jurisdictionally responsible for setting resource adequacy targets and weighing the costs of achieving them: the states, with support from FERC and the grid operators.

**B.    The first step of resource adequacy planning is setting a target, a decision within state jurisdiction that involves policy choices about local factors.**

Resource adequacy analysis is complex and requires both technical expertise and deep familiarity with the region being studied. *See, e.g.*, Midcontinent Indep. Sys. Operator, *Resource Adequacy Metrics*, *supra*, at 9–11 (describing how MISO performs resource adequacy analysis, annually updating "new data such as hourly load forecasts, list[s] of eligible resources and their technical properties, or list[s] of emergency

---

[2] Although the statutory text references the "Commission," referring to the Federal Power Commission, Congress assigned the emergency authorities in Section 202(c) to DOE in the DOE Reorganization Act of 1977. Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789, 803–04 (2025).

14

resources"). While conducting a resource adequacy analysis itself is an engineering exercise, determining what level of resource adequacy a region must achieve and how to measure it involves decisions about costs and risks, as it would be prohibitively expensive to build a system that could never experience an outage under any conditions. Energy Sys. Integration Grp., *New Resource Adequacy Criteria for the Energy Transition* 38 (2024), https://perma.cc/NXU4-N4UG.

Consequently, setting a resource adequacy target and deciding whether a region has achieved resource adequacy involves balancing society's desire for reliable electricity against the cost of providing that reliability. Determinations about the appropriate mix and quantity of energy resources to support resource adequacy are squarely within the jurisdiction of the states (with support from regional grid operators, where they exist). *See supra* Sec. I.A.

Setting a resource adequacy target involves two distinct choices: (1) selecting *metrics* to measure the resource adequacy of the region's electric system; and (2) selecting *numerical values* for each chosen metric. To illustrate metrics' and values' respective roles, consider how a doctor or medical professional might assess human health. First, the doctor would

15

select credible metrics that best define whether a person is healthy (e.g., blood pressure, resting heart rate, cholesterol levels). Second, the doctor would pick a value for each metric that would represent a normally healthy level (like a blood pressure level of 120/80 mmHg or less). To pick that value, the doctor considers the best available evidence on what level is optimal.

Similarly, to assess resource adequacy, planners begin by selecting metrics to measure the risk of outages in a region's electric system. The most common metric for assessing resource adequacy in the United States generally measures the number of days per year in which an outage could occur. Elec. Power Rsch. Inst., *Resource Adequacy for a Decarbonized Future* 2–3 (2022), https://perma.cc/7G9V-CNWB. This metric, called "loss-of-load expectation," primarily accounts for the *frequency* of outages; it only roughly accounts for outage *duration* and does not account for outage *magnitude*. *Id.* at 3. More nuanced approaches to resource adequacy analysis can supplement the loss-of-load expectation metric with additional ones that capture important outage dimensions besides frequency, such as duration and magnitude, and different regions are exploring the consequences of adopting them,

16

including their integration into their complex resource adequacy models. *See* N. Am. Elec. Reliability Corp. & Nat'l Acad. of Eng'g, *Evolving Planning Criteria for a Sustainable Power Grid* 2, 6 (2024), https://perma.cc/KE8D-W6VX.

After selecting one (or more) metrics, grid planners select numerical values for each metric, representing the resource adequacy *target*. In the United States, the most common value for the traditional loss-of-load expectation metric is less than or equal to 0.1. Energy Sys. Integration Grp., *supra*, at 8 tbl. 2. This value represents the goal of ensuring outages occur on no more than one day every ten years. *Id.* at 6. Other approaches attempt to select the value at which the incremental costs of achieving additional resource adequacy equal the incremental benefits of achieving it. *See* Elec. Power Rsch. Inst., *Metrics and Criteria* 35–36 (2024), https://perma.cc/W4VF-VQPD.

