SCHEDULED FOR ORAL ARGUMENT MAY 15, 2026

No. 25-1159
(Consolidated with 25-1160 and 25-1162)

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

THE PEOPLE OF THE STATE OF MICHIGAN,
*Petitioner*,
v.
U.S. DEPARTMENT OF ENERGY, AND CHRIS WRIGHT, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF ENERGY,
*Respondents*.

ON PETITION FOR REVIEW OF FINAL ORDER OF THE
DEPARTMENT OF ENERGY

## FINAL OPENING BRIEF OF THE STATES OF ILLINOIS, MICHIGAN, AND MINNESOTA

DANA NESSEL
*Michigan Attorney General*

MICHAEL E. MOODY (DC
Cir. 66350)
LUCAS WOLLENZIEN
*Assistant Attorneys General*
Special Litigation Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7627
MoodyM2@michigan.gov
WollenzienL@michigan.gov

PETER N. SURDO
*Special Assistant Attorney General*
Office of the Minnesota Attorney
General
445 Minnesota St., Suite 600
St. Paul, MN 55101
(651) 757-1061
peter.surdo@ag.state.mn.us

*Attorney for State of Minnesota*

JASON E. JAMES
*Assistant Attorney General*
Illinois Attorney General's Office
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
jason.james@ilag.gov

*Attorney for State of Illinois*

CHRISTOPHER M. BZDOK
*Special Assistant Attorney
General*
chris@tropospherelegal.com

*Counsel for the People of the State
of Michigan*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### A. PARTIES

<u>Petitioners:</u>

25-1159: The People of the State of Michigan

25-1160: Sierra Club, Natural Resources Defense Council, Michigan Environmental Council, Environmental Defense Fund, Environmental Law and Policy Center, Vote Solar, Union of Concerned Scientists, Ecology Center, and Urban Core Collective

25-1162: The State of Illinois and the State of Minnesota

<u>Respondents:</u>

25-1159: U.S. Department of Energy and Chris Wright in his official capacity as Secretary of the U.S. Department of Energy.

25-1160: U.S. Department of Energy and Chris Wright in his official capacity as Secretary of the U.S. Department of Energy.

25-1162: U.S. Department of Energy and Chris Wright in his official capacity as Secretary of the U.S. Department of Energy.

<u>Intervenors:</u>

Midcontinent Independent System Operator, Inc.

i

Consumers Energy Company.

Amici:

- Citizens Action Coalition of Indiana, Citizens Utility Board of Michigan, Citizens Utility Board of Minnesota, Citizens Utility Board of Wisconsin, and Consumers Council of Missouri [Consumer Advocates]

- Institute for Policy Integrity at New York University School of Law [Policy Integrity]

- The Niskanen Center, Professor Paul L Joskow & Professor Richard Schmalensee [Niskanen Center]

- Professor Joshua C. Macey, Professor Joel B. Eisen, Professor Alison Gocke, Professor Sharon B. Jacobs, Professor Alexandra B. Klass, Professor Andrew McKinley, Professor Felix Mormann, Professor David Owen, Professor Shelley Welton, and Professor Hannah Wiseman [Energy Law Scholars]

ii

## B. RULINGS UNDER REVIEW

The petitioners in Case Nos. 25-1159, 25-1160, and 25-1162 seek review of two orders from the U.S. Department of Energy and Secretary Chris Wright:

1. *Midcontinent Independent System Operator (MISO) 202(c) Order*, Order No. 202-25-3 (May 23, 2025); and

2. *Midcontinent Independent System Operator (MISO) 202(c) Order Addressing Arguments Raised on Rehearing*, Order No. 202-25-3B (Sept. 8, 2025).

## C. RELATED CASES

The petitions on review in cases Nos. 25-1159, 25-1160, and 25-1162 have not previously been before this court. Case Nos. 25-1198 and 25-1202 pending in this Court are related to this set of petitions, as they arise from a renewal of the Order challenged in these petitions. Case No. 25-1285, also pending in this Court, is also related to this set of petitions because it arises from an order of the Federal Energy Regulatory Commission issued in response to a complaint filed by Consumers Energy Company in response to the Order challenged in these petitions.

April 10, 2026                                         */s/ Michael E. Moody*
                                                      Michael E. Moody

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 2

STATUTES & REGULATIONS ................................................................ 3

STATEMENT OF THE ISSUES ............................................................... 3

STATEMENT OF THE CASE .................................................................. 4

    A.   The Federal Power Act entrusts states with responsibility for resource adequacy and defines a narrow role for DOE ................... 4

    B.   Campbell was scheduled to retire as a result of a careful planning process approved by the MPSC and MISO ...................................... 8

    C.   The White House directs DOE to use Section 202(c) to assert authority over long-term resource adequacy ................................. 10

    D.   DOE issues the Order, the Rehearing Order, and extensions ...... 11

    E.   FERC proceedings ................................................................. 15

SUMMARY OF ARGUMENT ................................................................ 16

STANDING .......................................................................................... 19

STANDARD OF REVIEW ..................................................................... 21

ARGUMENT ........................................................................................ 22

    I.   This Case Is Not Moot, But Even If It Were, A Mootness Exception Applies .............................................................................. 22

    II.   The Order Exceeds DOE's Statutory Authority ........................... 25

A. Section 202(c) authorizes DOE to address emergencies, not regulate the long-term resource adequacy of the electric power sector ............................................................................... 25

B. DOE is bound by the text of section 202(c) ............................. 32

C. The Order impermissibly attempts to regulate long-term resource adequacy rather than address an "emergency" under section 202(c) ................................................................. 33

III. The Order Is Not Supported By Substantial Evidence ................. 37

A. Neither the Order nor the Rehearing Order introduce facts to substantiate an emergency in MISO ......................................... 37

B. DOE ignored relevant facts ....................................................... 45

IV. Even If There Were an Emergency, the Order Would Still Violate Section 202(c) ............................................................................... 47

A. Section 202(c) does not authorize DOE to require "economic dispatch" .................................................................................... 48

B. The Order fails to establish that *any* operation of Campbell "best meets the emergency" ....................................................... 52

CONCLUSION ........................................................................................ 55

# TABLE OF AUTHORITIES

**Cases**

*Acuity Ins. Co. v. McDonald's Towing & Rescue, Inc.*,
   747 F. App'x 377 (6th Cir. 2018) .................................................. 26

*Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173 (D.C. Cir. 2022) ....... 21

*Biden v. Nebraska*, 600 U.S. 477, 501 (2023) ......................................... 31

*Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020) ................... 26, 32

*Conn. Dep't of Pub. Util. Control v. FERC*,
   569 F.3d 477 (D.C. Cir. 2009) .................................................. 5, 49

*County of Los Angeles v. Davis*, 440 U.S. 625 (1979) ............................ 22

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
   143 F.4th 518 (D.C. Cir. 2025) .............................................. 20, 22

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   140 S. Ct. 1891 (2020) .................................................................. 44

*Emera Maine v. FERC*, 854 F.3d 9 (D.C. Cir. 2017) .............................. 37

*Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009) ........................ 54

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ...................................................................... 30

*Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*,
   628 F.3d 568, (D.C. Cir. 2010) .............................................. 22, 24

*Kimball Wind, LLC v. FERC*, 140 F.4th 496 (D.C. Cir. 2025) .............. 21

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ....................... 22

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................ 19

*Manguriu v. Lynch*, 794 F.3d 119 (1st Cir. 2015) .................................... 46

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................ 33

*Mine Reclamation Corp. v. FERC*, 30 F.3d 1519 (D.C. Cir. 1994) ......... 22

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527 (2008) ..................................................... 5

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................................................................... 21

*Murray Energy Corp. v. EPA*, 936 F.3d 597 (D.C. Cir. 2019) ................. 54

*Nat'l Cable Television Ass'n, Inc. v. F.C.C.*, 33 F.3d 66 (D.C. Cir. 1994) ........................................................... 53

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014) .............................................. 33

*Nebraska v. E.P.A.*, 331 F.3d 995 (D.C. Cir. 2003) ................................. 46

*NextEra Energy Res., LLC v. FERC*, 118 F.4th 361 (D.C. Cir. 2024) ...... 4

*Oklahoma Gas & Elec. Co. v. FERC*, 11 F.4th 821, 832 (D.C. Cir. 2021) ............................................... 23

*Otter Tail Power v. FPC*, 429 F.2d 232 (8th Cir. 1970) ......................... 28

*Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943 (D.C. Cir. 2024) ........ 22, 26

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983) ....................................................................... 4

*Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177 (D.C. Cir. 2021) ..................... 10

*Richmond Power and Light v. FERC*, 574 F.2d 610 (D.C. Cir. 1978)....28

*Sierra Club v. E.P.A.*, 292 F.3d 895 (D.C. Cir. 2002) .............................19

