SCHEDULED FOR ORAL ARGUMENT MAY 15, 2026

No. 25-1159
(Consolidated with 25-1160 and 25-1162)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

THE PEOPLE OF THE STATE OF MICHIGAN,
*Petitioners*,
v.
U.S. DEPARTMENT OF ENERGY, AND CHRIS WRIGHT, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF ENERGY,
*Respondents*.

ON PETITION FOR REVIEW OF FINAL ORDER OF THE
DEPARTMENT OF ENERGY

## FINAL REPLY BRIEF OF
## THE STATES OF ILLINOIS, MICHIGAN, AND MINNESOTA

DANA NESSEL
*Michigan Attorney General*
MICHAEL E. MOODY (DC
Cir. 66350)
LUCAS WOLLENZIEN
*Assistant Attorneys General*
Special Litigation Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7627
MoodyM2@michigan.gov
WollenzienL@michigan.gov

PETER N. SURDO
*Special Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
(651) 757-1061
peter.surdo@ag.state.mn.us

*Attorney for State of Minnesota*

JASON E. JAMES
*Assistant Attorney General*
Illinois Attorney General's Office
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
jason.james@ilag.gov

*Attorney for State of Illinois*

CHRISTOPHER M. BZDOK
*Special Assistant Attorney General*
chris@tropospherelegal.com

*Counsel for the People of the State of Michigan*

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

## A. PARTIES

Petitioners:

25-1159: The People of the State of Michigan

25-1160: Sierra Club, Natural Resources Defense Council, Michigan Environmental Council, Environmental Defense Fund, Environmental Law and Policy Center, Vote Solar, Union of Concerned Scientists, Ecology Center, and Urban Core Collective

25-1162: The State of Illinois and the State of Minnesota

Respondents:

25-1159: U.S. Department of Energy and Chris Wright in his official capacity as Secretary of the U.S. Department of Energy.

25-1160: U.S. Department of Energy and Chris Wright in his official capacity as Secretary of the U.S. Department of Energy.

25-1162: U.S. Department of Energy and Chris Wright in his official capacity as Secretary of the U.S. Department of Energy.

Intervenors:

Midcontinent Independent System Operator, Inc.

Consumers Energy Company.

i

Amici:

- Citizens Action Coalition of Indiana, Citizens Utility Board of Michigan, Citizens Utility Board of Minnesota, Citizens Utility Board of Wisconsin, and Consumers Council of Missouri [Consumer Advocates]

- Institute for Policy Integrity at New York University School of Law [Policy Integrity]

- The Niskanen Center, Professor Paul L Joskow & Professor Richard Schmalensee [Niskanen Center]

- Professor Joshua C. Macey, Professor Joel B. Eisen, Professor Alison Gocke, Professor Sharon B. Jacobs, Professor Alexandra B. Klass, Professor Andrew McKinley, Professor Felix Mormann, Professor David Owen, Professor Shelley Welton, and Professor Hannah Wiseman [Energy Law Scholars]

## B. RULINGS UNDER REVIEW

The petitioners in Case Nos. 25-1159, 25-1160, and 25-1162 seek review of two orders from the U.S. Department of Energy and Secretary Chris Wright:

ii

1. *Midcontinent Independent System Operator (MISO) 202(c) Order,* Order No. 202-25-3 (May 23, 2025); and

2. *Midcontinent Independent System Operator (MISO) 202(c) Order Addressing Arguments Raised on Rehearing,* Order No. 202-25-3B (Sept. 8, 2025).

## C. RELATED CASES

The petitions on review in cases Nos. 25-1159, 25-1160, and 25-1162 have not previously been before this court. Case Nos. 25-1198 and 25-1202 pending in this Court are related to this set of petitions, as they arise from a renewal of the Order challenged in these petitions. Case No. 25-1285, also pending in this Court, is also related to this set of petitions because it arises from an order of the Federal Energy Regulatory Commission issued in response to a complaint filed by Consumers Energy Company in response to the Order challenged in these petitions.

