**DECIDED SEPTEMBER 11, 2026**

Nos. 25-1159, 25-1160, 25-1162 (consolidated)

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

PEOPLE OF THE STATE OF MICHIGAN, et al.,
*Petitioners*,

v.

UNITED STATES DEPARTMENT OF ENERGY, et al.,
*Respondents*.

---

Petitions for Review of United States Department of Energy Order No. 202-25-3

---

# FEDERAL RESPONDENTS' PETITION FOR REHEARING EN BANC OR PANEL REHEARING

---


ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT LUNDMAN
REBECCA JAFFE
KYLE GLYNN
*Attorneys*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-9568
kyle.glynn@usdoj.gov

Of Counsel:

JONATHAN D. BRIGHTBILL
General Counsel
U.S. Department of Energy

**TABLE OF CONTENTS**

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

GLOSSARY .......... v

INTRODUCTION .......... 1

STATEMENT OF THE ISSUE .......... 3

STATEMENT OF THE CASE .......... 3

A. Legal background .......... 3

B. Resource adequacy .......... 4

C. The Order .......... 5

D. Litigation .......... 7

ARGUMENT .......... 9

A. The Order identified a section 202(c) “emergency.” .......... 9

B. The panel’s interpretation is incorrect .......... 11

CONCLUSION .......... 18

CERTIFICATE OF COMPLIANCE .......... 20

ADDENDUM

## TABLE OF AUTHORITIES

### Cases

*Advanced Energy United v. FERC*,
185 F.4th 186 (D.C. Cir. 2026)........................................................ 1, 4, 5

*Cal. Pub. Utils. Comm'n v. FERC*,
20 F.4th 795 (D.C. Cir. 2021)...............................................................5

*Concert Inv., LLC v. SBA*,
100 F.4th 215 (D.C. Cir. 2024).............................................................15

*Conn. Dep't of Pub. Util. Control v. FERC*,
569 F.3d 477 (D.C. Cir. 2009)...........................................................5, 14

*Constellation Mystic Power, LLC v. FERC*,
45 F.4th 1028 (D.C. Cir. 2022)...............................................................6

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016).............................................................................13

*First Iowa Hydro-Elec. Co-op. v. Fed. Power Comm'n*,
328 U.S. 152 (1946).............................................................................13

*Grand Trunk Corp. v. TSA*,
153 F.4th 517 (7th Cir. 2025) ...............................................................10

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016)...............................................................................5

*Institutional S'holder Servs., Inc. v. SEC*,
142 F.4th 757 (D.C. Cir. 2025)...............................................................9

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020).............................................................................12

*New Eng. Power Gen. Ass'n v. FERC*,
757 F.3d 283 (D.C. Cir. 2014)...............................................................14

*New York v. FERC*,
535 U.S. 1 (2002) .......... 4

*S.C. Pub. Serv. Auth. v. FERC*,
762 F.3d 41 (D.C. Cir. 2014) .......... 16

**Statutes and court rules**

16 U.S.C. § 824(a) .......... 4

16 U.S.C. § 824(b)(1) .......... 4, 11, 13

16 U.S.C. § 824a(a) .......... 14

16 U.S.C. § 824a(b) .......... 15

16 U.S.C. § 824a(c)(1) .......... 1, 3, 10, 12, 13, 17, 18

16 U.S.C. § 824a(c)(2)-(4) .......... 4

16 U.S.C. § 824a(c)(4)(A) .......... 4

16 U.S.C. § 824a(e) .......... 15

16 U.S.C. § 824a(f) .......... 15

16 U.S.C. § 824a(g) .......... 15

16 U.S.C. § 825*l*(b) .......... 11, 18

42 U.S.C. § 7151(b) .......... 3

42 U.S.C. § 7172(a)(1)(B) .......... 3, 14

Fed. R. App. P. 40(b)(2)(D) .......... 2

Pub. L. No. 114-94, § 61002(a), 129 Stat. 1312
(codified at 16 U.S.C. § 824a(c)(2)-(5)) .......... 4, 16

Mich. Comp. Laws. Ann. §§ 10.83-10.84 ................................................................8

**Other authorities**

Black's Law Dictionary (3d ed. 1933)....................................................................10

DOE, *Fact Sheet: Energy Department Prevented Blackouts & Saved American Lives During Winter Storms* (Feb. 6, 2026), https://perma.cc/VRH9-APQW..... 2, 9, 17

DOE Mirant Order, No. 202-05-3, https://perma.cc/MQJ3-TQKC ........................16

Webster's New International Dictionary of the English Language (2d ed. 1934) ..........................................................................................................9

## GLOSSARY

| | |
|---|---|
| DOE | Department of Energy |
| FERC | Federal Energy Regulatory Commission |
| MISO | Midcontinent Independent System Operator |
| NERC | North American Electric Reliability Corporation |
| Order | Department of Energy Order No. 202-25-3 (Campbell 1) |

## INTRODUCTION

The United States is suffering an unprecedented shortage of electric generation capacity. Expansion of datacenters, electric vehicles and residential electrification, and reshoring of manufacturing are driving dramatic demand growth, while new generation is caught in a "decades-long traffic jam." *Advanced Energy United v. FERC*, 185 F.4th 186, 202 (D.C. Cir. 2026). In response, President Trump declared a national energy emergency on January 20, 2025. JA1130-31. Since then, the Secretary of the Department of Energy (DOE) has repeatedly invoked DOE's textually broad "emergency" authority under Federal Power Act section 202(c), 16 U.S.C. § 824a(c)(1). DOE is ordering many actions to preserve electric generation capacity across the country that "in [DOE's] judgment will best" prevent blackouts and save lives and property. *Id.* The J.H. Campbell Generating Plant in Michigan received one of the first section 202(c) orders in 2025.

The panel erred by vacating that order. The panel incorrectly held that "section 202(c)'s grant of emergency authority is triggered only when there is a need for immediate, essentially last-resort action and the circumstances require action by DOE in particular, as opposed to action by the state or states responsible for resource adequacy." Op. 30. The statute's plain text contains no such legal prerequisites. It does not require DOE to subordinate, delay, or defer to the actions (or inaction) of states or utilities. It certainly does not require DOE to first allow states or utilities

to "restrict consumption" or "redirect [a supplier's] energy to a needed facility" through rolling blackouts or curtailments. Op. 32.

The panel admitted this is not the ordinary meaning of "emergency." Op. 29. It discovered its atextual limits on DOE's authority in the supposed "structure" of section 202(c). But its view of the statute—derived from a seeming 1930s understanding of how the Nation's electricity grid operates and is regulated—is refuted by text, context, broader structure, and statutory history. Proper application of statutory-construction tools fully rejects subordinating DOE's authority to any prerequisite action or inaction by states or utilities.

The appropriate scope of DOE's section 202(c) emergency authority is a question of "exceptional importance." Fed. R. App. P. 40(b)(2)(D). DOE's section 202(c) orders—of which the challenged Campbell order is just one—are preventing blackouts, brownouts, and other grid disruptions across the country. "[T]he planned forced closures of coal and natural gas plants had the United States on track to experience 100 times more blackouts by 2030." DOE, *Fact Sheet: Energy Department Prevented Blackouts & Saved American Lives During Winter Storms* (Feb. 6, 2026), https://perma.cc/VRH9-APQW. The panel opinion's mistaken interpretation threatens section 202(c)'s safeguard and warrants en banc review or panel rehearing.

## STATEMENT OF THE ISSUE

Did the panel err when it created atextual statutory prerequisites for DOE's section 202(c) emergency authority that appear nowhere in the Federal Power Act?

## STATEMENT OF THE CASE

### A. Legal background

Section 202(c) of the Federal Power Act gives DOE authority to mandate "such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet" an "emergency." 16 U.S.C. § 824a(c)(1). This authority originally resided with the Federal Power Commission. In 1977, Congress transferred all of section 202's powers to DOE, except subsection 202(b) was transferred to the Federal Energy Regulatory Commission (FERC). 42 U.S.C. §§ 7151(b), 7172(a)(1)(B).

Section 202(c) authorizes DOE to act (1) "[d]uring the continuance of any war in which the United States is engaged" *or* (2) "whenever [DOE] determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, … or other causes." 16 U.S.C. § 824a(c)(1). Congress mandates no advance process or procedure. Rather, DOE can issue a section 202(c) order "either upon its own motion or upon complaint, with or *without notice, hearing, or report*." *Id*. (emphasis added). DOE's power to order "generation" in section 202(c) is an

express congressional modification of the Federal Power Act's historic deference to states for regulating "generation" and resource adequacy—i.e., for ensuring that there is enough generating capacity to meet consumer demand. *Id.* § 824(a), (b)(1).

In 2015, Congress further expanded DOE's section 202(c) power.[1] Now, DOE can waive application of federal, state, and local environmental laws "to meet the emergency." 16 U.S.C. § 824a(c)(2)-(4). Congress also expressly authorized DOE to *indefinitely* "renew or reissue" an order "for subsequent periods, not to exceed 90 days for each period, as [DOE] deems necessary." *Id.* § 824a(c)(4)(A). The statute thus imposes no limit for how long an "emergency" might persist.

### B. Resource adequacy

"[T]he landscape of the electric industry has changed" since the Federal Power Act's enactment in 1935, "when the electricity universe was 'neatly divided into spheres of retail versus wholesale sales.'" *New York v. FERC*, 535 U.S. 1, 16 (2002) (citation omitted). Until the mid-1990s, "vertically integrated utilities controlled generation, transmission, and distribution within their territories." *Advanced Energy*, 185 F.4th at 204.

In 1996, FERC issued Order 888, which "'unbundl[ed]' transmission from generation." *Id*. Later, through "Order 2000, FERC encouraged utilities to place

[1] Pub. L. No. 114-94, § 61002(a), 129 Stat. 1312 (codified at 16 U.S.C. § 824a(c)(2)-(5)).

operational control of transmission facilities in regional transmission organizations and independent system operators—entities that manage the grid over multi-state regions and administer competitive markets." *Id*.

As wholesale electricity markets became regionally organized, many regional transmission organizations and independent system operators assumed capacity resource-adequacy functions that were previously performed by state-regulated utilities and regional power pools. *See*, *e.g., Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 479 (D.C. Cir. 2009). While states continue to regulate generation facilities and resource choices, siting, local distribution, and retail matters, many of those decisions now operate within federally regulated regional markets. *See id.* at 481-82; *Cal. Pub. Utils. Comm'n v. FERC*, 20 F.4th 795, 797-800 (D.C. Cir. 2021). Indeed, *Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150, 163 (2016), held that the Federal Power Act *preempts* certain traditional state authorities to fund generation capacity and provide for resource adequacy.

**C. The Order**

Generation resources are "dispatchable" if they generally provide electricity on demand rather than depend on weather conditions. JA107. Dispatchable power is a central component of electric-grid reliability. It ensures that American households are powered rain or shine, day or night. When dispatchable resources retire, operators run with smaller reserve margins for ensuring reliability during

times of stress. JA725. This makes blackouts and outages more likely. *See*, *e.g.*, JA107; *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1037 (D.C. Cir. 2022) (discussing an independent system operator's evaluation of a dispatchable-resource retirement that would lead to rolling blackouts).

Nearly 2,700 megawatts of reliable, dispatchable coal-fired generating capacity has retired in Michigan since 2020. JA45. The closure of Michigan's Big Rock Point Nuclear Plant in 1997 and Palisades Nuclear Plant in 2022 further diminished dispatchable resources in the region. JA1. Michigan's 1,560-megawatt Campbell plant was scheduled to stop operating on May 31, 2025—*15 years* before the end of its engineered design life. *Id.*; JA30. The plant's retirement would further decrease available dispatchable generation capacity within the region it served. JA1.

Midcontinent Independent System Operator (MISO) is the regional grid operator for the region the Campbell plant serves. MISO forecasted potential tight reserve margins during the summer of 2025, particularly during periods of high demand or low electricity generation. *Id.* Likewise, the 2025 Summer Reliability Assessment of the North American Electric Reliability Corporation (NERC) showed that MISO was at elevated risk for shortfalls. *Id.*

Considering these facts, on May 23, 2025, DOE issued Order No. 202-25-3. JA3. DOE determined that an emergency existed in portions of the Midwest "due to a shortage of electric energy, a shortage of facilities for the generation of electric

energy, and other causes." JA1. DOE found that new electricity generation would be insufficient to offset the region's lost generation and to accommodate growing demand. JA1-2. DOE acknowledged that MISO and Consumers Energy (Campbell's owner) incorporated the plant's retirement into their forecasts. *Id.* But those forecasts were made several years before. JA168; JA175. DOE found that the Campbell plant was "necessary" to address the energy shortage. *Id.*

The Order directed MISO and Consumers Energy to "take all measures necessary to ensure that the Campbell plant is available to operate." JA2. The Order was effective upon issuance. JA3. DOE has renewed the Order five times; the current order (Campbell 6) expires November 14, 2026. Nevertheless, the first (and only) Campbell "Order under review has already expired" on August 21, 2025. Op. 40. The panel did not review any subsequent orders. Op. 25.

In response to rehearing requests, DOE further explained that immediate action was required to keep the Campbell plant available. JA12. It was not possible to wait until the likelihood of blackouts later became more certain because retired generation facilities are difficult if not impossible to bring back online once lost. *Id.*

**D. Litigation**

Petitioners challenged the Order. The panel granted the petitions, holding that "Congress in section 202(c) gave DOE narrow authority to intervene that is triggered only in the face of an electricity emergency *not otherwise addressable by states or*

*their utilities*." Op. 19 (emphasis added). It stated, "DOE intervention under section 202(c)" should be "rare and authorized only when states, their utilities, and [regional transmission organizations] are unable or unwilling to respond." Op. 6.

When interpreting section 202(c) to require this deference to state actions, the panel did not rely on statutory text. It divined this limitation from the supposed "structure" of the Federal Power Act, as further informed by a 1930s-era conception of how resource adequacy is regulated and assured. Op. 7-8. The panel correctly recognized that section 202(c) "falls outside of the coordinated resource-adequacy system altogether." Op. 17. But the panel interpreted section 202(c) as limited "to circumstances necessitating action by DOE in particular, as opposed to action by states." Op. 5. The opinion implied that states should first be permitted to "restrict consumption or command an energy supplier to redirect its energy to a needed facility," Op. 32, before DOE could act under section 202(c). In other words, the panel suggested that DOE might wait until after a state or utility *implements rolling blackouts* or other mandatory curtailments of electricity use before DOE can exercise its congressionally granted authority. *Id.* (citing JA696-701; Mich. Comp. Laws. Ann. §§ 10.83-10.84).

Turning to whether "the circumstances identified by DOE are facially sufficient to meet the statutory requirement of an emergency," the panel held "they are not." Op. 36. The panel claimed DOE offered only "indeterminant assertions of

summer electricity shortfalls" without "pinpoint[ing] a concrete supply issue beyond the state's competency that was likely to trigger a blackout in an identified area if temperatures peaked." Op. 37. The panel noted the presence of "mitigation measures" available to Michigan and the utility "to restrict energy consumption"—e.g., the state might order rolling blackouts. *Id.* The panel vacated the Order. Op. 40.

## ARGUMENT

The "potential loss of power to homes and local businesses in the areas that may be affected by curtailments or outages" (Op. 36-37; JA2) is an entirely sufficient "emergency" to justify action under section 202(c). The panel's contrary interpretation depends on erroneous considerations of state "primacy" and an atextual "last-resort action" requirement. Op. 30. Because Campbell has put thousands of megawatts of generation on the grid at a time when the grid needs every megawatt of capacity it can muster, *see Fact Sheet*, *supra*, the panel's decision threatens public health and safety and warrants rehearing.

### A. The Order identified a section 202(c) "emergency."

"To determine the ordinary meaning of a legal term, [courts] may look to contemporaneous dictionaries." *Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 766 (D.C. Cir. 2025). Doing so, an "emergency" is simply "an unforeseen combination of circumstances which calls for immediate action." Webster's New

International Dictionary of the English Language 837 (2d ed. 1934); *see* Black's Law Dictionary 654 (3d ed. 1933) ("sudden unexpected happening; an unforeseen occurrence or condition; specifically, a perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; exigency; pressing necessity"). Thus, an "emergency" may require immediate action, but it does not require any particular quantum or imminence of harm. *See Grand Trunk Corp. v. TSA*, 153 F.4th 517, 524-25 (7th Cir. 2025) ("[f]or decades," "the federal government has declared emergencies that have lasted years," like in response to COVID-19 and to prolonged terrorism threats).

