**DECIDED SEPTEMBER 11, 2026**

---

No. 25-1159
(Consolidated with 25-1160 and 25-1162)

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

THE PEOPLE OF THE STATE OF MICHIGAN,
*Petitioner*,
v.
U.S. DEPARTMENT OF ENERGY, AND CHRIS WRIGHT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF ENERGY,
*Respondents*.

ON PETITION FOR REVIEW OF FINAL ORDER OF THE
DEPARTMENT OF ENERGY

---

**PETITIONERS' OPPOSITION TO PETITION FOR REHEARING EN BANC OR PANEL REHEARING**

---


**DANA NESSEL**
**MICHIGAN ATTORNEY GENERAL**

Lucas Wollenzien
Michael E. Moody
Assistant Attorneys General
Special Litigation Division
P.O. Box 30755
Lansing, MI 48909
517-335-7627
WollenzienL@michigan.gov
MoodyM2@michigan.gov

Benjamin Chagnon (DC Cir. 65850)
Jennifer Yun (DC Cir. 66550)
Michael Lenoff (DC Cir. 66374)
Earthjustice
1250 I St. NW, 4th Floor
Washington, DC 20005
(202) 745-5210
bchagnon@earthjustice.org
jyun@earthjustice.org
mlenoff@earthjustice.org

*Counsel for Sierra Club and Urban Core Collective*

**KEITH ELLISON**
**ATTORNEY GENERAL**
**OF MINNESOTA**

Peter Surdo
Cat Rios-Keating
Ryan Pesch
*Special Assistant Attorneys General*
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101

**KWAME RAOUL**
**ATTORNEY GENERAL OF**
**THE STATE OF ILLINOIS**

Jason E. James
Assistant Attorney General
Sarah Hunger
Deputy Solicitor General
Joanna Brinkman
Complex Litigation Counsel
Illinois Attorney General's Office
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
Jason.james@ilag.gov

Lauren Piette (DC Cir. 66519)
Sameer Doshi (DC Cir. 64549)
Earthjustice
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 500-2193
lpiette@earthjustice.org
sdoshi@earthjustice.org

Christine Powell (DC Cir. 64908)
Earthjustice
180 Steuart St., #194330
San Francisco, CA 94105
(415) 217-2035
cpowell@earthjustice.org

*Counsel for Sierra Club and Urban Core Collective*

Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Elena Saxonhouse (DC Cir. 56639)
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
elena.saxonhouse@sierraclub.org

*Counsel for Sierra Club*

Caroline Reiser (DC Cir. 62319)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

Gavin McCabe (DC Cir. 53966)
Natural Resources Defense Council
40 W. 20th St., 11th Floor
New York, NY 10011
(212) 727-4529
gmccabe@nrdc.org

Simi Bhat (DC Cir. 55968)
Karen Chen
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
(415) 875-6110
sbhat@nrdc.org
kchen@nrdc.org

*Counsel for Natural Resources Defense Council*

Howard A. Learner (DC Cir. 61779)
Bradley Klein
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
(312) 673-6500
hlearner@elpc.org
bklein@elpc.org

Jessica O'Donnell (D.C. Cir. 50056)
Environmental Law & Policy Center
740 15th Street NW, Suite 700
Washington, D.C. 20005
(703) 581-7556
jodonnell@elpc.org

Katherine S. Duckworth
Environmental Law & Policy Center
1008 Floral Ave. SE
East Grand Rapids, MI 49506
(312) 673-6500
kduckworth@elpc.org

*Counsel for the Environmental Law & Policy Center, Ecology Center, Union of Concerned Scientists, and Vote Solar*

Danielle C. Fidler (DC Cir. 62486)
Francis W. Sturges, Jr. (DC Cir. 64964)
Veronica Saltzman (DC Cir. 64096)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
dfidler@catf.us
fsturges@catf.us
vsaltzman@catf.us

*Counsel for Michigan Environmental Council*

Tomás Carbonell (DC Cir. 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(202) 387-3500
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici.

Petitioners:

25-1159: The People of the State of Michigan.

25-1160: Sierra Club, Natural Resources Defense Council, Michigan Environmental Council, Environmental Defense Fund, Environmental Law and Policy Center, Vote Solar, Union of Concerned Scientists, Ecology Center, and Urban Core Collective.

25-1162: The State of Minnesota and the State of Illinois.

Respondents:

25-1159, 25-1160, 25, 1162: U.S. Department of Energy and Chris Wright in his official capacity as Secretary of the U.S. Department of Energy.

Respondent-Intervenor

25-1159, 25-1160, 25, 1162: Consumers Energy Company.

25-1159, 25-1160, 25-1162: Midcontinent Independent System Operator, Inc.