The socially optimal level of resource adequacy may differ in different regions, depending on the costs of the additional resources that would be needed to reduce outages and the consequences of those outages. *See* Energy Sys. Integration Grp., *supra*, at 39 fig. 12 (showing different "reliability standards"—or resource adequacy targets—used in

17

various European Union nations, and noting the standards vary due to differing cost and lost-load values). In North America, while a loss-of-load expectation value of less than or equal to 0.1 days per year is the most common resource adequacy target, different grid regions in North America have different resource adequacy targets. *See id.* at 8 tbl. 2. Ultimately, the regional resource adequacy target should represent the level of resource adequacy that a rate regulator has identified as socially optimal for a specific region, because it balances local costs and benefits.

Together, the selected metrics and values represent the resource adequacy target: the goal that balances the costs of procuring additional power generation against the risks (and related costs) of power outages. Crucially, these choices translate into electricity rates, as electricity consumers must pay the costs of additional generation that lowers the risk of outages. *See Electricity Explained: Factors Affecting Electricity Prices*, U.S. Energy Info. Admin., https://perma.cc/KH98-BNE5 (last updated June 29, 2023). This is ultimately a question of risk tolerance: How much are consumers willing to pay to make their risk of a power outage incrementally smaller? These decisions are assigned to the states by the Federal Power Act. *See supra* Sec. I.A.

### C. The next step of resource adequacy analysis requires modeling the regional electric system to determine whether the resource adequacy target is met.

After setting a resource adequacy target, planners (the states and/or the grid operators) assess whether a region is currently projected to achieve its target, and what (if any) additional generation capacity may be necessary to ensure that the target continues to be achieved on a long-term basis. This next step uses modeling techniques to assess whether a region achieves its resource adequacy target. These modeling techniques involve identifying region-specific conditions for peak risk to the grid, which will not always necessarily correspond to the period of peak demand. *See* Derek Stenclik & Michael Goggin, *Resource Adequacy for a Clean Energy Grid* 1 (2021), https://perma.cc/EQS3-3F9N (explaining that because of increasing amounts of renewable energy resources, "[p]eak reliability risk is no longer isolated to peak load hours . . . . but will eventually shift to multi-day periods of low solar and wind output").

After modeling the system, a grid planner can ascertain whether any single generation resource is necessary to maintain regional resource adequacy. If removing a specific generation resource from the model

19

would cause the region to no longer reach its target, then that resource is essential to maintaining regional resource adequacy. Because entirely rerunning this complex modeling takes significant resources, grid planners generally take a further step after modeling the system: assigning a value reflecting how much credit each individual energy resource deserves for its contribution toward the region's resource adequacy, a process called "accreditation." Danis, Graf & Lifson, *supra*, at 12–13. Calculating accreditation values allows grid planners to assess adequacy as conditions change over time without rerunning their entire resource adequacy modeling. Although this step is not essential to identify whether any specific generator's retirement could threaten a region's resource adequacy, it allows grid planners to compare and consider which energy resources or grid management tools would comprise adequate replacement capacity for the retiring resource. *Id.* at 12.

In summary: to accurately assess whether a region has achieved resource adequacy, rate regulators select a locational resource adequacy target. Next, planners use modeling to assess whether the region achieves that target. Only through performing both of these steps can

planners gather the information necessary to determine whether a specific generator is necessary to maintain regional resource adequacy. And only through additional region-specific analyses, including accreditation, can they also fully assess what replacement resources will ensure resource adequacy upon a particular resource's retirement.

### D. Both the State of Michigan and MISO performed analyses and determined that the Campbell Plant's scheduled retirement did not threaten regional resource adequacy.

The Campbell Plant's retirement was anticipated and planned for by both Michigan and MISO, and new generation capacity stood ready to replace the loss of the plant's contribution to adequacy. Both Michigan and MISO determined that the planned retirement of the Campbell Plant did not threaten regional resource adequacy. These determinations, based on detailed resource adequacy planning and analyses like those discussed above, stand in contrast to DOE's conclusory and unsupported findings. *See infra* Sec. II.B.