*Transunion LLC v. Ramirez*, 594 U.S. 413 (2021) ................................19

*Trump v. Mazars USA, LLP*, 39 F.4th 774 (D.C. Cir. 2022) .................24

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001)..............................................54

*W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022).........................31

*Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)...................................24

*Whitman v. Am. Trucking Associations*, 531 U.S. 457 (2001)................31

*Windsor Redding Care Ctr., LLC v. NLRB*,
    944 F.3d 294 (D.C. Cir. 2019).......................................................45

## Administrative Cases

*Constellation Mystic Power, LLC*, 172 FERC ¶ 61,044, 61,393 (2020)..51

*Consumers Energy*, 192 FERC ¶ 61,158 (Aug. 15, 2025) ................ 15, 23

*Devon Power*, 109 FERC ¶ 61,154 (2004) ..................................................4

*MISO*, 119 FERC ¶ 61,311, 62,722 (2007)...............................................6

## Statutes

Administrative Procedure Act

    5 U.S.C. § 706(2)(A)..................................................................21, 47

    5 U.S.C. § 706(2)(C)...........................................................21, 25, 47

5 U.S.C. § 706(2)(E) ........................................................................ 21

Federal Power Act

16 U.S.C. § 824a(b) ........................................................................... 8

16 U.S.C. § 824a(c)(1) ............................................................. 7, 25, 47

16 U.S.C. § 824a(c)(2) ..................................................................... 48

16 U.S.C. § 824a(e) ............................................................................ 8

16 U.S.C. § 824a-1(a) ......................................................................... 8

16 U.S.C. § 824a-3(f) .......................................................................... 8

16 U.S.C. § 824a-4 ............................................................................. 8

16 U.S.C. § 824b(a)(4) ....................................................................... 8

16 U.S.C. § 824c(b) ............................................................................ 8

16 U.S.C. § 824d .......................................................................... 5, 8

16 U.S.C. § 824e ........................................................................... 5, 8

16 U.S.C. § 824f ................................................................................. 8

16 U.S.C. § 824i(b) ............................................................................. 8

16 U.S.C. § 824j .................................................................................. 8

16 U.S.C. § 824j-1 .............................................................................. 8

16 U.S.C. § 824k ................................................................................ 8

16 U.S.C. § 824m ............................................................................... 8

16 U.S.C. § 824o ...............................................................8

16 U.S.C. § 824p ...............................................................8

16 U.S.C. § 825*l*(a).......................................................3, 24

16 U.S.C. § 825*l*(b)........................................ 2, 3, 21, 24, 37

Mich. Comp. Laws Ann. § 460.6t(3) .........................................6

Mich. Comp. Laws Ann. § 460.6t(8)(a).....................................7

## Regulations

10 C.F.R. § 205.371 ....................................................27, 36

## Other

D.C. Cir. L. Rule 28(a)(7) ...............................................19

Fed. R. Evid. 201(b) .....................................................46

Dep't of Energy, *Emergency Interconnection of Electric Facilities and the Transfer of Electricity to Alleviate an Emergency Shortage of Electric Power*, 46 Fed. Reg. 39,984, 39,985 (Aug. 6, 1981) ..........28

EO 14,262, *Strengthening the Reliability and Security of the United States Electric Grid,* 90 Fed. Reg. 15,521 ................................10-11

# GLOSSARY

EEA – Energy Emergency Alert

FPA – Federal Power Act

FPC – Federal Power Commission

MISO – Midcontinent Independent System Operator

MPSC – Michigan Public Service Commission

NERC –North American Electric Reliability Corporation

NOAA – National Oceanic and Atmospheric Administration

RTO – Regional Transmission Organization

## INTRODUCTION

In the Order under review, the Department of Energy (DOE), seeks to usurp states' long-standing authority to regulate in-state power plants for the economic and environmental benefit of their citizens. Invoking a rarely used, temporary emergency power—FPA section 202(c)—the Order compels the continued operation of J.H. Campbell (Campbell), a dirty, aged, uneconomic coal-fired power plant that the plant operator had scheduled for retirement with the express approval of expert state regulators and the regional grid operator. By defining "emergency" beyond its ordinary spatial and temporal limits while continuously extending mandated operation, DOE grants itself unheralded new power to control the nation's generation mix.

Nearly a century old, section 202(c) gives DOE authority to intervene in times of war or similar emergency circumstances—e.g., when a hurricane threatens the supply of power or an extreme cold-snap might spike demand—by ordering such action as may best meet the emergency. Historically, DOE has used that authority narrowly and sparingly. But here, DOE asserts that a 15-state region of the country is in an energy "emergency" that, if upheld, would empower

1

DOE to order any and all power plants in the region to operate for "years."

Section 202(c) does not give DOE such power. Under the plain text, DOE may act only in response to an "emergency"—i.e., sudden, unexpected, imminent conditions requiring an immediate response. DOE made no attempt to demonstrate such an emergency here. Nor could it. The retirement of the coal-fired power plant entailed years of careful planning, and the expert regulators entrusted with ensuring the grid's reliability found—repeatedly—that the retirement would have no ill effects on the grid.

Instead, the Order is an attempt to subordinate the states' careful planning to the dictates of an Administration bent on propping up its favored generation resources. This Court should reject that unprecedented assertion of authority and set aside the Order.

## JURISDICTIONAL STATEMENT

The FPA affords any party "aggrieved by an order" review of such order in the U.S. Court of Appeals for the District of Columbia Circuit. *See* 16 U.S.C. § 825*l*(b). Illinois, the People of the State of Michigan (Michigan), and Minnesota (the States) seek review of DOE's May 23,

2

2025, Order, Order 202-25-3 (the Order or Campbell I), JA0001[DOE0001] and the subsequent order on rehearing, Order 202-25-3B (Rehearing Order), JA0006[DOE0016].

The States were parties to the DOE proceeding, timely sought rehearing, 16 U.S.C. § 825*l*(a), and presented to DOE the objections raised herein, *id.* § 825*l*(b).

## STATUTES & REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum ("ADD").

## STATEMENT OF THE ISSUES

1.    Whether the Order is reviewable because it continues to have legally cognizable consequences and is part of an ongoing succession of short-duration emergency orders capable of repetition yet evading review.

2.    Whether the Order violates section 202(c) of the FPA because it failed to identify an "emergency" within the meaning of the Act.

3.    Whether the Order violates the FPA and Administrative Procedure Act (APA) because it failed to support its emergency

3

determination and remedy with substantial evidence and reasoned decision-making.

4.    Whether the Order violates section 202(c) because, even if there were an emergency, it imposed a remedy that exceeds statutory limits.

## STATEMENT OF THE CASE

### A.    The Federal Power Act entrusts states with responsibility for resource adequacy and defines a narrow role for DOE

Since its passage in 1935, the FPA has expressly reserved authority over electricity generation facilities to the states.  16 U.S.C. § 824(b)(1); *see NextEra Energy Res., LLC v. FERC,* 118 F.4th 361, 368 (D.C. Cir. 2024).  Utilities and system operators, under regulatory supervision, ensure the system has adequate generation resources (e.g., power plants) through a long-term process of resource-adequacy planning.  *See Devon Power*, 109 FERC ¶ 61,154, P 47 (2004) ("Resource adequacy is a matter that has traditionally rested with the states, and it should continue to rest there."); *cf. Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983) ("Need for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the

4

States."). Resource-adequacy planning involves evaluating technical, environmental, and economic considerations to determine what resources are added to the grid, what resources qualify as "capacity resources," and what resources should retire and when. JA0189[DOE0006_33n.117].

Some states have retained exclusive authority over resource adequacy. Others have directed or permitted their utilities to join RTOs that impose resource-adequacy requirements in tariffs subject to the just-and-reasonable review of the Federal Energy Regulatory Commission (FERC) under sections 205 and 206 of the FPA. 16 U.S.C. §§ 824d, 824e. *See generally Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527, 536 (2008) (describing role of RTOs). Some RTOs establish markets that allow participants to buy and sell capacity, thereby facilitating market entry and exit based on price signals. *See Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009) (describing capacity markets and federal/state interplay).

In Michigan, regulation of resource adequacy has both a state and a federal aspect. The Midcontinent Independent System Operator

5

(MISO) is the FERC-regulated RTO responsible for managing the grid across a 15-state region of the country including all or much of Michigan, Minnesota, and Illinois.  Like other RTOs, it establishes requirements designed to be complementary to the primary role of states in ensuring resource adequacy.  *See MISO*, 119 FERC ¶ 61,311, 62,722 at P 75 (2007) ("From the beginning . . . the Commission has recognized the role that state resource planning plays in managing the resource adequacy of [MISO]").  Consumers Energy (Consumers), Campbell's operator and primary owner, is a MISO member and must maintain at least the amount of capacity required under the MISO tariff.