April 10, 2026                              /s/ Michael E. Moody
                                            Michael E. Moody

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................ 3

ARGUMENT ............................................................................................................ 5

   I.   DOE's Reading of Section 202(c) Is Wrong ................................................. 5

      A. Misreading section 202(c)'s plain text, DOE mistakes an
         "emergency" for its potential causes ....................................................... 7

      B. "Electricity Sector Context" does not support an expansive
         reading of section 202(c) ...................................................................... 11

      C. DOE's Order is unprecedented ............................................................ 14

   II.   Substantial Evidence Does Not Support the Emergency
       Finding ........................................................................................................ 17

   III.   Compelling Campbell's Operation Does Not "Best Meet" the
        Emergency or Otherwise Comply With Section 202(c)'s
        Requirements ............................................................................................. 20

   IV.   Vacatur is the Appropriate Remedy for an Unlawful Order ........... 24

CONCLUSION ....................................................................................................... 26

CERTIFICATE OF COMPLIANCE ................................................................. 28

CERTIFICATE OF SERVICE ........................................................................... 29

iv

# TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
   594 U.S. 758 (2021) (per curiam) ....................................................6

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014) ..........24

*Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592 (D.C. Cir. 2026) ............7

*Biden v. Nebraska*, 600 U.S. 477 (2023) ....................................................9

*Conn. Dept. of Public Util. Control v. FERC*,
   569 F.3d 477 (D.C. Cir. 2009) ......................................................23

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
   143 F.4th 518 (D.C. Cir. 2025) ......................................................25

*Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026)  ................... 1, 5, 6, 7

*Michigan v. EPA*, 576 U.S. 743 (2015) ....................................................23

*N.J. Conservation Found. v. FERC*, 111 F.4th 42 (D.C. Cir. 2024) .......24

*Pub. Emps. for Env't Resp. v. Env't Prot. Agency*,
   77 F.4th 899 (D.C. Cir. 2023) .................................................. 18, 20

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) .............................................21

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) ............................25

*T-Mobile S., LLC v. City of Roswell, Ga.*, 574 U.S. 293 (2015) .............21

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951) ....................18

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...............1

## Administrative Cases

*Conn. Light & Power Co.*, 3 F.P.C. 869 (1942) ........................................ 14

*Crisp Cnty. Power Comm'n v. Ga. Power Co.*, 35 F.P.C. 629 (1966) ...... 15

*Duke Power Co.*, 2 F.P.C. 1055 (1941) .................................................... 15

*Niagara Falls Power Co.*, 2 F.P.C. 461 (1941) ....................................... 14

*Fla. Power & Light Co.*, 3 F.P.C. 712 (1942) .......................................... 14

*S.C. Power Co.*, 2 F.P.C. 1060 (1941) ..................................................... 15

## Statutes

Federal Power Act

     16 U.S.C. § 824a(c)(1) ................................................................... 8, 19

     16 U.S.C. § 825*l*(b) ............................................................................ 25

## Regulations

10 C.F.R. § 205.371 ............................................................................ 9, 10

## Other Authorities

Black's Law Dictionary 654 (3d ed. 1933) .............................................. 11

Benjamin Rolsma, *The New Reliability Override*,
    57 Conn. L. Rev. 789, 839–43 (2025) ............................................... 1

CMS Energy Corporation, Form 10K (Feb. 2026) ................................. 24

## GLOSSARY

FERC – Federal Energy Regulatory Commission

FPA – Federal Power Act

FPC – Federal Power Commission

RTO – Regional Transmission Organization

## INTRODUCTION

"Emergency powers," the Supreme Court recently warned, "tend to kindle emergencies." *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 641 (2026) (Roberts, C.J., concurring) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring)). This case proves the point. DOE's emergency power has kindled a wildfire of purported emergencies spreading nationwide from Michigan to Indiana, Pennsylvania, Colorado, Washington and beyond.[1] In the past year DOE issued more 202(c) orders than in its entire history[2] and shows no sign of stopping.

DOE has authority over emergency response, but it has no authority over long-term resource adequacy planning. The Federal Power Act (FPA) leaves that function with states and, in some circumstances, to regional transmission organizations (RTOs) regulated by the Federal Energy Regulatory Commission (FERC).

---

[1] *See* DOE Order Nos. 202-25-4, 202-25-8, 202-25-10 & 202-26-17 (Pennsylvania); 202-25-12 & 202-26-19 (Wheatfield, Indiana); 202-25-13 & 202-26-20 (Warrick County, Indiana); 202-25-14 & 202-26-21 (Colorado); 202-25-11 & 202-26-18 (Washington State).

[2] DOE's website shows 16 202(c) orders in 2025 and 27 in 2026. *See* Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789, 839–43 (2025) (identifying 18 202(c) actions by DOE since dissolution of FPC). Even accounting for extension orders, DOE had still issued fewer than 40 total orders prior to 2025.

The difference between long-term planning and emergency response is no small thing.  When states and RTOs plan for resource adequacy, they do so under state utility laws or sections 205 and 206 of the FPA.  They weigh reliability against costs and evaluate the lowest-cost solutions, often employing markets for that purpose.  *See* Energy Law Scholars 5-10.  Their plans are pressure-tested through public proceedings.  They set rates prospectively.  They make resource decisions that conform to the requirements of environmental law.