Congress gave textual reference points for what qualifies as a section 202(c) "emergency" by listing likely problems that DOE might be called upon to mitigate. An "emergency" might exist "by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes." 16 U.S.C. § 824a(c)(1). DOE may "order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency." *Id.* Both the listed possible causes of emergencies and the potential remedies for them are expansive. And Congress facially invoked aspects of utility execution that might require years-long intervention, like the need for generation construction and interconnection.

The combination of circumstances identified in the Order is an "emergency" within any ordinary understanding of the word and clearly within section 202(c)'s textual benchmarks. The MISO region was (and is) experiencing a shortage of electric generation capacity during an unforeseen surge in electricity demand. JA1-2; JA18. Closing Campbell's 1,560 megawatts of reliable, dispatchable electricity would exacerbate the shortage. And because Campbell's retirement was imminent, immediate action was "necessary." JA1-2. Once retired, coal plants cannot easily be brought back online. JA12. These findings—"supported by substantial evidence" and thus "conclusive," 16 U.S.C. § 825*l*(b)—fully justified the Order.

**B. The panel's interpretation is incorrect.**

The panel's interpretation imposes limitations on DOE's authority that are refuted by statutory text, context, structure, and statutory history. The panel acknowledged that "the ordinary meaning of 'emergency'" is merely "an event that requires immediate action." Op. 29. Yet this did "not complete the [panel's] analysis." *Id.* Relying on a general primacy of state authority—while ignoring Congress's "specifically provided" exceptions, 16 U.S.C. § 824(b)(1)—the panel believed that giving "emergency" its plain-text meaning "would render meaningless the constraints on federal power that Congress imposed throughout the act." Op. 30. These unfounded policy concerns—which ignore the federal government's already

vastly expanded role in capacity procurement and resource adequacy—cannot overcome the statute's plain text.

### 1. Deferral to states and utilities

First, the panel incorrectly concluded that section 202(c) imposes a statutory prerequisite on DOE to find a shortage "is not being timely addressed … by the state, its utilities, or [a regional transmission organization]." Op. 36. Congress's plain text authorizes DOE to act "*whenever* [DOE] determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes." 16 U.S.C. § 824a(c)(1) (emphasis added). There is no textual prerequisite to find a shortage "will be unmet by the state's resource planning" before DOE acts. Op. 26. The panel thus erred from the start. Courts may not "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020).

Context further confirms DOE's broad authority to act without deference to any predicate state action. The statute authorizes DOE to issue section 202(c) orders "with or without notice, hearing, or report." 16 U.S.C. § 824a(c)(1). A requirement for DOE to "find[] the state has not and will not timely take steps that must be taken

immediately to avert unacceptable risk to reliability," Op. 27, is facially inconsistent with Congress's broad delegation to act decisively without notice, hearing, or report.

The panel primarily unearthed DOE's obligation to defer to state action from the supposed "primacy of states" under the Federal Power Act. *E.g.*, Op. 5. But "where the Federal Government supersedes the state government there is no suggestion that the two agencies both shall have final authority" under the statute. *First Iowa Hydro-Elec. Co-op. v. Fed. Power Comm'n*, 328 U.S. 152, 168 (1946). While section 201(b) historically recognized state authority "over facilities used for the generation of electric energy," Congress did so "except as specifically provided in this subchapter and subchapter III." 16 U.S.C. § 824(b)(1). Section 202(c) is just such a congressionally specified exception to state authority. Congress authorized DOE to act to address generation shortages "whenever" "an emergency exists." *Id.* § 824a(c)(1). There is no textual section 202(c) requirement for DOE to defer to states.

It's correct that "state or local utilities controlled their own power plants, transmission lines, and delivery systems, operating as vertically integrated monopolies in confined geographic areas," when Congress enacted section 202(c) in 1935. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016). But now, for much of the Nation's population, a modern mix of federally regulated regional transmission organizations administers interstate "capacity markets" to procure

generation capacity to assure resource adequacy, not states or their public-utility commissions. *New Eng. Power Gen. Ass'n v. FERC*, 757 F.3d 283, 290 (D.C. Cir. 2014). Contrary to the panel's focus on supposed primacy of state authority over resource adequacy, this Court has now repeatedly affirmed Federal Power Act jurisdiction over federally regulated interstate "capacity market" mechanisms that procure generation for resource adequacy across the country, including Michigan. *See id.*; *Conn. Dep't*, 569 F.3d at 485.

The panel also invoked the supposed "structure" of the statute. Op. 5. It claimed section 202(a) "called on FERC to 'divide the country into regional districts'" and FERC, "[a]cting under that provision," formed regional transmission organizations. Op. 16 (quoting 16 U.S.C. § 824a(a)). The panel reasoned that "Congress's placement of section 202(c) after subsections (a) and (b)" "strongly implies that [Congress] meant use of subsection (c) to be essentially the last alternative among the three." Op. 5. But the panel erred when reading the statute. The statute originally assigned section 202(a) authority *to DOE*, not FERC. 42 U.S.C. § 7172(a)(1)(B) (transferring to FERC only section 202(b) authorities). And the "regional districts" originally contemplated by the 1930s-era provision and implemented by the historic Federal Power Commission fell into disuse decades ago.

The overall structure of section 202 and the Federal Power Act fully supports DOE's order when understood "with reference to the actual context of the regulated

industry in question." *Concert Inv., LLC v. SBA*, 100 F.4th 215, 222 (D.C. Cir. 2024). The hope is that states and regional planners will adequately predict and plan for generation losses, tight reserve margins, elevated shortfall risks, and explosive demand growth. Section 202(b) promotes those efforts by accelerating interstate transmission connections through federal intervention. 16 U.S.C. § 824a(b). But section 202 as a whole realizes that states and regional planners will sometimes fall short. So Congress authorized DOE to anticipate, mitigate, and prevent energy shortages without regard to state action through subsections 202(c)-(g).

To wit, the panel's review of the "structure" of section 202 was improperly abbreviated. Section 202(c) contains seven subsections—not just three, as the panel limited itself. These later subsections contain further congressional delegations of authority to DOE regarding generation. In section 202(e), DOE is charged with ensuring sufficient domestic generation and resource adequacy before authorizing electric energy exports to a foreign country. *Id.* § 824a(e). And rather than state primacy, section 202(f) reflects that any "State" regulation of certain generators within its own borders is subordinate to and may "not conflict with the exercise of [DOE]'s powers under or relating to subsection (e)." *Id.* § 824a(f). Congress also authorized DOE to gather information and contingency plans from utilities to prevent "shortages of electric energy or capacity" with "due consideration to the public health, safety, and welfare" of our citizens. *Id.* § 824a(g). Thus, a full

consideration of section 202 confirms DOE's important role in ensuring resource adequacy and primacy over states.

The panel also suggested "[t]he correctness of [its] reading is powerfully confirmed by the executive branch's consistent interpretation and limited exercise of [section 202(c)] authority over nearly a century." Op. 33-34. But that is wrong, too. DOE's response brief (at 36-42) extensively documented DOE's (and the Federal Power Commission's) long history of using section 202(c) to address electricity shortages like those in MISO without deference to state action. For example, in 2005, DOE issued a section 202(c) order requiring the Mirant plant—which the State of Virginia ordered to shut down—to nevertheless continue operating because of "the reasonable possibility an outage will occur that would cause a blackout" without the plant. Order No. 202-05-3 at 1, 6, https://perma.cc/MQJ3-TQKC.

In sum, DOE's section 202(c) authority is necessary to address electricity-reliability emergencies in the "increasingly interconnected" grid. *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 50 (D.C. Cir. 2014). Congress was aware of the greater federal (and DOE) role in maintaining resource adequacy when modifying section 202(c) in 2015. These revisions further expanded DOE's emergency authority, allowing it to waive environmental laws and *indefinitely* issue section 202(c) orders in 90-day increments. § 61002(a), 129 Stat. at 1772-73. The

panel's vague invocation of state "primacy" and "structure" to impose non-statutory limits on DOE's authority cannot be squared with Congress's implicit ratification and expansion of DOE's past actions.

### 2. "Last-resort" emergency

Second, the panel erred by defining a section 202(c) "emergency" to be only those "circumstances [that] require immediate, essentially last-resort action by DOE" rather than state planners. Op. 36. The statute does not limit DOE's authority to addressing only those emergencies demanding "last-resort action." The Federal Power Act empowers DOE to act "whenever" an "emergency" occurs. 16 U.S.C. § 824a(c)(1).

The statute did not require DOE to stand aside and allow others to (fail to) act until a judicially conceived "last resort." The range of situations Congress textually directed section 202(c) to address—like shortages of generation and facilities—is incompatible with limiting DOE to only "last-resort" circumstances. And relative to any one state, DOE is uniquely positioned to evaluate a plant closure's impacts to reliability—particularly at a time where planned retirements across different states cumulatively threaten the interconnected grid. *See Fact Sheet*, *supra*. Regardless, DOE plainly did not act prematurely without affording state planners a chance to act first. DOE ordered that Campbell remain available mere days before a state-

condoned retirement, Op. 20-22, and it was clear that Michigan would not prevent that occurrence.

*        *        *

According to NERC, the Nation's electricity grid is facing a "five-alarm fire." U.S. Br. 84. Much of the grid now "need[s] every single megawatt, every single electron and every single molecule" "to meet demand on those peak days and peak hours." *Id.* Congress delegated to DOE the authority to "best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(1). This is a question of exceptional importance. The panel's novel interpretation will undermine grid reliability, increase the risk of blackouts, and put American lives, property, and welfare in danger. Also, all section 202(c) orders can be challenged in the D.C. Circuit. *See* 16 U.S.C. § 825*l*(b).

## CONCLUSION

This Court should grant rehearing.

Respectfully submitted,

/s/ *Kyle Glynn*

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT LUNDMAN
REBECCA JAFFE
KYLE GLYNN
*Attorneys*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-9568
kyle.glynn@usdoj.gov

Of Counsel:

JONATHAN D. BRIGHTBILL
General Counsel
U.S. Department of Energy

October 26, 2026
90-13-5-17962

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 40(d)(3)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 3,893 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Kyle Glynn*
KYLE GLYNN

Counsel for Federal Respondents

**ADDENDUM**

Opinion, *People of the State of Michigan v. U.S. Dep't of Energy*, No. 25-1159 (D.C. Cir. Sept. 11, 2026) .......... 1a

Judgment, *People of the State of Michigan v. U.S. Dep't of Energy*, No. 25-1159 (D.C. Cir. Sept. 11, 2026) .......... 41a

16 U.S.C. § 824a .......... 42a

Webster's New International Dictionary of the English Language 837 (2d ed. 1934) .......... 46a

Black's Law Dictionary 654 (3d ed. 1933) .......... 49a

Certificate as to Parties, Rulings, and Related Cases .......... 51a

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued May 15, 2026 Decided September 11, 2026

No. 25-1159

PEOPLE OF THE STATE OF MICHIGAN,
PETITIONER

v.

UNITED STATES DEPARTMENT OF ENERGY AND CHRISTOPHER A. WRIGHT, SECRETARY, UNITED STATES DEPARTMENT OF ENERGY,
RESPONDENTS

MIDCONTINENT INDEPENDENT SYSTEM OPERATOR, INC. AND CONSUMERS ENERGY COMPANY,
INTERVENORS

---

Consolidated with 25-1160, 25-1162

---

On Petitions for Review of a Final Order
of the Department of Energy

---

*Lucas Wollenzien*, Assistant Attorney General, Office of the Attorney General for the State of Michigan, argued the cause for petitioners States of Illinois, Michigan, and Minnesota. With him on the briefs were *Dana Nessel*, Attorney

General, *Michael E. Moody*, Assistant Attorney General, *Christopher Bzdok*, Special Assistant Attorney General, *Peter Surdo*, Special Assistant Attorney General, Office of the Attorney General for the State of Minnesota, and *Jason E. James*, Assistant Attorney General, Office of the Attorney General for the State of Illinois.

*Benjamin P. Chagnon* argued the cause for the Public Interest Organization petitioners. With him on the briefs were *Jennifer J. Yun*, *Michael Lenoff*, *Gregory E. Wannier*, *Sanjay Narayan*, *Elena Saxonhouse*, *Caroline Reiser*, *Gavin G. McCabe*, *Simi Bhat*, *Lauren Piette*, *Sameer H. Doshi*, *Christine A. Powell*, *Howard Learner*, *Danielle Fidler*, *Francis W. Sturges Jr.,* *Veronica Saltzman*, and *Tomas Carbonell*. *Michael C. Soules* and *Ada Statler* entered appearances.

*Jennifer Danis* was on the brief for amicus curiae Institute for Policy Integrity at New York University School of Law in support of petitioners.

*Jonas Monast*, *James P. Duffy*, *Alexandra L. St. Romain*, and *Susannah Landes Weaver* were on the brief for amici curiae Energy Law Scholars in support of petitioners.

*Nicholas M. Gladd*, *John B. Kenney*, and *Zachary Norris* were on the brief for amici curiae The Niskanen Center, et al., in support of petitioners.

*Robert N. Stander*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *Adam R. Gustafson*, Principal Deputy Assistant Attorney General, *Robert J. Lundman*, *Kyle Glynn*, and *Rebecca Jaffe*, Attorneys, and *Jonathan Brightbill*, General Counsel, United States Department of Energy.

*Zachary C. Schauf* argued the cause and filed the brief for respondent-intervenor Consumers Energy Company. With him on the brief was *Juliana Brint*. *Arjun R. Ramamurti* entered an appearance.

*Adam S. Carlesco*, *Daniel C.W. Narvey*, and *John Liskey* were on the brief for amici curiae Citizens Action Coalition of Indiana, et al., in support of respondent.

Before: SRINIVASAN, *Chief Judge*, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Consumers Energy Company is a private business that owns and operates the J.H. Campbell Generating Plant, an aging coal-fired power plant in Michigan that was scheduled to shut down last year. The Company worked for several years to develop plans and secure regulatory approval to retire the old Campbell plant and replace it with a mix of expanded and new electricity-generation sources. Consumers Energy coordinated its planning with Michigan regulators and the Midwest Independent System Operator (MISO)—the 15-state regional transmission organization in which Michigan and Consumers Energy participate. The Company's closure-and-replacement proposal received comprehensive scrutiny from the public, private industry, and expert regulators. Finding that Consumers Energy's substitute sources would meet applicable reliability criteria, provide less polluting electricity at lower prices, and more than offset generation lost when the old plant closed, the Michigan Public Service Commission and MISO expressly approved the plan.

Shortly before Campbell's scheduled retirement, the Department of Energy (DOE or Department) unilaterally

commanded the unit's continued operation. The Department invoked a rarely used, short-term, federal emergency authority conferred in section 202(c) of the Federal Power Act to order the Campbell coal unit to stay open. Michigan petitioned for review of DOE's order. Illinois and Minnesota also petitioned, as did a group of environmental organizations, including the Sierra Club, Natural Resources Defense Council, Michigan Environmental Council, Environmental Defense Fund, Environmental Law and Policy Center, Vote Solar, the Ecology Center, Urban Core Collective, and the Union of Concerned Scientists. Consumers Energy intervened to "protect[] the company's right to recover the costs associated with DOE's order" from ratepayers, which is at issue in separate proceedings regarding recovery and allocation of costs currently pending before FERC. Resp.-Interv. Br. iv, 7.

We evaluate Petitioners' challenge to DOE's interpretation of its emergency power under section 202(c) by reference to statutory text and structure. And we deploy those interpretive tools against the backdrop of states' exclusive regulatory power over the generation of electricity.

The plain meaning of the text limits section 202(c) emergency authority to address an identified risk of a substantial energy supply shortfall that calls for immediate action. Section 202(c) gives DOE limited authority to sidestep states' jurisdiction over electricity generation to briefly compel generation or interconnection in times of war or other "emergency" situations. By its terms, section 202(c) allows DOE to command certain action "[d]uring the continuance of any war in which the United States is engaged," or when the Secretary determines that "an emergency exists" due to "a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for

generating facilities, or other causes . . . ." 16 U.S.C. § 824a(c)(1).

The structure of the Federal Power Act and the history of the respective regulatory roles of federal and state governments show that Congress intended to further limit DOE's section 202(c) emergency power to circumstances necessitating action by DOE in particular, as opposed to action by states.