Amici:

Institute for Policy Integrity at New York University School of Law.

Citizens Action Coalition of Indiana, Citizens Utility Board of Michigan, Citizens Utility Board of Minnesota, Citizens Utility Board of Wisconsin, Consumers Council of Missouri.

Joshua C. Macey (Yale Law School), Joel B. Eisen (University of Richmond School of Law), Alison Gocke (University of Virginia School of Law), Sharon B. Jacobs (University of California, Berkeley School of Law), Alexandra B. Klass (University of Michigan Law School), Andrew McKinley (Northwestern University Pritzker School of Law), Felix Mormann (Texas A&M University School of Law), David Owen (University of California College of the Law, San Francisco), Shelley Welton (University of Pennsylvania Carey Law School), Hannah Wiseman (Penn State Dickinson Law).

The Niskanen Center, Paul L. Joskow, Richard Schmalensee.

Proposed Amici:

States of Alabama, Arkansas, Florida, Indiana, Iowa, Kansas, Louisiana, Mississippi, Montana, Nebraska, Oklahoma, West Virginia, and Wyoming.

**B. Rulings under review.**

Order No. 202-25-3, dated May 23, 2025; Order No. 202-25-3A, dated July 28, 2025; and Order No. 202-25-3B, dated September 8, 2025.

Respondents seek rehearing of this Court's decision resolving the petitions for review in this case on September 11, 2026, *Michigan v. Department of Energy*, 191 F.4th 677 (D.C. Cir. 2026).

**C. Related cases.**

The petitions for review in this case are related to six sets of petitions challenging renewals of Order No. 202-25-3, the order challenged in this case: Case Nos. 25-1198, 25-1202, and 25-1254 (Campbell 2); Case Nos. 26-1024, 26-1025, and 26-1028 (Campbell 3); Case Nos. 26-1115, 26-1118, and 26-1165 (Campbell 4); Case Nos. 26-1233, 26-1240, and 26-1243 (Campbell 5); and Case Nos. 26-1288, 26-1291, 26-1292 (Campbell 6).

*/s/ Benjamin Chagnon*
Benjamin Chagnon

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............v

TABLE OF CONTENTS ........................................................................ viii

TABLE OF AUTHORITIES ........................................................................ ix

GLOSSARY OF ABBREVIATIONS ........................................................ xi

INTRODUCTION ..............................................................................................1

STATEMENT ......................................................................................................2

REASONS TO DENY THE PETITION ..........................................................7

I. Further Review Is Not Justified. ...............................................................7

II. The Panel Decision Is Correct. ..............................................................13

CONCLUSION ..................................................................................................19

CERTIFICATE OF COMPLIANCE ...............................................................20

CERTIFICATE OF SERVICE .........................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Energy United v. FERC*,
185 F.4th 186 (D.C. Cir. 2026) .................................................. 3, 10, 18

*Alcoa v. FERC*,
564 F.3d 1342 (D.C. Cir. 2009) .................................................. 3

*Biden v. Nebraska*,
600 U.S. 477 (2023) .................................................. 8

*Citizens Action Coal. of Ind. v. FERC*,
125 F.4th 229 (D.C. Cir. 2025) .................................................. 2

*Conn. Dep't of Pub. Util. Control v. FERC*,
569 F.3d 477 (D.C. Cir. 2009 .................................................. 2

*Consol. Edison Co. of N.Y. v. FPC*,
511 F.2d 372 (D.C. Cir. 1974) .................................................. 15

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016) .................................................. 9

*Learning Res., Inc. v. Trump*,
148 S. Ct. 628 (2026) .................................................. 15

*New England Power Generators Ass'n v. FERC*,
757 F.3d 283 (D.C. Cir. 2014) .................................................. 2

*Otter Tail Power Co. v. FPC*,
429 F.2d 232 (8th Cir. 1970) .................................................. 10

*Sacramento Mun. Util. Dist. v. FERC*,
616 F.3d 520 (D.C. Cir. 2010) .................................................. 2

**Statutes**

16 U.S.C. § 824a(a) .................................................. 3, 16

16 U.S.C. § 824a(b) .................................................. 3, 10, 16

16 U.S.C. § 824a(c)(1) .......... 3, 16, 18

16 U.S.C. § 824a(g)(2)(A) .......... 17

16 U.S.C. § 824a(g)(3) .......... 17

16 U.S.C. § 824*o* .......... 10

16 U.S.C. § 824*o*(a)(3) .......... 16

16 U.S.C. § 824*o*(c) .......... 4

16 U.S.C. § 824*o*(d) .......... 4

16 U.S.C. § 824*o*(e) .......... 4

16 U.S.C. § 824*o*(i)(2) .......... 4, 16

16 U.S.C. § 824(b) .......... 16

16 U.S.C. § 824(b)(1) .......... 2, 16

**Other Authorities**

S. Rep. No. 74-621 (1935) .......... 3, 17

**Rules**

Fed. R. App. P. 40(b) .......... 13

Fed. R. App. P. 40(b)(2) .......... 1, 7

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| FERC | Federal Energy Regulatory Commission |
| MISO | Midcontinent Independent System Operator |
| NERC | North American Electric Reliability Corporation |