Michigan has a robust resource adequacy process in place. *See generally Resource Planning*, Mich. Pub. Serv. Comm'n, https://perma.cc/2Y69-DP68 (last visited Dec. 2, 2025). The Michigan Public Service Commission requires utilities to file annual capacity

demonstrations showing that they have enough generation resources to meet projected demand over the next four years. *Id.*; Mich. Comp. Laws § 460.6w(8)(a) (2025). And utilities must also regularly file with the Commission long-term integrated resource plans, spanning at least 15 years, providing projections of the electricity demand and plans to meet that demand. Mich. Comp. Laws § 460.6t(3) (2025); *see generally* Mich. Pub. Serv. Comm'n, *Revised Integrated Resource Plan Filing Requirements* (2022), https://perma.cc/7GBU-UQ4P. These planning requirements are specifically designed to identify and plan for local resource adequacy issues, such as the planned retirement of a generation resource.

MISO also plays a key role in assessing and planning for regional resource adequacy as a FERC-approved planning coordinator. *MISO History 101*, Midcontinent Indep. Sys. Operator, https://perma.cc/Y6F9-3WGM (last visited Dec. 17, 2025). And MISO administers the wholesale capacity markets designed to help ensure that these targets are achieved. *See* Midcontinent Indep. Sys. Operator, *MISO Markets and Market Participation Overview*, https://perma.cc/U3FH-M3PF 1 (last visited Dec.

22

2, 2025). MISO is also subject to the only FERC-approved resource adequacy planning and analysis standard. *See supra* Sec. I.A.

In this specific instance, the Michigan Public Service Commission and MISO developed resource adequacy plans based on the Campbell Plant's scheduled retirement. Both entities determined that the retirement of the Campbell Plant did not pose a threat to the region's resource adequacy. *In re Capacity Demonstrations for the 2028/2029 Planning Year*, No. U-21775 et al., Order at 19 (Mich. Pub. Serv. Comm'n Aug. 21, 2025) (noting DOE's May emergency order, and stating that "the retirement of the Campbell Plant was planned for in [a] 2022 [integrated resource plan] and replacement capacity has been procured through the purchase of a natural gas fired power plant in 2023"); Req. for Reh'g by Mich. Att'y Gen. Dana Nessel at Attach. C, U.S. Dep't of Energy Order No. 202-25-3 (June 18, 2025), JA0322 (March 11, 2022 letter from MISO to the owner of the Campbell Plant approving the plant's suspension because it "would not result in violations of applicable reliability criteria").

Critically, neither entity asked DOE for a 202(c) order to keep the Campbell Plant operating. Kenneth W. Irvin et al., *Department of Energy*

*Blocks Shutdown of Coal-Fired Power Plant and Oil- and Gas-Fired Generator Units With Federal Emergency Orders*, Sidley (June 13, 2025), https://perma.cc/3AVR-V9LX. In fact, the chair of the Michigan Public Service Commission remarked that "it was baffling why [DOE] chose [the Campbell] plant. Nobody asked for this order. The power grid operator did not. The utility that owns the plant did not. The state regulator did not." Evan Halper & Jake Spring, *Trump Is Forcing This Dirty, Costly Coal Plant to Stay Open*, Wash. Post (June 6, 2025), https://www.washingtonpost.com/business/2025/06/01/energy-climate-trump-coal-solar.

Neither Michigan nor MISO requested a 202(c) order from DOE to keep the Campbell Plant operating for a simple reason: neither entity had found that the plant's continued operation was necessary to maintain regional resource adequacy.

## II. DOE May Not Substitute Its Judgments About Resource Identification Or Resource Adequacy Planning.

As described in Part I, establishing resource adequacy targets requires policy choices about region-specific issues. The entities best suited to make these policy choices are those to whom the Federal Power Act assigns jurisdictional responsibility for resource adequacy: the states,

24

with support from FERC and (where they exist) regional grid operators. And grid operators have operational and regional expertise that DOE lacks. While DOE plays a role in approving temporary solutions to avert emergencies, Section 202(c) orders are not tools for DOE to substitute its judgment for that of those responsible for developing, planning to meet, and paying to meet resource adequacy targets.