The Michigan Public Service Commission (MPSC) regulates the investment decisions of utilities in Michigan—including decisions about which generation resources to build and which to retire.  The MPSC requires each utility to file periodically an Integrated Resource Plan to meet its projected electricity demand over 5-, 10-, and 15-year time horizons.  Mich. Comp. Laws Ann. § 460.6t(3).  Through that process, the MPSC ensures that utilities, including Consumers, obtain the capacity needed to meet their obligations under the MISO tariff. It also

ensures that they do so at the best value to ratepayers, and with a composition of resources that complies with state law, including environmental requirements. *Id.* 460.6t(8)(a).

DOE has no statutory role in regulating long-term resource adequacy. Instead, it has a narrow, time-limited authority to command grid participants to take certain actions during an "emergency." Section 202(c) allows DOE to command certain action "[d]uring the continuance of any war in which the United States is engaged," or when the Secretary determines that "an emergency exists" due to "a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes . . . ." 16 U.S.C. § 824a(c)(1).[1]

When these extraordinary circumstances arise, section 202(c) permits DOE to respond unconstrained by the procedural safeguards and substantive limitations that undergird the rest of the FPA. For instance, while the rest of the FPA authorizes action only after

---

[1] Until 1977, the Federal Power Commission (FPC) exercised this authority.

opportunity for hearing,[2] section 202(c) allows DOE to act without notice. And in profound contrast to the rest of the FPA and general utility law principles, section 202(c) empowers DOE to require utilities to incur costs—through a command to provide generation or transmission service—without fully weighing the impact to ratepayers or whether the resulting rates will be just and reasonable.

## B. Campbell was scheduled to retire as a result of a careful planning process approved by the MPSC and MISO

The J.H. Campbell Generating Plant is an inefficient, dilapidated coal-fired power plant in Michigan that began operating in 1962. JA0167[DOE0006_11], JA0422[DOE0008_25]. In 2021, Consumers announced it would retire the plant in May 2025 and replace it with other resources. JA0168[DOE0006_12]. Consumers then executed that plan under the oversight of the state regulator, the MPSC, and with approval of the regional grid operator, MISO.

From 2021 to 2025, under the MPSC's oversight, Consumers implemented a plan to retire Campbell and replace it with newer resources that would increase available generation capacity, save

---

[2] *See, e.g.*, 16 U.S.C. §§ 824a(b), 824a(e), 824a-1(a), 824a-3(f), 824a-4, 824b(a)(4), 824c(b), 824d, 824e, 824f, 824i(b), 824j, 824j-1, 824k, 824m, 824o, & 824p.

ratepayers money, and reduce pollution.  JA0445-580[DOE0008_95-230].  For over a year, the MPSC reviewed the proposed retirement, including its effect on reliability, and ultimately approved it in a multi-party settlement agreement.  JA0445-580[DOE0008_95-230].  The agreement directed the Campbell retirement and the construction, procurement, and extended operation of other major generating resources.  Those resources are now online and producing cleaner, lower-cost power. JA0591,594-595[DOE0008_535,544-45].  The net effect was to substantially *increase* the total generating resources available in the region.  JA0173[DOE0006_17n.66].

MISO also determined through a detailed technical study that retiring Campbell would not harm reliability.  JA0322[DOE0006_166].  MISO's Tariff requires that a generator planning to suspend operations notify MISO at least 26 weeks in advance.  MISO then performs a study to determine whether the resource is necessary for reliability.  JA0888-0893[DOE0010_605-10].  In 2022, after studying its potential impacts to power system reliability, MISO approved the Campbell retirement.  JA0322[DOE0006_166].

In April 2025, MISO published the results of its 2025/2026 capacity auction. The capacity market allows utilities in MISO to "purchase commitments from generators to produce set amounts of electricity in the future." *Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177, 1186 (D.C. Cir. 2021). The auction results, MISO reported, "demonstrated sufficient capacity at the regional, subregional and zonal levels." JA0069[DOE0004_12].

## C. The White House directs DOE to use Section 202(c) to assert authority over long-term resource adequacy

On April 8, 2025, the President announced four executive orders (EOs) to exert control over the mix of the Nation's electricity resources. Among them was EO 14,262, *Strengthening the Reliability and Security of the United States Electric Grid*, which directed DOE to develop within 90 days a methodology that would (1) second-guess the reserve margins[3] used by states and RTOs based on DOE's own "acceptable threshold," and (2) "accredit" capacity for different generator types (i.e., decide how much coal, gas, solar, etc. are each worth in capacity terms),

---

[3] Reserve margin is the amount of unused available capability of an electric power system (at peak load) as a percentage of total capability.

10

presumably without regard for the capacity accreditation rules applied by states and RTOs.  90 Fed. Reg. 15,521 (Apr. 8, 2025).

The EO also directed DOE to decide, based on the above methodology, which generation resources across the country may retire. *Id.* at 15,522.  Again, the EO nowhere mentioned that states and RTOs currently oversee generator retirements—decisions DOE was presumably also expected to disregard.  To prevent retirements, the EO directed DOE to use its emergency authority in FPA section 202(c).  *Id.*

### D.     DOE issues the Order, the Rehearing Order, and extensions

On May 23, 2025, years after Campbell's retirement was approved by MISO and the MPSC, but just a week before its scheduled retirement, DOE issued the Order, claiming that an "emergency" existed in the 15-state MISO region "due to a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes . . . ."  JA0001[DOE0001_1].  DOE ordered Consumers and MISO to ensure the continued operation of Campbell for 90 days.

To justify an emergency, the Order pointed to "potential tight reserve margins during the summer 2025 period" in MISO, citing the North American Electric Reliability Corporation (NERC) 2025 Summer

Reliability Assessment finding that MISO is "at elevated risk of operational reserve shortfalls during periods of high demand or low resource output." JA0001[DOE0001_1]. But the Order nowhere acknowledged that such potential conditions are commonplace in MISO and elsewhere and have never been the basis for any prior section 202(c) order. The Order then described the retirement of thermal generation capacity, including the retirement of approximately 2,700 MW of coal-fired capacity in Michigan since 2020. JA0001[DOE0001_1]. The Order acknowledged Consumers' acquisition of replacement capacity and MISO's April 2025 conclusion that its auction resulted in "demonstrated sufficient capacity," JA0002[DOE0001_2], but did not reference, let alone consider, the extensive processes that MISO and the MPSC undertook to evaluate and mitigate any reliability risk from the Campbell retirement. Nor did the Order describe or evaluate any actions that DOE, MISO, or Consumers had taken or could take to mitigate any alleged emergency conditions short of ordering the continued operation of the plant.

Instead, the Order concluded that "additional dispatch of the Campbell Plant" for the 90-day duration of the order "is necessary to

best meet the emergency and serve the public interest." JA0002[DOE0001_2].  The Order then mandated that: (i) MISO and Consumers take all necessary steps to ensure Campbell is available for dispatch; and (ii) MISO ensure "economic dispatch" of the plant and that Consumers comply with all such dispatch orders.

On June 18, 2025, the Michigan Attorney General requested rehearing at DOE, JA0157[DOE0006], and on June 23, Minnesota and Illinois did, too.  JA0894[DOE0011].  On July 24, the Michigan Attorney General petitioned for review of the Order in this Court, and on July 25, Minnesota and Illinois did, too.

On July 7, DOE published the methodology called for in EO 14,262, entitled "*Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid*" (*Report*).  ADD7.  The *Report* analyzed the grid under current system conditions and under projected 2030 conditions.  As relevant here, the report found no resource adequacy problems under current system conditions, other than in Texas.  ADD21.

On September 8, immediately before submitting the administrative record in this case, DOE issued a rehearing order

13

(Rehearing Order). JA0006[DOE0016]. Although DOE had already denied rehearing of the Order by operation of law—i.e., by declining to respond—the Rehearing Order provided responses to some arguments, retroactively "modified" the Order in limited respects, and otherwise "sustained" the Order. JA0029[DOE0016_24].