DOE now attempts to bypass that robust process.  Acting under its emergency power, DOE is unconstrained by the normal guardrails of utility law.  Public process is unnecessary.  Cost is no object.  Rates are set retroactively.  Environmental laws may be ignored.

The Orders rest on DOE's effort to strip the word "emergency" of any independent meaning.  Under section 202(c), the word "emergency" is the lynchpin: it supplies the predicate finding, prescribes the actions DOE may command (i.e. those that "best meet the emergency"), limits when environmental laws are superseded ("hours necessary to meet the emergency"), and conditions renewal after 90-days (when "necessary to meet the emergency").  If the word "emergency" has no fixed meaning,

2

section 202(c) has no fixed limits. Indeed, DOE claims that its emergency authority is triggered the moment any future risk presents a need for long-term planning, without regard to its imminence or the availability of routine interventions to address that risk. And it claims authority to supersede state and RTO decisions about what units may retire and, based on its own unsubstantiated claims of years-away regional "needs," keep those plants running indefinitely through an endless cycle of 90-day orders.

So, while DOE's order suffers from numerous fatal legal and record flaws, to resolve this case, the Court need only hold that a plain text reading of "emergency" governs section 202(c), or that DOE is bound by its regulatory definition of "emergency," both of which compel the same conclusion: an "emergency" is something exigent, imminent, and unexpected. Neither DOE's brief nor the orders under review even claim DOE has met that definition on the facts of this case.

## SUMMARY OF ARGUMENT

DOE proposes a transformational expansion of the limited authority Congress delegated, allowing it to supersede state regulators whenever the Secretary identifies a future shortage of electricity. But

3

DOE's reading reflects a misinterpretation of section 202(c)'s plain text (§ I.A), an aggrandized view of DOE's role in the electricity market (§ I.B), and a misreading of the historical record (§ I.C).

The Secretary's emergency determination is also at odds with the evidence (§ II). Not only did DOE err in evaluating the evidence before it, discussed in the PIOs' reply,[3] but DOE also arbitrarily ignored critical contrary evidence—including its own experts' conclusion that MISO does not face an electricity shortfall.

DOE's unreasoned assertions failed to justify how the continued operation of Campbell could meet—let alone "best meet," as section 202(c) requires—the emergency it identified (§ III). Plus, economic dispatch is flatly inconsistent with section 202(c)'s requirement that the ordered generation operate only in the "hours necessary to meet the emergency." The claim it achieves cost-savings is unfounded.

For an order based on fundamental errors, vacatur is the "normal" and appropriate remedy (§ IV). A decision properly construing section

---

[3] PIOB__" refers to the Public Interest Organizations (PIOs) Opening Brief, "SB__" refers to the States' Opening Brief, ADD__ refers to the Addendum to the States' Opening Brief, "DB__" refers to DOE's Brief, "Consumers__" refers to Respondent-Intervenor Consumers Energy's Brief, and "PIOR__" refers to the PIO's Reply. The States adopt and incorporate by reference the arguments made in the PIOs' Reply.

202(c) as containing meaningful limits on emergency orders and vacating DOE's unlawful Order will still allow DOE to respond if a genuine emergency arises.

## ARGUMENT

### I.   DOE's Reading of Section 202(c) Is Wrong

DOE acknowledges, as it must, that an emergency determination is a precondition for superseding the traditional regulators of long-term resource planning.  DB42.  Yet DOE claims the power to declare an emergency limited only by the Secretary's discretion.  DB17.  And on DOE's reading, that discretion is effectively limitless because (1) notwithstanding the term's established meaning, an emergency can be *any* shortage of generation facilities anticipated by the Secretary—of any magnitude, any duration, and at any time in the future—and (2) such determination requires only the Secretary's say-so, regardless of the views  or actions of those traditional regulators or contrary record evidence.  In other words, the Secretary is "seeking to exploit questionable statutory language to aggrandize his own power." *Learning Res.*, 146 S. Ct. at 668 (Gorsuch, J., concurring).

But courts "have long expressed reluctance" to countenance agency interpretations that rely on unstated yet "extraordinary delegations of Congress's powers," particularly when "the Government claimed broad, expansive power on an uncertain statutory basis." *Id.* at 638-39 (Roberts, C.J., concurring) (cleaned up).  Such is the case even if, as DOE (incorrectly) asserts here, the text of an emergency statute "might as a matter of definitional possibilities have been read to delegate the asserted power" to address a Presidentially declared national emergency.  *Id.* at 639.