Start with the Act's structure: The statutory provisions immediately preceding section 202(c)—sections 202(a) and (b)—confirm the primacy of states and their utilities in planning to prevent and responding to emergency electricity shortfalls. First, section 202(a) facilitates states' and utilities' planning to generate and contract for adequate supplies of electrical power. It does so by enabling them to coordinate their efforts through voluntary participation in Regional Transmission Organizations (RTOs). Next, section 202(b) provides for coercive federal action to ensure adequate supply—but only at the request of states or their utilities. When "necessary or appropriate in the public interest," a state or utility may request that the Federal Energy Regulatory Commission (FERC) order a generator to connect to and sell or exchange energy with other facilities. Lastly, section 202(c) authorizes DOE to intervene to temporarily order similar action—connection of facilities and provision of electricity—to avert an emergency. Congress's placement of section 202(c) after subsections (a) and (b), which more broadly authorize state-level means of preventing and responding to emergency electricity shortages, strongly implies that it meant use of subsection (c) to be essentially the last alternative among the three.

Consider next the history of states' jurisdiction over generation of electricity: The last-resort character of section

202(c) is strongly supported by the respective regulatory powers of states and the federal government under the Federal Power Act. There is no dispute that for almost a century states have exercised authority, preserved by the Federal Power Act, to regulate in-state power plants for the economic and environmental benefit of their citizens. It is the states—informed by federal, regional, and load-serving entities' assessments of available supply and reliability needs—that bear the responsibility to plan for and avert reliability risks on an ongoing basis. To that end, states decide which generation resources must be built, expanded, reduced, or shut down. The Act empowers the federal government, in contrast, to regulate wholesale marketing and interstate transmission of electricity. That demarcation of federal and state regulatory power is further reason to treat DOE intervention under section 202(c) as rare and authorized only when states, their utilities, and RTOs are unable or unwilling to respond. That is exactly how the federal government has used its section 202(c) authority until today—to address short-term crises, such as blackouts caused by war or extreme weather events, not as a substitute for the states' long-term reliability planning.

Our reading of the text, structure, and history leaves us unpersuaded by DOE's sweeping conception of its "emergency" authority under section 202(c). The Department's position would empower it to pick its preferred power sources in Michigan—or, presumably, any other state—and order them to operate without regard to the multiple procedural and substantive constraints built into state reliability planning processes. We hold that section 202(c) is best read to apply where the Department identifies a risk of substantial harm from inadequate electricity supply that calls for immediate action by DOE in particular, as opposed to by the states. Because the circumstances DOE identified in the challenged order do not warrant resort to section 202(c) as

correctly interpreted, we grant the petitions for review and vacate the Order.

# I.

## A.

### 1.

Until 1935, the federal government had no regulatory authority over the nation's electricity supply. Instead, "state and local agencies oversaw nearly all generation, transmission, and distribution of electricity." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 265-66 (2016); *see Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983). In 1935, after the Supreme Court held that the Dormant Commerce Clause prohibited state regulation of certain interstate electricity transactions, *see Pub. Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89-90 (1927), Congress enacted the Federal Power Act (FPA or Act) to fill the resulting "regulatory void," *Elec. Power Supply Ass'n*, 577 U.S. at 266; *see* 16 U.S.C. §§ 824-824w.

The FPA affords the federal government authority to regulate "the transmission of electric energy in interstate commerce," *i.e.*, the movement of electric energy over long distances via high-voltage power lines. 16 U.S.C. § 824(b)(1). It also grants federal authority over "the sale of electric energy at wholesale in interstate commerce." *Id*. But the Act denies federal authority "over facilities used for the generation of electric energy." *Id.*

Federal regulatory authority over the nation's electrical supply is exercised by the Department of Energy (DOE), the Federal Energy Regulatory Commission (FERC), and the North American Electric Reliability Corporation (NERC), each

of which plays a distinct role. The principal and substantial federal agency acting in the electricity sector is FERC, which is responsible for rules and practices directly affecting rates for wholesale electricity sales and interstate transmission. *See generally* 16 U.S.C. §§ 824(a), 824a(f), 824d(a), 824e(a); *see also Elec. Power Supply Ass'n*, 577 U.S. at 266. NERC, which FERC designated in 2006 as an independent entity to "develop and enforce . . . reliability standards that provide for an adequate level of reliability of the bulk-power system," conducts periodic reliability assessments of the electric grid and sets and modifies nationwide reliability standards that inform but do not control levels of energy generation within each state. 16 U.S.C. § 824*o*(c), (d), (g); *see also* NERC, 2025 Summer Reliability Assessment ("NERC Reliability Assessment") (J.A. 103-56). For its part, the Department of Energy's only direct authority over the generation of electricity is its temporary emergency power under section 202(c).

Because the Federal Power Act extends federal authority "only to those matters which are not subject to regulation by the States," 16 U.S.C. § 824(a), it "maintains a zone of exclusive state jurisdiction," *Elec. Power Supply Ass'n*, 577 U.S. at 266. The Act generally preserves states' "control over in-state 'facilities used for the generation of electric energy,'" *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 154 (2016) (quoting 16 U.S.C. § 824(b)(1)); it contemplates incidental federal control of only those generation practices that "directly affect" FERC's exercise of its statutory authority over wholesale rates or interstate transmission. *Elec. Power Supply Ass'n*, 577 U.S. at 278. Accordingly, we have long and repeatedly recognized that the federal government "may regulate the transmission [interstate], but not the generation, of electricity." *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 365 (D.C. Cir. 2024); *see La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 389-90 (D.C. Cir. 2008) (similar

regarding FERC authority over wholesale rates). States "retain the right to regulate the facilities responsible for the generation of electric energy," *New England Power Generators Ass'n, Inc. v. FERC*, 757 F.3d 283, 285 (D.C. Cir. 2014), and they determine their own mix of electricity generation, *see Citizens Action Coal. of Ind. v. FERC*, 125 F.4th 229, 238 (D.C. Cir. 2025).

States, as the regulators of electricity generation, are largely responsible for meeting the core policy goal of achieving "resource adequacy." That means it is up to the states to make sure that enough electricity is generated to safely and reliably meet users' needs. *See Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 526 (D.C. Cir. 2010) (quoting *Cal. Indep. Sys. Operator Corp.*, 116 FERC ¶ 61,274, P 3 (2006)) (defining resource adequacy). Indeed, FERC itself expressly recognizes that "[r]esource adequacy is a matter that has traditionally rested with the states, and it should continue to rest there." *Devon Power, LLC*, 109 FERC ¶ 61,154, P 47 (2004). The supply of reliable electricity to serve fluctuating demand and avoid blackouts is accordingly a key consideration of state regulators when they determine whether to permit generation sources to be added to the grid or existing sources to retire.

In making those determinations, state regulators must meet additional legal obligations and policy priorities. Those obligations and priorities may include energy affordability, the environment and climate, and diversity of generation supply. *See, e.g.*, Mich. Comp. Laws. Ann. § 460.6t(8)(a). To achieve long-term resource adequacy consistently, efficiently, and with optimal legal compliance and public support, states, load-serving entities, voluntary regional transmission organizations (RTOs), and various other stakeholders engage in extensive, coordinated planning.

Under Michigan law, the state's public utility regulator, the Michigan Public Service Commission (Michigan Commission, Commission, or simply Michigan) is responsible for monitoring the supply and demand of electricity and ensuring resource adequacy. It reviews and approves applications to construct, expand, reduce, or retire generation resources as consistent with detailed and evolving projections of state and regional energy needs. *See* Mich. Comp. Laws. Ann. §§ 460.6a, 460.6s. As most directly relevant here, the Michigan Commission ensures that any retirement of a generation resource in Michigan is accomplished consistently with the adequacy of electrical supply to meet demands of electricity consumers.

Because Michigan law makes load-serving utilities responsible for securing sufficient generating capacity to serve their customers, *see* Mich. Comp. Laws. Ann. §§ 460.6t, 460.6w, much of the Michigan Commission's power over electrical supply is exercised by regulating those utilities' investment decisions. "Load" generally refers to customers' demand for electricity—the power that users draw from the grid—at a given time. A load-serving entity is a "a utility with an obligation created under law or contract to provide electricity service to end-use customers or to a distribution utility." *S. Car. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 90 n.12 (D.C. Cir. 2014); *see NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 110 (D.C. Cir. 2017). Michigan's State Reliability Mechanism requires load-serving utilities to demonstrate annually that they have sufficient generation capacity to meet projected demand four years in the future. *See id.* § 460.6w; *State Reliability Mechanism*, Mich. Pub. Serv. Comm'n (Nov. 21, 2017), https://perma.cc/CHH6-6NZ8. Separately, every five years, load-serving entities must file with the Michigan Commission longer-term "integrated resource plans" (IRPs) that report five-, ten-, and fifteen-year projections of the

capacity they will generate or procure to satisfy resource adequacy and reliability requirements calibrated by MISO to meet future capacity needs. *See* Mich. Comp. Laws. Ann. § 460.6t(3). Each load-serving entity's integrated resource plan reports its forecasted capacity needs, the supply-side generating resources it will draw on, and available demand-side resources it will deploy (*e.g.*, energy waste reduction measures and measures to reduce consumption). *Id.* § 460.6t(5).

By exercising the state's various regulatory powers over electrical supply as contemplated by the Federal Power Act, the Michigan Commission plays the leading role in ensuring sufficient generation to serve the state's electricity needs. To approve an integrated resource plan, the state Commission must determine that the load-serving entity's plan represents "the most reasonable and prudent means of meeting" that utility's current and future commitments to supply electricity. *See id.* § 460.6t(8)(a).

Michigan has authority to protect energy supply in the face of risks of imminent shortage. The Michigan Commission regularly monitors energy supply in the state and publishes a semiannual "energy appraisal" that highlights recent events affecting supply and prices, expected conditions, and changes over the upcoming six months. *See* Mich. Pub. Serv. Comm'n, *Michigan Energy Supply Monitoring*, https://perma.cc/MVF9-YGMU. In the event of an unexpected shortage, the Commission may issue a special update of its energy appraisal. *Id.* And, as explained below, state regulators can request that FERC order an interconnection and sale of energy to address a shortfall. If needed, Michigan's governor can declare a state energy emergency and order various mitigation measures, including restrictions on energy use in non-residential buildings, restrictions on energy sales to consumers, and

directives to an energy supplier to provide energy to any facility that provides essential services to the state. Mich. Comp. Laws. Ann. §§ 10.83-10.84.

States play the primary role in assuring resource adequacy, but they do not act alone. Regional entities are instrumental to Michigan's planning for resource adequacy. Michigan and its electric utilities participate in the Midcontinent Independent System Operator (MISO), the 15-state RTO whose territory stretches from Montana to Louisiana and includes Michigan. RTOs are "independent organizations that manage the transmission of electricity over the electric grid and ensure electricity is reliably available for consumers." *Md. Off. of People's Couns. v. FERC*, 164 F.4th 920, 924 (D.C. Cir. 2026) (quotation omitted). Here, we focus on MISO's role in ensuring reliable supplies of electric energy to serve expected load in member states.

MISO—like other RTOs—works in tandem with state regulators, including the Michigan Commission, to help ensure resource adequacy. MISO recognizes that "the states have the primary responsibility to maintain resource adequacy, including overseeing the planning or securing of new resources by load-serving entities . . . to adequately meet demand." *Resource Adequacy Metrics and Criteria Roadmap*, Midcontinent Indep. Sys. Operator 9 (Dec. 2024), https://perma.cc/8WNH-W33N. MISO supports the states to ensure resource adequacy in several ways. *Id.*

For starters, MISO sets a regional resource-adequacy standard, *i.e.*, it develops a mathematical model to estimate how much generation capacity the system will need to run reliably. Every year, MISO updates that model with new data, such as hourly load forecasts. *Id.* Next, MISO determines whether existing capacity can meet projected peak demand—

the highest projected level of energy consumption at any given time—under various conditions. In so doing, MISO builds in several time-tested reliability safeguards.

Most importantly, MISO subjects the existing generation capacity to a process called "resource accreditation." *Midcontinent Indep. Sys. Operator, Inc.*, 189 FERC ¶ 61,065, PP 3-4 (2024) (tariff revisions establishing accreditation methodology). Rather than simply adding up all the available generation units' nominal maximum-capacity figures, MISO assigns a realistic capacity value to each unit's expected contribution to system adequacy during periods of high demand. *See id.* In the case of a coal plant, the assigned capacity value discounts its total "nameplate" capacity to account for historical limits on its actual generation due to forced outages, required maintenance, and the like. *See* Midcontinent Indep. Sys. Operator, Inc., *Resource Accreditation White Paper Version 2.1*, at 10-11 (Mar. 2024), https://perma.cc/KP39-DKBX. In the case of solar- and wind-powered electrical generation units, their intermittent character is also accounted for. *Id.* at 11-12.

On the demand side, MISO does not stop with seasonal projections of system-wide peak demand. It also establishes annual "reserve margin" requirements to prevent shortages even in the face of extraordinary disruptions like extreme weather or outages that defy ordinary projection. *See Midcontinent Indep. Sys. Operator, Inc.*, 189 FERC ¶ 61,065, P 1; Energy Scholars Amicus Br. 15-16. States using MISO's projections of peak demand thus require load-serving entities to procure enough capacity to cover the specified reserve margin increment above expected peak demand. By adding a reserve margin to projected peak demand, MISO builds a reliability buffer into the target load figures states use in planning for resource adequacy.

MISO's resource adequacy standards provide an additional benchmark, not a substitute, for state reliability requirements such as integrated resource plans. *See Midcontinent Indep. Sys. Operator, Inc.*, 170 FERC ¶ 61,215, P 13 (2020); *see also Midwest Indep. Sys. Operator, Inc.*, 119 FERC ¶ 61,311, P 75 (2007) ("From the beginning . . . , [FERC] has recognized the role that state resource planning plays in managing the resource adequacy of [MISO]."). MISO coordinates with states by supplying determinations of the electric capacity needed and that which is available in the system so that state regulators, generators, and load-serving entities can incorporate those figures into their resource-adequacy planning. Energy Law Scholars Amicus Br. 14.

MISO also administers its territory's electric capacity market. "In a capacity market, in contrast to a [real-time] wholesale-energy market, [a load-serving entity] purchases from a generator an option to buy a quantity of energy, rather than purchasing the energy itself." *NRG Power Mktg., LLC v. Maine Pub. Utils Comm'n*, 558 U.S. 165, 168 (2010). With those options contracts in hand, a load-serving entity "can meet high demands for electricity by calling on the generators to produce it when the need arises. Purchasing capacity, in other words, ensures that distributors can reliably meet predicted peak power demands in an upcoming month, season, or year." *Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177, 1186 (D.C. Cir. 2021) (citation omitted). Load-serving entities "generally purchase more capacity, *i.e.*, rights to acquire energy, than necessary to meet their customers' anticipated demand." *NRG Power Mktg.*, 558 U.S. at 169; *see also Maine Pub. Utils Comm'n v. FERC*, 520 F.3d 464, 467 (D.C. Cir. 2008).

Concretely, MISO runs a competitive annual planning resource auction to enable load-serving entities to procure capacity to meet projected demand and satisfy their resource

adequacy requirements. *See* MISO, Planning Resource Auction Results for Planning Year 2025-26 ("MISO Planning Resource Auction") (J.A. 58-101). In the auction, generators offer capacity and load-serving entities submit bids for the amount needed to meet their "reserve margin" requirements. A crucial benefit of a competitive capacity market over command-and-control capacity requirements (including the Campbell Order at issue here) is that rising capacity prices in the market facilitate efficient resource adequacy planning by signaling to generators and regulators when they should invest in new generation resources or retain existing ones to ensure reliable supply of electricity; low or falling prices prevent over-investment in generation at ratepayers' expense. *See Midcontinent Indep. Sys. Operator, Inc.*, 187 FERC ¶ 61,202, P 9 (2024) (MISO tariff revisions aimed at "improving investment and retirement decisions by using price signals to properly time resource entry and exit"); Niskanen Center Amicus Br. 26-27.

If, despite states' best efforts at planning for resource adequacy, MISO identifies an imminent generation-shortage risk, it has numerous tools, like energy alerts and emergency energy procurements, to ensure adequate supply. *See* MISO Market Capacity Emergency 1-3 (J.A. 676-78). And, like the Michigan Commission, MISO has some power to defer a load-serving entity's decision to retire or suspend operations of a generation resource as needed to prevent a shortage. *See* MISO Tariff Section 38.2.7 (J.A. 887-893); *Generator Interconnection and Retirement*, Midcontinent Indep. Sys. Operator, https://perma.cc/WSS9-9AY7.