## INTRODUCTION

The Department of Energy exceeded its authority under Federal Power Act section 202(c) when it used that emergency provision to stop the long-planned retirement of an unreliable and dirty coal plant. The panel unanimously held that the Department may use section 202(c) authority only when it identifies grid reliability risk that calls for immediate action from the Department in particular. But the Department may not act where, as here, it identifies reliability risks that states, utilities, and grid operators—the actors tasked by the Act with generation planning and primary operation and planning of the grid—are able to address.

The Department cannot show the panel's interpretation is incorrect, let alone that it implicates any question of exceptional importance. *See* Fed. R. App. P. 40(b)(2). The panel properly looked to the Act's structure to reject the Department's reading, which would allow it to ignore state, utility, and grid operator efforts to address reliability risks and render meaningless the Act's limitations on federal authority. And the Department's suggestion that the decision will result in countless blackouts misreads the opinion, which preserves the Department's authority to act when unacceptable reliability risks remain and require its immediate intervention. The petition should be denied.

## STATEMENT

**1.** Initially passed in 1935, and updated since, the Federal Power Act has consistently hewed to the same division of labor for the regulation of electricity: The federal government may regulate the transmission and sale of electric energy in interstate commerce, 16 U.S.C. § 824(b)(1), while "states retain the right to regulate the facilities responsible for the generation of electric energy." *New England Power Generators Ass'n v. FERC*, 757 F.3d 283, 285 (D.C. Cir. 2014).

Under the Act, states accordingly can choose "their preferred mix of energy generation resources," *Citizens Action Coal. of Ind. v. FERC*, 125 F.4th 229, 238 (D.C. Cir. 2025); *see Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009), and are primarily responsible for ensuring "resource adequacy," that is, an "adequate supply of generation to support safe and reliable operation of the transmission grid," *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 526 (D.C. Cir. 2010).

The Act expressly denies federal authority "over facilities used for the generation of electric energy" except as "specifically provided." 16 U.S.C. § 824(b)(1). Section 202(c) is one such exception: It authorizes the Department to order "generation, delivery, interchange, or transmission of electric energy" when it "determines that an emergency exists by reason of . . . a shortage of electric

energy" or generating facilities. 16 U.S.C. § 824a(c)(1); *see* S. Rep. No. 74-621, at 19, 49 (1935).

Absent emergency circumstances, however, the Act specifies a supporting role for the federal government with respect to generation and resource adequacy, as epitomized elsewhere in section 202 and in section 215. Section 202(a) allows FERC to facilitate "voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy." 16 U.S.C. § 824a(a). Given this mandate to ensure resource adequacy only by promoting voluntary coordination among states and private actors, FERC has encouraged utilities to join regional transmission organizations, which manage regional grids and administer energy markets. *See Advanced Energy United v. FERC*, 185 F.4th 186, 204-05 (D.C. Cir. 2026). Section 202(b) grants FERC more coercive power but even this is still in service of supporting states and utilities: It allows FERC to require utilities to sell or exchange energy only when asked by states, utilities, or grid operators. 16 U.S.C. § 824a(b). FERC still cannot "compel the enlargement of generating facilities." *Id.*

Congress supplemented the voluntary, utility-led system of reliability that had prevailed under the Act when it added section 215 in 2015. *Alcoa v. FERC*, 564 F.3d 1342, 1344 (D.C. Cir. 2009). While empowering FERC to designate an independent entity—the North American Electric Reliability Corporation

(NERC)—to set mandatory reliability standards for grid operators, Congress still left resource adequacy decisions in the hands of states and grid operators: Reliability standards may not be enforced by ordering generation, and section 215 disallows requiring the "construction of additional generation . . . capacity" or "enforc[ing] compliance" with "adequacy" standards. 16 U.S.C. § 824*o*(c), (d), (e), (i)(2).

**2.** This case concerns the Department's use of section 202(c) to prevent the retirement of the J.H. Campbell Generating Plant, an aging coal-fired power plant in Michigan owned by Consumers Energy. The plant produces air and water pollution with well-documented health impacts, including 36-81 premature deaths each year. JA0345-0346; JA0606-0612; *see also* Op.19. It is also old, unreliable, and expensive to operate. JA0423-0424, JA0434, JA0601-0602.