### A. Section 202(c) does not authorize DOE to substitute its judgment about resource adequacy for that of the states or regional grid operators.

Section 202(c) does authorize DOE to order a generator scheduled for retirement to temporarily continue operating during an emergency. 16 U.S.C. § 824a(c)(1). Historically, DOE exercised this authority only in response to a request by a state public utility commission or a grid operator identifying the resource that the requestor believed must be kept operating to avoid an outage. *See* Req. for Reh'g by Mich. Att'y Gen. Dana Nessel*, supra*, at 5–8, JA0162–65. This historical practice reflects the proper role of Section 202(c) orders: supporting regional resource adequacy efforts with a temporary solution when an emergency occurs. *See* Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789, 810–13 (2025). But longer-term resource adequacy analysis and

planning is the bailiwick of rate regulators—the state public utility commissions and FERC (through its supervision of wholesale capacity markets and its approval of NERC's planning standards). Section 202(c) does not authorize DOE to substitute its judgment about resource adequacy for those made by the entities to whom the Federal Power Act reserves this responsibility.

It makes good sense that the Federal Power Act assigns responsibility for setting resource adequacy targets and planning to meet them to the state public utility commissions and to FERC. Both are rate regulators obligated to ensure that energy rates are just and reasonable. 16 U.S.C. §§ 824(b)(1), 824d(a); Peskoe, *supra*, at 288 & n.77. And decisions about resource adequacy have significant rate impacts, because ratepayers bear the burden of any additional generation resources procured to meet a higher level of resource adequacy for the electric grid. By assigning responsibility for resource adequacy to the rate regulators, the Federal Power Act ensures that decisions about what generation resources are necessary to ensure resource adequacy will not ignore the costs of those investments, or the ratepayers who will pay for them.

DOE, on the other hand, is not a rate regulator, and is not well-suited to make independent determinations about resource adequacy that conflict with those made by regulators responsible for generation and system operations. In DOE's own report on resource adequacy (published this summer), DOE admits that "the resource adequacy analysis that was performed in support of this study could benefit greatly from the in-depth engineering assessments which occur at the regional and utility level," because "entities responsible for the maintenance and operation of the grid have access to a range of data and insights that could further enhance the robustness of reliability decisions, including resource adequacy." U.S. Dep't of Energy, *Evaluating the Reliability and Security of the United States Electric Grid* i (2025), https://perma.cc/A587-S88S.

Resource adequacy analysis does not only benefit from more local data; it requires *choices* about local costs and risks. *See supra* Sec. I.B. These choices should be made by the entities best suited to balance costs and risks for the relevant region and its ratepayers, and to consider the local costs of the investments made to reduce outages and the local consequences of any outages. The entities best suited to make these

decisions and assessments are those that regulate generation resources directly (the states) and, where they exist, those that manage the regional grids and run the wholesale capacity markets (the grid operators, supervised by FERC).

To be sure, DOE is not required to wait for a request before issuing a 202(c) order; it may issue orders "upon its own motion." 16 U.S.C § 824a(c)(1). But it may not use those orders to thwart states' and grid operators' resource adequacy targets and plans. Section 202(c) emergency orders are not suited to the long-term, future-looking planning that resource adequacy analysis requires. And in this particular case, DOE's determination not only crossed jurisdictional boundaries; it also lacked a sound analytical basis.