The Rehearing Order made plain DOE's intent to regulate resource adequacy for the long term. Relying on an unexplained "assessment" of expected generation retirement and additions, the Rehearing Order concluded that "most regions—including the MISO region relevant to the Emergency Order—will face unacceptable reliability risks *within five years*." JA0019[DOE0016_¶42] (emphasis added). The Order, DOE asserted, "addresses that risk," even though, by its own terms, it lasted only 90 days. *Id.*

That intent has borne out. DOE has extended the Order's 90-day period twice. On August 20, DOE issued a second order, extending the mandate another 90 days. ADD81 (Order No. 202-25-7 (Campbell II)). Campbell II relied both on the prior evidence of an "emergency" purportedly justifying Campbell I as well as new "emergency" conditions "likely to continue" for "years." ADD81-88. On November

14

18, DOE issued a third order, extending the mandate until February 17, 2026.  ADD91 (Order No. 202-25-9 (Campbell III)).  Without any new evidence, DOE again claimed that "emergency conditions . . . continue, both in the near and long term," and are "likely to continue in subsequent years."  ADD94, 99.

### E.    FERC proceedings

On June 6, 2025, in response to a directive in the Order, Consumers filed a complaint at FERC seeking to modify MISO's tariff to incorporate a mechanism to recover the costs of complying with the Order and any extension thereof.  *Consumers Energy*, 192 FERC ¶ 61,158 at P 1 (Aug. 15, 2025).  Consumers conceded that FERC's ratemaking authority under FPA sections 205 and 206 would limit it to prospective relief.  *Id.* at P 14.  Consumers therefore requested FERC act instead pursuant to section 202(c), which Consumers argued did not restrict FERC from imposing retroactive cost recovery.  *Id.*

The States protested Consumers' complaint, arguing *inter alia* that the Order is *ultra vires* and therefore not a basis for cost recovery.  On August 15, FERC granted Consumers' complaint.  FERC determined that arguments that the DOE Order may be deemed

15

unlawful to be "beyond the limited scope of this proceeding." *Id*. at P 42. FERC, however, also specified that parties "may take appropriate steps, such as requesting rehearing in this proceeding, to preserve arguments that if the DOE Order were to be modified, then the Commission should require refunds or otherwise revisit its approach . . . ." *Id*. The Michigan Attorney General timely requested rehearing of FERC's order to preserve its argument that the cost recovery mechanism is invalid or, alternatively, should be modified. FERC Docket No. EL25-90-001 (Sept. 15, 2025). On December 15, 2025, after its rehearing request was deemed denied by operation of law, Michigan petitioned for review in this Court. *See* Case No. 25-1285.

## SUMMARY OF ARGUMENT

DOE is attempting to convert a temporary emergency authority into a long-term regulatory authority, usurping state control over electricity generation. The strategy has two steps. First, DOE stretches the meaning of "emergency" beyond recognition, purporting to identify a power sector emergency with no beginning and no end, across a 15-state region of the United States. Second, DOE strings together a

16

succession of 90-day emergency orders to achieve its desired long-term regulatory outcome years into the future.

The Order under review, through which DOE initiated this strategy, is unlawful for three reasons.

First, it is unlawful because DOE exceeded its statutory authority under section 202(c) by purporting to address a potential, future, generalized lack of capacity on a long-term basis. The plain meaning of an "emergency" in the statutory text, which DOE has affirmed in implementing regulations, is a "sudden" or "unexpected" occurrence requiring "immediate action." But as even DOE appears to acknowledge, those circumstances are not present here. Instead, DOE has claimed complete discretion to find emergencies wherever it likes. But DOE is bound by the words of the statute; it may not transform a narrow emergency authority into a broad regulatory authority without a basis in statutory text.

Second, the Order is unlawful because DOE failed to provide substantial evidence and apply reasoned decision-making for its determination that an emergency existed. Among other deficiencies. DOE distorted NERC's Summer Reliability Assessment and MISO's

17

auction results, failed to acknowledge the reliability reviews that MISO

and the MPSC undertook, and failed to respond reasonably to

petitioners' arguments about these sources on rehearing. DOE also

failed to acknowledge that during the period of the Order, it published a

Resource Adequacy Report intended to guide reliability interventions

such as this one, which found no current capacity shortfalls in MISO,

directly contradicting the findings in the Order.

Third, the Order is unlawful because the actions DOE commands

do not adhere to statutory limits. Section 202(c) authorizes DOE to

mandate only those actions that "best meet the emergency" and "only

during hours necessary to meet the emergency." Yet the Order

commands the plant to run based on economic criteria even when there

is no emergency, which DOE has no authority to do. Further, DOE

makes no showing that requiring an aging, unreliable, uneconomic coal

plant to run during non-emergency hours for 90 days "best meets" the

long-term, region-wide emergency that DOE claims to exist—

insufficient capacity during particular hours when demand is at its

peak.

18

## STANDING

When the States filed their petitions for review, the Order had not expired and was continuing to mandate Campbell's operation. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992) (standing determined based on "the facts as they exist when the complaint is filed." (cleaned up)).[4]  Since the Order's expiration, Campbell still cannot be retired because of the repeated, short-duration orders that evade this Court's review.  The operation of the plant injures the States and their people in several ways:

First, the Order imposes costs on the States and their ratepayers. The Campbell retirement and its replacement with more cost-effective resources were elements of a careful plan expected to save Michigan ratepayers nearly $600 million.  JA0160[DOE0006_4n.2].  By ordering Campbell's continued operation, the Order ensures that ratepayers throughout MISO, including the States, will pay higher costs.  Although the precise amount of costs remains unknown, Consumers noted a "net financial impact" of $53 million to continue operating the plant through

---

[4] Evidence relevant to establishing Petitioners' standing and to demonstrating that this case is not moot is included in Petitioners' Addendum, attached to this brief. *See Transunion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *Sierra Club v. E.P.A.*, 292 F.3d 895, 899 (D.C. Cir. 2002); D.C. Cir. L. Rule 28(a)(7).

August.  ADD166.[5]  As discussed below, resolution of the States'

petitions will have a direct bearing on who bears those costs.  *See*

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 143 F.4th 518, 526

(D.C. Cir. 2025).

Second, at the time of the petition, the Order was causing (and

ongoing operation of Campbell continues to cause) the States and their

people to suffer environmental harms.  Campbell burns coal, thereby

emitting $SO_2$, NOx, and PM 2.5—all air pollutants harmful to human

health.  JA0454[DOE0008_104].  As a result of the Order, Campbell

continued operating; absent the Order, it would be shuttered and no

longer emit harmful pollutants.

Pollution from Campbell is causing, and will continue to cause,

harms to public health in the States.  According to the U.S. EPA's

COBRA tool, the harms from a year of Campbell's continued operation

include 27 to 46 excess deaths as well as thousands of lost school- and

work-days.  ADD213.  The effects from each 90-day order would be

approximately one quarter of that.  *Id*.  For Michigan, Illinois, and

---

[5]  Those costs continued to increase during Campbell II.  *See* ADD166.

Minnesota alone, COBRA estimates effects from the Order that are the equivalent of $34.5 to $54.6 million in harms. *Id.*

Finally, the Campbell retirement was a critical element of a settlement agreement to which the Michigan Attorney General was a party. JA0445-580[DOE0008_95-230]. Because the Order deprives the Michigan Attorney General of the benefit of her bargain under the settlement agreement, she suffers a discrete and separate harm. *See Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 185 (D.C. Cir. 2022) (states have cognizable interest in "protecting their citizens and electric ratepayers in the traditional government field of utility regulation").

## STANDARD OF REVIEW

The APA applies to review of agency actions under the FPA. *Kimball Wind, LLC v. FERC*, 140 F.4th 496, 499 (D.C. Cir. 2025). This Court sets aside any "agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations," "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (C), (E); *see* 16 U.S.C. § 825*l*(b); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"[W]hen addressing a question of statutory interpretation, [courts] begin with the text" and apply "the traditional tools of statutory construction." *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 947-48 (D.C. Cir. 2024) (quotations omitted).  If an agency's interpretation of a statute is "not the best, it is not permissible." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

## ARGUMENT

### I.    This Case Is Not Moot, But Even If It Were, A Mootness Exception Applies

This case is not moot.  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).  But a case is not moot when resolution would affect the parties' interests in a parallel action.  *Crowley*, 143 F.4th at 526; *see also Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1523 (D.C. Cir. 1994) (case not moot where resolution could affect parallel agency adjudication).  Here, even though the period of the Order has elapsed, the States retain a legally cognizable interest in the outcome of this

22

case because the legal validity of the Order will determine who bears its costs.

FERC's authority to fix rates under FPA sections 205 and 206 is prospective only. *Consumers Energy*, 192 FERC ¶ 61,158 at P 14 (Aug. 15, 2025). The filed rate doctrine would prohibit FERC from requiring MISO to charge a rate other than that on file, regardless of any resulting inequities. *Oklahoma Gas & Elec. Co. v. FERC*, 11 F.4th 821, 832 (D.C. Cir. 2021) (filed rate doctrine "admits of no equitable adjustments by the Commission or this court.").