The reading of section 202(c) now proffered by DOE transforms a bounded emergency authority into an unprecedented power with economy-wide significance.  Under it, the Secretary could—as he has here—substitute his sole judgment for that of state and federal regulators regarding long-term resource adequacy—"unconstrained by the significant procedural limitations" such regulators are subject to, *id.* at 640, and in a way that "intrudes into an area that is the particular domain of state law," *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam).  "In light of the breadth, history, and constitutional context of that asserted authority, [the

6

Secretary] must identify clear congressional authorization to exercise it." *Learning Res.*, 146 S. Ct. at 646 (majority opinion). Instead, DOE relies on a misinterpretation of section 202(c)'s plain text, a fundamental misunderstanding of DOE's role in the electricity market, and a mistaken view of the historical record.

### A.    Misreading section 202(c)'s plain text, DOE mistakes an "emergency" for its potential causes.

An "emergency" is a sudden, unexpected, imminent condition requiring an immediate response. *See* SB25-29. To avoid the text's plain meaning, DOE advances a misreading of the statute.

First, section 202(c) does not set out "capacious examples" of *emergencies*. *Contra* DB24. Rather, it identifies potential *causes* of emergencies. Under section 202(c), the Secretary may act when he determines that "an emergency exists *by reason of*" one of several enumerated causes "or other causes." The phrase "by reason of" typically requires a causal relationship. *See Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 600-01 (D.C. Cir. 2026) (interpreting "'by reason of' language" to require a "causal connection"). Thus, a "sudden increase in the demand for electric energy" might *cause* an emergency, or it might not if the increase is small in relation to available supply. So, too,

7

might an emergency be caused by a "shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water." 16 U.S.C. § 824a(c)(1). But those are potential causes of an emergency, just like any "other causes." They are not themselves emergencies. The Secretary's responsibility is to determine "that an emergency exists" *because* of an enumerated or unenumerated cause. In making that determination, the Secretary must exercise judgment, but he is nevertheless bound by the plain meaning of "emergency," which *contra* DB25, is not defined by the statute's text.

DOE's reading of the statute produces an emergency authority virtually without limits. Eliding the distinction between an emergency and its cause, DOE argues that "section 202(c) defines 'emergency' broadly to include any 'shortage[s]' of electric power." DB25; *see id.* (repeatedly describing the causes of 202(c) emergencies as "examples" of emergencies). Under the Government's reading, such shortages might not arise for years. But over a span of years, *every* region of the country could be predicted to experience some "shortage" of electric power facilities, fuel or water, even if only as a product of load growth at normal, historical levels. Such a broad power is impossible to square

8

with DOE's limited role in resource-adequacy planning. *See infra* § I.B; SB4-8.

DOE illustrates its own overreach when it offers the analogy of the engineer who, recognizing that a bridge will become unsafe in five years, begins planning today. DB31. The flaw in this analogy is that the *states*, not DOE, are supposed to play the role of the engineer. *Biden v. Nebraska*, 600 U.S. 477, 501 (2023) ("[T]he question here is not whether something should be done; it is who has the authority to do it"). If state authorities can resolve the threat of bridge failure through normal planning and less disruptive options than immediate closure, the risk is not an emergency.

Second, DOE's regulations do not support the Secretary's emergency determination here. *Contra* DB37.[4] Like the statute, DOE's regulations distinguish between an "emergency" and its many potential causes. 10 C.F.R. § 205.371. That "inadequate planning" is one scenario from which a reliability emergency "can result," *see id.*, does not mean DOE can claim *any* (hypothetical) resource-planning

---

[4] DOE now seems to distance itself from its statement in the rehearing order that its regulations do not constrain the Secretary's discretion. *Compare* DB37 *with* JA0012[DOE0016_7].

mismatch as an emergency.  Nor has DOE demonstrated a planning failure here at all.  *See* SB8-10 (describing robust planning process).

The regulations specifically account for a scenario where an emergency results from "extended periods of insufficient power supply." 10 C.F.R. § 205.371.  "In such cases, the impacted 'entity' will be expected to make firm arrangements to resolve the problem until new facilities become available, so that a continuing emergency order is not needed." *Id.*  That provision demonstrates the key distinction between an emergency requiring a section 202(c) order and an ordinary resource-adequacy challenge: when a grid operator or utility faces "extended periods of insufficient power supply," there may be an initial, acute need for emergency intervention.  But once stabilized, responsibility reverts to the utility or grid operator to remedy a prolonged period of insufficient power supply.  DOE entirely ignored this common-sense approach.

Similarly, the regulations specifically contemplate that a "shortage of electric energy" may be "projected" because of market participants' inability to reach agreement.  Such shortages "will not be considered emergencies unless the inability to supply electric service is

10

imminent." *Id.* In other words, DOE's own regulations refute its assertion here that a section 202(c) emergency "include[s] any 'shortage[s]' of electric power." DB25. Regardless of the cause, a section 202(c) emergency must require the Secretary's action so urgently that the normal processes of resource adequacy planning cannot meet the challenge.