**2.**

The federal government, too, plays an important—albeit limited—role in the resource-adequacy scheme. Even as the

Federal Power Act generally preserves states' jurisdiction over electricity generation, it vests certain powers in the federal government to help protect the coordinated resource-adequacy system. Section 202 of the Act authorizes three tiers of federal action.

In the first tier, section 202(a), Congress called on FERC to "divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy." 16 U.S.C. § 824a(a). Acting under that provision, FERC encouraged the voluntary formation of RTOs to administer the transmission grid on a regional basis, and the formation of independent system operators (ISOs) that perform a similar function on a smaller scale. *See Amaren Servs. Co. v. FERC*, 880 F.3d 571, 574 (D.C. Cir. 2018); *see also Elec. Power Supply Ass'n*, 577 U.S. at 267-68. Regional coordination promotes efficient interstate sales of power from a state with available capacity to another state that may find itself short, for example, and prevents free-riding whereby load-serving entities in one state might "count on the capacity they expect others to buy in order to support their own reliability." *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 479 (D.C. Cir. 2009). FERC oversees ISOs and RTOs, including MISO, and reviews their electric capacity requirements, rates, and other rules under the "just and reasonable" standard. 16 U.S.C. §§ 824d, 824e; *see, e.g.*, *Conn. Dep't of Pub. Util. Control*, 569 F.3d at 478-79, 485 (reviewing FERC order affecting ISO capacity requirements).

The second tier, established by section 202(b), permits FERC to direct generators to connect to and sell or exchange energy with other facilities—a power afforded to FERC only upon "application of any State commission or of any person engaged in the transmission or sale of electric energy."

16 U.S.C. § 824a(b). So, if a state energy regulator, transmission entity (*e.g.*, an RTO or ISO), or load-serving entity requests FERC to do so, FERC may—"after notice to each State commission and public utility affected and after opportunity for hearing" and a finding that action is "necessary or appropriate in the public interest"—mandate a connection or sale. *Id.*

Importantly, even as the Federal Power Act gives FERC narrow authority to respond to requests to order electricity sales or exchanges, the Act expressly denies FERC authority to regulate generation facilities directly. *See* 16 U.S.C. § 824(b)(1). It is the prerogative of states "to forbid new entrants from providing new capacity, to require retirement of existing generators, to limit new construction to more expensive, environmentally friendly units, or to take any other action in their role as regulators of generation facilities without direct interference from the Commission." *Conn. Dep't of Pub. Util. Control*, 569 F.3d at 481. The final tier of federal power, conferred by section 202(c), is the sole exception.

The third tier falls outside of the coordinated resource-adequacy system altogether. Section 202(c) establishes a limited backstop mechanism empowering DOE to address certain electricity supply emergencies. That section authorizes the Secretary of Energy (Secretary) to compel generation of electricity only "[d]uring the continuance of any war in which the United States is engaged" or when the Secretary "determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes." 16 U.S.C. § 824a(c)(1).

Congress enacted section 202(c) in response to a "serious power shortage" during World War I and contemplated that its use would be limited to addressing wartime shocks and "similar crises" like "[d]rought and other natural emergencies." S. Rep. No. 74-621, at 49 (1935). Until now, the Department has exercised its section 202(c) authority sparingly. During nearly a century of state responsibility for sufficient supply of electricity under the FPA, the federal government has rarely used section 202(c) authority outside of wartime. It "has never used its section 202(c) authority to require additional generation to address long-term resource-adequacy concerns; instead, it has always used that authority to address discrete and unexpected events that threaten immediate grid needs." Energy Scholars Amicus Br. 21 (citing Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789 (2025)). The federal government has, until now, issued stopgap generation orders in response only to transitory emergencies caused by war, extreme weather events, market manipulation, or unplanned, short-term unavailability of specific generation units. *See* Rolsma, *supra* at 805-07, 839-46 tbls. 1 & 2. When a section 202(c) emergency arises, the Department can order generation that "in its judgment will best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(1).

Congress amended the Federal Power Act in 2015 to provide that section 202(c) emergency orders may override federal, state, and local environmental laws and regulations. Such an override must be cabined to circumstances in which compliance is not "practicable," any "adverse environmental impacts" are "minimize[d]," and the facility is ordered to operate only "during hours necessary to meet the emergency and serve the public interest." Pub. L. 114-94 § 61002, 129 Stat. 1772 (2015) (codified at 16 U.S.C. § 824a(c)(2)). Congress further specified that a section 202(c) order that "may

conflict" with environmental law "shall expire not later than 90 days after it is issued." 16 U.S.C. § 824a(c)(4).

As described above, Michigan's resource-adequacy regulation entails continuous, complex planning processes with intensive coordination by the state and MISO. That planning starts years in advance to prepare for future needs as well as near-term demand. FERC has peripheral—and limited—oversight of those entities, but no power to directly regulate generation facilities. And DOE has no role whatsoever in the resource-adequacy planning process. Instead, Congress in section 202(c) gave DOE narrow authority to intervene that is triggered only in the face of an electricity emergency not otherwise addressable by states or their utilities.

**B.**

The J.H. Campbell Generating Plant (Campbell), an aging coal-fired power plant in Michigan, is owned and operated by Consumers Energy Company, a load-serving entity that is part of MISO. Given its decades-old units, Campbell has become increasingly inefficient, polluting, and expensive to maintain. When in operation, the Campbell facility produces dangerous emissions, including $SO_2$, $NO_x$, and PM2.5, that cause approximately thirty excess deaths every year. Order Approving Settlement Agreement 9 (J.A. 454); State Add. 213. In June 2021, Consumers Energy filed with the Michigan Commission an integrated resource plan that proposed to retire the Campbell plant. Once an integrated resource plan is filed, the Michigan Commission reviews the plan through a year-long "contested case" process. *See* Mich. Comp. Laws. Ann. § 460.6t(a)(7). Interested parties may intervene, take discovery, submit expert testimony, and present and cross-examine witnesses at an evidentiary hearing. *See id.* §§ 460.6t(7)(ii), 24.271-24.288.

Dozens of interested parties, including environmental groups, the Michigan Attorney General, and several power companies, intervened in the Consumers Energy proceedings. In April 2022, Consumers Energy entered a multi-party settlement agreement with the environmental groups, the Michigan Attorney General, and the Michigan Commission's enforcement staff under which it memorialized its plan to retire the Campbell plant and obtain newer, cleaner, cheaper, and more reliable resources that would increase available generation capacity. *See* Settlement Agreement (J.A. 543-63). Specifically, the agreement provided that Consumers Energy would retire the Campbell plant on or before May 31, 2025. *See id*. 4-5 (J.A. 546-47). And it directed Consumers Energy to acquire a new gas plant, extend operations of two oil- and gas-fired units at one of its other plants, and add new solar energy generation and battery storage. *See id*. 3-9 (J.A. 545-51). The parties sought approval of the settlement by the Michigan Public Service Commission, Order Approving Settlement Agreement 1 (J.A. 446), which ruled on objections and granted approval on June 23, 2022, *id*. 95-97 (J.A. 540-42); *see also id*. 45-95 (J.A. 490-540).

In reviewing the settlement agreement, the Michigan Commission assessed whether the integrated resource plan Consumers Energy filed following the settlement met statutory requirements. *See id*. 4, 95 (J.A. 449, 540). By statute, the Michigan Commission must approve an integrated resource plan if it determines that "[t]he proposed integrated resource plan represents the most reasonable and prudent means of meeting the electric utility's energy and capacity needs." Mich. Comp. Laws. Ann. § 460.6t(8)(a). In making that determination about the post-settlement integrated resource plan, the Michigan Commission assessed its impact on resource adequacy and on Consumers Energy's ability to serve

anticipated peak electric load. *See* Order Approving Settlement Agreement 88-95 (J.A. 533-40).

Upon review of Consumers Energy's expected procurements and operating adjustments, the Commission determined that "the approval of the settlement agreement will enhance resource adequacy in [the Campbell region] in both the near-term and long term." *Id.* 93 (J.A. 538). Ultimately, the Commission concluded, Consumers Energy's retirement plan was "the most reasonable and prudent means of meeting Consumers' energy and capacity needs and otherwise meets the requirements of MCL 460.6t(8)." *Id.* 95 (J.A. 540). On appeal, the Michigan Court of Appeals affirmed the Michigan Commission's order approving the settlement agreement and determined that there was substantial evidence that the agreement would improve resource adequacy. *In re Consumers Energy*, No. 3622954, 2023 WL 2620437, at *5-6 (Mich. Ct. App. Mar. 23, 2023).

MISO, too, determined that Campbell's retirement as planned—with substitute generation provided by cheaper, cleaner, and more reliable new and expanded generation—would support reliability. *See* Attachment Y Notice 156 (J.A. 322). That determination followed a technical evaluation of transmission system conditions that would result from the plant's retirement. *See* MISO Tariff Section 38.2.7 2-3 (J.A. 888-89). MISO's analysis confirmed that Consumers Energy did not need to operate Campbell to satisfy the RTO's reliability criteria.

As Campbell's May 2025 retirement approached, Consumers Energy, the Michigan Commission, and MISO continued to prioritize resource adequacy. Consumers Energy had already begun winding down the Campbell unit, transitioning to new generation resources, and developing

additional capacity. In its annual capacity-demonstration filing with the Michigan Commission, *see* Mich. Comp. Laws. Ann. § 460.6w(8)(a), Consumers Energy documented that it had procured sufficient capacity to meet the projected demand of its customers in summer 2025 and beyond, *see* Motion to Intervene 24 (J.A. 357); Consumers Energy Capacity Demonstration 15 (J.A. 632). And MISO's planning resource auction results for summer 2025 through spring 2026, published in April 2025, "demonstrated sufficient capacity at the regional, subregional and zonal levels." MISO Planning Resource Auction 12 (J.A. 69); *see also id.* 5 (J.A. 62) (showing that MISO attained a reserve margin of 9.8% for summer 2025, nearly two percentage points above its target).

The Michigan Commission, utilities in the state, and MISO saw no need to invoke 202(b) to request that FERC order provision of additional electricity. Neither did the governor of Michigan see any ground to declare an energy emergency in response to Campbell's planned closure. *See* Mich. Comp. Laws. Ann. §§ 10.83-10.84.

Just days before Campbell's scheduled retirement, however, DOE sidestepped Michigan's coordinated, years-long process of planning, including the detailed, judicially reviewed, multiparty settlement.

On May 23, 2025, the Secretary issued a section 202(c) Order declaring an emergency and compelling Consumers Energy to keep Campbell in operation for at least 90 days. The Order asserts that "an emergency exists in portions of the Midwest region of the United States due to a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes." DOE Order 202-25-3 1 (J.A. 1). As support, the Order identifies "potential tight reserve margins during the summer 2025" in MISO and

potential electricity supply shortfalls due to the "retirement of thermal generation capacity." DOE Order 202-25-3 1 (J.A. 1).

DOE pointed to fragments of two documents as showing that the region faced an emergency within the meaning of section 202(c). First, it quoted a statement in a NERC report that MISO is "at elevated risk of operational reserve shortfalls during periods of high demand or low resource output." DOE Order 202-25-3 1 (J.A. 1); *see* NERC Reliability Assessment 5 (J.A. 107). DOE characterized that statement as describing an emergency even though the very same report concluded that MISO had "adequate anticipated resources" for "peak load conditions." NERC Reliability Assessment 5 (J.A. 107).

Second, DOE quoted a slide from a deck describing MISO's planning resource auction results for its North/Central region, which stated that "new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources" and that the summer months reflected the "highest risk and a tighter supply-demand balance." DOE Order 202-25-3 2 (J.A. 2); *see* MISO Planning Resource Auction 12-13 (J.A. 69-70). The first statement means that fewer capacity resources were *offered* in that region than in 2024; it does not conclude that the amount of capacity *purchased* was inadequate to serve load. *See* Michigan Attorney General Request for Rehearing 31 (J.A. 188). And, in context, the second statement is merely comparative: It explains that the supply-demand gap in summer 2025 was narrower than in fall, winter, or spring of that year. *See id.* 30-31 (J.A. 187-88). DOE acknowledges that both "MISO and Consumers ha[d] incorporated [Campbell's] planned retirement into their supply forecasts," and that MISO procured "sufficient capacity" for summer 2025. DOE Order 202-25-3 1-2 (J.A. 1-2). Brushing aside that vital context, DOE nonetheless concluded there was a risk of insufficient capacity

that warranted a section 202(c) emergency order. And it concluded, without explanation, that additional dispatch of Campbell in particular is "necessary to best meet the emergency and serve the public interest." DOE Order 202-25-3 2 (J.A. 2).

In June 2025, Michigan sought administrative rehearing, as did Illinois, Minnesota, and several environmental nonprofit groups. Rehearing was denied by operation of law when DOE failed to respond within 30 days. 16 U.S.C. § 825l(a). Petitioners then sought our review of the Order. On September 8, 2025, DOE issued a Rehearing Order that "modified" the Order in some respects and otherwise sustained it. DOE Order 202-25-3B 24 (J.A. 29).

The Rehearing Order reiterates that section 202(c) "specifically applies to the potential 'shortage of electric energy or of facilities for the generation or transmission of electric energy,'" which it describes as "exactly the situation that led to the issuance of the Emergency Order." Order 202-25-3B 4 (J.A. 9). DOE also announced a new interpretation of section 202(c) to authorize it to countermand the state's approval of a plant closing, even in the absence of a need for federal intercession to avert an imminent reliability risk beyond state or RTO control. Order 202-25-3B 7 (J.A. 12). It is enough, in DOE's view, that the Order "addresses [the] risk" that, in DOE's view, "if current retirement schedules and incremental additions remain unchanged, most regions—including the MISO region relevant to the Emergency Order—will face unacceptable reliability risks within five years," Order 202-25-3B 14 (J.A. 19).

The Act limits to 90 days the duration of a section 202(c) order that conflicts with environmental law, *see* 16 U.S.C. § 824a(c)(4)(A)—which this one indisputably does. DOE has

nonetheless extended the Order's 90-day period four times. Order No. 202-25-7 (DOE Aug. 20, 2025); Order No. 202-25-9 (DOE Nov. 18, 2025); Order No. 202-26-16 (DOE Feb. 17, 2026); Order No. 202-26-22 (DOE May 18, 2026). In each extension, DOE asserted that the emergency conditions "will continue in the near term and are also likely to continue in subsequent years." *See, e.g.*, Order No. 202-25-7 7 (State Add. 88); Order No. 202-25-9 8 (State Add. 99). Thus, DOE has compelled Campbell's continued operation for a total of 450 days, claiming that extended compulsion is appropriate "[t]o ensure that the Campbell Plant will be available if needed to address emergency conditions." *See* Order No. 202-25-9 8 (State Add. 99). Petitioners timely sought review of the extension orders, and we held those petitions in abeyance pending the outcome here.

**II.**

We have jurisdiction to review the initial Order challenged in these petitions. 16 U.S.C. § 825*l*(b); *see* 42 U.S.C. § 7192(a). We must set aside an agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Erie Blvd. Hydropower, LP v. FERC*, 878 F.3d 258, 266 (D.C. Cir. 2017) (quoting 5 U.S.C. § 706(2)(A), (C)). When determining whether an agency has exceeded its statutory authority, we interpret the relevant statutory provisions *de novo*. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400-01 (2024).

Petitioners claim that the Order exceeds DOE's statutory authority. Specifically, they argue that the circumstances DOE has identified—including an out-of-context quotation about an "elevated risk" of operational reserve shortfalls in summer 2025 and unspecified long-term reliability risks—do not constitute an "emergency" under section 202(c). The very

document DOE drew from established that there was in fact sufficient capacity due to Michigan's planning measures for resource adequacy and no anticipated electricity shortfall, so no "emergency." Petitioners also claim that the Order's finding that Michigan faced a section 202(c) emergency is not supported by substantial evidence and contravenes other limitations imposed by section 202(c). DOE responds that the Secretary has broad latitude to determine that a section 202(c) emergency exists and that the Order correctly identifies one here.