Thus, in 2022, Consumers Energy decided to retire Campbell on May 31, 2025, and replace its capacity (1,560 megawatts) with cheaper, cleaner, and more reliable resources. JA0475, 0485, 0537, 0546, 0548-0549, 0555. The Michigan regulator considered and rejected concerns that Campbell's retirement would threaten resource adequacy. JA0533-0540. And the grid operator that manages Campbell's region—the Midwest Independent System Operator (MISO)—rejected grid reliability concerns. JA0643.

Leading up to the retirement, Consumers Energy demonstrated sufficient capacity to meet demand. JA0357, 0412, 0632. MISO utilities also collectively had secured more than "sufficient capacity" to meet peak demand while maintaining a healthy buffer of additional capacity to account for any unexpected power outages: They secured thousands of megawatts beyond what MISO's forecast indicated was needed. *See* JA0061-0062, 0069. While NERC determined that "MISO is at elevated risk of operating reserve shortfalls during periods of high demand or low resource output," that "elevated risk" designation is routinely applied and reflects only that MISO may need to use readily available measures to further mitigate blackout risk. JA0107-0108, 0113, 0118; *see, e.g.*, JA0831, 0852, 0859. Those measures include requiring plant operators to suspend optional maintenance, turning on backup generators, and requesting imports from neighbors. JA0680-0700. These measures work: Between 2009 and June 2024, MISO documented only two blackout events, neither of which were in Campbell's MISO region. *See* JA0648-0671.

**3.** On May 23, 2025, the Department used section 202(c) to prevent Campbell's retirement. Order No. 202-25-3 (May 23, 2025), JA0001. The Department acknowledged that MISO "demonstrated sufficient capacity" for summer 2025. JA0002. But the Department nonetheless concluded that an "insufficiency of dispatchable capacity" created the risk of "potential loss of power

to homes and local businesses." JA0002. On agency rehearing, the Department asserted that its order addressed "growing resource adequacy concerns" and "unacceptable reliability risks" that might emerge "within five years." JA0015-0019.

The Department has repeatedly renewed its initial order, with each renewal lasting 90 days and containing similar reasoning. *See, e.g.*, Order No. 202-26-51 (Nov. 13, 2026), https://perma.cc/WS78-LEUA.

**4.** Petitioners sought review, and a unanimous panel held that "the circumstances [the Department] identified in the challenged order do not warrant resort to section 202(c)." Op.6-7. Relying on text, structure, and history, the panel held that section 202(c) "is best read to apply where the Department identifies a risk of substantial harm from inadequate electricity supply that calls for immediate action by [the Department] in particular, as opposed to by the states." Op.6; *see also* Op.27, 30. If the Department concludes the "state has not and will not timely take steps that must be taken immediately to avert unacceptable risk to reliability," the Department can "step in." Op.27, 36. Because the "circumstances [the Department] identified" in the order "plainly did not necessitate immediate action by" the Department, the order was not "facially sufficient to meet the statutory requirement of an emergency." Op.36-39. The panel vacated the order. Op.39-40.

## REASONS TO DENY THE PETITION

### I. Further Review Is Not Justified.

The Department identifies no conflict with a decision of this court, the Supreme Court, or a sibling circuit. Fed. R. App. P. 40(b)(2). And its claim that this case is of "exceptional importance"—because the panel's decision will prevent the Department from stopping "blackouts, brownouts, and other grid disruptions across the country," Pet. 2, 18—misconstrues the panel's opinion.

**A.** The panel decision allows the Department to prevent blackouts. For "virtually all risks of energy shortages, alternatives to Department intercession suffice." Op.32. But in the rare circumstances where the Department finds "the state has not and will not timely take steps that must be taken immediately to avert unacceptable risk to reliability," that "can trigger statutory authority for [the Department] to step in." Op.27. Imminent reliability risks are "more likely to warrant [the Department's] immediate action," Op.27, but the Department need not wait to act until "a state or utility implements rolling blackouts," Pet. 8. Rather, the Department can act as soon as it reasonably determines that existing state and grid operator mechanisms leave unacceptable risk requiring the Department's immediate action, including to address a "crisis" that is "foreseeable and far-off" if it has "reason to believe that the state cannot or will not act in time." Op.27-28, 36; *see* Pet. 10 (claiming long lead times for some emergency measures).

The Department could not intervene here because its order did not identify "a concrete supply issue beyond the state's competency that was likely to trigger a blackout" and instead identified only the "mere possibility of an electricity supply shortfall" that could be addressed by "reasonable [state and grid operator] alternatives to [the Department's intervention]." Op.37. The Department also failed to show that Michigan, MISO, and NERC would not address the Department's "longer-term reliability and resource adequacy concerns"—concerns that "fall[] even farther outside the meaning of 'emergency' under section 202(c)." Op.38-39.