**B.    Neither DOE's order nor the NERC analysis underlying it identify how or why the Campbell Plant is necessary to regional resource adequacy.**

DOE's Campbell Plant order relies on NERC's summer 2025 report indicating that the MISO region was at risk of a supply shortfall. U.S. Dep't of Energy, Order No. 202-25-3, at 1 (May 23, 2025), JA0001. But while NERC can perform risk assessments to help inform state decisions about resource adequacy, the ultimate decision about what investments

are cost-justified lies with state rate regulators, supported by grid operators. *See supra* Sec. I.A.  And neither DOE's order nor the NERC analysis that it relies on identify how or why the Campbell Plant is specifically necessary to maintain the region's resource adequacy. NERC's summer assessment does not attempt to identify what specific resources might be necessary to maintain regional resource adequacy within MISO, both because the assessment is not designed to do so but also because this question is properly left to the states and grid operators. *See* N. Am. Elec. Reliability Corp., *2025 Summer Reliability Assessment* 16 (2025), https://perma.cc/UY7T-G8RF, JA0118 (offering only a high-level summary of resources in MISO).

DOE's conclusion that the "Campbell Plant is necessary to best meet the emergency" is not based on resource adequacy modeling results that reflect that the Campbell Plant's operation is essential to meet the existing resource adequacy target. U.S. Dep't of Energy, Order No. 202-25-3, at 2 (May 23, 2025), JA0002. Instead, DOE's order relies on a NERC report making general recommendations directed at a different audience—states and grid operators—and concludes by ordering the continued operation of the Campbell Plant, without justifying how it

29

reached its identification of the Campbell Plant as specifically necessary to avoid potential outages. Following the rationale in DOE's order to its logical conclusion, every single plant in any region that NERC determines is at "elevated risk" would be an appropriate target for a 202(c) order. But as explained above, NERC's reliability assessments are not geared towards identifying resources necessary for regional resource adequacy. They are designed to illuminate the potential effects of determinations properly made by the states and grid operators, and to support those entities' forward-looking planning. *See supra* Sec. I.A. A NERC generalized assessment of regional "elevated risk" under certain future scenarios is an insufficient basis for DOE to identify specific resources necessary to regional resource adequacy.

While DOE's initial order spoke of a summer emergency, DOE has since issued two further 90-day extensions of its order. These orders both abandon the pretense that DOE is doing anything other than substituting its own judgments about resource adequacy for those made by Michigan and MISO for the foreseeable future, finding that the purported "emergency conditions . . . continue, both in the near and long term." U.S. Dep't of Energy, Order No. 202-25-7, at 2 (Aug. 20, 2025);

30

U.S. Dep't of Energy, Order No. 202-25-9, at 3 (Nov. 18, 2025); *contra* N. Am. Elec. Reliability Corp., *2025–2026 Winter Reliability Assessment*, *supra*, at 17 (NERC's most recent generalized regional assessment, assigning its lowest risk level to MISO).

Section 202(c) enables DOE to respond to emergencies to prevent unanticipated power outages. It does not authorize DOE to make ongoing determinations about the appropriate generation resource mix—a matter squarely within state jurisdiction. DOE's unsolicited Section 202(c) order usurps the role that the Federal Power Act assigns primarily to the states, supported by FERC and the regional grid operators.

## CONCLUSION

For these reasons, this Court should reject arguments that Section 202(c) authorizes DOE to override judgments about resource adequacy reached by the states and regional grid operators.

April 10, 2026

Respectfully submitted,

*/s/* Jennifer Danis

Jennifer Danis
Daniel J. Jones
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 998-6047
jennifer.danis@nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

## CERTIFICATE OF COMPLIANCE

This *amicus curiae* brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because this brief contains 5,723 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by counsel's word processing system.

This *amicus curiae* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

DATED:    April 10, 2026              Respectfully submitted,

                                      /s/ Jennifer Danis
                                      Jennifer Danis

                                      *Counsel for Amicus Curiae*
                                      *Institute for Policy Integrity*

# CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of April 2026, a true and correct copy of the foregoing Brief of the Institute for Policy Integrity at New York University School of Law as Amicus Curiae in Support of Petitioners was filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit via the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

DATED:    April 10, 2026    Respectfully submitted,

/s/ Jennifer Danis
Jennifer Danis

*Counsel for Amicus Curiae*
*Institute for Policy Integrity*