Only in the extraordinary context of an emergency under section 202(c) may FERC direct MISO to charge ratepayers retroactively for costs Consumers already incurred. FERC granted Consumers' complaint solely on the basis of section 202(c). *Consumers Energy*, 192 FERC at P 35. If this Court holds the Order unlawful, or requires DOE to modify it, the Court's ruling will directly affect Consumers' cost recovery at FERC. Vacatur of the Order enables the States to seek a refund of costs charged to their ratepayers (including the States themselves) and to eliminate the MISO cost-recovery mechanism

altogether.  Thus, even after the Order expired, its validity is a live matter affecting the States' interests.

Even if this case were moot, the Court should retain jurisdiction because "the dispute is capable of repetition yet evading review." *Trump v. Mazars USA, LLP*, 39 F.4th 774, 786 (D.C. Cir. 2022).  The "challenged action was in its duration too short to be fully litigated prior to its cessation or expiration" and "there [is] a reasonable expectation that the same complaining party would be subjected to the same action again."  *Id.* (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).

The Order lasted 90 days.  That is too short a period to litigate its validity, especially because the FPA required the States to seek rehearing and to present all objections before filing this petition, and afforded DOE at least 30 days to consider that rehearing request. 16 U.S.C. § 825*l*(a), (b); *see Honeywell*, 628 F.3d at 576 (order shorter than two years presumed to evade review).  Thus, review in this Court could not be completed before the Order expired.

Further, "here, there is more than just a reasonable expectation that [DOE] would reissue the same [order].  It has already done so." *Trump*, 39 F.4th at 786.  Indeed, it has done so twice.  All three Orders

24

concern the same generation facility and address the same purported "emergency"—an "ongoing" emergency characterized by "unacceptable reliability risks within five years."  JA0019[DOE0016_14]; *see* ADD88; ADD99.

## II.   The Order Exceeds DOE's Statutory Authority

Section 202(c) confers an extraordinary power, restricted to extraordinary circumstances—a sudden, unexpected, and imminent threat to the Nation's power grid.  But DOE has exercised this authority to address only a potential, generalized deficiency in electric capacity that it claims may last for "years."  Because section 202(c) grants only a more circumscribed power, the Order exceeds DOE's statutory authority.  5 U.S.C. § 706(2)(C).

### A.   Section 202(c) authorizes DOE to address emergencies, not to regulate the long-term resource adequacy of the electric power sector.

Section 202(c) authorizes DOE to act only in war or when DOE "determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes."  16 U.S.C. § 824a(c)(1).  Traditional tools of statutory interpretation—including

25

DOE's own regulation, courts' interpretations, and DOE's longstanding practice—confirm that an emergency must be sudden, unexpected, and imminent.  A general lack of electric capacity supposedly existing across a 15-state region of the country and expected to last for "years" is not an emergency.  Finally, context makes plain that the best meaning of the FPA's emergency provision is *not* that it confers unheralded authority to transform the electricity sector.

"[B]egin with the text."  *PG&E*, 113 F.4th at 948.  The FPA does not define "emergency," but contemporaneous dictionaries elucidate its meaning.  *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 655 (2020) (relying on contemporaneous dictionaries to determine plain meaning of statutory text).  Webster's New International Dictionary of the English Language (1930) defined "emergency" as a "sudden or unexpected appearance or occurrence . . . . An unforeseen occurrence or combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency."  Current dictionaries likewise define "emergency" as a circumstance "unexpectedly arising, and urgently demanding immediate attention."  *See Acuity Ins. Co. v. McDonald's Towing & Rescue, Inc.*, 747 F. App'x 377, 381 (6th Cir.

26

2018) (addressing a statute that leaves "emergency" undefined and quoting dictionaries to supply a definition).

Section 202(c)'s text also suggests that an "emergency" must be imminent. Section 202(c)(1) articulates its required predicates in the present tense: DOE may act "[d]uring the continuance of any war" or when "an emergency exists." Likewise, Section 202(c)'s substantive provisions all pre-suppose an active emergency. Section 202(c)(1) empowers DOE to take actions that "best meet the emergency." And section 202(c)(4)(A) allows DOE to extend orders for additional 90-day periods so long as it is "necessary to meet the emergency." Those provisions would make little sense if the "emergency" to which they refer might not even arise for years. *Contra* JA0019[DOE0016_14].

That an "emergency" must arise suddenly and unexpectedly is confirmed by DOE's own regulations implementing section 202(c):

> "Emergency," as used herein, is defined as an unexpected inadequate supply of electric energy which may result from the unexpected outage or breakdown of facilities for the generation, transmission or distribution of electric power.

10 C.F.R. § 205.371. When it adopted that definition, DOE explained that it did not want to "replace prudent utility planning and system expansion." DOE, *Emergency Interconnection of Electric Facilities and*

27

*the Transfer of Electricity to Alleviate an Emergency Shortage of Electric Power*, 46 Fed. Reg. 39,984, 39,985 (Aug. 6, 1981). Rather, DOE's role would be limited to periods of "unexpected inadequate supply of electricity," not solving "long-term problems." *Id.*

The few courts that have opined on the meaning of "emergency" in section 202(c) have emphasized that the provision applies in very limited circumstances, and not as a tool to address longer-term concerns. In *Richmond Power and Light v. FERC*, this Court upheld the FPC's judgment that, after the 1973 oil embargo had ended, the lingering need for additional electricity to address the Nation's pressing but longer-term dependence on foreign oil—the dominant question in national energy policy at the time—was not an "emergency" noting that section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances." 574 F.2d 610, 615 (D.C. Cir. 1978).

Similarly, in *Otter Tail Power v. FPC*, the Eighth Circuit described section 202(c) as enabling the FPC to "react to a war or national disaster." 429 F.2d 232, 234 (8th Cir. 1970). The court also distinguished section 202(c) from section 202(b), which "applies to a crisis which is likely to develop in the foreseeable future but which does

28

not necessitate immediate action on the part of the Commission."
Consistent with these differences in purpose, section 202(b) authorizes
action only after a hearing, whereas section 202(c) "enables the
Commission to proceed without notice or hearing" to address immediate
crises. *Id.*

DOE's longstanding practice likewise confirms the limited scope
of its powers. DOE used 202(c) just nineteen times from its founding in
1977 through 2024, mostly in response to extreme weather events such
as hurricanes, extreme cold, and extreme heat. JA0161[DOE0006_5];
*see* Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev.
789, 838 (2025). In each of these cases, the emergency order was
requested by the relevant system operator or responsible utility, or
both, and DOE carefully limited its remedy to ensure that generation
facilities were ordered to run only as necessary to address the
emergency, and in a manner to minimize conflict with environmental
requirements. JA0162[DOE0006_6]. DOE thus limited the duration of
those orders to the period necessary to address the emergency, often
shorter than 10 days. *Id.*

The plain text, prior regulatory interpretation, judicial precedent, and longstanding practice all confirm a limited power applicable only to sudden, imminent conditions.  Context makes that all the more plain. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (The "words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). The Order proposes a transformative use of section 202(c): as a means to intervene in the regulatory landscape, displacing both state law and sections 205 and 206 of the FPA, under which FERC regulates regional grid operators' resource adequacy requirements.  Had Congress intended to vest such a broad power in section 202(c) it would have stated so clearly.  Indeed, it defies logic that Congress would grant DOE general authority over which power plants may retire across the country—a function with profound implications for rates, state sovereignty, and a broad array of stakeholder interests—without any obligation to assess the effect on ratepayers or seek public input.

The Supreme Court has emphatically rejected statutory interpretations whereby an agency "claim[s] to discover in a long-extant statute an unheralded power representing a transformative expansion

30

in its regulatory authority." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724-25 (2022) (internal quotations omitted); *cf. Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions . . . ."). Yet what DOE attempts here is exactly that "extraordinary case[]," *W. Virginia*, 597 U.S. at 721 (cleaned up): the discovery—in a 90-year-old statutory provision used seldomly and only for limited purposes—of unheralded yet broad authority to transform the regulatory environment underpinning the electricity system by commanding the amount and type of generation on the grid. All without "clear congressional authorization," *id.* at 724, and notwithstanding that such authority has been reserved to and exercised by the States and, at their election, RTOs, for decades. *Cf. Biden v. Nebraska*, 600 U.S. 477, 501 (2023) ("The question here is not whether something should be done; it is who has the authority to do it"); *W. Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring) (agency overreach "also risks intruding on powers reserved to the States").

### B.    DOE is bound by the text of section 202(c).

Confronted with section 202(c)'s plain text, DOE's response is that it is not bound by the meaning of the word "emergency" as it appears in the statute or as defined in its regulations.  DOE asserted, without explanation, that the definition of emergency is "not persuasive" and that dictionary definitions "cannot limit the discretion Congress expressly delegated to the Secretary in section 202(c)." JA0012[DOE0016_7].