Finally, the dictionary definition on which DOE now relies is not supportive. DB24-25. That same dictionary first defined "emergency" as a "sudden unexpected happening; an unforeseen occurrence or condition; . . . a sudden or unexpected occasion for action; exigency; pressing necessity." Black's Law Dictionary 654 (3d ed. 1933). Those definitions all accord with the States' interpretation: that an "emergency" must require an immediate response. Even DOE's new favorite definition—"a relatively permanent condition of insufficiency of service or of facilities resulting in social disturbance or distress"—is silent with respect to whether an immediate response is necessary.

## B. "Electricity Sector Context" does not support an expansive reading of section 202(c).

DOE also appeals to "electricity sector context" to justify its foray into long-term planning. DB31. DOE claims that, because it takes

years to plan grid infrastructure, section 202(c) must be read to treat shortfalls anticipated years in advance as "emergencies." DB31-36. DOE's logic appears to be that, if something needs to be done, section 202(c) must be read to give DOE the power to do it. DOE's logic is wrong.

It is true, of course, that grid planning is complex and involves projects with long lead times. But the far more obvious implication of that fact is that long-term grid planning is not something Congress intended to address through an emergency authority. Rather, that other entities are tasked with (and expert at) planning for future risks is precisely the reason DOE may only respond to risks so sudden, imminent, and urgent as to warrant its intervention.

This case illustrates the electricity sector context well. The Campbell retirement resulted from the settlement of an open proceeding with a diverse set of stakeholders, carefully overseen by the Michigan Public Service Commission years in advance. It was executed through a plan that improved resource adequacy in the state, met MISO's requirements, advanced Michigan's environmental goals, and saved ratepayers money. *See* SB8-10; JA0168[DOE0006_11]; *see also*

12

Energy Law Scholars § 1.A (describing how states and RTOs conduct long-term resource adequacy planning).  As conditions continue to evolve, further planning may be necessary, but state regulators, RTOs, and utilities have the tools to respond—and in fact are responding—to demand growth on the timescales at issue here.  *See* JA0069[DOE0004_12]; Niskanen Center 5-18.

Given the complexity and sensitivity of this long-term task, it defies logic to suggest that Congress intended to place DOE in the role of long-term planner.  Congress would not have done so through section 202(c), a provision that (i) authorizes short-term orders, (ii) provides no more direction than that DOE may require "such generation . . . of electric energy as in its judgment will best meet the emergency and serve the public interest", and (iii) may be the only provision in the FPA that empowers the regulator to act without first assessing the effect on ratepayers or seeking public input.  *See* SB8&n.2; *see also* PIOR7-11 (explaining statutory context).  Consideration of the "electricity sector context" counsels for confining section 202(c) to actual emergencies, as its plain text demands.

13

### C.    DOE's Order is unprecedented.

Finally, historical practice under section 202(c) neither supports DOE's unconstrained reading of the provision nor rebuts the unheralded and transformative nature of the power now claimed.  *See* DB41.  DOE focuses on the large number of orders issued by the Federal Power Commission (FPC) during World War II and the Korean War, emphasizing how long each emergency lasted following issuance of those orders.  DB37-38.[5]  It is not how long an order remains in place that determines whether an emergency exists, but whether the conditions giving rise to an emergency necessitate the urgent action that section 202(c) authorizes.  DOE identifies no order predicated on far-off risks.

Rather, the historic 202(c) orders support the States' position, as the FPC frequently cited "sudden" or "unexpected" near-term increases in demand[6] and/or established specific, near-term shortages of power

---

[5] As an initial matter, the "continuance of war" provides an independent basis for issuing a 202(c) order; arguably most of the cited orders did not need to rely on an emergency finding.

[6] *See, e.g.*, *Niagara Falls Power Co.*, 2 F.P.C. 461, 462 (1941) ("Our studies indicated an immediate need for additional 25-cycle power to supply essential defense industries . . . ."); *Conn. Light & Power Co.*, 3 F.P.C. 869, 870-71 (1942) ("unusual" needs caused by state of war); *Fla. Power & Light Co.*, 3 F.P.C. 712 (1942) ("sudden and constantly increasing demand for electric energy").

that would be addressed by a particular order.[7]  It is DOE's refusal here to demonstrate that the need for federal intervention is urgent that is unprecedented.