**A.**

We first address petitioners' statutory argument. And because we find that argument dispositive, we need go no further. DOE relies not on its core power to compel electricity connection or generation to meet emergency needs in wartime, but on its power to compel generation of electric energy when the Secretary "determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes." 16 U.S.C. § 824a(c)(1). The Act gives the Secretary authority to determine whether an emergency exists. That grant of authority does not grant a boundless license to ignore the statutory text; it allows the Secretary to exercise discretion within the Act's statutory limits. The statutory limits in section 202(c) confine DOE's authority to temporary emergencies that the Secretary reasonably determines are and will be unmet by the state's resource planning.

The parties disagree about what counts as an "emergency" under section 202(c). Petitioners contend that an "emergency" for section 202(c) purposes must be sudden, unexpected,

imminent, and require an immediate response. State Pet'rs Br. 26-27. DOE contends that the term encompasses any anticipated shortage of electric power, even if neither imminent nor beyond the capability of the state to address. DOE Br. 23-25.

We hold that a section 202(c) "emergency" means a grid-reliability risk that calls for an immediate response by DOE in particular. If the Department finds the state has not and will not timely take steps that must be taken immediately to avert unacceptable risk to reliability, the need for immediate action can trigger statutory authority for DOE to step in.

In arriving at the best interpretation, "we begin with the text." *Pacific Gas & Electric Co. v. FERC*, 113 F.4th 943, 948 (D.C. Cir. 2024) (citation omitted). The Federal Power Act does not define "emergency," so "we look to the word's ordinary definition." *CSX Transp., Inc v. Ala. Dep't of Revenue*, 562 U.S. 277, 284 (2011). Definitions of "emergency" include an "unforeseen occurrence or combination of circumstances which calls for immediate action or remedy," a "pressing necessity," and an "exigency." *Webster's New Int'l Dictionary of the English Language* 716 (2d ed. 1930); *see also* 3 *Oxford English Dictionary* 119 (1933) (defining emergency as "a state of things unexpectedly arising, and urgently demanding immediate action").

The key consideration in determining whether a situation amounts to an emergency is whether it demands immediate action by DOE outside the ordinary process for assuring reliability. While the suddenness, imminence, and unexpectedness of a reliability risk will often make it more likely to warrant immediate action, it is, as we explain further below, *see infra* at 29-32, the combination of urgent need for action with circumstances showing that a federal response is

called for that epitomizes a section 202(c) emergency. And, contrary to petitioners' arguments that an emergency can stem only from an imminent and unforeseen energy shortage, *see* PI Pet'rs Br. 24; State Pet'rs Br. 25, the need for an immediate federal response might arise even when a crisis is foreseeable or will occur in the future: If, for example, a deteriorating nuclear power plant poses risks of a serious outage in three years absent immediate action to ensure repairs, and if DOE has reason to believe that the state cannot or will not act in time to reasonably respond, an emergency may exist even though the outage is foreseeable and far-off.

Based on the text, the need for immediate federal action to ensure adequate supply of electricity is the touchstone for a section 202(c) emergency. DOE's arguments to the contrary are unpersuasive.

DOE contends that the text of section 202(c) uses "emergency" broadly to include any shortages of electric energy. DOE Br. 23-25. The Department asserts that section 202(c) "spells out what constitutes a section 202(c) 'emergency' by capacious examples," including "'a shortage of electric energy'; 'a sudden increase in the demand for electric energy'; a shortage 'of facilities for the generation or transmission of electric energy'; a shortage 'of fuel or water for generating facilities'; or for 'other causes.'" DOE Br. 24 (quoting 16 U.S.C. § 824a(c)(1)). But DOE misreads the text. What it quotes in section 202(c) as statutorily identified emergencies are no such thing. They are potential *causes* of emergencies, not *examples* of emergencies. As the statute says, an emergency may "exist[] by reason of" a shortage of electric energy or of facilities for the generation or transmission of electric energy. 16 U.S.C. § 824a(c)(1). The statutory text plainly does not say those potential causes are themselves emergencies.

Next, DOE argues that the text of neighboring section 202(d) shows that the term "emergency" in section 202(c) cannot mean that immediate action is required. DOE Br. 28. Section 202(d) permits a utility that is not subject to FERC's jurisdiction to connect temporarily to the interstate grid during "any emergency requiring immediate action," and to do so without thereby subjecting itself to FERC's jurisdiction. 16 U.S.C. § 824a(d). The apparent role of this provision is to encourage such voluntary connection to help meet emergency conditions. DOE argues that the word "emergency" by itself in section 202(c) cannot refer to circumstances requiring immediate action because that would treat the modifying phrase accompanying the word "emergency" in section 202(d)—"requiring immediate action"—as surplusage. That is wrong. Even if there were no section 202(c) at all, the phrase in section 202(d) would be surplusage because, as the dictionaries and common usage establish, the word "emergency" standing alone denotes an acute situation requiring an immediate response. *See supra* at 27. The fact that "emergency" conveys the same meaning more succinctly than the more emphatically worded "emergency requiring immediate action" is no reason to eschew the word's ordinary meaning in section 202(c). After all, "the canon against surplusage is not an absolute rule," and it "certainly does not require us to favor an unusual meaning that will avoid surplusage over a more natural one." *Stanley v. City of Sanford*, 606 U.S. 46, 56 (2025) (quotation omitted).

For purposes of section 202(c), the ordinary meaning of "emergency" as an event that requires immediate action does not complete the analysis. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (quotation omitted). Given the structure and context of the

Federal Power Act, section 202(c)'s grant of emergency authority is triggered only when there is a need for immediate, essentially last-resort action *and* the circumstances require action by DOE in particular, as opposed to action by the state or states responsible for resource adequacy.

To start, Congress carefully structured the Federal Power Act, and section 202 within it, to preserve the primacy of state authority over electricity generation. At its outset, the Act clarifies that the limited federal authority it confers extends "only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a). And it expressly denies federal authority "over facilities used for the generation of electric energy." *Id.* § 824(b)(1). To help ensure that generation suffices to meet long-term demand, section 215 authorizes NERC to establish nationwide reliability standards. 16 U.S.C. § 824*o*(d). But that section, which expressly denies NERC power to demand additional generation capacity, makes clear that NERC's standards are to guide state planning, not to authorize federal intervention to direct electricity generation. FERC, too, facilitates production of an "abundant supply of electric energy," principally by prompting states and their utilities to engage in "voluntary interconnection and coordination" at the regional level. 16 U.S.C. § 824a(a). If those efforts prove deficient, a state, transmission organization, or load-serving entity may request, under section 202(b), that FERC direct a generator to sell or exchange energy with other facilities. *Id.* § 824a(b). But FERC only has authority to do that in response to a request. Permitting DOE to compel generation in a situation that can be resolved through the ordinary resource adequacy planning mechanisms or a request under section 202(b) would render meaningless the constraints on federal power that Congress imposed throughout the Act.

The only other court to consider Section 202(c)'s scope has come to the same conclusion. In *Otter Tail*, the court distinguished section 202(c), which enables a federal response "to react to a war or national disaster and order immediate interconnection of the facilities to maintain electrical service during such emergency," from section 202(b), which "applies to a crisis which is likely to develop in the foreseeable future but which does not necessitate immediate action on the part of the [Federal Power] Commission." *Otter Tail Power Co. v. Fed. Power Comm'n*, 429 F.2d 232, 234 (8th Cir. 1970). So there, too, the court treated the federal government's section 202(c) power as limited by the primacy of other, less top-down and coercive mechanisms to ensure resource adequacy.

The structure of the Federal Power Act makes clear that compelled generation under section 202(c) is generally appropriate only when DOE faces a type of reliability emergency that is unaddressed by actions contemplated by sections 202(a) and (b), so necessitates federal intervention. Section 202(c) is essentially a narrow, last-resort backstop. It provides for DOE to exercise emergency authority when coordinated state and regional resource adequacy planning, per section 202(a), and invocation of section 202(b) both fall short. When those mechanisms function as intended to address potential resource adequacy issues, there will typically be no "emergency" within the meaning of section 202(c).

The circumstances requiring use of section 202(c) are rare. If generation shortfalls or other reliability risks are anticipated, states, generators, and regional entities have every incentive and tool to make plans to procure replacement resources or prevent scheduled retirements. And even for imminent or unforeseen shortfalls, the coordinated resource-adequacy system includes alternative solutions. For instance, MISO may provide for energy imports from neighboring systems or deploy

operating mitigations like load-modifying resources—that is, demand-side measures to reduce energy consumption. *See* NERC Reliability Assessment 16 (J.A. 118); MISO, *Market Redefinition: Load Modifying Resource Reforms* 6 (Nov. 6, 2024), https://perma.cc/AZ69-Q3VN. MISO may also issue energy emergency alerts or operational alerts that require its stakeholders to take energy conservation actions. *See* MISO Market Capacity Emergency 21-26 (J.A. 696-701). States may declare energy emergencies pursuant to which they restrict consumption or command an energy supplier to redirect its energy to a needed facility. *See, e.g.*, Mich. Comp. Laws. Ann. §§ 10.83-10.84. And states, transmission organizations, or load-serving entities contemplating imminent shortages can call on FERC under section 202(b) to require generators to sell or exchange energy with other facilities. *See* 16 U.S.C. § 824a(b). For virtually all risks of energy shortages, alternatives to DOE intercession suffice.

When DOE exercises its section 202(c) authority to compel generation other than as a last resort, including by reversing a generator's long and carefully planned retirement as it did with Consumers Energy's Campbell unit, the results are disruptive. Unjustified use of section 202(c) upends existing resource-adequacy decisions made based on years of planning with intensive expert input and broad stakeholder participation. As DOE itself acknowledges, resource adequacy planning and adding generation capacity is a "many-year" process. *See* DOE Br. 33. States and RTOs closely scrutinize the impact of generation retirement or reduction and engage in sophisticated planning of expansion or construction of generation units and facility interconnections. They do so with public notice and input by a broad range of stakeholders. And they seek to achieve resource adequacy in a manner that serves the public interest in affordable, environmentally sound, reliable resources going forward. *See id.* at 33-34. Contrary to

DOE's position, DOE Br. 31-36, the complexity and advance planning that go into states' assurances of resource adequacy do not imply that DOE must have vast, top-down emergency power to pick its favorite generators to run at all costs, or to abruptly order disfavored units to shut down earlier than planned. Rather, the complexity of state planning processes helps to explain why the Federal Power Act leaves resource adequacy to be managed by states, utilities, and their RTOs.

The Department's reading of "emergency" invites frequent federal interventions that are unsupported by the statute and threaten the stability of the energy market. By directing a generator approved for retirement to remain operative while effectively walling it off from planning and market frameworks, the Order challenged here interferes with ordinary methods to assess a region's true generation capacity and distorts price signals that otherwise prompt appropriate capacity investments. *See* Energy Law Scholars Amicus Br. 16. DOE's use of its expansive interpretation of "emergency" to prevent planned retirements of generators slated to close, for example, will likely discourage development of needed new resources by artificially lowering capacity market prices and destabilizing those markets. *See id.* 16-20. Such distortions may be justified in the face of the rare emergency requiring DOE's immediate, short-term intervention. But unless DOE's involvement is needed in response to a genuine emergency as defined by section 202(c), it must be avoided.

The text and statutory structure are alone sufficient to settle the "best" understanding of FERC's section 202(c) authority. *See Loper Bright*, 603 U.S. at 370. The correctness of our reading is powerfully confirmed by the executive branch's consistent interpretation and limited exercise of that

authority over nearly a century. *See id.* at 386 (citations omitted).

The reading of section 202(c) we provide today is a familiar one. In *Richmond Power & Light v. FERC*, 574 F.2d 610 (D.C. Cir. 1978), we held that the Federal Power Commission (predecessor to both FERC and DOE) acted within its sound discretion in eschewing reliance on Section 202(c) to address electric supply problems caused by the 1973 oil embargo. 614-15. The Commission had determined to "invoke section 202(c) only if its emergency powers could have provided the sole authorization" to alleviate the shortage. *Id.* at 614. Rejecting the position of midwestern generators seeking compelled purchases of their capacity under section 202(c), the Commission treated continued reliance on foreign oil, despite a national policy discouraging such reliance, as not among the "'temporary' emergencies, epitomized by wartime disturbances" to which section 202(c) applies. *Id.* at 615. Given that the anticipated need could be mitigated by a temporary regional agreement to increase energy conservation and transfers from energy-rich states to those facing shortages, the Commission saw no role for last-resort federal compulsion under section 202(c). *Id*. at 613-14.

DOE's own rule—adopted shortly after we decided *Richmond Power & Light*—defines a section 202(c) "emergency" along similar lines as "an unexpected inadequate supply of electric energy which may result from the unexpected outage or breakdown of facilities for the generation, transmission or distribution of electric power." 10 C.F.R. § 205.371. That rule lists as examples of events that might cause an emergent inadequacy in electricity supply "weather conditions, acts of God, or unforeseen occurrences not reasonably within the power of the affected 'entity' to prevent"; unanticipated shortfalls might also result from "a

sudden increase in customer demand, an inability to obtain adequate amounts of the necessary fuels to generate electricity, or a regulatory action which prohibits the use of certain electric power supply facilities." *Id*. DOE explained when it adopted the rule that section 202(c) did not empower it to issue orders to "replace prudent utility planning and system expansion." Department of Energy, Emergency Interconnection of Electric Facilities and the Transfer of Electricity to Alleviate an Emergency Shortage of Electric Power, 46 Fed. Reg. 39,984, 39,985 (Aug. 6, 1981). As the rule specifies, a section 202(c) order is "envisioned as meeting a specific inadequate power supply situation," not solving a long-term problem. 10 C.F.R. § 205.371.

The historical uses of section 202(c) further reinforce its limited scope. *See Loper Bright*, 603 U.S. at 386 (emphasizing that the "'longstanding practice of the government'—like any other interpretive aid—'can inform [a court's] determination of what the law is'" (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (modification in original))). Outside of wartime, section 202(c) has been used sparingly. Between World War II and the Federal Power Commission's dissolution and replacement by the Department of Energy in 1977, the Commission issued only seven section 202(c) orders, typically in response to local requests and based on impending outages, operating and construction difficulties, or drought. *See, e.g.*, *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 47 F.P.C. 747, 748-50 (1972) (operating difficulties); *Crisp Cnty. Power Comm'n v. Ga. Power Co*., 35 F.P.C. 629, 630-31 (1966) (multiple system outages); *Tex. Elec. Serv. Co*., 7 F.P.C. 574, 575 (1948) (construction delays, generator outage, and drought); *see also* Rolsma, *supra*, at 843-46 tbl. 2.

After Congress transferred section 202(c) authority from the Federal Power Commission to DOE in 1977, DOE saw no

need to use it for decades. Before 2025, DOE had issued section 202(c) orders only at the request of local entities and to alleviate discrete crises, such as those caused by severe weather events or unexpected construction delays that required an immediate response. *See, e.g.*, DOE Order 202-20-2 1-2 (Sept. 6, 2020), https://perma.cc/7GEU-86C8 (extreme heat wave); DOE Order 202-17-1 1 (Apr. 14, 2017), https://perma.cc/6QJC-2SEG (unpredicted convergence of lightning strike and flooding); DOE Order 202-05-2 (Sept. 30, 2005), https://perma.cc/WH4A-LV8A (serial strikes of Hurricanes Rita and Katrina); *see also* Rolsma, *supra*, at 839-42 tbl 1.

In sum, an emergency under section 202(c) refers to an electricity shortage that is or will in the future be acute and is not being timely addressed by planning for resource adequacy by the state, its utilities, or an RTO. Those circumstances require immediate, essentially last-resort action by DOE outside the ordinary reliability planning process.

We next consider whether the circumstances identified by DOE are facially sufficient to meet the statutory requirement of an emergency. Because we conclude that they are not, we need not reach petitioners' substantial-evidence claims or their challenges to DOE's decision to choose Campbell as the source of additional capacity and to command it to run beyond the "hours necessary to meet the emergency." 16 U.S.C. § 824a(c)(2).

**B.**

The Order initially describes the emergency as "the potential for electricity supply shortfalls" in summer 2025 caused by the "retirement of thermal generation capacity." DOE Order 202-25-3 1 (J.A. 1). It warns that summer 2025 presented a risk of "potential loss of power to homes and local

businesses in the areas that may be affected by curtailments or outages." DOE Order 202-25-3 2 (J.A. 2). DOE continues to defend the Order on that basis, arguing that "emergency conditions existed . . . due to a shortage that would cause unacceptable reliability risks in the near-term." DOE Br. 31.