**B.** This case is accordingly not about whether the Department is defenseless against blackouts, but whether the Department—not the states, utilities, grid operators, NERC, or FERC—should be permitted to determine how to manage reliability risk in the first instance. *Cf. Biden v. Nebraska*, 600 U.S. 477, 501 (2023) ("question here is not whether something should be done" but "who has the authority to do it"). The panel explained in detail why the Federal Power Act demands otherwise. Op.30-33. And the Department's failure, even now, to grasp the most basic mechanisms that states, utilities, and grid operators have long deployed to assess resource adequacy and address blackout risk is powerful confirmation that it should not be in the driver's seat.

Indeed, the Department's claim that the decision will nonetheless result in blackouts rests on a mischaracterization of the mechanisms that states, utilities, grid operators, and other federal actors use to address reliability concerns. To take just one example, the Department maintains that the panel suggested the Department must defer to "state[s] . . . order[ing] rolling blackouts." Pet. 8-9; *see also* Pet. 1-2. But the "reasonable alternatives" to Department intervention the panel emphasized are those that "forestall[] outages," Op.37—that is, mitigation measures that aim to *avoid* rolling blackouts—including imports from neighbors, backup generators, and "demand-side measures to reduce energy consumption." Op.31-32, 37. The Department is just wrong that such demand-side measures, which incentivize users "to restrict energy consumption," are the same as "rolling blackouts." Pet. 8-9; *see FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 270 (2016) ("[D]emand response . . . pays consumers for commitments to curtail their use of power, so as to . . . prevent grid breakdowns.").

Moreover, the Department is not "uniquely positioned to evaluate" long-term interstate grid concerns that may result from "planned retirements across different states." Pet. 17-18; States Br. ADD9, Doc. No. 2151373 (July 2025 Department report recognizing that utilities and grid operators have greater expertise). As the panel recognized, Congress assigned those tasks to other actors—the states, supported by regional grid operators, NERC, and FERC—who

work in tandem to address any such long-term and interstate concerns. *See* Op.30-33, 38-39.

These mechanisms (which the Department ignores) address the very concerns the Department has raised. Op.38-39. States and regional grid operators, here Michigan and MISO, scrutinize "the construction and retirement of generating facilities," Op.38, with MISO considering the effect of plant retirements on interstate grid reliability, Op.21. MISO also has been "expediting approval" of new "generation resources" and "constructing new transmission lines" to help states respond to "long-term reliability risks." Op.21, 38-39. The federal government—though largely not the Department—also can act to support these efforts. FERC, not the Department, has used its authority to "clear" the "decades-long traffic jam" to add "roughly 2,600 gigawatts" to the grid. *See Advanced Energy*, 185 F.4th at 202; *contra* Pet. 1. FERC, not the Department, retains authority, under section 202(b), to require "physical connection" to address any "crisis which is likely to develop in the foreseeable future." *Otter Tail Power Co. v. FPC*, 429 F.2d 232, 234 (8th Cir. 1970); 16 U.S.C. § 824a(b); Op.32. And section 215 empowers NERC, not the Department, to modify "nationwide reliability standards" to address any lingering reliability concerns. Op.39; *see* 16 U.S.C. § 824*o*. The Act thus supplies finely tuned federal remedies that can

address long-term concerns, even while withholding "power to demand additional generation capacity." Op.30.

These actors have ensured—and will continue to ensure—that "the reliability of the power grid remains extremely high" without the Department's emergency intervention, even as potential "five-alarm fire" risk remains on the horizon. Ethan Howland, *NERC President Warns of "Five-Alarm Fire" for Grid Reliability*, Utility Dive (Oct. 22, 2026), https://perma.cc/85SC-NVSF; *contra* Pet. 18 (quoting "five-alarm fire" out of context). There is every reason to believe that non-emergency mechanisms will prevent the increased reliability risk by 2030 that the Department fears. *Contra* Pet. 2.

**C.** Whatever theoretical concerns the Department has with the panel opinion, the Department cannot point to a single example of a section 202(c) order that was needed to ensure grid reliability that the panel's decision would have prevented.

The Department has historically used section 202(c) to respond to reliability risks that state and other mechanisms fail to address and typically has acted only after a state or utility requested its intervention. Op.35-36. The Department (at 16) says that is not true of the Mirant order, where the Department intervened to keep a Virginia plant operating. But the Department ignores that it intervened only when the D.C. Public Service Commission requested an order and the Department

determined that existing mechanisms would be insufficient to avoid a significant risk of a blackout in downtown D.C. Order No. 202-05-3, at 1, 6-7 (Dec. 20, 2005), https://perma.cc/MQJ3-TQKC.