To be clear, DOE did not adopt a different definition of the word "emergency."  Nor did it provide reasons, using any other traditional tools of statutory construction, for disregarding the dictionary definition.  DOE simply said that *it gets to decide what an emergency is*—the purest specimen of *ipse dixit* one is likely to encounter in the wild.

Whatever discretion DOE may have, it does not have discretion to ignore the words of the statute.  Any delegation from Congress to DOE is necessarily constrained by "the words on the page."  *Bostock*, 590 U.S. at 654.  The statute directs the Secretary to determine whether an "emergency exists," but whatever discretion that affords "is not a

32

roving license to ignore the statutory text.  It is but a direction to exercise discretion within defined statutory limits." *Massachusetts v. EPA*, 549 U.S. 497, 533 (2007).

On rehearing, DOE also claimed to be unconstrained by its own regulatory definition of emergency, stating: "The definition of 'emergency' contained in DOE's regulations . . . does not supersede the discretion section 202(c) affords to the Secretary to 'determine[] that an emergency exists.'" JA0012[DOE0016_7].  "It is axiomatic, however, that an agency is bound by its own regulations." *Nat'l Env't Dev. Assoc.'s Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quotations omitted).

### C. The Order impermissibly attempts to regulate long-term resource adequacy rather than address an "emergency" under section 202(c).

DOE made no effort to show that its claimed emergency was "sudden," "unexpected," or otherwise a genuine "emergency."  Certainly, the Campbell retirement was neither sudden nor unexpected.  MISO approved the retirement in March 2022 after concluding it would not harm reliability.  JA0322[DOE0006_166].  And in June 2022, both the retirement and the procurement of replacement resources were

approved by the MPSC through a public proceeding, then carefully and timely executed over the ensuing years.  JA0445-580[DOE0008_95-230].  That DOE waited until the eve of the retirement to act does not transform a long-planned retirement into an emergency.

Nor did NERC's 2025 Summer Reliability Assessment, upon which the Order principally relied, describe a condition that was "sudden," "unexpected" or "imminent."  That report designated MISO as at "elevated risk of operating reserve shortfalls."  JA0107[DOE0005_5].  But NERC's "elevated risk" designation—which falls below "high risk"—is broadly and routinely applied.  The same report designated other large sections of the country as "elevated risk." JA0108[DOE0005_6].  And, except for summer 2022 when MISO was "high risk," NERC had designated MISO as "elevated risk" in every summer and winter assessment since NERC began using those labels in 2021.  JA0185[DOE0006_29nn.105-06].  Thus, if NERC's "elevated" risk designation indicated an emergency, that means the 15 states of MISO—and other large swaths of the United States—have been in an uninterrupted, years-long state of emergency.  Sudden and unexpected, that is not.

DOE also based its actions on, and attempted to remedy, concerns about resource adequacy that will not manifest, if at all, for years. The Rehearing Order adverts to an "assessment" of expected generation retirement and additions, which found (without explanation or substantiation) that "most regions—including the MISO region relevant to the Emergency Order—will face unacceptable reliability risks within five years." JA0019[DOE0016_14]. But section 202(c) does not empower DOE to act based on circumstances that might arise years *after* its 90-day order expires.

The Order also fails to describe an emergency under DOE's regulations. After claiming to be unfettered by its regulatory definition of "emergency," DOE appeared to contend that it nonetheless met the definition. Without further explanation, DOE stated: "In any event, those regulations specifically provide that '[e]xtended periods of insufficient power supply as a result of inadequate planning or the failure to construct necessary facilities can result in an emergency as contemplated in these regulations.'" JA0012[DOE0016_7]. DOE takes this sentence out of context. DOE's regulations do not say that inadequate planning is *itself* an emergency. Inadequate planning (or a

35

failure to construct facilities) could expose a utility to heightened *risk* of emergency. But the emergency itself must still qualify as an "unexpected inadequate supply of electric energy," which DOE made no effort to establish.

Further, DOE ignored the next sentence of its regulations, which limits how long an order caused by inadequate planning may extend: "In such cases, the impacted 'entity' will be expected to make firm arrangements to resolve the problem until new facilities become available, so that a continuing emergency order is not needed." 10 C.F.R. § 205.371. DOE made no attempt to enforce this key provision. Nor could it, as Consumers had already made "firm arrangements" to replace the power from Campbell, JA0445-580[DOE0008_95-230], and MISO had already procured adequate capacity to maintain reliability for Summer 2025, JA0069[DOE0004_12].

Rather than a carefully tailored response to a sudden and unexpected condition, the Order is a power grab: it claims the authority to identify an "emergency" by secretarial say-so and where the supposed emergent conditions may not arise for years. But the FPA commits such long-term planning to the states, whose routine, intervening

36

actions may prevent any future risk.  The statute requires that the predicate for DOE's action, the substantive limits of its action, and the duration of its action all depend on the existence of an active emergency.  The Order failed to show such an emergency existed here.

## III.  The Order Is Not Supported By Substantial Evidence

Under the FPA and APA, DOE must support its determinations with substantial evidence.  16 U.S.C. § 825*l*(b) (factual assertions in FPA orders must be supported by substantial evidence); *see, e.g.*, *Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) (FPA order must be "supported by substantial evidence" and based on methodology "consistent with past practice or adequately justified").

The Order falls well short of this standard.  It does not substantiate an emergency, relying instead on evidence that is incomplete or taken out of context.  And it ignores other essential facts, including DOE's own assessment of resource adequacy in MISO.

### A.  Neither The Order nor the Rehearing Order introduce facts to substantiate an emergency in MISO.

DOE's shifting rationales lack evidentiary support.  The Order purported to identify a resource adequacy "emergency" by pointing to three sources of evidence: (1) NERC's 2025 Summer Reliability

37

Assessment, (2) capacity retirements in MISO, and (3) MISO's

2025/2026 Planning Resource Action.  On rehearing, DOE tried to

bolster its deficient record by pointing to assertions in Executive

Orders, general statements from a MISO official, and *post hoc*

justifications based on alerts MISO issued while the Order was in effect.

None of these sources support DOE's conclusion that an emergency

existed or would exist in the summer of 2025 or beyond.

### *The Order*

The Order relied heavily on the NERC 2025 Summer Reliability

Assessment's statements that MISO is "at elevated risk of operational

reserve shortfalls" and that it has "potential tight reserve margins."

JA0001[DOE0001_1].  But the Order's discussion of the Assessment is

both incomplete and unreasoned.

First, NERC's "elevated risk" designation falls *below* NERC's

"high risk" designation and in no way signifies an emergency condition.

JA0112[DOE0005_10Tbl.1].  As the Rehearing Order acknowledged,

JA0016[DOE0016_11], NERC considers a region to be at "elevated"

risk if there would be reliability concerns only in *extreme* scenarios (i.e.,

extreme demand or extreme generator outages)—but NERC did not

38

assess the likelihood of such extreme supply or demand during the summer period.[6]

In MISO, designation of "elevated risk" represents an expectation of roughly 15 minutes of total outage over a year. JA0114[DOE0005_12]. It is no surprise, then, that this designation is far from unusual. Except when it was designated "high" risk, MISO had been designated as "elevated" risk in every Summer Assessment—and every Winter Assessment—since NERC began using the current designations in 2021. JA0185[DOE0006_29nn.105-06]. Nor is MISO an outlier. The Summer 2025 Assessment designated grid systems from Texas to New England as at "elevated risk." JA0112[DOE0005_10tbl.2].

Second, the "*potential* tight reserve margins" identified in the Order did not constitute an emergency, even in Summer 2025. JA0001[DOE0001_1] (emphasis added). NERC's calculation of anticipated reserve margin for Summer 2025 in MISO (24.7%) was the

---

[6] The Rehearing Order newly points to the National Oceanic and Atmospheric Administration Seasonal Outlook, finding the Midwest had a 33-50% chance of "above-normal" temperatures in summer 2025. JA0017[DOE0016_12]. But NOAA classifies such risk as merely "leaning above" average temperatures. In fact, the Midwest had the lowest chance of above-average temperatures of the continental United States. JA0111[DOE0005_9].

second highest level since 2020 and over 57% higher than its "Reference Margin Level" (the level that "meet[s] resource adequacy criteria") for MISO (15.7%). JA0112,117,146[DOE0005_10tbl.2, 15, & 44]. This does not reasonably constitute a "significant strain on the grid," JA0016[DOE0016_¶35]—much less an "emergency." Confronted with Petitioners' arguments that the NERC Assessment did not provide evidence of an emergency, DOE had nothing to say, other than to repeat NERC's definition of "elevated risk." JA0016[DOE0016_11].