DOE's citation to more recent orders fares no better.  DB39-40. Both the Mirant Corporation and Yorktown orders specified imminent risks of shortfall.  DOE identified the Mirant plant as one of only three sources of power to central Washington, D.C., but the other two would need to be "taken out of service sequentially" during construction of new lines, necessitating retention of the Mirant plant during the period of construction.  The D.C. Public Service Commission, in requesting a 202(c) order, urged that "the shutdown of the Plant 'will have a drastic and *potentially immediate effect* on the electric reliability in the greater Washington, D.C. area and could expose hundreds of thousands of consumers, agencies of the Federal Government and critical federal

---

[7]  *See, e.g.*, *S.C. Power Co.,* 2 F.P.C. 1060, 1061 (1941) (specifying quantities of power to be delivered to operate a particular electric furnace for war-time manufacturing); *Duke Power Co.*, 2 F.P.C. 1055, 1056 (1941) (requiring delivery of particular quantities of additional energy to serve needs at specified aluminum production facilities); *Crisp Cnty. Power Comm'n v. Ga. Power Co.*, 35 F.P.C. 629, 630-31 (1966) (identifying seven outages that occurred in past year in that county system due to identified shortages).

infrastructure to curtailments of electric service, load shedding and, potentially, blackouts.'"[8]

In the 2017 Dominion case, the utility (Dominion) and RTO (PJM) requested a 202(c) order to free two coal units from their environmental obligations so they could be available if called upon by PJM to prevent "imminent" risk of blackouts for 150,000 people in Hampton Roads, Virginia. *See* JA0164[DOE0006_7]. PJM had planned to avoid the need for the plants with a new transmission line. When the transmission line was unexpectedly delayed, PJM requested the 202(c) order. When the transmission line was complete, no further order was necessary.[9]

DOE likewise brushes aside that its emergency findings have typically come at the request of the local utility, grid operator, or state regulator. *See* Energy Law Scholars 22. DOE's argument that its *sua sponte* emergency finding is legally permissible under the statute, DB37, is beside the point. Where there is an urgent need for action to prevent shortages, the entities that face the greatest political

---

[8] DOE Order No. 202-05-3 at 2, https://www.energy.gov/oe/articles/department-energy-order-no-202-05-3 (emphasis added).

[9] Whether that case presented a valid 202(c) emergency was never litigated to conclusion. Suffice to say, the facts were nothing like those in the orders under review.

consequences of blackouts routinely ask the federal government to step in.

Just because Congress was aware of the Mirant orders does not mean Congress ratified the view DOE now advances. *Contra* DB41. If anything, Congress's 2015 amendments ratified the imminence requirement, since the Mirant order was predicated on a "drastic and potentially immediate effect on the electric reliability." DOE Order 202-05-03 at 2. Further, the Report makes explicit that Congress did not intend for its "amendment to section 202(c) to allow for long-term or indefinite" emergency orders. H.R. Rep. No. 113-86 at 7-8. That is why Congress directed DOE to "ensure" that its orders limited emergency action to "only those hours necessary to meet the emergency." *See id.* at 11. Congress did not "ratify" an emergency authority unbounded by an imminent need to act or unconstrained by the hours of need.

## II.   Substantial Evidence Does Not Support the Emergency Finding

In the face of evidence demonstrating that no emergency existed, DOE argues that it is "improper" for the States to question DOE's factual findings. *Contra* DB68. But the substantial evidence standard does not allow DOE to ignore relevant evidence before it. While

17

"balancing conflicting evidence is the agency's job," that is so only "as long as the agency reasonably weighs evidence both supporting and undermining its final conclusion." *Pub. Emps. for Env't Resp. v. Env't Prot. Agency*, 77 F.4th 899, 918 (D.C. Cir. 2023); *see Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951). As discussed in the PIOs Reply, DOE fails to show how its emergency determination reflected a reasonable interpretation of the evidence before it. *See* PIOR13-22. Further, because DOE engaged in no weighing of any conflicting evidence, setting aside the Order does not require judicial re-weighing of the evidence, *contra* DB56; the Court simply needs to examine whether DOE considered the whole record and reached a reasonable conclusion.

Most glaringly, DOE continues to ignore that its own Resource Adequacy Report directly contradicts the Order's conclusion. *See* DB59. That report, developed to "evaluate both the current state of resource adequacy as well as future pressures resulting from the combination of announced retirements and large load growth," ADD9, specifically analyzed resource adequacy in MISO. Its modeling under conditions

predicted by NERC out to 2030 found that "MISO did not experience shortfall events."  ADD34.

DOE does not dispute that this report was before the Secretary at the time of the Rehearing Order.  *See* DB59.  Nor does DOE offer any explanation to reconcile its "emergency" determination with the views of the agency's own experts.  *Id.*  Instead, it emphasizes the report's high-level conclusion that "more generation retirements and less dependable replacement generation is neither consistent with winning the AI race and ensuring affordable energy for all Americans, nor with continued grid reliability (ensuring "resource adequacy")."  *See* DB59-60; ADD15.  But to rely on that broad statement instead of the specific conclusion that MISO was *not* threatened by any immediate shortage gives the game away: DOE seeks control over the generation resource mix, not authority to respond urgently to any genuine emergency.