Those indeterminate assertions of summer electricity shortfalls are not what Congress meant by "emergency" in section 202(c). Had DOE pinpointed a concrete supply issue beyond the state's competency that was likely to trigger a blackout in an identified area if temperatures peaked, immediate intervention might have been appropriate. But the mere possibility of an electricity supply shortfall—with no specifics about its potential severity, timing, location, or likelihood—does not warrant an emergency federal response. Rather, reasonable alternatives to DOE's intervention were available, and in fact appear to have forestalled outages.

Because the circumstances DOE identified plainly did not necessitate immediate action by DOE, it did not meet the definition of an emergency under section 202(c). NERC's Reliability Assessment—the very document on which the Department relies to support its emergency determination—describes MISO mitigation measures to prevent operating shortfalls, including accessing load-modifying resources, requesting energy transfers from neighboring systems, and issuing energy emergency alerts. *See* NERC Reliability Assessment 16 (J.A. 118). MISO also instructs its stakeholders to lower energy use and increase output from backup generators. *See* MISO Market Capacity Emergency 21-26 (J.A. 696-701). Michigan's governor can declare an energy emergency to restrict energy consumption and direct supply to needed areas. *See* Mich. Comp. Laws. Ann. § 10.84. Such an intervention is modulated—in ways that DOE's section 202(c) order is not—by the governor's direct political accountability

to electricity users in the state and familiarity with state energy conditions. And, as already discussed, state regulators, transmission organizations, and load-serving entities have other mechanisms to address shortages, including requesting intervention from FERC under section 202(b).

DOE's Rehearing Order identifies an alternative basis for its emergency determination. The agency asserts that "most regions—including the MISO region relevant to the Emergency Order—will face unacceptable reliability risks within five years," and that requiring Campbell's continued operation "addresses that risk." DOE Order 202-25-3B 14 (J.A. 19). On appeal, DOE continues to defend the Order by pointing to longer-term reliability and resource adequacy concerns. *See* DOE Br. 79.

That added rationale falls even farther outside the meaning of "emergency" under section 202(c) than did the first. Long-term resource adequacy risks generally do not necessitate immediate action by DOE. They are routinely resolved through coordinated, forward-looking decision making within the ordinary resource adequacy system. That entire system prioritizes averting unacceptable long-term reliability risks. Again, Michigan addresses long-term reliability risks by reviewing generators' integrated resource plans and by approving or rejecting the construction and retirement of generation facilities. Regional entities like MISO facilitate states' responses to long-term reliability risks by setting resource adequacy requirements and encouraging new resource entry through effective administration of the capacity market. MISO has also adopted reliability initiatives aimed at improving its processes and transmission capabilities, such as implementing resource accreditation reforms, constructing new transmission lines, and expediting approval of new electric generation resources. *See* Testimony of Jennifer Curran 2

(J.A. 1140) (House Subcommittee testimony of MISO executive). And, if long-term resource adequacy continues to present a threat, NERC may modify its nationwide reliability standards. The federal government generally lacks statutory authority to address long-term reliability risks; much less is DOE empowered to make unauthorized use of section 202(c) emergency authority as a partial substitute for and disruption to the states' planning processes.

Because we conclude that DOE exceeded its statutory authority, we do not address petitioners' other challenges to the Order. *See MCI Telecomms Corp. v. FCC*, 765 F.2d 1186, 1188 (D.C. Cir. 1985).

**III.**

We vacate the Order. An order of a federal agency "that exceeds the scope of its statutory authority is, by definition, not in accordance with the law and subject to vacatur." *All Am. Telephone Co., Inc. v. FCC*, 867 F.3d 81, 89 (D.C. Cir. 2017); *see Calif. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 396 (D.C. Cir. 2004) (vacating order that FERC had no authority to make or enforce). To determine whether vacatur is the appropriate remedy, we evaluate (1) "the likelihood that deficiencies in an order can be redressed on remand" and (2) "the disruptive consequences of vacatur." *N.J. Conservation Found. v. FERC*, 111 F.4th 42, 64 (D.C. Cir. 2024) (quotation omitted).

The Order's deficiency cannot be redressed on remand because it depends on DOE's misconception of the nature and scope of its emergency authority under section 202(c). Because the circumstances identified by DOE do not amount to a section 202(c) emergency, the agency cannot claim any serious possibility that it will be able to "substantiate its decision on remand." *Id.* (quoting *Allied-Signal, Inc. v.*

*Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)). And vacatur will not be disruptive because the Order under review has already expired.

***

For the foregoing reasons, we grant the petitions and vacate the Order.

*So ordered.*

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 25-1159** **September Term, 2026**
FILED ON: SEPTEMBER 11, 2026

PEOPLE OF THE STATE OF MICHIGAN,
PETITIONER

v.

UNITED STATES DEPARTMENT OF ENERGY AND CHRISTOPHER A. WRIGHT, SECRETARY, UNITED STATES DEPARTMENT OF ENERGY,
RESPONDENTS

MIDCONTINENT INDEPENDENT SYSTEM OPERATOR, INC. AND CONSUMERS ENERGY COMPANY,
INTERVENORS

---

Consolidated with 25-1160, 25-1162

On Petitions for Review of a Final Order
of the Department of Energy

Before: SRINIVASAN, *Chief Judge*, PILLARD and WILKINS, *Circuit Judges*

## J U D G M E N T

These causes came to be heard on the petitions for review of a final order of the Department of Energy and were argued by counsel. On consideration thereof, it is

**ORDERED** and **ADJUDGED** that the petitions for review be granted and the order be vacated, in accordance with the opinion of the court filed herein this date.

**Per Curiam**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY: /s/

Daniel J. Reidy
Deputy Clerk

Date: September 11, 2026

Opinion for the court filed by Circuit Judge Pillard.

United States Code Annotated
Title 16. Conservation
Chapter 12. Federal Regulation and Development of Power (Refs & Annos)
Subchapter II. Regulation of Electric Utility Companies Engaged in Interstate Commerce

16 U.S.C.A. § 824a

§ 824a. Interconnection and coordination of facilities; emergencies; transmission to foreign countries

Effective: December 4, 2015
Currentness

**(a) Regional districts; establishment; notice to State commissions**

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnection and coordinated electric facilities. It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts. Before establishing any such district and fixing or modifying the boundaries thereof the Commission shall give notice to the State commission of each State situated wholly or in part within such district, and shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations.

**(b) Sale or exchange of energy; establishing physical connections**

Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: *Provided,* That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them.

**(c) Temporary connection and exchange of facilities during emergency**

**(1)** During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes, the Commission shall have authority, either upon its own motion or upon complaint, with or without notice, hearing, or report, to


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

require by order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest. If the parties affected by such order fail to agree upon the terms of any arrangement between them in carrying out such order, the Commission, after hearing held either before or after such order takes effect, may prescribe by supplemental order such terms as it finds to be just and reasonable, including the compensation or reimbursement which should be paid to or by any such party.

**(2)** With respect to an order issued under this subsection that may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation, the Commission shall ensure that such order requires generation, delivery, interchange, or transmission of electric energy only during hours necessary to meet the emergency and serve the public interest, and, to the maximum extent practicable, is consistent with any applicable Federal, State, or local environmental law or regulation and minimizes any adverse environmental impacts.

**(3)** To the extent any omission or action taken by a party, that is necessary to comply with an order issued under this subsection, including any omission or action taken to voluntarily comply with such order, results in noncompliance with, or causes such party to not comply with, any Federal, State, or local environmental law or regulation, such omission or action shall not be considered a violation of such environmental law or regulation, or subject such party to any requirement, civil or criminal liability, or a citizen suit under such environmental law or regulation.

**(4)(A)** An order issued under this subsection that may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation shall expire not later than 90 days after it is issued. The Commission may renew or reissue such order pursuant to paragraphs (1) and (2) for subsequent periods, not to exceed 90 days for each period, as the Commission determines necessary to meet the emergency and serve the public interest.

**(B)** In renewing or reissuing an order under subparagraph (A), the Commission shall consult with the primary Federal agency with expertise in the environmental interest protected by such law or regulation, and shall include in any such renewed or reissued order such conditions as such Federal agency determines necessary to minimize any adverse environmental impacts to the extent practicable. The conditions, if any, submitted by such Federal agency shall be made available to the public. The Commission may exclude such a condition from the renewed or reissued order if it determines that such condition would prevent the order from adequately addressing the emergency necessitating such order and provides in the order, or otherwise makes publicly available, an explanation of such determination.

**(5)** If an order issued under this subsection is subsequently stayed, modified, or set aside by a court pursuant to section 825*l* of this title or any other provision of law, any omission or action previously taken by a party that was necessary to comply with the order while the order was in effect, including any omission or action taken to voluntarily comply with the order, shall remain subject to paragraph (3).

**(d) Temporary connection during emergency by persons without jurisdiction of Commission**

During the continuance of any emergency requiring immediate action, any person or municipality engaged in the transmission or sale of electric energy and not otherwise subject to the jurisdiction of the Commission may make such temporary connections with any public utility subject to the jurisdiction of the Commission or may construct such temporary facilities for the transmission of electric energy in interstate commerce as may be necessary or appropriate to meet such emergency, and shall not become subject to the jurisdiction of the Commission by reason of such temporary connection or temporary construction: *Provided,* That such temporary connection shall be discontinued or such temporary construction removed or otherwise disposed



WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

of upon the termination of such emergency: *Provided further,* That upon approval of the Commission permanent connections for emergency use only may be made hereunder.

**(e) Transmission of electric energy to foreign country**

After six months from August 26, 1935, no person shall transmit any electric energy from the United States to a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application unless, after opportunity for hearing, it finds that the proposed transmission would impair the sufficiency of electric supply within the United States or would impede or tend to impede the coordination in the public interest of facilities subject to the jurisdiction of the Commission. The Commission may by its order grant such application in whole or in part, with such modifications and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate.

**(f) Transmission or sale at wholesale of electric energy; regulation**

The ownership or operation of facilities for the transmission or sale at wholesale of electric energy which is (a) generated within a State and transmitted from the State across an international boundary and not thereafter transmitted into any other State, or (b) generated in a foreign country and transmitted across an international boundary into a State and not thereafter transmitted into any other State, shall not make a person a public utility subject to regulation as such under other provisions of this subchapter. The State within which any such facilities are located may regulate any such transaction insofar as such State regulation does not conflict with the exercise of the Commission's powers under or relating to subsection (e).

**(g) Continuance of service**

In order to insure continuity of service to customers of public utilities, the Commission shall require, by rule, each public utility to--

**(1)** report promptly to the Commission and any appropriate State regulatory authorities any anticipated shortage of electric energy or capacity which would affect such utility's capability of serving its wholesale customers,

**(2)** submit to the Commission, and to any appropriate State regulatory authority, and periodically revise, contingency plans respecting--

**(A)** shortages of electric energy or capacity, and

**(B)** circumstances which may result in such shortages, and

**(3)** accommodate any such shortages or circumstances in a manner which shall--

**(A)** give due consideration to the public health, safety, and welfare, and



WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(B)** provide that all persons served directly or indirectly by such public utility will be treated, without undue prejudice or disadvantage.

**CREDIT(S)**

(June 10, 1920, c. 285, pt. II, § 202, as added Aug. 26, 1935, c. 687, Title II, § 213, 49 Stat. 848; amended Aug. 7, 1953, c. 343, 67 Stat. 461; Pub.L. 95-617, Title II, § 206(a), Nov. 9, 1978, 92 Stat. 3141; Pub.L. 114-94, Div. F, § 61002, Dec. 4, 2015, 129 Stat. 1772.)

16 U.S.C.A. § 824a, 16 USCA § 824a
Current through P.L. 119-73. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# WEBSTER'S NEW INTERNATIONAL DICTIONARY

OF THE

# ENGLISH LANGUAGE

**Second Edition**

UNABRIDGED

AN ENTIRELY NEW BOOK
UTILIZING ALL THE EXPERIENCE AND RESOURCES OF MORE THAN
ONE HUNDRED YEARS OF GENUINE WEBSTER DICTIONARIES

*A Merriam-Webster*

REG. U.S. PAT. OFF.


WILLIAM ALLAN NEILSON, PH.D., LL.D., L.H.D., LITT.D.
*Editor in Chief*

THOMAS A. KNOTT, PH.D.
*General Editor*

PAUL W. CARHART
*Managing Editor*



G. & C. MERRIAM COMPANY, PUBLISHERS

46a

SPRINGFIELD, MASS., U.S.A.

19[illegible]2

COPYRIGHT, 1934
BY
G. & C. MERRIAM CO.

COPYRIGHT UNDER INTERNATIONAL COPYRIGHT UNION
ALL RIGHTS RESERVED UNDER INTERNATIONAL AMERICAN CONVENTION (1910) BY
G. & C. MERRIAM CO.

[illegible]
COPYRIGHT, [illegible] 1927, 1930
BY G. & C. MERRIAM CO.

NEW WORDS SECTION

COPYRIGHT, 1939
BY
G. & C. MERRIAM CO.

*All rights reserved*

MADE IN THE U.S.A.
[illegible]
47a
[illegible]