It also suggests that the panel opinion renders it powerless to shore up the grid during winter storms and other extreme weather events. *See* Pet. 2, 9. But recent history proves otherwise: Consistent with the Department's historical practice, the orders addressing heat waves in summer 2025 and 2026,[1] Winter Storm Fern,[2] and generator outages in isolated areas[3] all satisfied the panel's test because they established an immediate need for the Department to act.

Nor is there any support for the claim that *Campbell* was needed to address these events. The Department asserts that "the grid needs every megawatt of capacity it can muster," but the "fact sheet" it cites does not show Campbell was needed. Pet. 9. The fact sheet's claim that Campbell operated during Winter Storm Fern proves little: The Department has directed Campbell to operate even when other resources are available. Public Interest Organization Br. § II.B. And the evidence shows Campbell was not needed: During the storm, MISO had access to between 5,000-7,500 megawatts of excess capacity—or nearly ten times

[1] *See, e.g.*, Order No. 202-25-5 (June 24, 2025), https://perma.cc/N6Z2-CVT3; Order No. 202-26-27 (June 11, 2026), https://perma.cc/JEW8-8FHB.
[2] *See, e.g.*, Order No. 202-26-04 (Jan. 25, 2026), https://perma.cc/YHC9-A344; Order No. 202-26-09 (Jan. 30, 2026), https://perma.cc/VJ2P-LELM.
[3] Order No. 202-26-38 (Aug. 5, 2026), https://perma.cc/Z7YL-ZGVA.

what Campbell was providing—that MISO did not use. Public Interest Organizations' Request for Rehearing of Order No. 202-26-39 at 25 (Sept. 11, 2026), https://perma.cc/7EBY-MMYF; *contra* West Virginia Br. 12-13 (mistakenly stating that the Campbell order was part of 20 emergency orders issued in response to the storm). Thus, "alternatives" to Campbell's operation "were available" and would have "forestalled outages." Op.37.[4]

## II. The Panel Decision Is Correct.

The panel correctly interpreted section 202(c) to apply only "where the Department identifies a risk of substantial harm from inadequate electricity supply that calls for immediate action by [the Department] in particular, as opposed to by the states." Op.6, 27. The Department spends most of its petition attacking this conclusion. Such attacks cannot justify rehearing, Fed. R. App. P. 40(b), and regardless, they are wrong.

**A.** The Department's dispute with the decision is narrow. The Department has retreated from its lead argument at the panel stage, where it maintained that any "shortage of electric energy" could "constitute[]" an emergency, even if there were no circumstances calling for immediate action. U.S.

[4] Campbell's owner also maintains Campbell is unnecessary and "still plans to retire Campbell" as soon as the Department lets it. *Integrated Resource Plan Application* at 8, Mich. Pub. Serv. Comm'n, Case No. U-22127 (Sept. 3, 2026), https://perma.cc/6DBU-C5UF.

Br. 24, 28. It now agrees with the panel (and Petitioners) that while a "shortage" may "cause[]" an emergency, an emergency separately requires "circumstances . . . call[ing] for immediate action" in the sense of an "exigency" or "pressing necessity." Pet. 9-11 (citations omitted); *see* Op.4, 27-29. The Department breaks from the panel only in maintaining that the circumstances permitting it to act can be present even if other actors—states, utilities, and regional grid operators—will "timely take steps that must be taken immediately to avert unacceptable risk to reliability." Op.27, 36. The panel correctly concluded that the structure and history of the Act require this limit, Op.30-33, and the Department's contrary arguments fail.

The Department's principal critique is that the panel supposedly discarded "the ordinary meaning of 'emergency'" when it looked to structure and context to inform the scope of section 202(c) emergencies. Pet. 2, 11, 14. That misstates what the panel did: It did not, as the Department argues (at 2), "admit[]" that it was abandoning the ordinary meaning of the term. Rather, the panel recognized that concluding that an "emergency" is "an event that requires immediate action" would not fully answer the question of what events would rise to that level. Op.29.

There is nothing strange about looking to the Federal Power Act's context and structure to answer that question. "[W]ords of a statute" always "must be read in their context and with a view to their place in the overall statutory scheme."