In addition to the NERC Assessment, the Order attempts to support its emergency finding by observing that various power plants have retired in Michigan. JA0001[DOE0001_1]. But power plant retirements are a regular occurrence in the electric power sector; this fact fails to present even *prima facie* evidence of an emergency. It was also arbitrary to rely on capacity retirements in one state in isolation without also considering all the other factors that contribute to

40

resource adequacy in MISO, including capacity additions and access to out-of-state resources.[7]

Finally, the Order cited MISO's April 2025 summary of its Planning Resource Auction, which reported results from MISO's 2025/2026 capacity auction.  The Order picks out MISO's statement that for that planning year, "new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources." JA0002[DOE0001_2].  But here MISO was simply noting that the total capacity of resources offered into the auction was lower than what was offered the prior year—primarily because MISO had changed its methodology to recognize that coal plants like Campbell contribute less to reliability than MISO had previously assumed, *see*

---

[7] Of course, MISO and the MPSC *did* consider all those factors:  MISO, in its modeling to conclude that the Campbell retirement would not threaten reliability, JA0195[DOE0006_39n.125], and the MPSC in its proceeding approving Consumers' Integrated Resource Plan.  JA0445-580[DOE0008_95-230].  Yet, as discussed below, DOE arbitrarily failed even to acknowledge these proceedings.

JA0070[DOE0004_13]—not that the total amount of capacity procured was inadequate.  JA0017[DOE0006_10].

If anything, the Planning Resource Auction severely undercuts the emergency determination.  In that same document, MISO concluded that the auction had "demonstrated sufficient capacity at the regional, subregional and zonal levels."  JA0069[DOE0004_12].  MISO's statements acknowledging that additional capacity would be *beneficial* during the summer do nothing to rehabilitate DOE's claim that the auction somehow evidenced an *emergency* during summer 2025.  *See* JA0017[DOE00016_¶38].  The Rehearing Order did not engage with the substance of the States' arguments explaining the import of the Planning Resource Auction.  *See id.*

### *The Rehearing Order*

None of the Rehearing Order's new justifications constitute substantial evidence of an emergency.  Conclusory statements about a "National Energy Emergency" in EO 14,156 and an "unprecedented surge in electricity demand" in EO 14,262, JA0018[DOE0016_13], do not provide particularized facts that constitute evidence of an

42

emergency for purposes of 202(c).  The FPA does not allow DOE to substitute White House say-so for "substantial evidence."

Rather than demonstrate an emergency, the anticipatory statements from MISO's Jennifer Curran cited in the Rehearing Order, JA0018-19[DOE0016_13-14], *see* JA1143[DOE0021_5], show only the unremarkable fact that MISO takes its reliability function seriously. Curran's reference to "resource adequacy and reliability challenges" falls far short of claims that there is or will be an emergency.  And her reference to "growing reliability risk" from "the rapid retirement of existing coal . . . [that] threatens to outpace the ability of new resources . . . to replace them," JA1145[DOE0021_7], is clearly not a reference to Campbell, whose retirement was not "rapid," was replaced with equivalent resources, and was judged *by MISO* not to create a reliability risk.  More relevant and timely assessments by MISO leadership—such as the May 2025 statement of its Senior Vice President of Markets and Digital Strategy that "[w]e are confident that the [MISO] footprint will continue to be resource adequate in the near and longer term," JA0726[DOE0009_174]—make clear that DOE's

43

reliance on Curran's testimony to support emergency action is misplaced.

Finally, DOE pointed to events that occurred during the period of the Order—i.e., *after* the Order was issued—to bolster its emergency determination retroactively. *Post hoc* evidence, even if it proved what DOE purports (which it does not), cannot substitute for substantial evidence *at the time* DOE issued the Order. *Cf. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907-08 (2020) (agency bolstering previous decision may provide "a fuller explanation of the agency's reasoning *at the time of the agency action,"* but "may not provide new [reasons]" (internal quotations omitted)).

Regardless, MISO's alerts do not constitute evidence that an emergency existed in summer 2025. On June 23, MISO issued an "Energy Emergency Alert" (EEA) Level 1. EEA Level 1 is the lowest level of EEA, issued when the grid is stable but a grid operator "is concerned about sustaining its required Contingency Reserves." JA0844[DOE0009_490]. In other words, declaration of EEA Level 1 indicates concern, not emergency. DOE has never previously recognized EEA Level 1 as constituting a section 202(c) "emergency."

44

To the contrary, numerous recent section 202(c) orders—before and after Campbell I's issuance—make clear that EEA Level 1 is insufficient, using EEA Level 2 as the *minimum* trigger for ordered operations.[8]  The Rehearing Order also asserts that MISO issued "dozens of alerts to manage grid reliability" but does not specify what kinds of alerts, ignoring that MISO routinely issues non-emergency alerts, for example, as early notification that there *may* be a need in coming days to bring additional generation on-line.  *See* JA0644-671[DOE0009_92-119].  MISO's successful management of grid reliability—its core job—using its normal communications tools does not evidence an "emergency."

## B.    DOE ignored relevant facts.

Not only did DOE rely on evidence insufficient to substantiate an emergency, but it also ignored critical evidence demonstrating the absence of an emergency.  *See, e.g.*, *Windsor Redding Care Ctr., LLC v. NLRB*, 944 F.3d 294, 299 (D.C. Cir. 2019).

---

[8] *See* DOE Order No. 202-25-5 at 4 (June 24, 2025); DOE Order No. 202-22-4 at 4 (Dec. 24, 2022); DOE Order No. 202-22-3 at 4 (Dec. 23, 2022); DOE Order No. 202-22-2 at 4 (Sept. 4, 2022); DOE Order No. 202-22-1 at 4 (Sept. 2, 2022); DOE Order No. 202-21-2 at 5 (Sept. 10, 2021).

DOE failed to consider its own *Resource Adequacy Report,* which was intended to "identify at-risk region(s) and guide reliability interventions" such as this one.  ADD14.[9]  While the Order was issued prior to release of the *Report,* the Rehearing Order was not.  Yet DOE declined even to acknowledge that the report *flatly contradicts* the Order's conclusion that there is a resource adequacy emergency in MISO: "In the current system model . . . MISO did not experience shortfall events."  ADD34.  In other words, the study did not identify any capacity shortfalls in MISO under current system conditions.

DOE also ignored the reliability assessments of MISO and the MPSC.  As noted above, MISO approved the Campbell retirement through a study process governed by its tariff.  JA0322[DOE0006_166].  As the system operator, MISO has more in-depth knowledge of its system and conducted significantly more thorough analysis than did DOE.  So too does the MPSC, which concluded in its Michigan capacity demonstration proceedings that both Consumers and the relevant part

---

[9] Although DOE has excluded the Report from the record, this Court may take judicial notice of the Department's own publication.  *See* Fed. R. Evid. 201(b); *Nebraska v. E.P.A.*, 331 F.3d 995, 999 n.3 (D.C. Cir. 2003); *Manguriu v. Lynch*, 794 F.3d 119, 121 (1st Cir. 2015) ("[C]ourts normally can take judicial notice of agency determinations.").

of MISO had sufficient resources in 2025 and the years to follow. JA0174[DOE0006_18n.70].

DOE needed to explain why it reached a different conclusion than MISO and the MPSC.  Instead, DOE failed to mention the MPSC analysis entirely.  DOE did not engage the substance of the MISO analysis but instead tried to dismiss it because it was issued before the 2025 NERC report.  JA0017[DOE0016_12].  But as discussed above, nothing in the NERC report was new or otherwise provided a basis to dismiss MISO's decision to approve the Campbell retirement.

These failures of reasoned decisionmaking—ignoring the conclusions of its own analysis and departing from the conclusions of the relevant expert bodies without explanation—render the Order arbitrary.

## IV.   Even If There Were an Emergency, the Order Would Still Violate Section 202(c)

Independent of its failure to substantiate an "emergency," DOE also violated the FPA and APA because the "economic dispatch" remedy exceeds its statutory authority, 5 U.S.C. § 706(2)(C), and its justification for compelling Campbell's operation was unreasoned, *id.* § 706(2)(A).

47

### A. Section 202(c) does not authorize DOE to require "economic dispatch."

Even in response to a true emergency, DOE may only command generation that "will best meet the emergency and serve the public interest" and then "only during hours necessary to meet the emergency." 16 U.S.C. § 824a(c)(1), (2). Instead, the Order directs MISO to ensure the "economic dispatch of the Campbell Plant." That command exceeds DOE's authority under each statutory provision.