DOE also cannot justify its failure to account for the contrary conclusions of MISO and the Michigan Public Service Commission.  *See* DB62.  DOE argues that, because it may issue an order under 202(c) without notice, hearing, or report, *see* 16 U.S.C. § 824a(c)(1), it need not explain how its conclusions are consistent with contrary evidence, *see*

19

DB62.[10]  But an order that does not "reasonably weigh[] evidence both supporting and undermining its final conclusion" is not supported by substantial evidence.  *Pub. Emps.*, 77 F.4th at 918.  To benefit from the deferential standard of review it now demands, DOE was required to reasonably consider the evidence before it.  However limited such obligations might be prior to issuing an order under 202(c), *see* DB80-82, DOE remained obligated on rehearing to weigh the evidence before it.  It did not.

### III.   Compelling Campbell's Operation Does Not "Best Meet" the Emergency or Otherwise Comply With Section 202(c)'s Requirements

Neither the Order nor the Rehearing Order made any attempt to explain why the continued operation of Campbell would best meet the emergency identified by the Secretary.  *See* JA0002[DOE0001_2]; JA0022-23[DOE0016_17-18].  Instead, like DOE's brief, they insisted that the Secretary's judgment was reason enough.  *See id.*; DB47-52. But whatever judgment the Secretary exercised, he did not explain.  In its brief, DOE attempts to backfill a justification for the Secretary's determination that mandating Campbell's operations would "best meet

---

[10]DOE's argument that it may weigh its own experts over contrary views lacks force, DB62, given that it *ignored* the conclusions of its own experts.

the emergency." But such wholly new rationale is procedurally barred and, in any event, DOE is wrong on the law and the facts.

The "substantial evidence" standard incorporates the *Chenery* principle: the "recognition that 'the orderly functioning of the process of [substantial-evidence] review requires that the grounds upon which the administrative agency acted be clearly disclosed,' and that 'courts cannot exercise their duty of [substantial-evidence] review unless they are advised of the considerations underlying the action under review.'" *T-Mobile S., LLC v. City of Roswell, Ga.*, 574 U.S. 293, 301 (2015) (quoting *SEC v. Chenery Corp.,* 318 U.S. 80, 94 (1943)) (alterations in original). Accordingly, the Secretary was required to "clearly disclose" *how* the facts in the record support the conclusion that Campbell's operation best meets the emergency the Secretary identified.

DOE attacks a strawman when it argues that any obligation to explain that its action "best meets the emergency" would gut its ability to act. DB49-50. The Secretary's reasoning need not take a particular form or length; but the phrase "in [his] judgment" cannot be read to eliminate the "best meets" requirement. If the Secretary has no obligation to consider and (at least on rehearing) explain why his

chosen remedy "best meets" the emergency, then that requirement lacks any meaning.

In any event, the explanation now put forth fails, too, because it contravenes section 202(c)'s limit that an order compel plants to run only during "hours necessary to meet the emergency" (temporal restriction) and because economic dispatch is an unreasonable means by which to limit costs.

DOE ignored the statute's temporal restriction and instead required Campbell to engage in "economic dispatch," an instruction related to market prices not the "hours" of the emergency. DOE did not explain this departure from the statute in the orders. Now, it tries to defend its "economic dispatch" command on the basis that the order addresses a "longer-term and persistent 'shortage of electricity.'" DB70. This explanation is still unresponsive. Even if there were a "persistent shortage," is DOE claiming that the shortage is so persistent that it is occurring at all hours of every day?

If that is indeed what DOE is now arguing, it betrays a continued misunderstanding of the markets in which the Secretary is intervening. As the States explained, DOE purported to remedy a *capacity*

emergency.  *See* JA0023[DOE0016_18]; SB49.  Lack of capacity is a problem of inadequate energy during peak demand, i.e., only during specific periods of acute need.  *See Conn. Dept. of Public Util. Control v. FERC*, 569 F.3d 477, 479 (D.C. Cir. 2009).  DOE does not explain how compelling Campbell to sell into the energy market (based on economic considerations), which covers needs for all hours of the day, solves a purported shortage during particular windows of acute need.