**em′bry·o·car′di·a** (ĕm′brĭ·ō·kär′dĭ·ȧ), *n.* [NL., fr. *embryo-* + *-cardia.*] *Med.* A morbid condition of the heart, in which its action resembles that of the heart of the fetus.
**em′bry·oc′to·ny** (ĕm′brĭ·ŏk′tō·nĭ), *n.* [*embryo-* + Gr. *kteinein* to kill.] *Med.* The killing of the embryo, as in abortion. — **em′bry·oc·ton′ic** (-ŏk·tŏn′ĭk), *adj.*
**em′bry·og′e·ny** (ĕm′brĭ·ŏj′ē·nĭ), *n.* [*embryo-* + *-geny.*] *Biol.* The formation and development of the embryo. Among plants, it may be *direct* (*homoblastic*) or *indirect* (*heteroblastic*). In the former case the embryo resembles the parent form and produces a similar adult individual; in the latter it differs, often widely, from the adult form, which it bears as a lateral outgrowth. See PROEMBRYO. — **em′bry·o·gen′ic** (-ō·jĕn′ĭk), *adj.*
**em′bry·oid** (ĕm′brĭ·oid), *adj.* [*embry-* + *-oid.*] Resembling an embryo.
**em′bry·ol′o·gy** (-ŏl′ō·jĭ), *n.* [*embryo-* + *-logy.*] *Biol.* **a** The department of biology which relates to embryogeny in animals and plants; the study of the development of the individual from the egg to the adult stage. See ONTOGENY. **b** The features and phenomena, collectively, exhibited in the formation and development of an embryo. **c** A treatise on embryology. — **em′bry·o·log′ic** (-ō·lŏj′ĭk), **em′bry·o·log′i·cal** (-ĭ·kăl), *adj.* — **-o·log′i·cal·ly**, *adv.* — **-ol′o·gist** (-ŏl′ō·jĭst), *n.*
**em′bry·o′ma** (ĕm′brĭ·ō′mȧ), *n.*; *pl.* -OMATA (-tȧ), -OMAS (-mȧz). [NL., fr. *embry-* + *-oma.*] *Med.* A tumor derived from embryonic structures; a teratoma.
**em′bry·o·nal** (ĕm′brĭ·ō·năl; -n′l), *adj.* Embryonic.
**em′bry·o·nar′y** (-nĕr′ĭ; -nẽr·ĭ), *adj.* Embryonic. *Rare.*
**em′bry·o·nate** (-nāt), *adj.* **a** *Obs.* Embryonic. **b** Having an embryo. **c** *Obs.* = EMBRYONATED.
**em′bry·o·nat′ed** (-nāt′ĕd; -ĭd; 119), *adj.* **1.** *Chem.* Combined with or embedded in another substance. *Obs.*
**2.** Containing an embryo; as, an *embryonated* egg.
**em′bry·on′ic** (ĕm′brĭ·ŏn′ĭk), *adj.* Of or pertaining to an embryo; incipient and rudimentary. — **em′bry·on′i·cal·ly** (-ĭ·kăl·ĭ), *adv.*
**embryonic layer.** A germ layer.
**embryonic sac.** *Bot.* The embryo sac.
**embryonic segregation.** *Biol.* In embryology, the process by which an equipotential system of elements becomes divided into two systems of restricted specific possibilities.
**embryonic shield.** A shieldlike thickened area of the walls of the blastodermic vesicle in which the embryo appears.
**embryonic vesicle.** = EGG, 1 b.
**em′bry·o·nif′er·ous** (ĕm′brĭ·ō·nĭf′ẽr·ŭs), *adj.* Bearing an embryo. *Rare.*
**em′bry·on′i·form** (-ŏn′ĭ·fôrm), *adj.* Like an embryo in form.
**em′bry·o·ny** (ĕm′brĭ·ō·nĭ), *n.* [See EMBRYO; 1st -Y.] *Biol.* The condition of having, or the production of, an embryo or embryos. Cf. MONEMBRYONY, POLYEMBRYONY.
**em′bry·o·phore′** (ĕm′brĭ·ō·fōr′; 181), *n.* [*embryo-* + *-phore.*] *Zool.* The outer cellular covering of the hexacanth embryo of tapeworms.
**Em′bry·oph′y·ta** (ĕm′brĭ·ŏf′ĭ·tȧ), *n. pl.* [NL. See EMBRYO; -PHYTA.] *Bot.* In the system of Engler and Prantl, a primary division of the vegetable kingdom embracing all plants having embryonal generation and vascular tissues. It is practically equivalent to the vascular plants of other authors and includes all plants except the Myxophyta and Thallophyta. The two great divisions are called **Em′bry·oph′y·ta a·si′pho·nog′a·ma** (ȧ·sī′fō·nŏg′ȧ·mȧ), equiv. to *Archegoniatae*, and **Em′bry·oph′y·ta si′pho·nog′a·ma**, equiv. to *Spermatophyta*. — **em′bry·o·phyte′** (ĕm′brĭ·ō·fīt′), *n.*
**em′bry·o·plas′tic** (-ō·plăs′tĭk), *adj.* [*embryo-* + *-plastic.*] Relating to, or aiding in, the formation of an embryo.
**embryo sac.** *Bot.* A large thin-walled cell within the nucellus of the ovule, in which the egg, becoming after fertilization an embryo, is developed. See MEGASPORE.
**em′bry·ot′e·ga** (ĕm′brĭ·ŏt′ē·gȧ), *n.*; *pl.* -GAE (-jē). [NL., fr. *embryo-* + Gr. *tegos* roof.] *Bot.* The caplike callosity near the hilum of certain seeds, which is detached by the radicle in germination.
**em′bry·ot′ic** (ĕm′brĭ·ŏt′ĭk), *adj.* Embryonic. *Rare.*
**em′bry·o·tome′** (ĕm′brĭ·ō·tōm′), *n.* [*embryo-* + *-tome.*] *Med.* An instrument used in embryotomy.
**em′bry·ot′o·my** (-ŏt′ō·mĭ), *n.* [*embryo-* + *-tomy.*] *Med.* **a** Mutilation of a fetus for removal, as when natural delivery is impossible. **b** Dissection of embryos for examination.
**em′bry·ous** (ĕm′brĭ·ŭs), *adj.* Embryonic. *Rare.*
**em·bu′i′a** (ĕm′bōō·ē′ȧ), *n.* [Pg. *embuia, embuí*, of Tupian origin.] Any of several Brazilian trees (genus *Nectandra*) whose wood is used for fine cabinetwork and construction.
**em·bus′** (ĕm·bŭs′), *v. t.*; EM·BUSSED′ (-bŭst′); EM·BUS′SING. [*em-* + *bus.*] *Mil.* To put (as troops) on an automotive vehicle, as a bus or truck. — *v. i.* To get on an automotive vehicle; — used of troops.
**em·busk′** (-bŭsk′), *v. t.* To bind with, or raise by, a busk.
‖**em′bus′qué′** (äN′büs′kā′), *n.* [F., past part. of *embusquer*. See AMBUSCADE.] A shirker; slacker.
**em dash.** See 2d DASH, 13.
**eme** (ēm), *n.* [AS. *ēam*; akin to D. *oom*, G. *ohm*, *oheim*, L. *avunculus*.] An uncle; also, a friend; a gossip. *Dial.*
**Em′e·line, Em′me·line** (ĕm′ĕ·lĭn; -lēn), *n.* [Cf. EMILY, or EMMA.] Feminine proper name.
**e·mend′** (ē·mĕnd′), *v. t.* [L. *emendare*. See AMEND.] Orig., to free from faults or defects; to mend; better; now, specif., to make corrections in (a literary work).
**Syn.** — Amend, correct, improve, rectify. See MEND.
**e·mend′a·ble** (ē·mĕn′dȧ·b′l), *adj.* [L. *emendabilis.*] That may be emended; rectifiable.
**e′men·date** (ē′mĕn·dāt), *adj.* Emendated. *Obs.* — **e′men·date·ly**, *adv.* *Obs.*
**e′men·date** (ē′mĕn·dāt), *v. t.* To rectify (a text) by removing errors, restoring corrupted passages, etc.
**e′men·da′tion** (ē′mĕn·dā′shŭn; ĕm′ĕn·dā′shŭn; 277), *n.* [L. *emendatio.*] **1.** Act of emending; correction.
**2.** Critical alteration or correction; removal of errors or corruptions, as from a literary text; that which is substituted as a restoration of the original reading.
**3.** *O. Eng. Law.* The pecuniary composition made by payment of bot, or the fine so paid.
**e′men·da′tor** (ē′mĕn·dā′tẽr; ĕm′ĕn-), *n.* [L.] One who emendates.
**e·mend′a·to′ry** (ē·mĕn′dȧ·tō′rĭ *or, esp. Brit.*, -tẽr·ĭ), *adj.* [LL. *emendatorius.*] Pert. to emendation; corrective.
**e·mend′er** (ē·mĕn′dẽr), *n.* One who emends.
**Em′er** (āv′ẽr), *n.* *Irish Saga.* Wife of Cuchulainn and personification of ideal womanhood.

**em′er·ald** (ĕm′ẽr·ăld), *n.* [ME. *emeraude*, fr. OF. *esmeraude, esmeralde* (F. *émeraude*), fr. VL. *smaraldus*, for L. *smaragdus*, fr. Gr. *smaragdos, maragdos*, appar. of Indian origin (Prakrit *maragada*, Skr. *marakata*), and perh. ult. fr. Sem.; cf. Heb. *bāreqeth* emerald, *bāraq* to glisten. Cf. SMARAGD.] **1.** A variety of beryl distinguished by a rich green color caused by the presence of oxide of chromium, and highly prized as a precious stone. The finest specimens come from Colombia. The ***Oriental emerald*** is a rare green variety of corundum. ***Uralian emerald*** is another name for demantoid.
**2.** A color, yellow-green in hue, of medium saturation and medium brilliance, the color of the emerald. Cf. COLOR.
**3.** *Print.* A size of type intermediate between minion and nonpareil, used by English printers.
**em′er·ald**, *adj.* Of the color of the emerald.
**emerald bird of paradise.** See BIRD OF PARADISE.
**emerald copper.** *Mineral.* Dioptase.
**emerald cuckoo.** **a** A small brilliant-green African cuckoo (*Chrysococcyx smaragdineus*) with yellow breast. **b** A small bright-green cuckoo (*Chalcites maculatus*) found from the Himalayas to southern China.
**emerald cut.** *Jewelry.* A kind of step cut in which the contour of the gem is square. — **em′er·ald–cut′**, *adj.*
**emerald feather.** A commonly cultivated greenhouse plant (*Asparagus sprengeri*) with feathery, green foliage.
**emerald fish.** Any of several gobies of the Gulf of Mexico, esp. *Gobionellus oceanicus*, remarkable for the brilliant green-and-blue color of the base of the tongue.
**emerald green.** **a** A color, greenish yellow-green in hue, of medium saturation and high brilliance. Cf. COLOR. **b** A very pure variety of Paris green, used as a pigment. **c** Guignet's green. **d** Brilliant green. — **em′er·ald-green′** (66), *adj.*
**Emerald Isle.** Ireland; — so called from its verdure. The name is said to have been first used by Dr. William Drennan (1754–1820), in his poem *Erin*.
**emerald moth.** Any of various bright-green moths, as those of the genus *Hipparchus*.
**emerald nickel.** *Mineral.* Zaratite.
**emerald spodumene.** *Mineral.* Hiddenite.
**emerald wedding.** See WEDDING, 1, *Note*.
**emerald whip snake.** See WHIP SNAKE **a**.
**em′er·aude** (ĕm′ẽr·ōd), *n.* [F. *émeraude* emerald.] The color emerald; also, the color viridian.
**e·merge′** (ē·mûrj′), *v.*; E·MERGED′ (-mûrjd′); E·MERG′ING (-mûr′jĭng). [L. *emergere, emersum*, fr. *e* out + *mergere* to dip, plunge. See MERGE.] *Intransitive*: **1.** To rise from or as from an enveloping fluid; to come out into view; as, the sun *emerges* from eclipse; rays *emerging* from a prism.
**2.** To reveal itself to notice, esp. so as to call for immediate attention; to become manifest; as, a question *emerges*.
**3.** To issue from an inferior or obscure condition into well-being; as, to *emerge* from poverty, slavery, or ignorance.
**4.** *Philos. & Biol.* To arise in the manner of an emergent. See EMERGENT EVOLUTION.
——, *Transitive*: To cause to emerge.
**Syn.** — See ISSUE.
**e·mer′gence** (ē·mûr′jĕns), *n.* [ML. *emergentia.*] **1.** Act or instance of emerging; a rising into view; as, *emergence* from the water, from barbarism.
**2.** **a** *Obs.* A notable and unexpected occurrence; an emergency. **b** *Rare.* Urgent need; exigence.
**3.** *Astron.* Emersion.
**4.** *Bot.* Any of various outgrowths from the fundamental tissue below the epidermis. The common form of emergence is a prickle, as that of the rose.
**5.** *Philos. & Biol.* The appearance of an emergent. Cf. EMERGENT EVOLUTION.
**e·mer′gen·cy** (-jĕn·sĭ), *n.*; *pl.* -CIES (-sĭz). [See EMERGENCE.] **1.** = EMERGENCE, 1. *Now Rare.*
**2.** An unforeseen combination of circumstances which calls for immediate action; also, less properly, exigency.

A safe counselor in most difficult *emergencies*. *Brougham.*

**3.** *Philos. & Biol.* The theory of emergent evolution.
**4.** *Sports.* A substitute; an emergency man. *Australia.*
**Syn.** — Crisis, pinch, strait, necessity. See JUNCTURE.
**emergency barrage.** See BARRAGE.
**emergency brake.** *Automobiles.* A hand brake which can be set so that it continues to hold in the driver's absence; — opposed to *service brake*.
**emergency landing field.** A surface, either of water or land, which is adapted but not equipped for the landing and taking off of aircraft.
**emergency man.** **a** In Ireland, a bailiff's officer recruited for special service. **b** A substitute held ready for emergencies, as a substitute player in cricket or football.
**emergency measures.** *Govt.* Laws that are passed by a legislature under the war power of a constitution or on occasions involving the "preservation of the public peace, health, or safety," such as the Emergency Ship Act (1914) and the Emergency Revenue Act (1916) of the United States, and the Emergency Powers Act (1920) of Great Britain. Such laws generally require a special declaration of emergency and sometimes must obtain an extraordinary majority; they usually go into effect at once without submission to the voters in a referendum.
**emergency ration.** See RESERVE RATION.
**e·mer′gent** (ē·mûr′jĕnt), *adj.* [L. *emergens*, pres. part. of *emergere.*] **1.** Emerging out of a fluid or anything that covers or conceals; issuing forth; rising into notice.

The mountains huge appear *emergent*. *Milton.*

**2.** Suddenly appearing; arising unexpectedly; calling for prompt action; urgent; as, *emergent* danger.
**3.** Arising as a natural or logical consequence or outcome; as, political issues *emergent* from war.
**4.** *Philos. & Biol.* Appearing as something novel in a process of evolution. Cf. EMERGENT EVOLUTION.
— **e·mer′gent·ly**, *adv.* — **e·mer′gent·ness**, *n.* *Rare.*
**e·mer′gent**, *n.* **1.** *Obs.* **a** An emerging effect. **b** An emergency.
**2.** *Philos. & Biol.* An emergent quality or character.
**emergent evolution.** *Philos. & Biol.* Evolution conceived as characterized by the appearance, at different levels, of new and antecedently unpredictable qualities of being or modes of relatedness, such as life and consciousness. Cf. CREATIVE EVOLUTION.
**emergent year.** *Chron.* The year, according to the Jews, reckoned from their departure from Egypt; hence, erroneously, the epoch or date from which any people begin to compute their time or dates.

**E·mer′i·ta** (ē·mĕr′ĭ·tȧ), *n.* [NL., fr. L. *emeritus*. See EMERITUS.] *Zool.* A genus of marine crustaceans similar to *Hippa*. See ANOMURA, *Illust.*
**e·mer′it·ed** (ē·mĕr′ĭ·tĕd; -tĭd; 119), *adj.* [See EMERITUS.] Retired as having served sufficiently. *Archaic.*
**e·mer′i·tus** (ē·mĕr′ĭ·tŭs), *adj.* [L., past part. of *emerere, emereri*, to obtain by service, serve out one's term, fr. *e* out + *merere, mereri*, to merit, earn, serve. See MERIT.] Retired from office or active duty on account of age, infirmity, or long and faithful service, and honored with a nonofficial position and title corresponding to those held in active service; — esp. of a clergyman or college professor.
**e·mer′i·tus**, *n.*; *pl.* EMERITI (-tī). [L.] **1.** A Roman veteran honorably discharged after completing his service.
**2.** An emeritus clergyman or professor.
**em′er·ize** (ĕm′ẽr·īz), *v. t.* **1.** To grind with emery.
**2.** To scratch (cotton or woolen fabrics) with emery rollers to raise a nap or impart a sheen.
**em′er·ods** (ĕm′ẽr·ŏdz), *n. pl.* [OF. *emmeroides*. See HEMORRHOIDS.] Hemorrhoids. *Archaic.*
**e·mersed′** (ē·mûrst′), *adj.* [L. *emersus*, past part. See EMERGE.] **1.** Standing out of, or rising above, a surface.
**2.** *Bot.* Rising above the water instead of floating on it.
**e·mer′sion** (ē·mûr′shŭn), *n.* [See EMERGE.] **1.** Act of emerging; emergence; as, *emersion* from obscurity.
**2.** *Astron.* The reappearance of a celestial body after eclipse or occultation or a conjunction with the sun.
**Em′er·so′ni·an** (ĕm′ẽr·sō′nĭ·ăn), *adj.* Like, or pertaining to, Ralph Waldo Emerson (1803–82), his writings, or his theories. See TRANSCENDENTAL SCHOOL. — *n.* A follower of Emerson. — **Em′er·so′ni·an·ism** (-ĭz′m), *n.*
**Em′er·y, Em′mer·y, Em′o·ry** (ĕm′ẽr·ĭ, ĕm′ō·rĭ), *n.* [Cf. OF. *Aimeri*, Pr. *Aymeric*, and OHG. *Amalrich*.] Masculine proper name. L. *Almericus* (ăl′mē·rī′kŭs); It. *Amerigo* (ä′mā·rē′gō); F. *Émeri, Émery* (ā′m′·rē′); G. *Emerich* (ĕm′ẽr·ĭk).
**em′er·y** (ĕm′ẽr·ĭ), *n.* [F. *émeri*, earlier *esmeril*, fr. It. *smeriglio*, fr. Gr. *smiris, smyris, smēris*; akin to Gr. *myron* unguent. See SMEAR.] **1.** A common dark granular variety of corundum, containing more or less magnetite or hematite. On account of its great hardness, it is used, in the form of powder, grains, or larger masses, for grinding and polishing. Phrases in this sense are:

| | | |
|---|---|---|
| emery belt | emery file | emery powder |
| emery cloth | emery paper | emery surfacer |

**2.** *Gems.* An abrasive used in modern gem grinding, composed of impure sapphire occurring naturally in magnetic iron ores.
**em′er·y**, *v. t.*; EM′ER·IED (-ĭd); EM′ER·Y·ING. To cover with, or rub with, emery.
**em′er·y**, *adj.* Pertaining to or made of emery.
**emery bag.** A cloth bag filled with powdered emery.
**emery board.** Cardboard pulp mixed with emery and molded.
**emery cake.** Powdered emery caked in a binding material.
**emery grinder.** A mounted emery wheel.
**emery wheel.** A wheel made of consolidated emery powder, or having a surface of emery, used for abrading, grinding, polishing, etc.
**Em′e·sa** (ĕm′ē·sȧ), *n.* [NL., fr. L. & Gr. *Emesa* (mod. Homs), city of Syria.] *Zool.* A genus of very slender, long-legged bugs (order Hemiptera), the spider bugs, resembling stick insects, and typifying a family, **E·mes′i·dae** (ē·mĕs′ĭ·dē).