Op.29 (quoting *Sturgeon v. Frost*, 577 U.S. 242, 438 (2016)). And that is especially true of section 202(c), for two reasons. First, section 202(c) provides for an emergency response, and, by design, an emergency response addresses problems that routine, non-emergency mechanisms have failed to address. So the Court needed to consider the "backdrop of clear and limited delegations" Congress provided in the rest of the Federal Power Act to understand those non-emergency mechanisms and determine limits on section 202(c). *Learning Res., Inc. v. Trump*, 148 S. Ct. 628, 640 (2026) (Roberts, C.J., concurring). That interpretative approach was necessary to avoid the Department "unlock[ing] extraordinary power" based on a mere "declaration of emergency." *Id.*; *see also Consol. Edison Co. of N.Y. v. FPC*, 511 F.2d 372, 382-83 (D.C. Cir. 1974) ("residual emergency powers . . . must be carefully confined"). Second, section 202(c) is expressly a limited *exception* to the Federal Power Act's general division of authority, Pet. 13, and so the panel was required to interpret this exceptional, emergency authority in a way that would not "render meaningless the constraints on federal power that Congress imposed throughout the act." Op.30.

The Department maintains that limiting section 202(c)'s scope to preserve the Act's overall constraints on federal authority conflicts with section 202(c)'s "expansive" list of the "causes of emergencies and the potential remedies for them." Pet. 10. But that expansiveness is another reason the panel needed to

harmonize section 202(c)'s scope with the other provisions of the Act, including sections 201, 202(a), (b), and 215. Those provisions also address who may order "generation, delivery, interchange, or transmission of electric energy" and are broadly aimed at ensuring sufficient generation and transmission to avoid "shortage[s] of electric energy or of facilities." *Compare* 16 U.S.C. § 824a(c)(1), *with, e.g.*, *id.* §§ 824(b)(1); 824a(a), (b); 824*o*(a)(3), (i)(2). Because shortages do not always cause an emergency, Op.28; Pet. 10, and these other provisions sharply limit how the federal government may respond to potential shortages, 16 U.S.C. §§ 824(b); 824a(a), (b); 824*o*(i)(2), Congress plainly intended not to grant the Department broad remedial authority to be used in the same circumstances where such authority was otherwise withheld. Op.30.

The Department dismisses the Act's structure as supplying merely the "hope . . . that states and regional planners" will address resource adequacy concerns in the first instance. Pet. 15. But the Department's reading would allow the Department, citing the same potential shortage state and regional grid operators already have addressed, to swoop in and override any approach the Department does not prefer. *See* Pet. 13. Allowing the Department to address any shortage "without regard" to the steps state and regional grid operators have taken, Pet. 15, amounts to the coercive "top-down" model of grid planning the Act rejects. Op.30-33. Such "frequent federal interventions" are "unsupported by the statute,"

impose unnecessary costs, and generate uncertainty that destabilizes state-level planning and energy markets. Op.32-33; *see also* Jeffrey Tomich, Politico, *Red-State Regulators Pan DOE Orders to Keep Coal Plants Running* (Oct. 21, 2026), https://perma.cc/7ZCF-Q4U8 (Iowa regulator explaining that section 202(c) orders "add a level of chaos and uncertainty that just plain doesn't help"); Doc. No. 2202833, at 9, Case No. 26-1171 (similar).

The Department's other response to the panel's structural analysis is that it was "improperly abbreviated." Pet. 15 (referencing 16 U.S.C. §§ 824a(e)-(g)). But it made sense for the panel to focus on subsections 202(a) and (b), because subsections 202(a)-(c) were conceived of together. *See* S. Rep. No. 74-621, at 19-20, 49. Abbreviated treatment of other section 202 provisions is also unsurprising because the Department did not rely on them before the panel. *See generally* U.S. Br. Regardless, none undermine state primacy. Section 202(g) reflects that the Department's role is generally limited to collecting and *responding* to state "plans respecting . . . shortages of electric energy." 16 U.S.C. § 824a(g)(2)(A), (g)(3). Other section 202 provisions give the Department a greater role, but only because they concern international exports, not everyday grid planning.

**B.** The Department's remaining arguments are unpersuasive.

First, state primacy need not give way because section 202(c) empowers the Department to engage in "years-long intervention[s]." Pet. 10. As explained (at 7), the Department *can* act to solve "far-off" concerns.[5]

Second, the Department suggests that while state primacy may have made sense under a "1930s understanding" of the grid, it no longer does given the development of regional transmission organizations. Pet. 2, 13-14. But the panel repeatedly accounted for that innovation. *See* Op.12-14, 33, 36, 38; Energy Law Scholars Br. 5-20. Moreover, FERC's limited jurisdiction to regulate regional transmission organizations and interstate market mechanisms, Pet. 13-14, does not support the Department's authority to commandeer resource adequacy planning. *See Advanced Energy*, 185 F.4th at 204-05; Op.38. Indeed, these institutions give additional tools to non-federal actors to solve problems in a way that avoids the "destabilizing" effect that frequent federal interventions would have on those very same markets. Op.33.