First, DOE's command to ensure "economic dispatch" of Campbell flatly contradicts section 202(c)(2)'s affirmative requirement that its order "requires generation . . . only during hours necessary to meet the emergency." "Economic dispatch" is the practice of operating an electric system so that the lowest marginal-cost generators are used first, followed by more expensive ones. *See* JA200-202[DOE0006_44-46]; 42 U.S.C. § 16432(b). In other words, "economic dispatch" requires the plant to run based on prevailing market prices, not based on criteria related to emergent need, and thus does not limit operation only to hours of emergency.

DOE acknowledged the Order "may result in a conflict with environmental standards and requirements," JA0002[DOE0001_2],

48

triggering applicability of section 202(c)(2), but never reconciled the Order with that subsection's terms. *See* JA0019-20[DOE0016_14-15]. Instead, DOE defended its "economic dispatch" instruction by again appealing to the "discretion" afforded by section 202(c). JA0021[DOE0016_16]. But appeals to discretion do not authorize DOE to invoke emergency powers for hours beyond the "emergency" in contravention of the statute.

Second, requiring economic dispatch violates section 202(c)(1) because it does not limit operation to that needed to "best meet" DOE's purported *capacity* emergency. *See* JA0023[DOE0016_18]. Lack of capacity is a problem of inadequate energy during peak demand, i.e., only during periods of acute need. *See Conn.*, 569 F.3d at 479 (capacity market aim is "sufficient capacity to easily meet expected peaks in electricity demand"). DOE never shows how compelling Campbell to sell into the energy market (based on economic considerations), which covers needs for all hours of the day, solves a purported shortage during particular windows of acute need.

In the Rehearing Order, DOE defended economic dispatch as "reducing electricity costs and serving the public interest."

49

JA0021[DOE0016_16].  But DOE cannot order power plants to run under section 202(c) during hours when there is no emergency, even if doing so lowered electricity costs.

Regardless, DOE's determination that such operation will "minimize cost to ratepayers" is arbitrary and capricious because it lacked a basis to reach that conclusion.  *See* JA0002[DOE0001_2].  Coal plants are often uneconomical and require long ramp-up times JA0436-437[DOE0008_39-40].  To be available to ramp up for peak demand, a plant like Campbell typically needs to operate during normal conditions when market prices are low—thus operating at a net loss. JA0438[DOE0008_41].  Indeed, Campbell cost at least $120 million to operate, but only received $67 million in revenue during the period of the Order.  *See* ADD166.  Perversely, then, because of Campbell's operating limits, economic dispatch ensures Campbell will run at a net loss.  States and other MISO ratepayers are left covering those losses.

The Rehearing Order contends that even if Campbell operates on a "must run basis" such operation minimizes cost to ratepayers because Campbell would be a "price taker" that "cannot increase" the market price.  JA0022[DOE0016_16].  That defense betrays DOE's fundamental

50

misunderstanding: ratepayers are paying the market price *and* covering Campbell's net losses, so they are necessarily paying above market costs in total. *See Constellation Mystic Power, LLC*, 172 FERC ¶ 61,044, 61,393 at P 41 (2020) (where a market sale is competitive only because ratepayers are covering the generator's net losses "the entirety of that transaction does not benefit customers.").

The Order is also inconsistent with the public interest.[10] The practical consequence of requiring "economic dispatch" is that Campbell will run more often. This will burn more coal and cause more pollution than it would if it remained on standby and dispatched only during emergency circumstances. Given Campbell's age and condition, it also risks additional and more expensive repairs. *See* JA0423-424[DOE0008_26-27].

Finally, DOE fails to explain its choice to run Campbell near continuously during non-emergency conditions, rather than only during periods of grid strain, and only after other mitigating steps had been exhausted. Such operation imposes excess cost and harm to the public and is unnecessary to "best meet" the emergency. Indeed, in the few

---

[10] The requirement that actions ordered by DOE "best meet the emergency and serve the public interest" is conjunctive. DOE Order No. 202-18-1, Summary of Findings at 4 (Nov. 6, 2017).

cases when DOE temporarily prevented a power plant retirement to meet an emergency, DOE did not order economic dispatch. Rather, DOE ordered the plants to run only under narrowly defined circumstances, such as when called upon by the grid operator for reliability purposes. JA0203-204[DOE0006_47-48].

### B. The Order fails to establish that *any* operation of Campbell "best meets the emergency."

Beyond the unlawfulness of the "economic dispatch" command, DOE's order is arbitrary and capricious because it fails to justify the determination that any operation of Campbell will "best meet" the emergency.

Campbell is an aging, uneconomic plant that amounts to less than 1% of generation in MISO. JA0199[DOE0006_43]. DOE offers no reason to conclude that preventing Campbell's retirement best meets the 15-state, years-long emergency it claims to have identified. Petitioners submitted data, which DOE did not address, that Campbell is unreliable, JA0423[DOE0008_26] (Campbell's outage rates greatly exceed average), and that it requires significant periods of maintenance to operate, JA0424[DOE0008_27] (documenting more than 285 days of outages during 2024 alone). DOE claims that Campbell is needed for a

regional emergency, yet offers no evidence to show that energy generated from Campbell is deliverable to any areas in the region that would be expected to face energy shortage during periods of strained grid operations.  The absence of engagement on this point is notable, because DOE is aware that adequate replacement capacity within the grid zone where Campbell is located was already operating.  JA0016[DOE0016_11]; *see* JA0468-469[DOE0008_118-19] (approved plan increased capacity in MISO Zone 7).  With the record before it, DOE had no basis to conclude that Campbell would be capable of serving other zones within MISO that could experience shortages during periods of grid strain.

In short, DOE's sole basis to conclude that Campbell would "best meet" the emergency is that it is a dispatchable plant in MISO.  By this logic, any dispatchable plant in MISO is equally the "best."  But "best meets" is not equivalent to "any that meets."  *Nat'l Cable Television Ass'n, Inc. v. F.C.C.*, 33 F.3d 66, 74 (D.C. Cir. 1994) (rejecting an interpretation that results in an "exception that excepts nothing" because a court "must, if possible, give effect to every phrase of the statute") (internal quotation omitted).  It requires DOE to compare

53

among alternatives to discern whether other options better resolve the purported region-wide shortage of capacity.  *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (interpreting "best" as requiring selection of the alternative that is "most advantageous" on some relevant metric).

DOE's defense is again that it is unconstrained by the statutory text.  JA0023[DOE0016_18] (section 202(c) "does not require the Secretary to engage in a lengthy weighing of options or explanation of the Secretary's actions prior to issuing an emergency order").  Rather, DOE asserts, the phrase "in its judgment" is an express delegation of the appropriate remedy to the Secretary.  JA0023[DOE0016_18].  But DOE's approach writes "best meets" out of the statute, in an apparent effort to avoid judicial review of DOE's conduct.  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant") (cleaned up).  Moreover, agency judgment is still subject to review under the APA.  *See e.g.*, *Murray Energy Corp. v. EPA*, 936 F.3d 597, 604 (D.C. Cir. 2019) (reviewing and

54

vacating in part EPA air standards, where the requisite statutory standard is determined "in the judgment of" the EPA Administrator). DOE was required to reasonably consider whether compelling Campbell's operation would "best meet" the supposed region-wide, years-long emergency. It did not.

## CONCLUSION

This Court should hold unlawful and set aside the Order.

Respectfully submitted,

Dana Nessel,
Michigan Attorney General

*/s/ Peter N. Surdo*
Peter N. Surdo
Special Assistant Attorney
General
Office of the Minnesota Attorney
General
445 Minnesota St., Suite 600
St. Paul, MN 55101
(651) 757-1061
peter.surdo@ag.state.mn.us

*Attorney for State of Minnesota*

*/s/ Michael E. Moody*
Michael E. Moody (DC Cir.
66350)
Lucas Wollenzien (P86928)
Assistant Attorneys General
Special Litigation Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7627
MoodyM2@michigan.gov
WollenzienL@michigan.gov

*Counsel for the People of the
State of Michigan*

55

/s/ Jason E. James
Jason E. James
Assistant Attorney General
Illinois Attorney General's Office
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
jason.james@ilag.gov

*Attorney for State of Illinois*

/s/ Christopher M. Bzdok
Christopher M. Bzdok (P53094)
Special Assistant Attorney
General
chris@tropospherelegal.com

*Counsel for the People of the
State of Michigan*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a) because this document contains 9,949 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

*/s/ Michael Moody*
Michael Moody
(DC Cir. 66350)

57

## CERTIFICATE OF SERVICE

I hereby certify that, on April 10, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit through this Court's CM/ECF system, which will serve a copy on all registered users.

/s/ *Michael Moody*
Michael Moody
(DC Cir. 66350)

58