DOE's attempt to defend its "economic dispatch" command as an effort to save money likewise fails.  First, even if that were true, it would not free DOE from the statutory command to "ensure that such order requires generation . . . only during hours necessary to meet the emergency."  Second, requiring economic dispatch does not save money. The States showed that economic dispatch resulted in ratepayers paying market prices *and* covering Campbell's net losses.  SB50. Regardless whether section 202(c) would allow the Secretary to entirely disregard costs, *but cf. Michigan v. EPA*, 576 U.S. 743, 752 (2015), the Secretary "endeavored to minimize costs" in an entirely irrational way, DB79.  And the proof is in the result.  Keeping the old and uneconomic Campbell plant running every day has come at an exorbitant cost to

23

ratepayers. After accounting for its market revenue (which ratepayers pay for), Consumers, the plant's owner, will require an *additional* subsidy from ratepayers of $135 million for the first six months of DOE's orders—roughly $750,000 per day[11] of needless costs foisted on ratepayers at a time when energy affordability is already a pressing concern.

## IV. Vacatur is the Appropriate Remedy for an Unlawful Order

"[V]acatur is the normal remedy" for unlawful agency action. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). DOE's error was fundamental: it took an unprecedented action beyond the scope of its powers, intruding on Michigan's careful planning and imposing exorbitant costs on ratepayers of keeping the Campbell plant running. *See N.J. Conservation Found. v. FERC*, 111 F.4th 42, 64 (D.C. Cir. 2024). And there is no reason to think the Government could fix that error on remand, since it has repeatedly asserted its expansive interpretation over the course of nearly a year.

---

[11] *See* CMS Energy Corporation, Form 10K at 117-18 (Feb. 2026), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000201533/016cee55-60d5-4eb2-b0be-b7e9b0f07c57.pdf.

24

Vacatur would not be disruptive. *See id.* As the Government recognizes, the Order under review has expired. *Accord* DB83. The States have not sought any equitable relief beyond the relief available under the FPA: that the Court "set aside" the Order. 16 U.S.C. § 825*l*(b). Whether the Order is vacated or not, therefore, cannot possibly bear on the Secretary's ability to respond to *future* emergencies.[12]

If this Court holds the Order unlawful, future panels of this Court will be bound by "those portions of the opinion necessary to that result," *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996), which should, as a practical matter, constrain the Secretary in the future. But a decision embracing the States' interpretation will not hamstring the Secretary's ability to prevent a crisis like the 2003 blackout. *Contra* DB84. Rather, a decision of this Court holding that the Secretary may

---

[12] The States agree with Respondent-Intervenor Consumers Energy that cost-recovery issues are not presented in this case. *Accord* Consumers13-15. This Court need not decide what effect its decision holding the Order unlawful may have on the cost-recovery proceedings ongoing at FERC and subject to a separate petition for review in this Court. The States maintain, however, that if the Order is held unlawful, that "may affect" the States' "related lawsuit in" the cost-recovery proceedings. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 143 F.4th 518, 526 (D.C. Cir. 2025). In any event, no party argues this case is moot, and the Court has ample grounds to find this case is not moot. *See* SB22-25.

act only in response to genuine emergencies—i.e., those that are so sudden, imminent, or unexpected that the normal resource-adequacy planning process cannot address them—would allow the Secretary the same authority and discretion that his predecessors and the FPC before them have exercised responsibly for 90 years.

## CONCLUSION

This Court should hold unlawful and set aside the Order.

Respectfully submitted,

Dana Nessel,
Michigan Attorney General

/s/ Peter N. Surdo
Peter N. Surdo
Special Assistant Attorney
General
Office of the Minnesota Attorney
General
445 Minnesota St., Suite 600
St. Paul, MN 55101
(651) 757-1061
peter.surdo@ag.state.mn.us

Attorney for State of Minnesota

/s/ Jason E. James
Jason E. James
Assistant Attorney General
Illinois Attorney General's Office
201 W. Pointe Drive, Suite 7
Belleville, IL 62226

/s/ Michael E. Moody
Michael E. Moody (DC Cir.
66350)
Lucas Wollenzien (P86928)
Assistant Attorneys General
Special Litigation Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7627
MoodyM2@michigan.gov
WollenzienL@michigan.gov

Christopher M. Bzdok (P53094)
Special Assistant Attorney
General
chris@tropospherelegal.com

Counsel for the People of the
State of Michigan

26

27

(217) 843-0322
jason.james@ilag.gov

Attorney for State of Illinois

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a), D.C. Circuit Rule 32(e), and the Court's November 20, 2025, and December 2, 2025, Orders because this document contains 4,997 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Michael Moody
Michael Moody

(DC Cir. 66350)

## CERTIFICATE OF SERVICE

I hereby certify that, on April 10, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit through this Court's CM/ECF system, which will serve a copy on all registered users.

/s/ Michael Moody
Michael Moody

(DC Cir. 66350)