Emesa (*E. longipes*). Nat. size.

**E′me–sal′** (ē′mē·säl′), *n.* [Sumerian.] A special form or dialect of Sumerian in which many religious texts were written.
**em′e·sis** (ĕm′ē·sĭs), *n.* [NL., fr. Gr. *emesis*. See EMETIC.] *Med.* Vomiting.
**emet-**, = EMETO- (which see), as in **e·met′a·tro′phi·a** (ĕ·mĕt′ȧ·trō′fĭ·ȧ). See ATROPHY.
**e·met′ic** (ē·mĕt′ĭk), *adj.* Also **e·met′i·cal** (-ĭ·kăl). [L. *emeticus*, fr. Gr. *emetikos*, fr. *emein* to vomit. See VOMIT.] *Med.* Inducing to vomit; exciting the stomach to discharge its contents by the mouth. — **-i·cal·ly**, *adv.*
**e·met′ic**, *n.* An agent which causes vomiting.
**emetic holly.** The yaupon.
**emetic mushroom.** A mushroom (*Russula emetica*) with a deep-red or, rarely, white pileus, growing usually in the woods. It is violently emetic and poisonous.
**emetic root.** The flowering spurge.
**emetic weed.** Indian tobacco.
**em′e·tine** (ĕm′ē·tēn; -tĭn; 157), *n.* Also **-tin.** [See EMETIC.] *Chem.* A crystalline alkaloid, $C_{29}H_{40}N_2O_4$, extracted from ipecac root. It is used as an emetic and expectorant, and as a specific for amoebic dysentery.
**em′e·to-** (ĕm′ē·tō-), **emet-**. A combining form, from Greek *emetos*, vomiting, denoting: **a** *Vomiting (and)*, as in **em′e·to·ca·thar′tic**. See CATHARTIC. **b** *Emetic*, as in **em′e·to·mor′phine**, apomorphine.
**em′e·tol′o·gy** (ĕm′ē·tŏl′ō·jĭ), *n.* [*emeto-* + *-logy.*] Medical science, or a treatise, concerning emesis and emetics.
‖**é′meute′** (ā′mût′; *E.* ē·mūt′), *n.* [F.] A seditious tumult; an outbreak.
**em·gal′a** (ĕm·găl′ȧ), *n.* [Nyamwezi & Shambala *ngili*, Swahili *ngiri*.] The South African wart hog.
**-e′mi·a, -ae′mi·a** (-ē′mĭ·ȧ). Also **-he′mi·a, -hae′mi·a** (-hē′mĭ·ȧ). [NL., fr. Gr. *-aimia*, fr. *haima* blood.] A suffix denoting a (specified) *condition of the blood*, used chiefly in the naming of diseases, as in *septicemia, pyemia, leucocythemia*.
**e·mic′tion** (ē·mĭk′shŭn), *n.* [L. *e* out + *mingere, mictum*, to make water.] Urination; also, urine.
**e·mic′to·ry** (ē·mĭk′tō·rĭ), *adj. & n.* *Med.* Diuretic.
**em′i·grant** (ĕm′ĭ·grănt; -grănt), *adj.* [L. *emigrans, -antis*, pres. part. of *emigrare* to emigrate. See EMIGRATE.] **1.** Departing from a country to settle permanently elsewhere.
**2.** Migratory; — of birds.
**3.** *Physiol. & Med.* Passing by emigration.
**em′i·grant**, *n.* One who emigrates; specif., an émigré.
**Syn.** — EMIGRANT, IMMIGRANT. EMIGRANT (so also *emigrate* and *emigration*) is used with reference to the country *from* which, IMMIGRANT (so also *immigrate* and *immigration*), with reference to the country *into* which, migration is made. The former marks the going out from a country, the latter the entrance into it. Cf. STRANGER.

**em′bry·o·ism**, *n.* See -ISM.
**em′bry·on** (ĕm′brĭ·ŏn), *n.* = EMBRYO.
**em′bry·ul′ci·a** (ĕm′brĭ·ŭl′shĭ·ȧ; -sĭ·ȧ), *n.* [NL., fr. Gr. *embryoulkia*, fr. *embryon* embryo + *helkein* to draw.] = EMBRYOTOMY.
**em′bry·ul′cus** (-kŭs), *n.* [NL.] = EMBRYOTOME.
**em·bub′ble**, *v. t.* See EN-, 2.
**em·burse′.** † IMBURSE.
**embush.** † AMBUSH, *v.*
**em·bus′kin**, *v. t.* See EN-, 1.
**em·bus′y**, *v. t.* To make busy. *Obs.*
**Em′den** (ĕm′dĕn). [EMBDEN.] Var. of
**e·meer′**, **e·meer′ate**, **e·meer′ship.** Vars. of EMIR, etc.
**Em′e·ly′e** (ĕm′ĕ·lē′ĕ), *n.* See PALAMON.
**e·men′di·cate**, *v. t.* [L. *emendicatus*, past part. of *emendicare.*] To obtain by begging. *Obs.*
**em′er·ald·ine** (ĕm′ĕr·ăl·dēn; -dĭn), *n.* See ANILINE BLACK.
**em′er·ant.** † EMERALD.
**em′er·aud.** † HEMORRHOID.
**emerged wedge.** *Naval Arch.* See IMMERSED WEDGE.
**em′er·il.** Var. of EMERY.
**emerine.** † ERMINE.
**e·merse′**, *v. t.* = EMERGE; — in contrast with *immerse*.
**e′meu.** Var. of EMU.
**em′fa·sis.** Emphasis. *Ref. Sp.*
**em′fa·size.** Emphasize. *R. S.*
**em·fat′ic.** Emphatic. *Ref. Sp.*
**em′fi·se′ma.** Emphysema. *R. S.*
**em′fi·teu′tic.** Emphyteutic. *Obs. exc. Ref. Sp.*
**em·forth′**, *prep.* [AS. *em-, emn-*, in comp. equiv. to *efen* equal + *forth* forth.] According to; conformably to. *Obs.* — *adv.* Equally. *Obs.* [SERIES.]
**e.m.f. series.** = ELECTROMOTIVE
**em′i·ca′tion** (ĕm′ĭ·kā′shŭn), *n.* [L. *emicatio*, fr. *emicare* to spring



F G H I J K L M

# BLACK'S LAW DICTIONARY

CONTAINING

DEFINITIONS OF THE TERMS AND PHRASES OF AMERICAN AND ENGLISH JURISPRUDENCE, ANCIENT AND MODERN

AND INCLUDING

THE PRINCIPAL TERMS OF INTERNATIONAL, CONSTITUTIONAL, ECCLESIASTICAL AND COMMERCIAL LAW, AND MEDICAL JURISPRUDENCE, WITH A COLLECTION OF LEGAL MAXIMS, NUMEROUS SELECT TITLES FROM THE ROMAN, MODERN CIVIL, SCOTCH, FRENCH, SPANISH, AND MEXICAN LAW, AND OTHER FOREIGN SYSTEMS, AND A TABLE OF ABBREVIATIONS

BY

HENRY CAMPBELL BLACK, M.A.

AUTHOR OF TREATISES ON JUDGMENTS, TAX TITLES, INTOXICATING LIQUORS, BANKRUPTCY, MORTGAGES, CONSTITUTIONAL LAW, INTERPRETATION OF LAWS, RESCISSION AND CANCELLATION OF CONTRACTS, ETC.

## THIRD EDITION

BY

THE PUBLISHER'S EDITORIAL STAFF

ST. PAUL MINN.
WEST PUBLISHING CO.
1933

unreaped when the tenant goes away, his lease having determined; and the right to emblements is the right in the tenant to take away the away-going crop, and for that purpose to come upon the land, and do all other necessary things thereon. Brown; Wood v. Noack, 84 Wis. 398, 54 N. W. 785; Davis v. Brocklebank, 9 N. H. 73; Cottle v. Spitzer, 65 Cal. 456, 4 P. 435, 52 Am. Rep. 305; Sparrow v. Pond, 49 Minn. 412, 52 N. W. 36, 16 L. R. A. 103, 32 Am. St. Rep. 571; Dinwiddie v. Jordan (Tex. Com. App.) 228 S. W. 126, 127; Miller v. Lewis (Tex. Civ. App.) 277 S. W. 796; Nesbitt v. Thompson, 157 N. Y. S. 166, 169, 93 Misc. 251.

Where a life tenant, having leased the premises, died, and the remainderman did not recognize the lease, the lessee of the life tenant was entitled to the emblements, which are the crops of grain growing yearly, but requiring an outlay of labor or industry, without payment of any compensation for use of the land in harvesting the emblements. Turner v. Turner, 132 Tenn. 592, 179 S. W. 132, 133; Bateman v. Brown (Tex. Civ. App.) 297 S. W. 773, 775.

**EMBLERS DE GENTZ.** L. Fr. A stealing from the people. The phrase occurs in the old rolls of parliament: "Whereas divers murders, *emblers de gentz*, and robberies are committed," etc.

**EMBOLISM.** In medical jurisprudence. The mechanical obstruction of an artery or capillary by some body traveling in the blood current, as, a blood-clot (embolus), a globule of fat, or an air-bubble.

Embolism is to be distinguished from "thrombosis," a thrombus being a clot of blood formed in the heart or a blood vessel in consequence of some impediment of the circulation from pathological causes, as distinguished from mechanical causes, for example, an alteration of the blood or walls of the blood vessels. When embolism occurs in the brain (called "cerebral embolism") there is more or less coagulation of the blood in the surrounding parts, and there may be apoplectic shock or paralysis of the brain, and its functional activity may be so far disturbed as to cause entire or partial insanity. See Cundall v. Haswell, 23 R. I. 508, 51 A. 426.

**EMBRACEOR.** A person guilty of the offense of embracery (*q. v.*). See Co. Litt. 369.

**EMBRACERY.** In criminal law. This offense consists in the attempt to influence a jury corruptly to one side or the other, by promises, persuasions, entreaties, entertainments, *douceurs*, and the like. The person guilty of it is called an "embraceor." Brown; State v. Williams, 136 Mo. 293, 38 S. W. 75; Grannis v. Branden, 5 Day (Conn.) 274, 5 Am. Dec. 143; State v. Brown, 95 N. C. 686; Brown v. Beauchamp, 5 T. B. Mon. (Ky.) 415, 17 Am. Dec. 81.

Embracery being but an attempt corruptly to influence juror, there is no such crime as attempt to commit embracery. Wiseman v. Commonwealth, 143 Va. 631, 130 S. E. 249, 251.

**EMENDA.** Amends; something given in reparation for a trespass; or, in old Saxon times, in compensation for an injury or crime. Spelman.

**EMENDALS.** An old word still made use of in the accounts of the society of the Inner Temple, where so much in *emendals* at the foot of an account on the balance thereof signifies so much money in the bank or stock of the houses, for reparation of losses, or other emergent occasions. Spelman.

**EMENDARE.** In Saxon law. To make amends or satisfaction for any crime or trespass committed; to pay a fine; to be fined. Spelman. *Emendare se,* to redeem, or ransom one's life, by payment of a weregild.

**EMENDATIO.**

### In Old English Law

Amendment, or correction. The power of amending and correcting abuses, according to certain rules and measures. Cowell.

### In Saxon Law

A pecuniary satisfaction for an injury; the same as *emenda* (*q. v.*). Spelman.

### In General

—**Emendatio panis et cerevisiæ.** In old English law. The power of supervising and correcting the weights and measures of bread and ale, (assising bread and beer.) Cowell.

**EMERGE.** To arise; to come to light. "Unless a matter happen to *emerge* after issue joined." Hale, Anal. § 1.

**EMERGENCY.** A sudden unexpected happening; an unforeseen occurrence or condition; specifically, a perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; exigency; pressing necessity. State v. Zangerle, 95 Ohio St. 1, 115 N. E. 498, 500; Frank v. Board of Education of Jersey City, 90 N. J. Law, 273, 100 A. 211, 212, L. R. A. 1917D, 206; Seaboard Air Line Ry. v. McMichael, 143 Ga. 689, 85 S. E. 891, 894; People ex rel. Rayland Realty Co. v. Fagan, 194 App. Div. 185, 186 N. Y. S. 23, 30; Missouri, O. & G. R. Co. of Texas v. Black (Tex. Civ. App.) 176 S. W. 755, 757; White v. City of Casper, 35 Wyo. 371, 249 P. 562, 565; Koger v. Keller, 120 Kan. 196, 243 P. 294, 295; First State Bank of Sulphur Springs v. Becker, 78 Colo. 436, 242 P. 678, 679; Belt Line Ry. Corporations v. City of New York, 118 Misc. 665, 195 N. Y. S. 203.

A relatively permanent condition of insufficiency of service or of facilities resulting in social disturbance or distress. Huff v. City of New York, 202 App. Div. 425, 195 N. Y. S. 257, 258; Puget Sound Traction, Light & Power Co. v. Reynolds (D. C.) 223 F. 371, 378; Omaha & C. B. St. R. Co. v. Nebraska State Ry. Commission, 103 Neb. 695, 173 N. W. 690, 692; State v. Lewis, 187 Ind. 564, 120 N. E. 129, 132; Grout v. Gates, 97 Vt. 434, 124 A. 76, 82.

**EMERGENT YEAR.** The epoch or date whence any people begin to compute their time.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and amici

Petitioner in case no. 25-1159 is the State of Michigan. Petitioners in case no. 25-1160 are Sierra Club, Natural Resources Defense Council, Michigan Environmental Council, Environmental Defense Fund, Environmental Law and Policy Center, Vote Solar, Union of Concerned Scientists, the Ecology Center, and Urban Core Collective. Petitioners in case no. 25-1162 are the States of Minnesota and Illinois.

Respondents are Chris Wright, Secretary of the United States Department of Energy, and the United States Department of Energy.

The Maryland Office of People's Counsel moved to intervene but was denied intervention. The Midcontinent Independent System Operator (MISO) and Consumers Energy Company have intervened.

The following parties have filed amicus briefs: The Institute for Policy Integrity at New York University School of Law; the Citizens Action Coalition of Indiana, Citizens Utility Board of Michigan, Citizens Utility Board of Minnesota, Citizens Utility Board of Wisconsin, and Consumers Council of Missouri; The Niskanen Center, Professor Paul L. Joskow, and Professor Richard Schmalensee; Joshua C. Macey (Yale Law School), Joel Eisen (University of Richmond School of Law), Alison Gocke (University of Virginia School of Law), Sharon Jacobs

(Berkeley School of Law), Alexandra Klass (University of Michigan Law School), Andrew McKinley (Northwestern University Pritzker School of Law), Felix Mormann (Texas A&M University School of Law), David Owen (University of California College of the Law), Shelley Welton (University of Pennsylvania Carey Law School), and Hannah Wiseman (Penn State Dickinson Law).

**B. Rulings under review**

Petitioners challenge Department of Energy Order No. 202-25-3, which was issued on May 23, 2025.

Respondents seek rehearing of a decision granting the petitions for review and issued by a panel of this Court on September 11, 2026. The decision is included in this addendum (at 1a) and available on Westlaw at *Michigan v. U.S. Department of Energy*, — F.4th —, 2026 WL 2671756 (D.C. Cir. Sept. 11, 2026).

**C. Related cases**

Under Circuit Rule 28(a)(1)(C), this case is related to *Sierra Club v. U.S. Department of Energy*, Nos. 25-1198, 25-1202, 25-1254 (D.C. Cir.) (consolidated); *Sierra Club v. U.S. Department of Energy*, Nos. 26-1024, 26-1025, 26-1028 (D.C. Cir.) (consolidated); *Sierra Club v. U.S. Department of Energy*, Nos. 26-1115, 26-1118, 26-1165 (D.C. Cir.) (consolidated); *Sierra Club v. U.S. Department of Energy*, Nos. 26-1233, 26-1240, 26-1243 (D.C. Cir.) (consolidated); and *People of the State*

*of Michigan v. U.S. Department of Energy*, Nos. 26-1288, 26-1291, 26-1292 (D.C. Cir.) (consolidated).

/s/ *Kyle Glynn*
KYLE GLYNN

Counsel for Federal Respondents