Finally, as discussed (at 11-13), the Department is wrong that state primacy is inconsistent with the "long history of using section 202(c)." Pet. 16.

[5] Section 202(c) does not authorize "generation *construction*." *Contra* Pet. 10 (emphasis added); *see* 16 U.S.C. § 824a(c)(1) (authorizing "generation" by already-constructed facilities).

## CONCLUSION

The petition should be denied.

Dated: November 17, 2026 Respectfully Submitted,

[Continued for signatures.]

_/s/ Benjamin Chagnon_[6]
Benjamin Chagnon (DC Cir. 65850)
Jennifer Yun (DC Cir. 66550)
Michael Lenoff (DC Cir. 66374)
1250 I St. NW, 4th Floor
Washington, DC 20001
(202) 745-5210
bchagnon@earthjustice.org
jyun@earthjustice.org
mlenoff@earthjustice.org

Lauren Piette (DC Cir. 66519)
Sameer Doshi (DC Cir. 64549)
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 500-2193
lpiette@earthjustice.org
sdoshi@earthjustice.org

Christine Powell (DC Cir. 64908)
180 Steuart St., #194330
San Francisco, CA 94105
(415) 217-2035
cpowell@earthjustice.org

*Counsel for Sierra Club and Urban Core Collective*

_/s/ Gregory E. Wannier_
Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Elena Saxonhouse (DC Cir. 56639)
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
elena.saxonhouse@sierraclub.org

*Counsel for Sierra Club*

_/s/ Danielle C. Fidler_
Danielle C. Fidler (DC Cir. 62486)
Francis W. Sturges, Jr. (DC Cir. 64964)
Veronica Saltzman (DC Cir. 64096)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
dfidler@catf.us
fsturges@catf.us
vsaltzman@catf.us

*Counsel for Michigan Environmental Council*

[6] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

*<u>/s/ Caroline Reiser</u>*
Caroline Reiser (DC Cir. 62319)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

Gavin McCabe (DC Cir. 53966)
Natural Resources Defense Council
40 W. 20th St., 11th Floor
New York, NY 10011
(212) 727-4529
gmccabe@nrdc.org

Simi Bhat (DC Cir. 55968)
Karen Chen
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
(415) 875-6110
sbhat@nrdc.org
kchen@nrdc.org

*Counsel for Natural Resources Defense Council*

*<u>/s/ Tomás Carbonell</u>*
Tomás Carbonell (DC Cir. 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(202) 387-3500
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

*<u>/s/ Howard A. Learner</u>*
Howard A. Learner (DC Cir. 61779)
Bradley Klein
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
(312) 673-6500
hlearner@elpc.org
bklein@elpc.org

Jessica O'Donnell (D.C. Cir. 50056)
Environmental Law & Policy Center
740 15th Street NW, Suite 700
Washington, D.C. 20005
(703) 581-7556
jodonnell@elpc.org

Katherine S. Duckworth
Environmental Law & Policy Center
1008 Floral Ave. SE
East Grand Rapids, MI 49506
(312) 673-6500
kduckworth@elpc.org

*Counsel for the Environmental Law & Policy Center, Ecology Center, Union of Concerned Scientists, and Vote Solar*

**KEITH ELLISON**
**ATTORNEY GENERAL**
**OF MINNESOTA**

*<u>/s/ Peter Surdo</u>*
Peter Surdo
Cat Rios-Keating
Ryan Pesch
*Special Assistant Attorneys General*
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101

**DANA NESSEL**
**MICHIGAN ATTORNEY GENERAL**

*<u>/s/ Lucas Wollenzien</u>*
Lucas Wollenzien
Michael E. Moody
Assistant Attorneys General
Special Litigation Division
P.O. Box 30755
Lansing, MI 48909
517-335-7627
WollenzienL@michigan.gov
MoodyM2@michigan.gov

**KWAME RAOUL**
**ATTORNEY GENERAL OF THE STATE OF ILLINOIS**

*<u>/s/ Jason E. James</u>*
Jason E. James
Assistant Attorney General
Sarah Hunger
Deputy Solicitor General
Joanna Brinkman
Complex Litigation Counsel
Illinois Attorney General's Office
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
Jason.james@ilag.gov

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(g), D.C. Circuit Rule 32(e), and the Court's November 3, 2026 Order because this document contains 3,898 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e).
2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Benjamin Chagnon*
Benjamin Chagnon

## CERTIFICATE OF SERVICE

I hereby certify that, on November 17, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit through this Court's CM/ECF system, which will serve a copy on all registered users.

/s/ Benjamin Chagnon
Benjamin Chagnon